UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

---

WISCONSIN GAS LLC,

                Plaintiff,

        v.                        Case No. 2:20-cv-1334

AMERICAN NATURAL RESOURCES
COMPANY,

                Defendant.

---

### WISCONSIN GAS'S RESPONSE TO AMERICAN NATURAL RESOURCES COMPANY'S STATEMENT OF PROPOSED MATERIAL FACTS AND ITS COUNTER-STATEMENT OF PROPOSED MATERIAL FACTS

---

In accordance with Civ. L.R. 56(b)(2), Plaintiff Wisconsin Gas LLC ("Wisconsin Gas"), by and through its undersigned attorneys, respectfully submits the following responses to American Natural Resources Company's ("ANR's") Statement of Proposed Material Facts and Wisconsin Gas's Counter-Statement of Proposed Material Facts[1] in Support of its Opposition to ANR's Motion for Summary Judgment or, in the Alternative, for Judgment on Partial Findings. In responding to ANR's Proposed Material Facts, Wisconsin Gas does not concede that any of the statements contained therein are material to ANR's Motion, nor does failure to dispute a fact extend to the reliability or admissibility of the documents(s) cited by ANR in support of such fact(s). In accordance with Civil L. R. 56(b)(4), any statements not disputed below shall be deemed uncontroverted only for the purpose of deciding summary judgment and Wisconsin Gas reserves the right to dispute any material facts as to which a genuine dispute may exist.

---

[1] Exhibits 1 to 42 are appended to the declaration of Mark LeMahieu. Exhibits 43 to 116 are appended to the declaration of Matthew Kennison.

**PLAINTIFF WISCONSIN GAS LLC'S SPECIFIC RESPONSES TO DEFENDANT ANR'S PROPOSED STATEMENT OF MATERIAL FACTS**

1.      The Milwaukee Solvay Coke & Gas Superfund Site (the "Site"), located at 311 East Greenfield Avenue in Milwaukee, is an approximately 45-acre parcel of waterfront property just south of downtown Milwaukee, north of and adjacent to the Kinnickinnic River, and west of Lincoln Memorial Harbor at Lake Michigan.[2]

**RESPONSE:**  Undisputed.

2.      The Site is comprised of a number of adjacent lots where a variety of industrial activities—including coke and gas production, iron manufacturing, hide tanning, and other operations—have occurred since at least 1900.[3]

**RESPONSE:**  Disputed. The property is not presently "comprised of a number of adjacent lots" as described in paragraph 2, but is instead a single, approximately 45-acre parcel of property as described in paragraph 1. Further disputed in that the various industrial activities which have occurred at the Site since at least 1900 primarily included coke and manufactured gas production; recovery of saleable by-products, including light oil (*i.e.* benzol, toluol, xylol, and solvent naptha) and ammonia by-products (*i.e.* strong ammonia liquor, ammonium sulfate); and the collection of tar waste product for removal.   Ex. 1, USEPA Enforcement Action Memorandum, May 17, 2019, WG-ANR-00137976(980)[4]. The site was also subsequently used in a scrap-and-salvage operation, *see* Paragraph 7, and is currently the headquarters of Komatsu Mining Corp. *See* Maredithe Meyer, *Komatsu celebrates grand opening of new headquarters in Milwaukee's Harbor District*, BizTimes (June 27, 2022), available at https://tinyurl.com/ydwhy6c4;   2017   ASAOC   at   5   ¶¶   10,   12   available   at https://semspub.epa.gov/src/document/05/936166.

---

[2] Amended Compl. [Doc. 25] ¶¶ 1, 9.

[3] *Id.* ¶ 10; WEC Energy Group, *Historical Industrial Site Getting 21st Century Makeover, Paving Way for Future Job Growth,* WE ENERGIES NEWS, Oct. 13, 2017, http://weenergies.blogspot.com/2017/ 10/historical- industrial-site-getting-21st.html.

[4] Amended

3.     A coke and manufactured gas plant occupied the northern portion of the Site from the early 1900s until 1983.[5]

**RESPONSE:**  Disputed. The plant *operated* through 1983, but *occupied* the Site until Wisconsin Gas acquired and remediated it beginning in 2017. *See* 2017 ASAOC at p. 6, ¶15, publicly available at https://semspub.epa.gov/work/05/936166.pdf  (noting the buildings were razed as part of a "Raze Action" filed by the City of Milwaukee); December 10, 2018 Engineering Evaluation/Cost Analysis, Revision 4, at p. 9, publicly available at https://semspub.epa.gov/work/05/944738.pdf (some building were razed in 2015 after the City of Milwaukee filed a Raze Action.  The remaining three buildings on the northern portion  of the land were razed in 2016, but the debris from the buildings remained on the site).

4.     Directly south of the coke and gas plant, The Milwaukee Electric Railway & Light Company, now known as Wisconsin Electric Power Company, owned a portion of the Site, where it operated electric railroad facilities to support streetcar operations for the area.[6]

**RESPONSE:**   Undisputed, but answering further that the "portion of the Site" owned by Wisconsin Electric Power Company comprised 4.8 of the Site's 45 acres for 40 years.  Ex. 43, Title Search Report for Solvay Coke and Gas Site, August 2002, ANRC-00002068(076); Ex. 2, Letter from CSX Transportation to USEPA regarding information request on Solvay Coke site, September 23, 2004, WG-ANR-00000299(306); ANR's Exh. A-1 at 4.

5.     The Milwaukee Electric Railway & Light Company converted its property at the Site for use as a coal storage yard in 1917 and ultimately sold the property to a third party in or

---

[5] Amended Compl. [Doc. 25] ¶¶ 10-11, 14.

[6] Ex. A-1, Letter from Rachel Schneider of Quarles & Brady, LLP to Craig Melodia of U.S. EPA, Oct. 29, 2004, and Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, produced by Wisconsin Gas at WG-ANR-00010740-41 (cover letter) and WG-ANR-00046079-93 (narrative response, without attachments or enclosures); U.S. EPA, *Solvay Coke and Gas Co., Milwaukee, WI, Site Documents and Data,* Milwaukee Solvay Coke & Gas, Remedial Investigation Report ("RI Report") App. B—Historical Site Documentation, prepared for the Milwaukee Solvay Coke & Gas Site RI/FS Group, including Wisconsin Gas, by Arcadis U.S., Inc., Dec. 2015, at p. 4-1, *publically [sic]  available at* https://semspub.epa.gov/src/document/05/929359.

around 1936.[7]

**RESPONSE:**  Undisputed.

6.  Wisconsin Electric Power Company, the successor to The Milwaukee Electric Railway & Light Company, is an affiliate of Plaintiff Wisconsin Gas, LLC ("Wisconsin Gas"). Jointly owned by WEC Energy Group, Wisconsin Gas and Wisconsin Electric Power Company do business together as "We Energies."[8]

**RESPONSE:**  Undisputed.

7.  From the time coke and gas manufacturing operations in the northern portion of the Site were discontinued in 1983 until approximately 2003, Wisconsin Wrecking Company ("Wisconsin Wrecking") used that part of the Site as a scrap metal salvage operation under a land contract with the property's owner, Cliffs Mining Company ("Cliffs Mining").[9]

**RESPONSE:**  Disputed insofar as the referenced exhibits indicate that Wisconsin Wrecking in fact leased the entirety of the Site.

8.  In January 2003, Cliffs Mining conveyed the Site by quitclaim deed to a limited liability company called Water Street Holdings, LLC ("Water Street"), which in turn quit claimed the property to another limited liability entity named Golden Marina Causeway, LLC ("Golden Marina").[10]

**RESPONSE:**  Undisputed.

9.  The United States Environmental Protection Agency ("U.S. EPA") performed initial investigative work at the Site in 2001 and 2002 and identified various contaminants based on historic operations.[11]

**RESPONSE:**  Undisputed.

---

[7] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, Oct. 29, 2004, at WG-ANR-00046079; RI Report App. B—Historical Site Documentation, prepared for the Milwaukee Solvay Coke & Gas Site RI/FS Group, including Wisconsin Gas, by Arcadis U.S., Inc., Dec. 2015, at p. 4-1, https://semspub.epa.gov/src/document/05/929359.

[8] Ex. B, Wisconsin Gas's Verified Response to Interrogatory No. 6 of ANR's First Set of Interrogatories, Mar. 19, 2021, at 6; *see also* Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, at WG-ANR-00046079.

[9] Amended Compl. [Doc. 25] ¶ 11; Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study, U.S. EPA Region 5, Docket No. V-W-07-C-861, Jan. 31, 2007 ("RI/FS ASAOC"), at 5 ¶ 13, *publically available at* https://semspub.epa.gov/work/05/269627.pdf.

[10] *Id.*

[11] *Id.* at 6 ¶ 14; Administrative Settlement Agreement and Order on Consent for Site Fencing/Security, Engineering Evaluation/Cost Analysis and Non-Time Critical Removal Action at the Uplands, EPA Region 5, Docket No. V-W-17-C-010, effective Aug. 31, 2017 ("2017 ASAOC"), at 5 ¶ 11, *publically available at* https://semspub.epa.gov/src/document/05/936166.

10.     On February 14, 2003, U.S. EPA issued an Administrative Order by Consent (No. V-W-03-C-733) (the "2003 Removal Order") requiring Cliffs Mining, Water Street, and Wisconsin Wrecking to perform a removal action under CERCLA to secure the Site with fencing and address primary sources of surface contamination.[12]

**RESPONSE:**  Undisputed.

11.     After work under the 2003 Removal Order was completed, U.S. EPA sent a CERCLA Special Notice Letter on March 30, 2006, to an expanded group of companies it then considered potentially responsible parties ("PRPs") for further work at the Site. In addition to Cliffs Mining, the Special Notice recipients included both Wisconsin Gas and its affiliate Wisconsin Electric Power Company, as well as ANR, Maxus Energy Corporation, and others.[13]

**RESPONSE:**  Undisputed.

12.     U.S. EPA's 2006 Special Notice invited the recipients to form a group to engage in negotiations for performance of a Remedial Investigation and Feasibility Study ("RI/FS") to facilitate U.S. EPA's selection of a final remedial action under CERCLA.  The letter cautioned that U.S. EPA might otherwise pursue litigation or take unilateral administrative action against some or all of them, subject to the noted threat of litigation.[14]

**RESPONSE:**  Disputed as to the characterization that EPA's 2006 Special Notice ("Notice") merely "invited" the recipients to form the RI/FS. The Notice included a demand for payment of past costs and strongly encouraged "voluntary" negotiation of an AOC entailing an agreement to perform the RI/FS work.

13.     U.S. EPA's 2006 Special Notice did not request that any of the recipients commit to performing or funding the remedial design or construction of the final remedy itself; rather, U.S. EPA requested only a commitment to perform RI/FS work and reimburse the agency's past costs.[15]

**RESPONSE:**     Disputed. The Notice strongly encouraged voluntary negotiation of an "administrative order on consent under which you and other PRPs agree to perform the RI/FS" and also stated that the "EPA can order, or ask a court to order, responsible parties, to conduct

---

[12] RI/FS ASAOC at 5-6 ¶ 13, https://semspub.epa.gov/work/05/269627.pdf; 2017 ASAOC at 5 ¶ 12, https://semspub.epa.gov/src/document/05/936166.

[13] Ex. C-1, U.S. EPA Special Notice Letter, Mar. 30, 2006, ANRC-00002416 (Enclosure 2, "List of Parties Sent Special Notice Letter"); *see also Cliffs Mining Co. v. Wis. Elec. Power Co.,* No. 18-CV-581, 2018 WL6181470 (E.D. Wis. Nov. 27, 2018).

[14] Ex. C-1, U.S. EPA Special Notice Letter, Mar. 30, 2006, at 2, 5 (ANRC-00002409, 12).

[15] *Id.* at 1-4 (ANRC00002408-11).

response actions at the site," and further that "[f]ailure to comply with an administrative order issued under Section 106(a) of CERCLA may result in a fine of up to $25,000 per day … or imposition of treble damages, under … CERCLA." Ex. 44, U.S. EPA Special Notice Letter, Mar. 30, 2006, ANRC-00002408(409,411).

14.    On or about January 31, 2007, Wisconsin Gas, Wisconsin Electric Power Company, ANR, Cliffs Mining, and other recipients of U.S. EPA's 2006 Special Notice entered into an Administrative Settlement Agreement and Order on Consent with the U.S. EPA (the "RI/FS ASAOC"), agreeing to complete the requested RI/FS work at the Site in exchange for a covenant not to sue from the agency and statutory protection from contribution claims based matters addressed in the order.[16]

**RESPONSE:**  Undisputed.

15.    As expressly agreed in paragraph 4 of the RI/FS ASAOC:

> EPA and Respondents recognize that … the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law and determinations in … this Settlement Agreement."[17]

**RESPONSE:**  Undisputed.

16.    In 2017, after the Remedial Investigation was performed but before a Feasibility Study was completed, Wisconsin Gas purchased the Site on an "as is, where is" basis out of the bankruptcy estate of Golden Marina for ultimate development and resale to Komatsu Mining Corporation.[18]

**RESPONSE:**    Disputed.  ANR  misstates  the  record  of  the  October  26,  2020  scheduling

---

[16] Amended Compl. [Doc. 25] ¶ 36; RI/FS ASAOC, at 27 ¶ 78 (Covenant Not to Sue) & 30-31 ¶ 92 (Contribution), https://semspub.epa.gov/work/05/269627.pdf.

[17] *Id.* at 1 ¶ 4.

[18] Amended Compl. [Doc. 25] ¶ 65; Scheduling Conf. Transcript [Doc. 17], Oct. 26, 2020, at 4:6-12 & 4:18-23 (acknowledgment that Wisconsin Gas "purchased this property in 2017 knowing full well … that this is a cleanup site," that Wisconsin Gas bears responsibility for the cleanup, and that the "ultimate goal" was for the Site to "be the headquarters of Komatsu"); 2017 ASAOC at 5 ¶ 13 (stating that the Remedial Investigation was complete), https://semspub.epa.gov/src/document/05/936166; Ex. A-2, *In Re Golden Marina Causeway, LLC,* Order Authorizing Sale, Bankr. No. 16-03587 (Bankr. N.D. Ill. filed Apr. 4, 2017), produced by Wisconsin Gas at WG-ANR-00073558-63; Ex. A-3, *In Re Golden Marina Causeway LLC,* Order Approving Sale Procedures, Etc., Bankr. No. 16-03587, Schedule 1 at 5 (p. 14 of 27) (Bankr. N.D. Ill. filed Jan. 23, 2017) ("As Is, Where Is").

conference with the Court for its unsupported assertion that *prior* to Wisconsin Gas's purchase

of the Solvay Site in 2017, "the 'ultimate goal' was for the Site to 'be the headquarters of

Komatsu.'" Scheduling Conf. Transcript [Doc. 17], Oct. 26, 2020, at 4:6-12 & 4:18-23. It was

not until September 2018—nearly a year after the acquisition—that Komatsu Mining Corp.

announced its intention to purchase the property and develop its headquarters on the Site. Ex. 1,

USEPA Enforcement Action Memorandum, May 17, 2019, WG-ANR-00137976(979).

17.     Wisconsin Gas also entered into a separate Administrative Settlement Agreement
and Order on Consent with U.S. EPA in 2017 (the "2017 ASAOC") for performance of a "non-
time-critical removal action" at the Site.[19]

**RESPONSE:**  Disputed insofar as the 2017 ASAOC in fact required Wisconsin Gas to "perform

an EE/CA and, following EPA's approval of the EE/CA, EPA will select removal actions for the

Site in an Action Memorandum. [Wisconsin Gas] shall perform, at a minimum, all actions

necessary to implement the Action Memorandum," which was to include a "Health and Safety

Plan; EE/CA Support Sampling Plan; EE/CA; Monthly Reports; EE/CA Report; Removal Action

Work plan; Removal Action Implementation; Removal Action Report." 2017 ASAOC at 8-9 ¶¶

25-26 available at https://semspub.epa.gov/src/document/05/936166.

18.     On March 29, 2018, the U.S. EPA directed that "for the upland portions of the
Site subject to the [RI/FS ASAOC], EPA will hold in abeyance work under the [RI/FS ASAOC]
while We Energies performs the work under the 2017 [ASAOC]."[20]

**RESPONSE:**  Disputed insofar as the referenced EPA communication referred to its intention

not to return comments to "the identification of significant deficiencies in the" September 2017

CAAM, or the RI/FS group's draft Comparative Analysis of Alternatives Memorandum, which

"effectively places work requirements under the 2007 AOC in abeyance until such time EPA

returns comments."

---

[19] 2017 ASAOC, https://semspub.epa.gov/src/document/05/936166; Amended Compl. [Doc. 25] ¶ 66.
[20] Ex. A-4, Letter from Viral Patel, EPA Remedial Project Manager, to Jack Kratzmeyer, RI/FS Group Project
Coordinator, Mar. 29, 2018, produced by Wisconsin Gas at WG-ANR-00108873.

19.     On August 28, 2020, Wisconsin Gas filed this lawsuit, seeking to require ANR to pay a portion of the costs Wisconsin Gas claims to have incurred performing its "non-time-critical removal action" under the 2017 ASAOC.[21]

**RESPONSE:**   Disputed insofar as Wisconsin Gas seeks a declaratory judgment determining ANR's and Honeywell International, Inc.'s ("Honeywell's") allocable shares for costs and damages associated with remediation of the Solvay Site; "a determination that [ANR and Honeywell] are liable for those costs and damages that are allocable to [them]; holding that [those] determinations shall be binding on any subsequent action or actions to recover further response costs or damages;" and "contribution against [ANR and Honeywell] for costs and damages paid by Wisconsin Gas" related to the Solvay Site that are allocable to ANR and Honeywell, with interest. Amended Complaint, Prayer For Relief, ECF No. 25 at 17.

20.     ANR is the successor-in-interest to a holding company incorporated in New Jersey in 1901 as American Light & Traction Company ("ALT").[22]

**RESPONSE:**   Undisputed that ANR is the successor-in-interest to ALT. *See also* Ex. 115, ANR 30(b)(6) Tr. at 42:10-14. Disputed that ALT was merely a "holding company," for the reasons and exhibits cited in response to paragraphs 21, 23, and Wisconsin Gas's Counter-Statement of Facts paragraphs P38-P41, *infra*.

21.     With offices in New York City and Chicago, ALT was formed to consolidate the stock ownership of several public utility companies in different states, including Milwaukee Gas Light Company in Wisconsin.[23]

**RESPONSE:**   Disputed. ALT was formed, among other things, "[t]o buy, acquire, lease, construct, lay, maintain, *and operate* works and plants for the generation, purification, and

---

[21] Compl. [Doc. 1]. Wisconsin Gas added Honeywell International, Inc. ("Honeywell") as a defendant in 2021. Amended Compl. [Doc. 25]. Wisconsin Gas's claims against Honeywell are not material to ANR's motion.

[22] Amended Compl. [Doc. 25] ¶ 27 (referring to ALT as a predecessor of ANR); JOHN MOODY, MOODY'S MANUAL OF INVESTMENTS, *American Light & Traction Co.* 257 (1922), *available at* https://babel.hathitrust.org/cgi/pt?id=uc1.c2583274&view=1up&seq=415&skin=2021.

[23] *Id.*; Ex. A-5, Henry John O'Leary, *Financial History of the Milwaukee Gas Light Company,* at 9 (WG- ANR-48122) (U. Wis. B.A. Thesis 1930); Ex. A-6, Carl Claussen, *The Story of American Natural Gas Company,* Speech Given to the Citigas Executives Luncheon Club, Nov. 17, 1964, at 1 (WG-ANR-00007183).

storage of gas." Ex. 45, ALT Incorporators Meeting minutes, May 31, 1901, ANRC-00003198(3199) (emphasis added). Further, ALT's "largest investments were made in stocks of public utility companies which it operated and managed. Its charter vested the company with broad general powers to own *and operate* waterworks, gas, electric and steam plants, and in addition to carry on any lawful business which to the corporation seemed capable of being conveniently carried on in connection therewith, or calculated, directly or indirectly, to enhance the value of its property." Ex. 3, Compilation of corporate history documents for Newport Company, Cliffs and Koppers, WG-ANR-00001740(1847) (emphasis added). Disputed further in that ALT did not establish an office in Chicago until 1928, years after it was "formed." *See* Ex. 46, 1928 ALT Annual Report, ANRC-00000108(115) ("it was decided to move our operating offices to some point more conveniently located. Chicago was selected as being more nearly central than any other point . . . The first of the year the operating offices were moved to the 22d floor of the Bankers Building, 105 West Adams St., Chicago, and the advantages to our operating organization and our properties are already apparent.).

22. Milwaukee Gas Light, a predecessor of Plaintiff Wisconsin Gas, held an exclusive and perpetual franchise from the Wisconsin Public Service Commission to provide gas service in the City of Milwaukee.[24]

**RESPONSE:** Disputed that the referenced exhibits support the stated proposition, or that the proposition was true for the duration of MGL's operations.

23. ALT itself was solely "a holding corporation," or parent company, of its operating subsidiaries.[25]

---

[24] Ex. A-1, Letter from Rachel Schneider of Quarles & Brady, LLP to Craig Melodia of U.S. EPA, Oct. 29, 2004, and Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, produced by Wisconsin Gas at WG-ANR-00010740-41 (cover letter) and WG-ANR-00046079-93 (acknowledging that Wisconsin Gas is the successor to Milwaukee Gas Light); THE MANUAL OF STATISTICS, *Western Gas Co.,* Vol. 25 at 789 (1903), *available at* https://www.google.com/books/edition/_/wS45AAAAMAAJ?hl=en&gbpv=1.

[25] *Financial News,* AM. REV. OF REVS., Vol. LII, No. 2, at 256 (Aug. 1915), *available at* https://babel.hathitrust.org/cgi/pt?id=hvd.hn46bc&view=1up&seq=270&skin=2021; *United Light & Power Co.,* 22 S.E.C. 704, 1946 WL 24903, at *2 (Apr. 31, 1946) (describing ALT as "solely [a] holding compan[y]").

**RESPONSE:** Undisputed that ALT was the parent company of its subsidiaries, but disputed that ALT was "'solely' a holding company," as characterized in paragraph 23. *See, e.g.,* Response to Paragraph 21, *supra*, and exhibits cited therein. Rather, ALT conducted the operations of its subsidiaries alongside the staff of those subsidiaries. For example, ALT provided services directly to the Milwaukee Gas Light Company ("MGL") "through its organization and staff" beginning in at least 1914. Ex. 4, Vol. III of the Secretary's Record for Milwaukee Gas Light Co., WG-ANR-00080667(1020); Ex. 5, Vol. V of the Minutes of Milwaukee Gas Light Company, WG-ANR-00081243(349-50). ALT later similarly provided services directly to the Milwaukee Coke and Gas Company (later named the Milwaukee Solvay Coke Company, and collectively referred to herein as, "the Coke Company"), thereby controlling and directly participating in the operations of the Coke Company and its coke plant in Milwaukee. Ex. 46, 1928 ALT Annual Report, ANRC-00000108(111) ("We took over the operation of the Milwaukee Coke & Gas Company in August and its business has prospered, even better than we expected, during the time that its operation has been in our hands."); Ex. 6, response of ALT to a Questionnaire from the Special Senate Committee appointed to Investigate Lobbying Activities in 1935, WG-ANR-00074249(254,259)) (ALT "'[s]ervicing' operations of companies" including the Coke Company "are performed by the staffs of the respective companies in this group, and by staff of [ALT]."

24.     The United States Securities and Exchange Commission ("SEC") concluded in 1946 that ALT "performs no substantial functions for its operating utility subsidiaries."[26]

**RESPONSE:** Disputed. In an April 30, 1946 written opinion upholding its earlier decision finding the liquidation and dissolution of ALT necessary in order to comply with the Public

---

[26] *United Light & Power Co.,* 22 S.E.C. 704, 1946 WL 246903, at *6 (Apr. 30, 1946); *see also* Ex. A-5, Henry John O'Leary, *Financial History of the Milwaukee Gas Light Company,* at 12 (WG-ANR-48125) (U. Wis. B.A. Thesis 1930) (noting that ALT "provides very few services for its subsidiaries").

Utility Holding Company Act of 1935 ("Holding Company Act"), a majority of the SEC stated in pertinent part that "[t]he management witness has testified and we find that, at the present time, American Light performs no substantial functions for its ***operating utility subsidiaries***." *See In the Matter of the United Light & Power Co. & Its Subsidiary Companies the United Light & Railways Co. Am. Light & Traction Co. Cont'l Gas & Elec. Corp. United Am. Co. & Iowa-Nebraska-Light & Power Co.*, 65 P.U.R.(NS) 433 (Apr. 30, 1946) (emphasis added). But as the SEC also observed, the Coke Company was a "non-utility company operation in the City of Milwaukee…" *See In the Matter of the United Light & Railways Co. Am. Light & Traction Co., et al.*, 27 S.E.C. 441 (Dec. 30, 1947). Further, two SEC commissioners dissented from the April 30, 1946 findings, and before the matter was reargued, ALT submitted a new plan to the SEC reversing its prior position that dissolution was necessary and advocated for the continuation of ALT as a holding company over its Milwaukee subsidiaries, which included the Coke Company. *In the Matter of the United Light & Railways Co. Am. Light & Traction Co., et al.*, 27 S.E.C. 441 (Dec. 30, 1947). The SEC made it clear after this amended plan submission that "the question is still open whether the remaining properties [including the Coke Company] constitute integrated systems and other businesses which are retainable under Section 11(b)(1)," noting that ALT now argued that ALT's subsidiaries and "Milwaukee Solvay will constitute 'other businesses' which are so related to the operation of the integrated system that they may properly be retained in the American system under the standards of Section 11(b)(1)." *Id*. The SEC found the non-utility Coke Company and its coke plant were economically necessary and appropriate to the operations of the utility MGL, but reserved jurisdiction to reconsider that matter if there was a substantial change in the relationship of the two companies after the introduction of natural gas to Milwaukee. *Id*.

25.     In 1949, ALT changed its name to American Natural Gas Company.[27]

**RESPONSE:**  Undisputed.

26.     Milwaukee Gas Light Company, then still a subsidiary of American Natural Gas, changed its name to Wisconsin Gas Company in 1965 and later became Wisconsin Gas, LLC in 2004.[28]

**RESPONSE:**  Undisputed.

27.     As its counsel advised U.S. EPA in 2005, Wisconsin Gas "has had no corporate relationship with American Natural Gas since June 30, 1975," when American Natural Gas divested all its stock holdings in Wisconsin Gas Company.[29]

**RESPONSE:**  Undisputed.

28.     Shortly after that divestiture, American Natural Gas changed its own name to American Natural Resources Company in 1976.[30]

**RESPONSE:**  Undisputed.

29.     Wisconsin Gas now claims that its former parent is liable to it under CERCLA based on operations of another former ALT subsidiary, Milwaukee Coke & Gas Company.[31]

**RESPONSE:**  Disputed, insofar as ANR has mischaracterized Wisconsin Gas's allegations as stated in the Amended Complaint. Wisconsin Gas alleges, *inter alia*, that ANR itself, through its myriad predecessor entities, directly controlled the coke and manufactured gas facilities at the Solvay Site itself over a span of at least 35 years. *See* Amended Complaint, ¶¶24, 32. Wisconsin Gas further alleges that in 1962, prior to the sale of the Coke Company to a third party, ANG (ANR's predecessor) assumed liabilities of the Coke Company up to approximately $5 million (approximately          $49.3M          in          2023          dollars.          *See* https://www.in2013dollars.com/us/inflation/1962?amount=5000000; Amended Complaint, ¶34.

---

[27] Ex. C-2, ALT Minutes of Stockholders' Meeting, Vol. 18, June 15, 1949, at 116 (ANRC-00000839); *see also* Amended Compl. [Doc. 25] ¶ 30.

[28] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to EPA Information Request, Oct. 29, 2004, at WG-ANR-00046080.

[29] Ex. A-7, Letter from Rachel A. Schneider of Quarles & Brady to Craig Melodia of U.S. EPA, Mar. 23, 2005, produced by Wisconsin Gas with bates numbers WG-ANR-00000665-70.

[30] Amended Compl. [Doc. 25] ¶ 35.

[31] *See* Amended Compl. [Doc. 25] ¶¶ 24-35 & 56-64.

30.     Milwaukee Coke & Gas was incorporated in Wisconsin on January 12, 1903, and dissolved under Wisconsin law almost 60 years ago.[32]

**RESPONSE:**  Disputed. Milwaukee Coke & Gas changed its name to the Milwaukee Solvay Coke Company in 1942, and then changed its name again to MSC Corporation in 1962. Ex. 7, Cliffs Mining response to EPA, WG-ANR-00121250(261); Ex. 47, Minutes of Special Meeting of Board of Directors for Coke Company, June 1, 1962, ANRC-00007718. ANG then assumed MSC Corporation's debts and liabilities, and then caused MSC Corporation to dissolve on December 31, 1962.  Ex. 48, Transfer of Assets in Liquidation of MSC Corporation, December 27, 1962, ANRC-00007688; Ex. 49, Statement of intent to dissolve filed with the Register of Deeds in Milwaukee County, December 3, 1962, ANRC-00001932.

31.     As reflected in the Articles of Association for Milwaukee Coke & Gas, the stated purpose of the company included the manufacture of coke and by-products; the reduction of by-products in that process; and the mining, manufacture, and transportation of iron and coal.[33]

**RESPONSE:**  Disputed. The cited Articles of Association state

> [t]he business or purpose of [the Coke Company] is and shall be manufacturing coke, and any and all by-products thereof; reducing the by-products thereof; purchasing, leasing, owning, holding and selling iron mining lands and coal mining lands in the United States and in foreign countries; operating iron and coal mines; developing iron mining properties and coal mining properties; purchasing, leasing, owning, holding and selling of plants and machinery for the purpose of operating said mines or developing the same; purchasing and selling timber lands; mining iron ore and coal; reducing iron ore and manufacturing pig iron, and any and all products of iron ore; the transportation of iron ore or coal, or both; and, the buying, selling and dealing in any other property necessarily or properly connected with the main purposes of this corporation or advantageous thereto; and the transaction of any and all kinds of business necessarily or properly connected with the main purposes of this corporation or advantageous thereto.

---

[32] Ex. C-3, Articles of Association and filing receipt by Wisconsin Secretary of State, filed Jan. 12, 1903 (ANRC-00000056-59); *see also* paragraphs 104 and 109-12, *infra*.

[33] Ex. C-3, Articles of Association and filing receipt by Wisconsin Secretary of State, filed Jan. 12, 1903 (ANRC-00000056).

Ex. 50, Articles of Association for Milwaukee Coke & Gas Company, December 9, 1902, ANRC-00000056.

32.     Milwaukee Coke & Gas owned and operated, at least in part, the coke and gas plant on the northern portion of the Site prior to selling all or substantially all of its business and assets, including the plant and equipment, to a third party in 1962.[34]

**RESPONSE:** Disputed. The entity that owned the coke and gas plant prior to its sale to the third

party (*i.e.,* Wisconsin Coke Company, a subsidiary of Pickands Mather) was Milwaukee Solvay

Coke Company. Ex. 51, Purchase Agreement between Wisconsin Coke Company, Inc. and

Milwaukee Solvay Coke Company, June 1, 1962, ANRC-00001752. Further, ANG sold the plant

and equipment to a third party in 1962 after the Coke Company transferred its assets to ANG in

exchange for ANG assuming all of the Coke Company's liabilities, up to the value of the

transferred assets. Ex. 48, Transfer of Assets in Liquidation of MSC Corporation, December 27,

1962, ANRC-00007688.

33.     In 1928, ALT purchased all the outstanding stock of Milwaukee Coke & Gas from the Koppers Gas & Coke Company.[35]

**RESPONSE:** Undisputed.

34.     Both before and after ALT's 1928 purchase of Milwaukee Coke & Gas Company's stock, Milwaukee Coke & Gas sold surplus gas generated as a by-product of its coking process to Wisconsin Gas's predecessor, Milwaukee Gas Light Company.[36]

**RESPONSE:** Disputed that the referenced documents support the notion that the Coke

Company sold "surplus" gas to MGL. MGL—another ALT direct subsidiary, having been

formed in 1852 and acquired by ALT upon ALT's formation in 1901—was the Coke Company's

---

[34] Amended Compl. [Doc. 25] ¶ 26; *see also id.* ¶ 33 and paragraphs 101-02, *infra*.

[35] Amended Compl. [Doc. 25] ¶ 27; Ex. C-4, U.S. Rev. Auditor's Report, Milwaukee Coke & Gas Co., Year 1927, Mar. 27, 1929, at ANRC-00010206 ("Under date of July 6, 1928, [ALT] purchased the capital stock of the Milwaukee Coke and Gas Co. from The Koppers Gas and Coke Co.").

[36] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, Oct. 29, 2004, at WG-ANR-00046079; *see also* Ex. A-8, Milwaukee Coke & Gas Company Gas Delivered to Milwaukee Gas Light Company, 1917 to 1931, at WG-ANR-00004610.

sole customer of coke oven gas produced by the Coke Company. Ex. 8, Wisconsin Gas Response to USEPA 104(e) information request on Solvay Site, WG-ANR-00046079.

35.     Milwaukee Coke & Gas Company's primary business (and the source of the majority of its operating revenue) was selling the coke, chemicals, and coke by-products produced through the coking process to customers other than Milwaukee Gas Light.[37]

**RESPONSE:**  Undisputed.

36.     Milwaukee Gas Light and Milwaukee Coke & Gas continued to deal with each other by contract as separate legal entities after ANR's acquisition of Milwaukee Coke & Gas Company's stock.[38]

**RESPONSE:**  Disputed. MGL and the Coke Company were commonly owned at all relevant times by ALT, and were not truly "deal[ing] with each other by contract as separate legal entities," as ALT purchased the Coke Company in order to artificially suppress the Coke Company's price of the sale of coke oven gas.  Ex. 78, Memorandum in *Helfman v. American Light & Traction Co.*, WG-ANR-00005534(605) (ALT's stated goal in acquiring the Coke Company—MGL's sole outside supplier of gas—was to consolidate "operation of the two properties under the same management."); Ex. 79, Answer of ALT in *Helfman v. American Light & Traction Co.*, WG-ANR-00005356 (ALT admitted that it purchased the Coke Company, in part, so that ALT and MGL "thereafter owned and controlled [MGL's] sources of gas supply," which as a result "was no longer dependent upon the business judgment of others or their financial difficulties."); Ex. 9, Transcript and Exhibits for hearing before SEC in the matter *United Light and Railway Company*, on November 24, 1952, WG-ANR-00073896 (the Coke Company needed to be retained by ALT because it otherwise would "wish to conduct its operations so as to maximize the amount of money it could make."); Ex. 10, MGL's Statement

---

[37] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, Oct. 29, 2004, at WG-ANR-00046079.

[38] *E.g.,* Ex. A-9, Contract for the Sale and Purchase of Crude Coke Oven Gas, Aug. 21, 1934, produced by Wisconsin Gas with bates numbers WG-ANR-00078628-32; *see also* paragraph 46, *infra*.

in Response to Request for Exhibit 92 in Docket 54-25, WG-ANR-00073750 (if ANG no longer controlled the Coke Company, "we believe the cost of coke-oven gas to the Gas Company and the cost of standby might be materially increased . . .").

37.     An August 1934 agreement, for example, obligated Milwaukee Coke & Gas to supply no less than 13,000,000 cubic feet of gas per day for a five-year term and gave Milwaukee Gas Light the option to purchase the rest. Among other things, the contract also required that the gas be washed and scrubbed and placed limits on naphthalene and sulfur content.[39]

**RESPONSE:**  Undisputed that the August 1934 agreement referenced in paragraph 37 contained those stated operating requirements for the coke plant. Disputed that this is an "example" supporting the proposition that after ALT's purchase of the Coke Company in 1928, the Coke Company and MGL "continued to deal with each other by contract as separate legal entities," for the reasons and record evidence cited in the prior response to paragraph 36.

37A. Even after ALT acquired the stock of Milwaukee Coke & Gas Company, detailed financial records of Milwaukee Coke & Gas were prepared and kept in the ordinary course of its business. These separate financial records reflect, among other things, the discrete costs and revenue of Milwaukee Coke & Gas in conducting its operations and business at the Site.[40]

**RESPONSE:** Disputed that the excerpted and cited financial records are complete, or reflect the value or extent of the services performed at the Solvay Site by ALT, which according to ALT's contemporaneous statements to the federal government, were in fact performed directly by ALT and not charged to the Coke Company. *See* Ex. 6, response of ALT to a Questionnaire from the Special Senate Committee appointed to Investigate Lobbying Activities in 1935, WG-ANR-00074249(258) ("[t]he kind and nature of services so rendered is operating, engineering, accounting, financial, and other services."); *Id*. at 264 ("'servicing functions' are performed by

---

[39] Ex. A-9, Contract for the Sale and Purchase of Crude Coke Oven Gas, Aug. 21, 1934.

[40] *See* ANR Supplement to it Proposed Statement of Material Facts, and exhibit thereto, at ECF No. 48, filed on December 16, 2022.

[ALT's] staff without compensation of any sort to respondent or to any member of respondent's staff.")

38.     After the stock acquisition in 1928, there never was a time when ALT directors or officers held a majority of seats on the board of Milwaukee Coke & Gas or any more than three (and sometimes fewer) of the eight executive officer positions of Milwaukee Coke & Gas.[41]

**RESPONSE:**  Disputed. The term, "executive officer position" is vague and undefined. Further, between 1951 and 1956 there were four or more directors at Milwaukee Coke & Gas who were either officers or directors at ANG, and comprised a majority of the directors between 1951 and 1955. *Compare* ANR's Exh. C-5 at pp. 105, 109, 113, 117, 120, 125, 127, Milwaukee Coke & Gas Company/Milwaukee Solvay Coke Company Annual Reports of Officers and Directors from 1922 to 1962 *with* ANR's Exh. C-6 at pp. 74, 77, 80, 84, 87, 90, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962 (lists of officers and directors). After ALT's acquisition of the Coke Company in 1928, the president of the Coke Company was also the president of ALT/ANG. Ex. 11, List of Coke Company Director and Executive Officers, 1926-1932, October 28, 1932, WG-ANR-00054546(546-47); Ex. 46, 1928 ALT Annual Report, ANRC-00000108(151).

39.     Both the local Vice President in Charge of Operations and Vice President in Charge of Sales for Milwaukee Coke & Gas continued to serve in those capacities for many years after ALT acquired the company's stock.[42]

**RESPONSE:**  Disputed as to the term "many," which is vague and undefined.

40.     George W. Mackie of Milwaukee had been the Vice President in Charge of Operations at the Milwaukee Coke & Gas plant since at least 1925 and remained the designated

---

[41] *Compare* Ex. C-5, Milwaukee Coke & Gas Company/Milwaukee Solvay Coke Company Annual Reports of Officers and Directors from 1922 to 1962 *with* Ex. C-6, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962 (lists of officers and directors).
[42] *See* paragraphs 40-41, *infra*.

Vice President in Charge of Operations for the company until at least 1942.[43]

**RESPONSE:** Undisputed.

41.     Walter C. Liebner, another local Milwaukeean, had been an executive officer of Milwaukee Coke & Gas Company since 1922, and continued to serve as Vice President in Charge of Sales for the company until 1945.[44]

**RESPONSE:** Disputed. Liebner was listed as the Vice President in Charge of Sales for the years 1931 through 1942. In the other years he was listed as either Assistant to the President (1922-1924), Second Vice President (1925-1926), First Vice President (1927), Third Vice President (1927, 1929-1930), Director and Third Vice President (1928), and Vice President (1943-1945). *See* ANR's Ex. C-5, Milwaukee Coke & Gas Company/Milwaukee Solvay Coke Company Annual Reports of Officers and Directors from 1922 to 1962.

42.     In addition to serving as executive officers of the company, Mr. Mackie and Mr. Liebner were members of the Board of Directors of Milwaukee Coke & Gas Company, both before and after ALT acquired the stock of that company. Mr. Mackie and Mr. Liebner were not, however, ever directors nor officers of either ALT or Milwaukee Gas Light.[45]

**RESPONSE:** Undisputed.

43.     On or about March 7, 1942, the Milwaukee Coke & Gas Company filed a Certificate of Amendment to its Articles of Incorporation, changing the company's name to Milwaukee Solvay Coke Company.[46]

**RESPONSE:** Undisputed.

---

[43] Ex. C-5, Milwaukee Coke & Gas Company/Milwaukee Solvay Coke Company Annual Reports of Officers and Directors from 1922 to 1962 (G.W. Mackie listed as Vice President in Charge of Operations in reports from Jan. 14, 1925 to Jan. 1, 1942).

[44] *Id.* (W.C. Liebner of Milwaukee shown as officer of company in reports to the Secretary of State from Aug. 14, 1922 to Jan. 1, 1945).

[45] *See* Ex. C-5, Milwaukee Coke & Gas Company/Milwaukee Solvay Coke Company Annual Reports of Officers and Directors from 1922 to 1962 (showing G.W. Mackie as a director from 1925 to 1939 and 1942, and W.C. Liebner as a director from 1922 to 1939 and 1942 to 1945); Ex. C-6, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962 (lists of officers and directors); Ex. A-10, Wisconsin Gas Co., *Milwaukee Gas Light Company 1852-1965 Wisconsin Gas Company 1966- Presidents and Directors,* produced by Wisconsin Gas at WG-ANR-00047929-36; Ex. A-11, Excerpts from Milwaukee Gas Light Board of Directors Minutes (showing officers elected from 1928 to 1941); Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962 (lists of officers and directors).

[46] Ex. A-13, Certificate of Amendment to Articles of Incorporation of Milwaukee Coke & Gas, Feb. 28, 1942, WG-ANR-00013321-24.

44.     James A.B. Lovett and Paul J. Kortsch, the President and Secretary, respectively, of the Milwaukee Coke & Gas [sic], signed the notarized certification of the name-change resolution.[47]

**RESPONSE:**  Undisputed.

45.     Neither Mr. Lovett nor Mr. Kortsch ever served as an officer or director of ALT.[48]

**RESPONSE:**  Undisputed.

46.     Despite the elimination of the word "Gas" in the company's name, Milwaukee Solvay Coke Company entered into a new agreement on January 29, 1943, to supply manufactured gas from the coke plant to Milwaukee Gas Light, and the parties amended the contract a few months later.[49]

**RESPONSE:**  Undisputed.

47.     As a public utility holding company, ALT came under new federal requirements when Congress passed the Public Utility Holding Company Act of 1935.  The Act required, among other things, that any holding company's utility system be limited to subsidiaries operating in a single state or that the operations be part of an "integrated system" serving a limited geographic area.[50]

**RESPONSE:**  Undisputed.

48.     Although ALT was the direct parent of both Milwaukee Solvay Coke Company and Milwaukee Gas Light Company, ALT itself was merely an intermediate holding company in a larger public utility holding company system.[51]

**RESPONSE:**  Disputed for the reasons stated in response to paragraphs 21 and 23, *supra*, and

the facts recited in paragraphs P38-P41 of Wisconsin Gas' Counter-Statement of Facts, *infra*.

49.     United Light and Railways Company ("ULR"), one of the largest public utility

---

[47] *Id.* at WG-ANR-0013323.

[48] Ex. C-6, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962 (lists of officers and directors do not include Messrs. Lovett or Kortsch in any year); *see also* Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962 (Mr. Lovett not shown as an officer or director of Milwaukee Gas Light before 1946 or after 1948; no listing for Mr. Kortsch as officer or director of Milwaukee Gas Light in any year).

[49] *See* Ex. A-14, Coke Oven Gas Contract, Aug. 22, 1950, at 3 (WG-ANR-00054350; mentioning Jan. 29, 1943 contract and Apr. 5, 1943 amendment).

[50] Public Utility Holding Company Act of 1935, ch. 687, Title I, 49 Stat. 803 (1935) (codified at 15 U.S.C. §§ 79 – 79z-6 and repealed by Pub. L. 109–58, Title XII, § 1263, 119 Stat. 974 (2005)).

[51] *See, e.g., Allied Chem. Corp. v. United States,* 305 F.2d 433, 435 (Ct. Cl. 1962) (describing ownership structure of ALT).

holding companies at the time, held approximately 51 percent of ALT's voting stock. ULR, in turn, was wholly owned by United Light & Power Company, which stood "at the apex of the system."[52]

**RESPONSE:** Undisputed.

50. In a Public Utility Holding Company Act decision dated March 20, 1941, the SEC required the liquidation and distribution of United Light & Power Company, leaving ULR at the top of the holding company system.[53]

**RESPONSE:** Undisputed.

51. In a second opinion dated August 5, 1941, the SEC directed ULR to divest its entire interest in ALT, ultimately making ALT a publically [sic] held company.[54]

**RESPONSE:** Undisputed.

52. The SEC's August 5, 1941 opinion also required ALT to divest its interest in three Texas subsidiaries and eliminate other common-stock holdings to comply with the provisions of the Public Utilities Holding Companies Act. The SEC's order did not require ALT to divest other holdings in Michigan or Wisconsin, including ALT's interest as majority shareholder of Milwaukee Gas Light or as sole shareholder of Milwaukee Coke & Gas.[55]

**RESPONSE:** Undisputed.

53. ALT's management initially believed, however, that dissolution and liquidation of ALT was the only practical means of achieving full compliance with the Public Utility Holding Company Act and SEC's directives.[56]

**RESPONSE:** Undisputed.

54. In 1945, ALT, Milwaukee Gas Light Company, and Milwaukee Solvay Coke Company sought approval from the SEC to allow Milwaukee Gas Light to acquire Milwaukee Solvay Coke's stock as a preliminary transaction to facilitate ALT's own plan of dissolution and liquidation.[57]

**RESPONSE:** Undisputed.

---

[52] *Id.*

[53] *In re United Light & Power Co.,* 8 S.E.C. 837, 1941 SEC LEXIS 1788 (Mar. 20, 1941).

[54] *In re United Light & Power Co.,* 9 S.E.C. 833, 1941 SEC LEXIS 1034 (Aug. 5, 1941).

[55] *Id.* at 845, 1941 SEC LEXIS 1034 at *20-21; *see also* Ex. C-6, Excerpts from /American Natural Gas Annual Reports from 1928 to 1962 (1941 Annual Report at 3, ANRC-00000421).

[56] *Id.*; Ex. A-6, Carl Claussen, *The Story of American Natural Gas Company,* Speech Given to the Citigas Executives Luncheon Club, Nov. 17, 1964, at 8, WG-ANR-00007190.

[57] Ex. C-7, ALT, Minutes of Special Meeting of Board of Directors, Oct. 10, 1945; Ex. C-8, *In re United Light & Power Co.,* S.E.C. File Nos. 59-11, 59-17, & 54-25, Application No. 21A, filed Nov. 11, 1954, at 3.

55.    Around the same time, Milwaukee Gas Light Company filed a petition with the Wisconsin Public Service Commission, seeking approval to purchase Milwaukee Solvay Coke Company as a standby source of gas.[58]

**RESPONSE:**  Undisputed.

56.    Milwaukee Gas Light's legal counsel advised the Wisconsin Public Service Commission that, in light of the planned dissolution of ALT, "the gas light company has 'a wonderful opportunity' to buy the coke firm for $4,500,000.  He said the holding firm had paid $7,800,000 to get the coke company in 1928."[59]

**RESPONSE:**  Undisputed that the news article contains the referenced quote, but dispute that A-16 is the properly cited exhibit. Disputed further that ALT was a mere "holding firm" as referenced, for the reasons stated in response to paragraphs 21 and 23, *supra*, and the facts recited in paragraphs P38-P41 of Wisconsin Gas' Counter-Statement of Facts, *infra*.

57.    In support of the proposed purchase, Milwaukee Gas Light indicated that it contemplated "the operation of the said Coke plant as a self-supporting unit."[60]

**RESPONSE:**  Undisputed that the cited article contains the referenced quote. Disputed that the Coke Company's operations were intended to be or were in fact "a self-supporting unit" as characterized in paragraph 57. *See* Ex. 52, SEC 21A Application of ALT, MGL, Coke Company, et al. regarding ALT liquidation, November 11, 1945, ANRC-00006776(779-80) ("The operations of the two companies, under common control, have been closely integrated, to their mutual benefit and that of the public interest and the interest of investors and consumers."); Ex. 53, Letter from ALT to Miller, Mack & Fairchild review of charter, August 13, 1945, ANRC-00007411(411) (requesting that before MGL's acquisition of the Coke Company, MGL's charter and bylaws be examined in order to determine whether they were "broad enough to permit… the

---

[58] E.F. Burdick, *Your Job and Natural Gas,*  MILWAUKEE SOLVAY NEWS, Apr. 1946, at WG-ANR-00004747 (included in Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas).

[59] Ex. A-16, *Gas Co. Again Pleads to Buy Solvay Plant,* MILWAUKEE J., Jan. 3, 1946, at 37, col. 2 (ANRC-00010919).

[60] *See* E.F. Burdick, *supra,* note 55.

operation of the coke business."); Ex. 110, Article entitled "Natural Gas Plan Revived: Plan for Wisconsin," *The Milwaukee Journal*, November 2, 1944, WG-ANR-00132810(810-11) (On November 2, 1944, *The Milwaukee Journal* reported that Bruno Rahn, president of the Milwaukee Gas Light Co., issued a statement on the proposed dissolution of American Light & Traction, which included the following language: "If the plan is approved, Milwaukee Gas Light will merge with Milwaukee Solvay Coke Co. and continue to operate Solvay exactly as it is run today.").

58.    On January 3, 1947, with approval from both the SEC and the Wisconsin Public Service Commission, Milwaukee Gas Light acquired all the outstanding common stock of Milwaukee Solvay Coke from ALT in exchange for 362,828 shares of newly issued common stock of Milwaukee Gas Light having an aggregate par value of $4,353,936.[61]

**RESPONSE:**  Undisputed.

59.    The 1947 stock transaction made Milwaukee Solvay Coke Company a direct, wholly-owned subsidiary of Milwaukee Gas Light and thus a second-tier subsidiary of ALT.[62]

**RESPONSE:**  Undisputed.

60.    Ultimately, ALT withdrew its plan to dissolve after another of its subsidiaries received approval from the Federal Power Commission to install a natural gas transmission pipeline between Detroit and Milwaukee.[63]

**RESPONSE:**  Undisputed that ALT withdrew its plan to dissolve, but disputed that the referenced document is characterized correctly or fully. ALT had been attempting to access a natural gas source since before World War II but was unable to do so because of steel shortages

---

[61] *See, e.g.,* Ex. C-6, Excerpts from /American Natural Gas Annual Reports from 1928 to 1962 (1946 Annual Report at 7, ANRC-00000622); Ex. C-9, American Natural Gas Board of Directors Minutes, Oct. 27, 1954, at ANRC-00005276; *In re United Light & Power Co.,* Public Utility Holding Company Act Release No. 7023, Order Granting Application and Permitting Declaration to Become Effective, 1946 SEC LEXIS 688 (Dec. 2, 1946); *see also Panhandle E. Pipe Line Co. v. SEC,* 170 F.2d 453, 463 (8th Cir. 1948) (affirming the SEC's approval of the plan); Ex. A-17, Milwaukee Gas Light Board of Directors Minutes, Jan. 18, 1955, at 218 (attached Order of Wisconsin Public Service Comm'n, at WG-ANR-00009879).

[62] *See, e.g.,* Ex. C-6, Excerpts from /American Natural Gas Annual Reports from 1928 to 1962 (1946 Annual Report at 7, ANRC-00000622).

[63] *See, e.g.,* Ex. A-6, Carl Claussen, *The Story of American Natural Gas Company,* Speech Given to the Citigas Executives Luncheon Club, Nov. 17, 1964, at 8, WG-ANR-00007190.

due to the war effort. Ex. 54, 1948 ALT Annual Report, ANRC-00000766(768); and ANR Exh. A-6 – Claussen report, at 10. ALT did receive permission from the Federal Power Commission ("FPC") to construct a pipeline in 1946 and withdrew its liquidation proposal to the SEC in July 1947. Ex. 54, 1948 ALT Annual Report, ANRC-00000766(769).

61.     The SEC agreed that the natural gas pipeline would make ALT's utility holdings in Wisconsin and Michigan an "integrated system" in a single area or region, within the meaning of the Public Utility Holding Company Act, and that Milwaukee Solvay could remain within the system as an "economically necessary and appropriate" non-utility business.[64]

**RESPONSE:**  Undisputed.

62.     No longer facing dissolution, ALT changed its name to American Natural Gas Company on or about June 15, 1949.[65]

**RESPONSE:**  Undisputed that ALT changed its name to ANG in June 1949, but dispute that the name change was the result of ALT "no longer facing dissolution." ALT name change to ANG reflected its shift from manufactured to natural gas, and from primarily a local gas utility operator to primarily an interstate gas pipeline company. ANR's Exh. A-6 at 11-12.

63.     Later that same year, American Natural Gas Company incorporated a new subsidiary in Michigan called the American Natural Gas Service Company to offer the holding company's operating subsidiaries certain services at cost, including assistance with purchasing, taxes, accounting, engineering, and insurance procurement.[66]

**RESPONSE:**  Undisputed that ANG incorporated the American Natural Gas Service Company (the "Service Company") in 1949 to continue providing services to ANG's subsidiaries, but disputed to the extent paragraph 63 attempts to characterize the Service Company as playing only a limited role in the operation of ANG's subsidiaries, including the coke plant, particularly in respect to the broad services provided by Henry Fink, Ralph McElvenny, and lead engineer T.

---

[64] *In re United Light & Rys. Co.,* 27 S.E.C. 441, 473, 1947 SEC LEXIS 485, at *62-63 (Dec. 30, 1947); *see also Panhandle E. Pipe Line Co. v. SEC,* 170 F.2d 453, 463 n.9 (8th Cir. 1948).
[65] Ex. C-2, American Light & Traction, Minutes of Stockholders' Meeting, June 15, 1949, at 116 (ANRC-00000839).
[66] *In re Am. Natural Gas Serv. Co.,* 30 S.E.C. 807, 1950 WL 40347, at *2 (Jan. 24, 1950).

W. Weigele. Paragraphs 44-61 of Wisconsin Gas' Counter-Statement of Facts, *infra*. Also disputed in that the purposes of the Service Company were "[t]o render advice, assistance and services to affiliated companies with respect to *all phases* of their proper corporate affairs, activities and functions." Ex. 55, Service Company First Meeting of Sole Incorporator and Stockholder meeting minutes, October 20, 1949, ANRC-00011092(095) (emphasis added).

64. By agreement, the services of the American Natural Gas Service Company were provided only if and when requested by operating subsidiaries within the American Natural Gas system.[67]

**RESPONSE:** Disputed. While the form of the Service Agreement between the Service Company and ANG's subsidiaries stated that services would be provided only when the subsidiary requested them, that was not reflective of actual practice. *See* Ex., 56, Letter from Kreuz to McElvenny regarding operating budget, January 9, 1961, ANRC-00008520 (operating budget for the Coke Company submitted to the Service Company President with no corresponding indication the Coke Company requested any services from the Service Company). *See also* various financial records showing service charges being charged to the Coke Company without corresponding evidence of requests initiated by the Coke Company, including for engineering services. Ex. 57, Financial Statements of Service Company, year ending December 31, 1951, ANRC-00010463(470) (for the twelve months ending December 1951, the Service Company allocated to the Coke Company $346.87 [or nearly $4,000 in 2023 dollars[2]] for "engineering, new business and purchasing salaries."); Ex. 12, MGL Form 10-K Annual Report for fiscal year ending December 31, 1950, WG-ANR-00049839(845) (noting that in 1950, the

---

[67] *Id.*; Ex. A-18, Letter from Milwaukee Gas Light to Wis. Pub. Serv. Comm'n, Nov. 3, 1949, at 2 (WG- ANR-00006010); Ex. A-19, Letter from Milwaukee Gas Light to Wis. Pub. Serv. Comm'n, Dec. 1, 1949, at 4 (WG- ANR-00006046); Ex. A-20, Wis. Pub. Serv. Comm'n, Order Approving Contract, No. 2-U-3206, Dec. 20, 1949, WG-ANR-00099735-37. *Cf. In re App. of Milwaukee Gas Light Co.*, No. 2-U-1438, 21 Wis. Pub. Serv. Comm'n Rep. 637, 640 (Oct. 25, 1939) (discussing prior agreement with United Light & Power Service Co.), *available at* https://www.google.com/books/edition/Opinions_and_Decisions_of_the_Public_Ser/cR9SAAAAMAAJ?hl=en&gbpv=637.

[2] https://www.in2013dollars.com/us/inflation/1951?amount=346.87

Coke Company paid the Service Company $9,658 [or $118,940 in 2023 dollars[3]] for services provided); Ex. 13, MGL Form 10-K Annual Report for fiscal year ending December 31, 1952,WG-ANR-00006284(6289) (noting that in 1952, the Coke Company paid the Service Company $13,519 [or $151,411 in 2023 dollars[4]] for services provided); Ex. 14, MGL Form 10-K Annual Report for fiscal year ending December 31, 1953, WG-ANR-00050135(140) (noting that in 1953, the Coke Company paid the Service Company $13,693 [or $152,211 in 2023 dollars[5]] for services provided); Ex. 15, MGL Form 10-K Annual Report for fiscal year ending December 31, 1954, WG-ANR-00049677(682) (noting that in 1954, the Coke Company paid the Service Company $10,653 [or $117,538.23 in 2023 dollars[6]] for services provided); Ex. 58, Coke Company Trial Balance Sheet, May 1962, ANRC-00008769(774) (noting $1217.74 [or $12,087 in 2023 dollars[7]] due to the Service Company in 1961); Ex. 59, Amendment No. 3 to Service Company's Application to SEC for Formation of Service Company, October 2, 1963, ANRC-00010492(496) (indicating that for the last 6 months of the Coke Company's existence, the amount charged to it for services provided by the Service Company totaled $9,131 [or $88,563 in 2023 dollars[8]]); Ex. 60, Service Company's Annual Report to SEC for period ending December 31, 1951, ANRC-00010551 (562 – noting $44,995.69 in engineering services provided to associate companies and 569 – noting charges to the Coke Company both for construction services overseen by the Service Company and other direct services provided).

65.     Milwaukee Solvay Coke Company independently employed hundreds of local Milwaukee employees of its own, including chemists, engineers, mechanics, machinists,

---

[3] https://www.in2013dollars.com/us/inflation/1950?amount=9658
[4] https://www.in2013dollars.com/us/inflation/1952?amount=13519
[5] https://www.in2013dollars.com/us/inflation/1953?amount=13693
[6] https://www.in2013dollars.com/us/inflation/1954?amount=10653
[7] https://www.in2013dollars.com/us/inflation/1961?amount=1217.74
[8] https://www.in2013dollars.com/us/inflation/1963?amount=9131

pipefitters, ironworkers, and blacksmiths at the Site.[68]

**RESPONSE:** Disputed as to the characterization that the Coke Company "independently" employed "hundreds" of "its own" engineers or chemists at the Solvay Site, as the cited documents do not support these assertions.

66.     Milwaukee Solvay Coke Company maintained separate purchasing, engineering, and mechanical departments as well as its own laboratory at the Site.[69]

**RESPONSE:** Disputed that the referenced "departments" were "separate." Not only is the use of these undefined terms vague and ambiguous, but ALT maintained "operating offices" for all its operating plants in a centralized location, Chicago. Ex. 46, 1928 ALT Annual Report, ANRC00000108(115). ALT publicly touted the benefits of overseeing all the subsidiaries operations, noting that "[t]he anticipated advantages and conveniences of the location at Chicago of the operating offices have been fully experienced." Ex. 61, 1929 ALT Annual Report, ANRC-00000171(174). ANG and Service Company President McElvenny later testified to the SEC that with respect to matters concerning the subsidiaries, "any really important matter in the system is checked with or discussed, or if it is of sufficient importance, approved by the board of the parent company." Ex. 16, Transcript of hearing before SEC in the matter of *Milwaukee Gas Light Company* on June 4, 1958, WG-ANR-00052302(313).

---

[68] Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas (*Your Job,* MILWAUKEE SOLVAY NEWS, Aug. 1946, at WG-ANR-00004760-61; *Around the Plant,* MILWAUKEE SOLVAY NEWS, Nov. 1946, at WG-ANR-00004768-69; *Around the Plant,* MILWAUKEE SOLVAY NEWS, Jan. 1947, at WG-ANR-00004775; *Do You Know,* MILWAUKEE SOLVAY NEWS, Jan. 1947, at WG-ANR-00004773; *Chemical Workers Nominate New Officers,* MILWAUKEE SOLVAY NEWS, Nov. 1947, at WG-ANR-00004787; Harold Gerlach, *Pictures and Story Tell "What Makes the Wheels Go 'Round" at Solvay Coke Plant,* MILWAUKEE SOLVAY NEWS, July 1948, at WG-ANR-00004807-09; *Machinists Guard Against Plant Breakdowns,* MILWAUKEE SOLVAY NEWS, Mar. 1949, at 4, WG-ANR-00031265; *Engineers Seek New Methods To Lower Costs Without Loss of Efficiency in Operations,* MILWAUKEE SOLVAY NEWS, Oct. 1949, at 4, WG-ANR-00004838; *New Officers— Quarter Century Club,* MILWAUKEE SOLVAY NEWS, May-June 1955, at WG-ANR-00004886).

[69] Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas (*Around the Plant,* MILWAUKEE SOLVAY NEWS, Nov. 1946, at WG-ANR-00004768-79; *Other Plans for New Equipment,* MILWAUKEE SOLVAY NEWS, Apr. 1947, at 2, WG-ANR-00016440; *Engineers Seek New Methods To Lower Costs Without Loss of Efficiency in Operations,* MILWAUKEE SOLVAY NEWS, Oct. 1949, at 4, WG-ANR-00004838; *New Officers—Quarter Century Club,* MILWAUKEE SOLVAY NEWS, May-June 1955, at WG- ANR-000048860; Ex. A-21, *History of the Milwaukee Solvay Coke Company,* at 10, WG-ANR-00046310.

67.    In addition, Milwaukee Solvay Coke Company had its own safety policies, safety courses, fire brigade, and safety inspector.[70]

**RESPONSE:**  Undisputed that the Coke Company maintained certain safety policies, but disputed that ALT/ANG/Service Company policies did not also govern the operations of the coke plant. *See, e.g.,* Ex. 62, 1933 ALT Annual Report, ANRC-00000242(245-46). ("[t]here has been no change in the company's policy of always fully maintaining properties in first class condition."); Ex. 63, 1934 ALT Annual Report, ANRC-00000265(268) ("[t]he properties have been maintained in first-class operating condition."); Ex. 64, 1935 ALT Annual Report, ANRC-00000288(290) (same); Ex. 65, 1936 ALT Annual Report, ANRC-00000311(313) (discussing ALT's replacement of ruptured mains due to the freezing of ground at the Michigan and Wisconsin properties).

68.    Among other things, Milwaukee Solvay Coke Company had its own employee insurance plan, pension plan, and labor union contracts.[71]

**RESPONSE:**  Disputed insofar as ANG renegotiated the employee buy-out clause in order to facilitate the sale of the Coke Company to a third party in 1962. Ex. 17, Transcript of Claussen talk given before the Citigas Executives Luncheon Club, November 17, 1964, WG-ANR-00007183(192); Ex. 66, Agreement between Milwaukee Solvay Coke Company and Local Union No. 311, March 1, 1962, ANRC-00001509; Ex. 67, Agreement between Milwaukee Solvay Coke Company and several affiliated unions, March 1, 1962, ANRC-00001514; Ex. 68,

---

[70] Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by  Wisconsin Gas (*Your Job,* MILWAUKEE SOLVAY NEWS, Aug. 1946, at WG-ANR-00004761; Emil Rahn, Safety Inspector, *Company Holds Fire Demonstration,* MILWAUKEE SOLVAY NEWS, Nov. 1947, at 3, WG-ANR-00004787; *Twenty Five Sign For Safety Classes*, MILWAUKEE SOLVAY NEWS, Mar. 1949, at 3, WG-ANR-00004822; *Employees' Training Course Is Announced,* MILWAUKEE SOLVAY NEWS, Oct. 1949, at 2, WG-ANR-00004836).

[71] Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas (*Your Job,* MILWAUKEE SOLVAY NEWS, Aug. 1946, at WG-ANR-00004760; *Sickness Benefit Increase Approved by Employees of Plant,* MILWAUKEE SOLVAY NEWS, Jan. 1947, at WG-ANR-00004771; *Chemical Workers Nominate New Officers,* MILWAUKEE SOLVAY NEWS, Nov. 1947; *Company and Unions Reach Agreement,* MILWAUKEE SOLVAY NEWS, Oct. 1949, at WG-ANR-00004836; *Blue Cross Offers New Hospital Plan,* MILWAUKEE SOLVAY NEWS, Oct. 1949, at WG-ANR-00004836; *How Good Is Our Pension Plan,* MILWAUKEE  SOLVAY NEWS, Oct. 1953, at 2, WG-ANR-00037205).

Agreement between Wisconsin Coke Company, Inc. and Local Union No. 311, May 2, 1962, ANRC-00001593; Ex. 69, Agreement between Milwaukee Solvay Coke Company and several affiliated unions, March 1, 1962, ANRC-00008588. Disputed further in that ANG approved its subsidiaries' respective employee savings plans. Ex. 70, Service Company Board of Directors regular meeting minutes, March 20, 1958, ANRC-00011201(202-03) (noting that after ANG's board of directors "adopted a resolution approving the adoption of employees' savings plans by other American Natural Gas system companies," "subsequently, the boards of directors of several of such companies adopted resolutions authorizing their officers to formulate employees' savings plans along the lines authorized by the board of directors of [ANG].").

69.     Milwaukee Solvay Coke Company also had a separate employee news publication and social clubs for its employees.[72]

**RESPONSE:**  Undisputed.

70.     Financial data for Milwaukee Solvay Coke Company were separately maintained in balance sheets and other accounting records, reflecting Milwaukee Solvay Coke's operating revenues, operating expenses, and retained earnings.[73]

**RESPONSE:**  Disputed insofar as financial data relevant to the Coke Company was also maintained by ALT/ANG, including financial data related to capital expenses incurred directly by ALT/ANG for construction at the coke plant throughout ownership of the Coke Company. Ex. 71, ANG and Subsidiaries Consolidated U.S. Corporation Income Tax Return for Calendar Year 1960, ANRC-00001411.

71.     Milwaukee Solvay Coke Company continued to have its own by-laws as well as company rules and policies.[74]

---

[72] Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas.

[73] *See, e.g.,* Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962 (separate financial statements for Milwaukee Solvay Coke Company in each report from 1949 through 1954); *see also, e.g.,* Ex. C-10, ALT Board of Directors Meeting Minutes, Sept. 12, 1945 (describing board's review of separate balance sheets, statements of income and statements of earned surplus for Milwaukee Solvay Coke Company).

[74] Ex. C-11, Milwaukee Solvay Coke Company By-Laws, Dec. 31, 1950, ANRC-00009337-44; *see also, e.g., Now Is the Time to Plan Vacations,* MILWAUKEE SOLVAY NEWS, Mar. 1949, at 2, WG-ANR-00004821 (referring to

**RESPONSE:** Undisputed that the Coke Company maintained bylaws, but disputed that the Coke Company maintained "its own" policies. *See* responses to paragraphs 66-67, *supra*.

72.     Although Milwaukee Solvay Coke Company and its new parent, Milwaukee Gas Light Company, shared some of the same officers and directors, most of the officers of Milwaukee Solvay Coke were local executives who did not hold any position as an executive officer or director of Milwaukee Gas Light or ALT/American Natural Gas Company.[75]

**RESPONSE:** Disputed insofar as ANR's characterization in paragraph 72 omits that the highest-ranking offices of the Coke Company during much of the ALT ownership period, including its President, were often staffed by ALT/ANG officers. *See* Ex. 115, ANR 30(b)(6) Tr. at 59:9-12 (admitting in 1929 "R.B. Brown now is also – not only is he president of ALT but he's also president of Milwaukee Coke & Gas…"); Ex. 46, 1928 ALT Annual Report, ANRC-00000108(115); Ex. 72, Annual Report of Domestic Corporation filed with Wisconsin Secretary of State, January 1, 1929, ANRC-00010271(272). Further disputed in that the cited exhibits do not support ANR's assertion that the listed officers were "local executives."

73.     As a Milwaukee Solvay Coke Company employee newsletter reported in February 1950, "E.F. Burdick, who served the Company as Vice President in charge of operations since 1945, was advanced to the office of Executive Vice President, and Owen J. Pritchard, General Superintendent, was named to succeed Mr. Burdick as Vice President in charge of operations."[76]

**RESPONSE:** Undisputed that the referenced document contains the referenced quote.

74.     Mr. Burdick reportedly "started with [Milwaukee Coke & Gas Company] as a Chemist 42 years" earlier, in or around 1908. "Later he was made Chief Chemist, then Foreman and General Superintendent" prior to becoming Vice President in Charge of Operations in 1945

---

[75] *Compare* Ex. C-5, Milwaukee Coke & Gas Company/Milwaukee Solvay Coke Company Annual Reports of Officers and Directors from 1922 to 1962 *with* Ex. C-6, Excerpts of American Light & Traction/American  Natural Gas Annual Reports from 1928 to 1962 (lists of officers and directors); *see also* Ex. A-22, Officers & Directors of Milwaukee Solvay Coke Company & Milwaukee Gas Light Company (1946-1957), produced by Wisconsin Gas with bates numbers WG-ANR-00005877-83.

[76] *Solvay Executives Advanced by Board,* MILWAUKEE SOLVAY NEWS, Feb. 1950, at 3, WG-ANR- 00004842 (included in Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas).

and Executive Vice President in 1950.[77]

**RESPONSE:** Undisputed that the referenced document contains the referenced quote.

75. As further reported in the February 1950 newsletter, "Mr. Pritchard … also started with [Milwaukee Coke & Gas] as a Chemist. He has been with the Company 32 years, during which time he served as Chemist, Chief Chemist, General Foreman, Assistant Superintendent and General Superintendent."[78]

**RESPONSE:** Undisputed that the referenced document contains the referenced quote.

76. Mr. Burdick and Mr. Pritchard did not at any time serve as officers or directors of ALT, American Natural Gas Company, or Milwaukee Gas Light Company.[79]

**RESPONSE:** Undisputed.

77. In 1950, Milwaukee Solvay Coke Company entered into a new contract to sell its coke-oven gas for a period of ten years to Milwaukee Gas Light Company for resale to the City of Milwaukee's Sewerage Commission and to provide standby capacity in case of an interruption in natural gas.[80]

**RESPONSE:** Undisputed that the contract was signed, but dispute that the Coke Company truly "entered" the transaction. Ex. 18, Letter from Kreuz to McElvenny, May 28, 1953, WG-ANR-00077055(056) ("coke oven gas and gas sewerage contracts were consummated with the understanding that the close relationship between Solvay and Milwaukee Gas would continue as in the past. It is a certainty that the minimum delivery of 60,000 therms per day would not have been agreed upon by Solvay if the Company has been or expected to be separated from the American Natural Gas System"); Ex. 19, Letter from Hetherington outlining conclusions and recommendations from study of Coke Company requested by ANG, June 10, 1959, WG-ANR-

---

[77] *Id.*

[78] *Id.*

[79] Ex. C-6, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962 (lists of officers and directors do not include Messrs. Burdick or Pritchard in any year); *see also* Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962 (Messrs. Burdick and Pritchard likewise are not shown as officers or directors of Milwaukee Gas Light in any year).

[80] Ex. A-23, Coke Oven Gas Contract, Aug. 22, 1950, WG-ANR-00000781-98; Ex. A-24, Supplemental Opinion and Order of the Wis. Pub. Serv. Comm'n., Aug. 31, 1950, at 2, WG-ANR-00036324-25 (approving contract, as amended, as both reasonable and consistent with the public interest); *see also Plan Sale of Surplus Coke Oven Gas to Milwaukee Sewerage Commission,* MILWAUKEE SOLVAY NEWS, Mar. 1949, at 3, WG-ANR-00004822 (included in Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas).

00006870 ("with the exception of the commitment to supply a minimum of 60,000 therms per day of coke oven gas for use by the Sewerage Commission and the continuation of the firing of natural gas and solid fuels instead of low cost coke oven gas, operating decisions have been generally sound"); *Id.* at 871 ("[t]he commitment to deliver a minimum of 60,000 therms per day of coke oven gas for consumption by the Sewerage Commission was ill-advised.")

78.     Milwaukee Solvay Coke also continued to manufacture coke for sale to industrial or commercial customers unrelated to Milwaukee Gas Light.[81]

**RESPONSE:**  Undisputed.

79.     As part of a plant expansion that the U.S. government certified as "necessary in the interest of the national defense," Milwaukee Solvay Coke Company installed 20 new coke ovens at the Site in or around 1951 to help meet the increased demand for metallurgical coke and coal chemicals necessary for defense production during the Korean War and cold-war era.[82]

**RESPONSE:**  Disputed that the Coke Company alone (rather than ALT) "installed 20 new ovens at the site." *See* Ex. 20, document detailing Acquisition of Coke Company by ALT and Additional Investments, WG-ANR-00036272 (noting investments by ALT and MGL, "including twenty additional ovens"); Ex. 21, We Energies History of the Milwaukee Solvay Coke Company, WG-ANR-00046300 (noting 20 additional Solvay-type coke ovens were constructed); Ex. 22, Log Book Notes, WG-ANR-00046252(255) (On December 6, 1951, MGL and ANG officers "were at the [Milwaukee Solvay Coke Company] plant to inspect the installation of the 20 new ovens.").

80.     In 1952, the SEC reopened proceedings to determine whether Milwaukee Solvay

---

[81] *See, e.g.*, Ex. A-25, Log Book Notes, WG-ANR-00046252-62 (describing shipments of coke to industrial customers on various dates); Ex. C-12, American Natural Gas Co. Board of Directors Minutes, Sept. 27, 1950, at ANRC-00004983 (reporting that Milwaukee Solvay had received orders for its entire output of coke for the first half of 1951); Ex. C-13, American Natural Gas Co. Board of Directors Minutes, Oct. 25, 1950, at ANRC-00004987-88 (reporting "very satisfactory" earnings of Milwaukee Solvay based on further commitments for purchase of the entire output of coke).

[82] *See Defense Minerals: Hearings Before the Comm. on Interior & Insular Affairs,* 82d Cong. 134 (1951), https://www.google.com/books/edition/Defense_Minerals/EPpEAQAAMAAJ?hl=en&gbpv=1&dq=oclc10578809&pg=PA134&printsec=frontcover; *see also* U.S. Presidential Proclamation No. 2914, 15 Fed. Reg. 9029 (Dec. 16, 1950) (declaring national emergency).

Coke Company could remain within the American Natural Gas holding-company system.[83]

**RESPONSE:** Undisputed.

81. The SEC's Division of Corporate Regulation took the position that Milwaukee Solvay Coke Company should be divested because "Solvay is a substantial industrial enterprise the major portion of whose business consists of the production and marketing of coke and coal chemicals having no operating relationship to Milwaukee [Gas Light]'s utility business[.]"[84]

**RESPONSE:** Undisputed that the referenced document contains the referenced quote.

82. Noting the contractual relationship between Milwaukee Solvay and Milwaukee Gas Light and the benefits to both parties, the SEC declined to modify the previous order allowing Milwaukee Solvay Coke to remain within the system at that time.[85]

**RESPONSE:** Undisputed, insofar as "the SEC declined to modify the previous order." Disputed

that the "contractual relationship" "presented benefits to both parties," as the Vice President of

Operations of MGL testified that a Coke Company not subject to the contract would have

operated differently. *Re United Light & R. Co.*, 3 P.U.R.3d 238 (1954). (observing "that an

independent Solvay wishing to maximize its profits would be inclined to discontinue the

maintenance of its auxiliary underfiring facilities and use the maximum of coke oven gas for

underfiring…"). *See also* Ex. 18, Letter from Kreuz to McElvenny, May 28, 1953, WG-ANR-

00077055 ("It is a certainty that the minimum delivery of 60,000 therms per day would not have

been agreed upon by Solvay if the Company has been or expected to be separated from the

American Natural Gas System"); Ex. 19, Letter from Hetherington outlining conclusions and

recommendations from study of Coke Company requested by ANG, June 10, 1959, WG-ANR-

00006870 ("with the exception of the commitment to supply a minimum of 60,000 therms per

day of coke oven gas for use by the Sewerage Commission and the continuation of the firing of

---

[83] American Natural Gas 1953 Annual Report, at 9 (included in Ex. C-6, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962).
[84] *In re United Light & Rys. Co.*, 35 S.E.C. 516, 519, 1954 SEC LEXIS 616, at *7 (Jan. 22, 1954).
[85] *Id.* at 519-20, 526, 1954 SEC LEXIS 616, at *9-10, *23-24.

natural gas and solid fuels instead of low cost coke oven gas, operating decisions have been generally sound.").

83.     In its Findings and Opinion dated January 22, 1954, the SEC also noted, incidentally, that American Natural Gas Company was "solely a holding company" and thus not an operating company itself.[86]

**RESPONSE:**  Disputed that the SEC made any specific finding that ANG was "not an operating company itself." *Re United Light & R. Co.*, 3 P.U.R.3d 238 (1954). See also response to paragraph 23, *supra*.

84.     In October 1954, the Chairman of American Natural Gas reported that "it was deemed desirable for [American Natural Gas] to acquire from Milwaukee Gas Light Company the latter's investment in the common stock of Milwaukee Solvay Coke Company, so that the Coke Company would become a direct instead of an indirect subsidiary of [American Natural Gas] Company.  The Chairman explained that "it was believed the Wisconsin Public Service Commission would prefer such direct ownership to exist" by the holding company rather than Milwaukee Gas Light.[87]

**RESPONSE:**  Undisputed that the referenced document contains the referenced quotes.

85.     With the approval of both the Wisconsin Public Service Commission and the SEC, Milwaukee Gas Light transferred of all the common stock of Milwaukee Solvay Coke back to American Natural Gas through a series of dividends paid in stock of Milwaukee Solvay Coke Company, resulting "in the disposal by Milwaukee Gas Light of its entire interest in [Milwaukee Solvay Coke Company]."[88]

**RESPONSE:**  Undisputed.

86.     By paying dividends in stock rather than cash, Milwaukee Gas Light was able "to retain cash equal to its investment in the stock of Solvay" and thereby "conserve cash to finance its construction program."[89]

**RESPONSE:**  Undisputed.

---

[86] *Id.* at 517, 1954 SEC LEXIS 616, at *3.

[87] Ex. C-9, American Natural Gas Board of Directors Minutes, Oct. 27, 1954, at ANRC-00005276.

[88] Milwaukee Gas Light 1955 Annual Report, at 10, WG-ANR-00048359 (included in Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962); *Am. Natural Gas Co.*, S.E.C. Release No. 35-12746, 1954 WL 5317 (Dec. 16, 1954); *In re App. of Milwaukee Gas Light Co.*, No. 2-U-4346, 39 Wis. Pub. Serv. Comm'n Rep. 570, 572-73 (Dec. 21, 1954), *at* https://www.google.com/books/edition/_/Hy5SAAAAMAAJ?hl=en&gbpv=1.

[89] *See Am. Natural Gas Co.*, S.E.C. Release No. 35-12746, 1954 WL 5317, at *1 (Dec. 16, 1954); Milwaukee Gas Light 1955 Annual Report, at 5, WG-ANR-00048354 (included in Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962).

87.     Milwaukee Gas Light Company completed the transfer of Milwaukee Solvay Coke Company's stock to American Natural Gas in March 1956, returning Milwaukee Solvay Coke to its status as a first-tier subsidiary of American Natural Gas.[90]

**RESPONSE:**  Undisputed.

88.     As indicated in a manuscript article prepared in or around 1958, Milwaukee Solvay Coke Company was operating around the clock and had 514 active employees, 103 of whom had been with the company for at least 25 years.[91]

**RESPONSE:**  Undisputed.

89.     Nevertheless, each year from 1956 through 1958, Milwaukee Solvay Coke Company experienced a decrease in earnings resulting from declining coke sales.[92]

**RESPONSE:**  Disputed in that the assertions in paragraph 89 characterize the underlying causes of declining revenues.  *See, e.g.,* Ex. 23, 1958 ANGC Annual Report, WG-ANR-00011899(911-12) (noting the coke business "is very cyclical and the company suffered from the poor business conditions prevailing, particularly in the steel industry, during much of 1958. A substantial profit was shown in the last three months of the year and continuation of the improved economic conditions will assure profitable operations in 1959.").

90.     In 1959, American Natural Gas commissioned a study by an independent consultant to evaluate "(a) if the [Milwaukee Solvay] Coke Company is being operated most effectively and (b) the most desirable arrangements for the future between the [Milwaukee Solvay] Coke Company and [Milwaukee Gas Light], both until the termination of the Coke Oven Gas Contract in 1960, and thereafter."[93]

**RESPONSE:**  Undisputed.

91.     The ensuing Report on the Operations of Milwaukee Solvay Coke Company, by Chas. R. Hetherington & Co. Ltd. (the "Hetherington Report"), observed that Milwaukee Solvay Coke's "supervisory personnel at the plant are capable and experienced men doing a

---

[90] *See* Milwaukee Gas Light 1955 Annual Report at 10, WG-ANR-00048359 (included in Ex. A-12, Excerpts of Milwaukee Gas Light Annual Reports from 1939 to 1962).

[91] Ex. A-26, Manuscript from Henry T. Garvey of Milwaukee Gas Light to Fred H. McIntire, *Milwaukee Solvay Coke Company,* dated July 1957, at WG-ANR-00011385.

[92] *See* Ex. C-6, Excerpts of American Light & Traction/American Natural Gas Annual Reports from 1928 to 1962 (1956 Annual Report, at 13; 1957 Annual Report, at 13; and 1958 Annual Report, at 12).

[93] Ex. A-27, Letter from Chas. R. Hetherington & Co. Ltd. to American Natural Gas Co., July 10, 1959, at 1 (WG-ANR-00006870) and attached Report on the Operations of Milwaukee Solvay Coke Company, June 1, 1959, at 2 (WG-ANR-00006881).

creatable job."[94]

**RESPONSE:** Disputed. The Hetherington Report observed "operating decisions have been generally sound" but noted significant exceptions, including "the commitment to supply a minimum of 60,000 therms per day of coke oven gas for use by the Sewerage Commission and the continuation of the firing of natural gas and solid fuels instead of low cost coke oven gas." Ex. 19, Letter from Hetherington outlining conclusions and recommendations from study of Coke Company requested by ANG, June 10, 1959, WG-ANR-00006870(6871). *See also* Ex. 24, Hetherington Report on the Operations of Milwaukee Solvay Coke Company, June 1959, WG-ANR-00006876(910-11) (noting a deferral of "a substantial amount of capital" and the negative impact deferred maintenance could have on the operations of the plant in the future.).

92.    The Hetherington Report also stated that Milwaukee Solvay Coke Company's "operating management is giving careful attention to [the] equipment but is limiting repairs to a necessary minimum." In that regard, the report noted that "if operation is to be continued for more than a few years an additional expenditure in excess of the amount planned to be spent for maintenance must be made. An additional … $250,000 annually is estimated to be required…."[95]

**RESPONSE:** Disputed to the extent it is contended that the "operating management" referred to the Coke Company's operating management, as opposed to ANG's.

93.    The Hetherington Report further indicated, however, that the coke plant could realize cost savings, estimated at up to $183,000 each year, by using as much of its coke-oven gas as possible for its own operations, instead of continuing to purchase natural gas or solid fuels, to fire the coke ovens at the plant.[96]

**RESPONSE:** Undisputed.

94.    The cost to Milwaukee Solvay Coke Company of maintaining standby service for Milwaukee Gas Light under the Coke Oven Gas Contract amounted to an additional expense of $32,000 that otherwise could be avoided each year, the Hetherington Report noted.[97]

---

[94] *Id.* at 22, WG-ANR-00006901.

[95] *Id.* at 33, WG-ANR-00006912.

[96] *Id.* at 29, WG-ANR-00006908.

[97] *Id.* at 18, WG-ANR-00006897.

**RESPONSE:** Disputed, in that the cited Hetherington Report notes that the cost was $32,500.

95. Regardless, the Hetherington Report suggested that "the loss in revenue to the Coke Company" of continuing to sell coke-oven gas to Milwaukee Gas Light for the remaining 18-month term of the Coke Oven Gas Contract "represents a gain in revenue to the Gas Company," so that "there is no net effect upon the American Natural System ...."[98]

**RESPONSE:** Undisputed.

96. Further, because there was a net benefit to Milwaukee Solvay Coke Company from the annual standby fee it received from Milwaukee Gas Light, the Hetherington Report concluded that "the [Milwaukee Solvay] Coke Company and the American Natural system will benefit during the next 18 months by keeping the Coke Oven Gas Contract in effect, until it expires."[99]

**RESPONSE:** Undisputed.

97. Milwaukee Gas Light Company and Milwaukee Solvay Coke Company nevertheless mutually agreed in 1959—before the end of the contract's term—to relieve Milwaukee Solvay Coke of any further obligation to sell gas to Milwaukee Gas Light for resale to the Sewerage Commission.[100]

**RESPONSE:** Undisputed.

98. In the early 1960s, Milwaukee Solvay Coke Company made various plant improvements including the replacement of 120 feet of fuel-gas main, the reconditioning of a tank used to "quench" coke with water upon its removal from the ovens, and improvements to bins and screens used to sort coke.[101]

**RESPONSE:** Disputed. The cited exhibits do not support that the Coke Company itself "made various plant improvements" related to the referenced construction projects, nor do they indicate who approved the projects or the budgets for them. Responding further, ANR's corporate representative was unable to conclude which entities made or approved improvements (or their

---

[98] *Id.* at 36, WG-ANR-00006916.

[99] *Id.*

[100] Ex. C-14, Letter from Carl Claussen to J. Russell Forgan, July 8, 1960, at 1 (ANRC-00008528) ("In 1959, by mutual consent of the Milwaukee companies, the contract under which Milwaukee Gas purchased Milwaukee Coke Company's coke oven gas was terminated...."); *id.* at 3 (ANRC-00008530) (describing operational changes by Milwaukee Solvay Coke in 1959 that were "made possible through cancellation of the contract with Milwaukee Gas Light Company under which the latter purchased the Coke Company's coke oven gas for resale to the Sewerage Commission of Milwaukee").

[101] Ex. A-15, Excerpts of various Milwaukee Solvay Coke Co. employee newsletters produced by Wisconsin Gas (*Fuel Gas Main Replaced*, MILWAUKEE SOLVAY NEWS, Mar.-Apr. 1960, at 4, WG-ANR-00004918; *Construction Work*, MILWAUKEE SOLVAY NEWS, July-Aug. 1960, at 3, WG-ANR-00004920).

budgets) at the coke plant during various points in ANR's ownership of the Coke Company. *See* Ex. 115, ANR 30(b)(6) Tr. at 70:16-71:6; 75:3-8; 111:4-11; 113:19-23; 121:20-122:1; 130:12-18.

99.     Because Milwaukee Solvay Coke Company no longer sold any gas to Milwaukee Gas Light Company and the standby arrangement between them terminated in 1959, American Natural Gas considered it "very possible that if the [SEC] reopened this matter, it would no longer find the operations of the Coke Company to be economically necessary to the utility business of Milwaukee Gas Light Company, in which case a divestment would presumably be required under … Section 11" of the Public Utilities Holding Company Act.[102]

**RESPONSE:**  Undisputed.

100.     American Natural Gas Company therefore evaluated the possibility of selling Milwaukee Solvay Coke Company, concluding that "[i]f a prospective buyer is willing to purchase the stock of Solvay, this would be the simplest transaction.  If the buyer will buy only assets, then a resolution to liquidate should be adopted and the sale and liquidation completed within one year."[103]

**RESPONSE:**  Disputed insofar as paragraph 100 neglects to include the fact that ANG proposed withdrawing millions of dollars from the Coke Company prior to selling its remaining assets to a third-party purchaser. Ex. 73, Service Company inter-office memo regarding proposed sale of Coke Company, June 3, 1960, ANRC-00008533(534); Ex. 74, Service Company inter-office memo regarding meeting with Pickands Mather about their proposed purchase of Coke Company, November 27, 1961, ANRC-00008502(506).

101.     By agreement dated June 1, 1962, Milwaukee Solvay Coke Company sold its business and substantially all of its assets, including the Site, to Wisconsin Coke Company, Inc. ("Wisconsin Coke"), a newly formed subsidiary of Pickands Mather & Co.[104]

---

[102] Ex. C-15, American Natural Gas Service Co. Interoffice Memorandum Re Milwaukee Solvay Coke Company—Application of Public Utility Holding Company Act to Proposed Disposition of American Natural's Interest, July 12, 1961, at 2 (ANRC-00008515).

[103] Ex. C-16, American Natural Gas Service Co. Interoffice Memorandum Re Possible Sale of Milwaukee Solvay Coke Company, Aug. 18, 1960, at ANRC-00008522; *see also* Ex. C-14, Letter from Carl Claussen to J. Russell Forgan, July 8, 1960, at ANRC-00008528-29 ("Because of the possibility that the [SEC] might sometime in the future rule that American Natural should dispose of the Coke Company, … American Natural is giving consideration to the desirability of selling the Coke Company.").

[104] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, Oct. 29, 2004, at WG-ANR-00046080; Ex. C-17, Purchase Agreement between Wisconsin Coke Company, Inc. and

**RESPONSE:** Undisputed.

102.     Wisconsin Coke agreed to buy all of Milwaukee Solvay Coke Company's assets, excluding cash, stocks, bonds and other securities, prepaid expenses, claims for tax refunds and claims for utility rebates for services incurred before June 1, 1962.[105]

**RESPONSE:** Undisputed.

103.     Following the June 1, 1962 consummation of the sale, Wisconsin Coke promptly filed the necessary documents with the Wisconsin Secretary of State to change its name to Milwaukee Solvay Coke Company, Inc. and continued operations at the Site without interruption.[106]

**RESPONSE:** Undisputed.

104.     The former Milwaukee Solvay Coke Company changed its name to MSC Corporation ("MSC") and ceased to have any employees or operations after June 1, 1962.[107]

**RESPONSE:** Undisputed.

105.     On June 20, 1962, the chairman of American Natural Gas reported that, in light of the sale, MSC "should be liquidated and dissolved as soon as the necessary legal steps can be taken."[108]

**RESPONSE:** Undisputed.

106.     By resolution that same day, the directors of American Natural Gas authorized the company's officers to take all necessary steps toward liquidation of MSC Corporation and "to agree to the assumption by the Company of any outstanding liabilities of MSC Corporation not otherwise provided for[.]"[109]

**RESPONSE:** Undisputed.

---

Milwaukee Solvay Coke Company, June 1, 1962; *see also* Ex. C-18, Letter from MSC Corporation to Wisconsin Industrial Comm'n, Sept. 7, 1962.

[105] *See* Ex. C-17, Purchase Agreement between Wisconsin Coke Company, Inc. and Milwaukee Solvay Coke Company, June 1, 1962, at 1-2.

[106] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, Oct. 29, 2004, at WG-ANR-00046080; Ex, A-28, Certificate of Amendment of Articles of Incorporation of Wisconsin Coke, filed June 19, 1962; Ex. A-29, The Milwaukee Solvay Coke Company, Inc. 1962 Annual Report at 1, WG-ANR-00007146; Ex. C-19, Letter from Milwaukee Solvay Coke Company to Milwaukee Water Works, May 24, 1962.

[107] Ex. A-1, Response of Wisconsin Electric Power Company and Wisconsin Gas to U.S. EPA Information Request, Oct. 29, 2004, at WG-ANR-00046080; Ex. C-20, Milwaukee Solvay Coke Company, Minutes of Special Meeting of Board of Directors, June 1, 1962; Ex. C-21, Letter from MSC Corporation to Herny J. Gmeinder, Wisconsin Industrial Commissioner, June 18, 1962.

[108] *See* Ex. C-22, American Natural Gas, Minutes of Regular Meeting of Board of Directors, June 20, 1962, at ANRC-00005913.

[109] *Id.*

107.    In September 1962, the directors of American Natural Gas again met and authorized the President or any Vice President of American Natural Gas to execute written consents that may be required of the sole shareholder of MSC under the Wisconsin Business Corporations Law (Wis. Stat., Title XVII, ch. 180) to authorize "the complete liquidation, dissolution and termination of the corporate existence of MSC."[110]

**RESPONSE:**  Undisputed.

108.    On November 2, 1962, the SEC issued an order approving the planned liquidation of MSC.  The SEC order recited that:

> MSC, whose assets consist substantially of cash and cash items, … proposes to reacquire all of its outstanding stock … in exchange for its assets and then dissolve.  American Natural, as sole stockholder of MSC, proposes to surrender the common stock in exchange for MSC's assets subject to its liabilities as of the date of dissolution.[111]

**RESPONSE:**  Undisputed.

109.    MSC filed a statement of intent to dissolve with the Wisconsin Secretary of State on November 27, 1962.[112]

**RESPONSE:**  Undisputed.

110.    A copy of the statement of intent, as certified by the Wisconsin Secretary of State, was duly recorded in the office of the Milwaukee County Register of Deeds on December 3, 1962.[113]

**RESPONSE:**  Undisputed.

111.    On December 27, 1962, the officers of MSC executed Articles of Dissolution that were filed with, and accepted by, the Wisconsin Secretary of State the following day.[114]

**RESPONSE:**  Undisputed.

112.    A certified copy of MSC's Articles of Dissolution was duly recorded in the

---

[110] Ex. C-23, American Natural Gas, Minutes of Regular Meeting of Board of Directors, Sept. 19, 1962, at ANRC-00005933.

[111] *In re Am. Natural Gas Co.,* Public Utility Holding Company Act Release No. 14737, 1962 SEC LEXIS 1073, at *2-3 (Nov. 2, 1962).

[112] Ex. C-24, Statement of Intent to Dissolve, certified as filed with the Wisconsin Secretary of State, Nov. 27, 1962 (ANRC-00007650-52).

[113] *Id.*; *see also* Ex. C-25, Statement of Intent to Dissolve, certified as received and accepted by the Milwaukee County Register of Deeds, Dec. 3, 1962 (ANRC-00001931-34).

[114] Ex. C-26, Articles of Dissolution, Dec. 27, 1962 (ANRC-00007654).

Milwaukee County Register of Deeds office on December 31, 1962.[115]

**RESPONSE:** Undisputed.

113. As stated in MSC's Articles of Dissolution, "[a]ll debts, obligations and liabilities of [MSC] have been paid and discharged" and "[a]dequate provision has been made for all debts, obligations and liabilities, contingent in nature, of which the corporation has actual knowledge."[116]

**RESPONSE:** Undisputed.

114. On the same day MSC's officers signed the Articles of Dissolution, MSC and American Natural Gas executed an instrument titled Transfer of Assets in Liquidation, providing for the complete liquidation of MSC's remaining assets to its sole shareholder, American Natural Gas.[117]

**RESPONSE:** Undisputed.

115. The Transfer of Assets in Liquidation recited that "all debts, obligations and liabilities of MSC of which MSC has knowledge have been paid and discharged" and provided for American Natural Gas "to pay on behalf of MSC any and all debts, obligations, and liabilities of MSC which may hereafter be established, including, but not in limitation of the generality of the foregoing, any liabilities which may be established under the Wisconsin Workmen's Compensation Act[.]"[118]

**RESPONSE:** Disputed. The pertinent passage from paragraph no. 2 of the Transfer of Assets in

Liquidation reads as follows:

> American Natural hereby assumes and agrees to pay on behalf of MSC any and all debts, obligations and liabilities of MSC which may hereafter be established, including, but not in limitation of the generality of the foregoing, any liabilities which may be established under the Wisconsin Workmen's Compensation Act; provided, however, that the aggregate amount of debts, obligations and liabilities assumed by American Natural under this paragraph 2 shall not exceed the value of the assets transferred by MSC to American Natural under paragraph 1 hereof.

Ex. 48, Transfer of Assets in Liquidation of MSC Corporation, December 27, 1962, ANRC-00007688.

116. The Transfer of Assets in Liquidation further provided that "the aggregate amount

---

[115] *Id.*

[116] *Id.*

[117] Ex. C-27, Transfer of Assets in Liquidation between MSC Corporation and American Natural Gas Company, Dec. 27, 1962.

[118] *Id.*

of debts, obligation and liabilities assumed by American Natural … shall not exceed the value of the assets transferred" in liquidation of MSC.[119]

**RESPONSE:** Undisputed.

117.    MSC's assets at the time of liquidation consisted of cash, including the proceeds from its sale of all of Milwaukee Solvay Coke Company's operating assets and business to Wisconsin Coke, as well as other cash items and accounts receivable.[120]

**RESPONSE:** Undisputed that ANG received the referenced assets and "assumed and agreed to pay any and all debts, obligations and liabilities of MSC which may hereafter be established, subject to the limitation that the aggregate amount of debts, obligations and liabilities assumed ...shall not exceed the value of the assets transferred by MSC to American Natural." Ex. 75, Letter to SEC regarding apportionment of federal income tax liability of ANG affiliate groups, December 31, 1962, ANRC-00007818.

118.    In a close-out letter to the SEC dated December 31, 1962, American Natural Gas and its subsidiaries, including MSC and Milwaukee Gas Light, reported that

> MSC … has paid all of its known debts, obligations and liabilities and transferred all if its assets, consisting of cash and accounts receivable … to American Natural Gas … as a distribution in complete liquidation of MSC.… MSC has been dissolved. American Natural has added the proceeds received upon the liquidation of MSC to the treasury funds of American Natural, and American Natural's investment in MSC has been closed out.[121]

**RESPONSE:** Undisputed.

119.    The two-year window under Wisconsin law in which the dissolved MSC and its shareholders may be sued for the company's debts, obligations, and liabilities closed in 1964.[122]

**RESPONSE:** Disputed. Wisconsin Gas objects to this paragraph as impermissibly stating a legal conclusion, not a statement of uncontroverted fact.

---

[119] *Id.*

[120] Ex. A-30, Letter to the SEC, *In re Am. Natural Gas Co.,* File No. 70-4064, Dec. 31, 1962 (WG-ANR- 00031282).

[121] *Id.*

[122] *See* Wis. Stat. § 180.787 (1961) (renumbered, as amended, as Wis. Stat. § 180.1407, effective Jan. 1, 1991).  A copy of the Wisconsin Business Corporations Law, Wis. Stat., Title XVII, ch. 180, as it existed at the time of MSC's dissolution is included as Exhibit D hereto.

120.    CERCLA was enacted in 1980, some 18 years after the dissolution of MSC.[123]

**RESPONSE:** Undisputed.

---

[123] *See* Comprehensive Environmental Response, Compensation and Liability Act of 1980, Pub. L. No. 96- 510 (showing CERCLA's enactment in 1980).

## PLAINTIFF WISCONSIN GAS LLC'S
## <u>COUNTER-STATEMENT OF PROPOSED MATERIAL FACTS</u>

In accordance with Civ. L.R. 56(b)(2)(B)(ii), Plaintiff Wisconsin Gas LLC ("Wisconsin Gas"), by and through its undersigned attorneys, respectfully submits the following Counter-Statement of Proposed Material Facts in Support of its Opposition to ANR's Motion for Summary Judgment:

P1.    The Milwaukee Coke and Gas Company (later named the Milwaukee Solvay Coke Company and then MSC Corporation, and collectively referred to herein as, "the Coke Company") was Milwaukee Gas Light Company's ("MGL") sole outside supplier of manufactured gas. Ex. 8, Wisconsin Gas Response to USEPA 104(e) information request on Solvay Site, WG-ANR-00046079.

P2.    After its organization in 1901, ALT became the majority owner and holder of the stock of Western Gas Company, which was the owner of the entire capital stock of MGL. Ex. 76, ALT Director's Meeting minutes, June 11, 1901, ANRC-00003215(219-20); Ex. 77, ALT Executive Committee Meeting minutes, February 10, 1902, ANRC-00003239(241).

P3.    The byproduct coke plant at the Solvay Site began operating in 1904. Ex. 21, We Energies History of the Milwaukee Solvay Coke Company, WG-ANR-00046300.

P4.    ALT purchased the Coke Company in 1928, in order to consolidate the "operation of the two properties [i.e., MGL and the Coke Company] under the same management." Ex. 78, ALT Memorandum in *Helfman v. American Light & Traction Co.*, WG-ANR-00005534(605).

P5.    In 1928, ALT also informed its shareholders that "[f]or over twenty years the Milwaukee Gas Light Company had purchased a large part of its gas requirements from the Milwaukee Coke & Gas Company. This contract will soon expire. The management of American Light & Traction Company believed that in the operation of its Milwaukee properties it was

economically sound the for the Gas Company to own its own gas manufacturing plant." Ex. 46, 1928 ALT Annual Report, ANRC-00000108(114). *See also* Ex. 115, ANR 30(b)(6) Tr. at 55:17-20 ("what this says is that they believed it was economically sound to own this company.").

P6.     In its Answer to the Complaint in a shareholder derivative lawsuit brought against it by Harry Helfman, ALT stated the following:

> [T]his defendant says that under all the circumstances the purchase of the Milwaukee Coke & Gas Company stock by this defendant as a factor of the Transaction of 1928, was not only advisable but highly beneficial to this defendant and to its subsidiary said Milwaukee Gas Light Company in that this defendant and said subsidiary thereafter owned and controlled said subsidiary's sources of gas supply and such supply was no longer dependent upon the business judgement of others or their financial difficulties, and was no longer dependent upon a contract for a long period of years at a fixed price, with the dangers incident thereto.

Ex. 79, Answer of ALT in *Helfman v. American Light & Traction Co.*, WG-ANR-00005356(418). *See also* Ex. 25, Answer of ALT in *Helfman v. American Light & Traction Co.*, WG-ANR-00078028(085) and Ex. 26, Answer of ALT in *Helfman v. American Light & Traction Co.*, WG-ANR-00078161(221).

P7.     ALT also stated in its Answer to the *Helfman* complaint that "the desirability of the purchase, ownership and operation of a merchant coke plant by a gas manufacturing and distributing utility is a matter of business judgement" and that "the purchase of the stock of Milwaukee Coke & Gas Company by this defendant was to its great advantage and has resulted in a very considerable financial gain to it, and alleges the fact to be that the subsequent operation of said Milwaukee Coke & Gas Company has more than justified the purchase thereof[.]" *Id.* at 414, 419.

P8.     In 1928, shortly after purchasing the Coke Company, ALT represented to shareholders that "[w]e took over the operation of the Milwaukee Coke & Gas Company in August and its business has prospered, even better than we expected, during the time that its operation has been in our hands." Ex. 46, 1928 ALT Annual Report, ANRC-00000108(111).

P9.     After ALT acquired the Coke Company in 1928, it invested in production equipment at the Coke Company plant including, among other things, $781,277 (equivalent to approximately $13.6 million in 2023 dollars[124]) for a producer plant, which allowed more of the coke oven gas to be sent to MGL. Ex. 20, document detailing Acquisition of Coke Company by ALT and Additional Investments, WG-ANR-00036272; Declaration of Vandeven, Ex. A, ("Vandeven Report"), at Section 5.3.

P10.     In 1929, ALT approved a construction budget of $992,100 (equivalent to approximately $17.3 million in 2023 dollars)[125] for the Coke Company. Ex. 80, ALT Executive Committee regular meeting minutes, February 5, 1929, ANRC-00003581(583); Ex. 115, ANR 30(b)(6) Tr. at 69:3-18.

P11.     "Milwaukee Solvay's plant was designed from the beginning to be an integral part of the Gas Light Company's gas supply," as was acknowledged years later in a March 1953 submission to the SEC, by ALT (which by that time had changed its name to American Natural Gas Company, or "ANG"). Ex. 27, ANG's Brief before the SEC in the matter of United Light & Railways, American Light & Traction, File Nos. 59-11, 59-17, and 54-25, WG-ANR-00006338(368-69).

P12.     At the ALT Executive Committee meeting in 1929, "[t]he [ALT] President advised the Committee of the necessity of Plant Additions or Betterments" and estimated the costs of $650,000 [equivalent to approximately $11.3 million in 2023 dollars[126]] in Milwaukee for a 6,000,000 Cu.Ft. holder & connections. Ex. 81, ALT Executive Committee special meeting minutes, October 1, 1929, ANRC-00003587(588). *See also* Ex. 61, 1929 ALT Annual Report,

---

[124] https://www.in2013dollars.com/us/inflation/1928?amount=781277
[125] https://www.in2013dollars.com/us/inflation/1929?amount=992100
[126] https://www.in2013dollars.com/us/inflation/1929?amount=650000

ANRC-00000171(173) ("With the growth of demand and the increase in coke oven gas available at Milwaukee, our holder capacity is somewhat short. To correct this, we are building a six million cubic foot storage holder to be in service in the Fall of 1930.").

P13. ALT informed its shareholders in 1929 that "[t]he new producers at the Milwaukee Coke & Gas Plant went into operation in June, and have functioned perfectly, greatly increasing our output of gas from that source." *Id*.

P14. In or around 1928, ALT moved its "operating offices" for all its operating plants to a centralized location in Chicago. Ex. 46, 1928 ALT Annual Report, ANRC-00000108(115).

P15. ALT publicly touted the benefits of overseeing the operations of all the subsidiary operations from a central location, noting that "[t]he anticipated advantages and conveniences of the location at Chicago of the operating offices have been fully experienced." Ex. 61, 1929 ALT Annual Report, ANRC-00000171(174).

P16. ALT Directors and Executive Committee members—with no corresponding formal roles with the Coke Company—"reported on matters pertaining to the operation of ….The Milwaukee Coke & Gas Company" *See* Ex. 82, ALT Board of Directors regular meeting minutes, June 2, 1939, ANRC-00004126(130); Ex. 83, ALT Executive Committee meeting minutes, September 7, 1939, ANRC-00004134(137); Ex. 84, ALT Board of Directors regular meeting minutes, December 22, 1943, ANRC-00004341(345); Ex. 85, ALT Board of Director special meeting minutes, April 25, 1944, ANRC-00004368(371) (noting that after stopping shipment of coke to another company on unfavorable terms, "subsequent operations of the [the Coke Company] should show an improvement.").

P17. At other times, the ALT Board of Directors discussed "the operations of the Milwaukee Coke & Gas Company" even though there were no Coke Company directors or

officers present. Ex. 86, ALT Board of Directors regular meeting minutes, December 8, 1941, ANRC-00004228(229).

P18.    In 1930, the construction budget for the "Milwaukee District" – which included both MGL and the Coke Company – was the largest of any other ALT market. Ex. 87, ALT Executive Committee regular meeting minutes, January 7, 1930, ANRC-00003589(590).

P19.    ALT also approved a significant construction budget of $152,260 [nearly $3 million in 2023 dollars][127] for the Coke Company in 1931. Ex. 88, ALT Executive Committee special meeting minutes, February 20, 1931, ANRC-00003591(592).

P20.    ALT's SEC filings detailed over $3 million of direct investments by ALT in coke plant equipment additions for the Coke Company between 1928 and 1952. Ex. 28, Detailed investments by ALT and MGL, WG-ANR-00032282.

P21.    ANG financed its subsidiaries' capital investments by increasing its own outstanding common stock, which it then invested in the common stock of its subsidiaries, purchasing shares in amounts equal to new construction loans taken out by the subsidiaries. *See*, *e.g.*, Ex. 29, 1948 ANG Annual Report, WG-ANR-00011675(685-86) (describing this strategy).

P22.    ANG also raised capital funds by causing the subsidiaries (described as "operating units") to issue senior securities. *See*, *e.g.*, Ex. 30, 1953 ANG Annual Report, WG-ANR-00011772(776-77).

P23.    At least as early as 1933, ALT's Executive Committee also began making unsolicited operating "recommendations" to the Coke Company, which the Coke Company then routinely followed. For instance, on February 28, 1933, ALT's Executive Committee "recommended" that the Coke Company invest $350,000 in government securities, and the Coke

---

[127] https://www.in2013dollars.com/us/inflation/1931?amount=152260

Company did so the following month. *See* Ex. 89, ALT Executive Committee meeting minutes, February 28, 1933, ANRC-00003673; Ex. 90, Executive Committee special meeting minutes, March 28, 1933, ANRC-00003684(686); Ex. 115, ANR 30(b)(6) Tr. at 189:4-8; Ex. 70, Service Company Board of Directors regular meeting minutes, March 20, 1958, ANRC-00011201(202-03) (noting that after ANG's board of directors "adopted a resolution approving the adoption of employees' savings plans by other American Natural Gas system companies," "subsequently, the boards of directors of several of such companies adopted resolutions authorizing their officers to formulate employees' savings plans along the lines authorized by the board of directors of [ANG].").

P24. On August 25, 1935, President Franklin D. Roosevelt signed into law the Public Utility Holding Company Act of 1935 (the "Holding Company Act"), which gave the Securities and Exchange Commission authority to "provide for control and regulation of public-utility holding companies." *See* 15 U.S.C. 79 (repealed), available at https://www.sec.gov/about/laws/puhca35.pdf.

P25. At the time of the passage of the Holding Company Act, ALT was itself a subsidiary of The United Light and Railways Company, which was itself a subsidiary of the The United Light and Power Company (together, "ULP"). *See In the Matter of the United Light & Power Co.*, 13 S.E.C. 1 (Apr. 5, 1943).

P26. In or around 1936, shortly after the passage of the Holding Company Act, in response to a Special Senate Committee questionnaire (the "Questionnaire"), ALT responded that "'[s]ervicing' operations of companies in Group C" – which included the Coke Company – "are performed by the staffs of the respective companies in this group, *and by the staff of [ALT].*" Ex. 6, response of ALT to a Questionnaire from the Special Senate Committee

appointed to Investigate Lobbying Activities in 1935, WG-ANR-00074249(251, 254) (emphasis added). *See also* Ex. 115, ANR 30(b)(6) at 78:16-25.

P27.    ALT's Questionnaire response to the Special Senate Committee also stated that ALT's subsidiary companies provided their own operating services only "in part," and that other services – including "engineering, accountant, financial, legal, purchasing, insurance and matters in connection with taxes….are rendered to all companies in Group C [which includes the Coke Company] by the staff of the respondent [i.e., ALT]." Ex. 6, response of ALT to a Questionnaire from the Special Senate Committee appointed to Investigate Lobbying Activities in 1935, WG-ANR-00074249(258-59). *See also* Ex. 115, ANR 30(b)(6) Tr. at 83:18-21.

P28.    ALT's Questionnaire response to the Special Senate Committee also stated that the Coke Company and other subsidiaries of ALT received services from ALT's staff "without compensation of any sort to respondent or to any member of respondent's staff," and "without contract or understanding…." Ex. 6, response of ALT to a Questionnaire from the Special Senate Committee appointed to Investigate Lobbying Activities in 1935, WG-ANR-00074249(264). Rather, such services "are performed because of respondent's ownership of all or substantially all of the voting stock of such company…." *Id*.

P29.    Due to the requirements of the newly passed Holding Company Act, ALT needed to secure SEC approval of a service company to providing the services to its operating subsidiaries that ALT had been providing directly to those subsidiaries, as described in part in response to the Questionnaire. Ex. 31, Oral Argument Transcript for proceeding before SEC in matter of *Milwaukee Gas Light* Company, Docket No. 70-3692, WG-ANR-00052417(424). *See also* Ex. 115, ANR 30(b)(6) Tr. at 89:2-11 (noting the Holding Company Act "affected the companies that the parent could own and then it affects interactions among those companies.").

P30.    In order to comply with the Holding Company Act, in 1938, a service agreement was made and entered into between another ULP subsidiary and ALT affiliate, The United Light and Power Service Company, later referred to by ANG as The United Light and Railways Service Company" (together, "the ULP Service Company"), and ALT's subsidiaries, including the Coke Company. Ex. 32, Vol. X of the Meeting Minutes of Milwaukee Gas Light Company, WG-ANR-00082743(785-98). *See also* Ex. 33, ANG's SEC Form U-13-1 Declaration with Respect to Organization and Conduct of Business Subsidiary Service Company, November 4, 1949, WG-ANR-00006020 (noting that The United Light and Railways Service Company "has performed services at cost for [ANG] and its subsidiaries since 1938").

P31.    The ULP Service Company "developed and maintains a complete organization for the rendition of various types of managerial, *operating*, financial, accounting, purchasing, valuation, *engineering*, contracting, *construction* and other services . . . the Service Company proposes to render such services to various companies in The United Light and Power Company system at the cost to it of rendering such services[.]" *Id.*at 785 (emphasis added).

P32.    The ULP Service Company "performed services for [ALT] and its subsidiaries and received reimbursement therefor with respect to the year 1940 in the aggregate amount of $232,248," which included services for "engineering, accounting, valuation, purchasing, etc." Ex. 91, ALT Board of Directors special meeting minutes, February 19, 1941, ANRC-00004194(197-98).

P33.    On September 27, 1940, ALT's Board of Directors appointed a committee – composed of ALT employees – to examine the "natural gas situation in Wisconsin and to formulate a plan which will be later submitted to and reviewed by this Board." Ex. 92, ALT Board of Directors regular meeting minutes, September 27, 1940, ANRC-00004157(63).

P34.    On July 13, 1943, ALT's Board of Directors discussed the "labor situation" at the Coke Company as well as coal and coke prices, although no Coke Company officers were present. Ex. 93, ALT Board of Directors special meeting minutes, July 13, 1943, ANRC-00004318(321).

P35.    In ALT's 1945 SEC Application to permit it to sell all shares of the Coke Company to MGL, ALT stated "[t]he operations of the two companies, under common control, have been closely integrated, to their mutual benefit. . . ." Ex. 52, SEC 21A Application of ALT, MGL, Coke Company, et al. regarding ALT liquidation, November 11, 1945, ANRC-00006776(780).

P36.    Immediately before MGL acquired the common stock of the Coke Company, the Coke Company paid ALT a $1.2 million cash dividend, a transaction that was "proposed" by ALT to the SEC as part of the transaction. Ex. 111, Article entitled "End of Hearing on Coke Deal: Stock Issue in Question," from *The Milwaukee Journal*, October 28, 1945, WG-ANR-00132818; Ex. 94, ALT Board of Directors special meeting minutes, October 10, 1945, ANRC-00004491(494).

P37.    On December 30, 1947, the SEC approved ALT's amended application requesting that ALT remain the parent company of an integrated gas system and continue to own MGL and the Coke Company. Ex. 95, ALT Board of Directors regular meeting minutes, December 10, 1947, ANRC-00004646(655).

P38.    In October 1947, ALT ordered the diversion of the entire supply of the Coke Company's coke production to its "company affiliates," in fact a misleading reference to the Inland Steel Company, which was forging the steel pipe for ALT's new interstate natural gas pipeline. Ex. 112, Article entitled "Bohn Blames Parent Firm for Coke Diversion," the

*Milwaukee Sentinel*, October 1, 1947, WG-ANR-00132834 (citing a letter from Coke Company to fuel dealers that coke was being diverted "because of the increased coke requirements of our affiliated companies"); *id.* (Milwaukee Mayor Bohm publicly commenting that his sources indicated the Coke Company "had no control over the situation" and that "its officers had to carry out the orders of 'their superiors and the absentee owners…'"). *See also* Ex. 113, Article entitled "Federal Probe of Coke Moves Asked by Bohn," *The Milwaukee Journal*, October 1, 1947, WG-ANR-00132836; Ex. 34, October 1947 *Milwaukee Solvay News*, WG-ANR-00031259(260).

P39.     In November 1947, ALT advanced $50,000 (approximately $665,464 in 2023 dollars)[128] to the Coke Company "on open account without interest for the purpose of financing a portion of that company's coal purchases and to maintain its working capital." Ex. 95, ALT Board of Directors regular meeting minutes, December 10, 1947, ANRC-00004646(648).

P40.     In early 1949, fourteen miles of steel pipe for ANG's new interstate natural gas pipeline was stored on the Coke Company's property during construction. Ex. 35, March 1949 *Milwaukee Solvay News*, WG-ANR-00031262(264).

P41.     Louis Kreuz – chemical engineer and assistant manager of operations of the Michigan Consolidated Gas Company in Detroit – inspected the Milwaukee Plant on March 17, 1949 and was then officially transferred by ANG from Michigan Consolidated to the Coke Company on May 1, 1949. *Id.*; Ex. 36, January 1950 *Milwaukee Solvay News*, WG-ANR-00004839.

P42.     In or around 1949, with the divestiture of ANG from the United Light and Power holding company system, ANG organized the American Natural Gas Service Company (the

---

[128] https://www.in2013dollars.com/us/inflation/1947?amount=50000

"Service Company"). Ex. 33, ANG's SEC Form U-13-1 Declaration with Respect to Organization and Conduct of Business Subsidiary Service Company, November 4, 1949, WG-ANR-00006020.

P43.    The purposes of the Service Company were "[t]o render advice, assistance and services to affiliated companies with respect to *all phases* of their proper corporate affairs, activities and functions." Ex. 55, Service Company First Meeting of Sole Incorporator and Stockholder meeting minutes, October 20, 1949, ANRC-00011092(095) (emphasis added).

P44.    In its 1949 application to the SEC, ANG stated that "[t]he Service Company contemplates a small, closely knit organization with a limited staff of experienced men" that "will not function on rigid departmental lines but will operate with flexibility on a coordinated and integrated basis so as to make available to the associate companies served the combined resources, knowledge and experience of the entire organization," and that "[i]n the interest of efficiency and economy, the Service Company proposes to provide services to the greatest extent possible through its own personnel, rather than by employment of independent persons." Ex. 33, ANG's SEC Form U-13-1 Declaration with Respect to Organization and Conduct of Business Subsidiary Service Company, November 4, 1949, WG-ANR-00006020(027).

P45.    ANR's application to the SEC regarding the Service Company also provided the following:

> Declarant will have a staff who, with but few exceptions, were formerly officers or principal personnel of either The United Light and Railways Service Company (which has performed services at cost for American Natural and its subsidiaries since 1938), American Natural, or its largest subsidiary, Michigan Consolidated. The officers and principal personnel have been performing services for companies within the integrated system for years and are thus thoroughly familiar with the operations, problems and affairs of the system companies.

*Id.* at 030.

P46.    The Service Company's 1949 declaration to the SEC states that it intended "to employ an Assistant Engineer to direct, under the immediate supervision of the Engineer, all engineering services provided to associate companies." *Id.* at 027.

P47.    The Service Company contract – which is identical with all the subsidiaries, *see* Ex. 37, MGL Board of Directors regular meeting minutes, November 20, 1939, WG-ANR-00011222(236-37) – identified the types of services that the Service Company would render, which included "check[ing] the results of operations," to [e]xamine and make tests at the factory, mines and elsewhere of fuel and other materials, equipment and supplies to be acquired by the Company for operating purposes," to "design, lay out and prepare engineering plans and specifications, bills of material and final cost estimates for any construction or reconstruction work required by the Company; make detailed engineering investigations and do other things necessary in connection with the design of the work," "and in general maintain close contact with the progress of any construction work for the purpose of securing the best results and maximum economy in the handling of such work." *Id*. at 226-28.

P48.    On November 3, 1949, MGL sent a letter to the Wisconsin Public Service Commission ("PSC") seeking approval for its proposed contract with the Service Company, stating in support that MGL "has had a similar arrangement with The United Light and Railways Service Company for more than ten years" under a contract approved by the PSC on October 25, 1939. Ex. 38, Letter to the WI Public Service Commission regarding approval of proposed contract between MGL and Service Company, November 3, 1949, WG-ANR-00036554(555).

P49.    In 1949, McElvenny testified to the SEC that the operations of ANG and its subsidiaries were integrated: "[w]e conceive of the operations of our system as if it were one large operating company…." Ex. 96, Transcript, Exhibits, and Findings and Opinion and Order

on Service Company's Application on Organization and Conduct of Company before SEC, ANRC-00010611(695). *See also* Ex. 115, ANR 30(b)(6) Tr. at 100:20-103:7 ("I think that's his statement – is that this is their philosophical conception.").

P50.    McElvenny also testified to the SEC that the various corporate entities within the system were mere formalities:

> While due to requirements of local law, it may be necessary for us to maintain the corporate entities with respect to the operating properties, which we now have, we believe in furtherance of the findings of the Commission on our integration case and in furtherance of our own beliefs as to the economies to be achieved by coordination in operation, we will from the operating viewpoint, be able to treat the enterprise as if it were in fact one large operating unit with the three departments to which I have referred.

*Id.*

P51.    McElvenny also testified that while the Service Company was being formed, ANR *itself* was providing services to the subsidiaries, in anticipation of turning them over to the new Service Company. *Id.* at 827.

P52.    In 1949, the chief engineer of the Service Company, T. Weigele, admitted in sworn testimony that the Coke Company and the Gas Light Company needed help from the engineers supplied by ANG. *Id.* at 706.

P53.    On May 31, 1950, a Proxy Statement furnished in connection with ANG's annual meeting of stockholders stated the following: "The services heretofore rendered to the Company and its subsidiaries by The United Light and Railways Service Company will hereafter be furnished by American Natural Gas Service Company." Ex. 97, Proxy Statement for Annual Meeting of Stockholders, May 31, 1950, ANRC-00004943(946).

P54.    The Coke Company was required to (and in fact did) submit its proposed annual budget to the Service Company for review. Ex. 56, Letter from Kreuz to McElvenny regarding operating budget, January 9, 1961, ANRC-00008520. *See also* Ex. 16, Transcript of hearing

before SEC in the matter of *Milwaukee Gas Light Company* on June 4, 1958, WG-ANR-00052302(320) ("Q: Do the individual subsidiary companies prepare their estimated budgets for the ensuing year and then submit them to the parent company officials? A: They prepare them and then they are reviewed by the heads of the individual companies, and then they are discussed with [Ralph McElvenny, President of ANG and the Service Company] and the associates in the service company.").

P55.    Services were in fact regularly provided by the Service Company directly to the Coke Company – including engineering services – without any corresponding evidence that the Coke Company requested such services. *See* Ex. 56, Letter from Kreuz to McElvenny regarding operating budget, January 9, 1961, ANRC-00008520 (operating budget for the Coke Company submitted to the Service Company President). *See also* various financial records showing service charges being charged to the Coke Company, including for engineering services – Ex. 57, Financial Statements of Service Company, year ending December 31, 1951, ANRC-00010463(470) (for the twelve months ending December 1951, the Service Company allocated to the Coke Company $346.87 [or nearly $4,000 in 2023 dollars[2]] for "engineering, new business and purchasing salaries."); Ex. 12, MGL Form 10-K Annual Report for fiscal year ending December 31, 1950, WG-ANR-00049839(845) (noting that in 1950, the Coke Company paid the Service Company $9,658 [or $118,940 in 2023 dollars[3]] for services provided); Ex. 13, MGL Form 10-K Annual Report for fiscal year ending December 31, 1952, WG-ANR-00006284(6289) (noting that in 1952, the Coke Company paid the Service Company $13,519 [or $151,411 in 2023 dollars[4]] for services provided); Ex. 14, MGL Form 10-K Annual Report for

---

[2] https://www.in2013dollars.com/us/inflation/1951?amount=346.87
[3] https://www.in2013dollars.com/us/inflation/1950?amount=9658
[4] https://www.in2013dollars.com/us/inflation/1952?amount=13519

fiscal year ending December 31, 1953, WG-ANR-00050135(140) (noting that in 1953, the Coke Company paid the Service Company $13,693 [or $152,211 in 2023 dollars[5]] for services provided); Ex. 15, MGL Form 10-K Annual Report for fiscal year ending December 31, 1954, WG-ANR-00049677(682) (noting that in 1954, the Coke Company paid the Service Company $10,653 [or $117,538.23 in 2023 dollars[6]] for services provided); Ex. 58, Coke Company Trial Balance Sheet, May 1962, ANRC-00008769(774) (noting $1217.74 [or $12,087 in 2023 dollars[7]] due to the Service Company in 1961); Ex. 59, Amendment No. 3 to Service Company's Application to SEC for Formation of Service Company, October 2, 1963, ANRC-00010492(496) (indicating that for the last 6 months of the Coke Company's existence, the amount charged to it for services provided by the Service Company totaled $9,131 [or $88,563 in 2023 dollars[8]]); Ex. 60, Service Company's Annual Report to SEC for period ending December 31, 1951, ANRC-00010551 (562 – noting $44,995.69 in engineering services provided to associate companies and 569 – noting charges to the Coke Company both for construction services overseen by the Service Company and other direct services provided).

P56. On February 6, 1951, a memorandum from the Defense Solid Fuels Administration noted that the Coke Company was a subsidiary of American Natural Gas Co. and that "Mr. Hugh C. Daly of American Natural Gas Co…represents Milwaukee-Solvay Coke Co. in Washington." Ex. 114, Hearings before the Committee on Interior and Insular Affairs on Defense Minerals Program held January 19, February 12 and 13, 1951, WG-ANR-00133427(437).

---

[5] https://www.in2013dollars.com/us/inflation/1953?amount=13693
[6] https://www.in2013dollars.com/us/inflation/1954?amount=10653
[7] https://www.in2013dollars.com/us/inflation/1961?amount=1217.74
[8] https://www.in2013dollars.com/us/inflation/1963?amount=9131

P57.    On February 8, 1951, Hugh Daly, Vice President and Assistant Secretary of the Service Company wrote to Leo Plein, the Chief of Finance Section, Solid Fuels Administration, Department of the Interior, advocating for the granting of the necessity certificate for the financing and construction of 20 additional coke ovens at the Coke Company plant, noting that the "general decrease in the domestic coke market and the availability of natural gas in large quantities in the immediate area supplied by the Milwaukee Solvay Coke Co. would make it unnecessary to construct the proposed additional ovens were it not for the industrial coke demands resulting from the defense mobilization program." *Id.* at 436. *See also* Ex. 98, Service Company Board of Directors regular meeting minutes, May 19, 1955, ANRC-00011140 (noting Daly's officer position in the Service Company).

P58.    ANG representatives often visited the Coke Company plant. For example, on June 14, 1951, "Mr. Allen and Mr. Baker of the American Natural Gas Company accompanied by Mr. Dixon of the Payroll Department" visited the Milwaukee Solvay Coke Company plant. Ex. 22, Log Book Notes, WG-ANR-00046252(255).

P59.    And on December 6, 1951, "Glenn R. Chamberlain, Pres. of Milwaukee Gas Light Co., Dudley C. Brown, Executive Vice President of Milwaukee Gas Light Co., and Wm. C. Woolfolk, Chairman of Michigan Consolidated Gas Co., were at the [Milwaukee Solvay Coke Company] plant to inspect the installation of the 20 new ovens." *Id*.

P60.    In the September 30, 1953 ANG Board of Directors meeting, the ANG Board discussed that Henry Fink – an experienced engineer and the then president of ANG and the Service Company – was also "the directing head of *all* engineering work and operations of the subsidiaries," though he held no officer position with the Coke Company. Ex. 99, ANG Board of Directors meeting minutes, September 30, 1953, ANRC-00005202(207) (emphasis added); Ex.

33, ANG's SEC Form U-13-1 Declaration with Respect to Organization and Conduct of Business Subsidiary Service Company, November 4, 1949, WG-ANR-00006020(027-28); Ex. 39, 1953 MGL Annual Report, WG-ANR-00048378(380).

P61.     Despite the fact that he was getting ready to retire from his positions as President of ANG and the Service Company, Fink agreed to stay on with ANG to "continue to supervise the affairs of…the Coke Company." Ex. 99, ANG Board of Directors meeting minutes, September 30, 1953, ANRC-00005202(207). *See also* Ex. 115, ANR 30(b)(6) Tr. at 161:2-162:9.

P62.     Erwin Brenner, the operating Vice President of MGL, admitted in sworn testimony to the SEC in November 1952 that the Coke Company needed to be retained [by MGL and ANG] because if it was allowed to operate independently of ANG, then it would "wish to conduct its operations so as to maximize the amount of money it could make…." Ex. 9, Transcript and Exhibits for hearing before SEC in the matter *United Light and Railway Company*, on November 24, 1952, WG-ANR-00073896(933). *See also* Ex. 10, MGL's Statement in Response to Request for Exhibit 92 in Docket 54-25, WG-ANR-00073750 (if ANG no longer controlled the Coke Company, "we believe the cost of coke-oven gas to the Gas Company and the cost of standby might be materially increased . . .").

P63.     Brenner also testified to the SEC that if the Coke Company were: under independent management we could expect a constant series of problems to arise as the interests of the Coke Company and the Gas Company conflicted over the matters such as the amount of different kinds of coal to be used in making of coke, which affects of course the amount of gas which is to be released. We might also expect arguments over the quality of gas supplied by the Coke Company and failure to keep its specific gravity as low as we desire and are able to require when the Coke Company is a subsidiary or an affiliate[,]and further that "[s]uch operations are

now carried out in a cooperative schedule which is more than we could expect of an independent coke company." Ex. 9, Transcript and Exhibits for hearing before SEC in the matter *United Light and Railway Company*, on November 24, 1952, WG-ANR-00073896(934-35).

P64.    The Coke Company itself identified several major operating decisions foisted upon it by ALT/ANG over the years, dating from the beginning of its ownership and including multiple installations of operating equipment. For example, the Coke Company producer plant ALT commissioned and paid for in 1928 would not have been built but for the requirements of MGL. Ex. 40, Letter from Kreuz to Gordon Black confirming data in exhibits to SEC, January 6, 1953, WG-ANR-00132702.

P65.    The Coke Company LPG (liquid petroleum gas) Plant also would not have been built but for the requirements of MGL: it "was built solely for the benefit of [MGL] to meet customer demands. If it had not been for close relationship between Companies, the installation would not have been made." *Id*.

P66.    In May 1953, Louis Kreuz (then president of the Coke Company) indicated that the Coke Company's current gas standby contract, which promised a minimum delivery of 60,000 therms per day to the Milwaukee Sewerage Commission, "would not have been agreed upon by Solvay if the Company had been or expected to be separated from the American Natural Gas System." Ex. 18. Letter from Kreuz to McElvenny, May 28, 1953, WG-ANR-00077055. *See also* Ex. 115, ANR 30(b)(6) Tr. at 154:19-155:2.

P67.    The September 22, 1954 ANG Board of Directors meeting minutes reflect ANG's plan to make the Coke Company a direct subsidiary of ANG once again, noting that such a plan "will preserve the benefits to the Milwaukee Gas Light Company of the existing stand-by arrangements with the Coke Company but the transfer in stock ownership will provide greater

flexibility in meeting the difficult operating conditions in the merchant coke business." Ex. 100, ANG Board of Directors regular meeting minutes, September 22, 1954, ANRC-00005267(273).

P68.    On December 21, 1954, the PSC gave its consent and approval for the outstanding capital stock of the Coke Company to be transferred back to ANG from MGL, remarking:

> "The applicant alleges that the proposed transfer will simplify the structure and functioning of the holding system by making the 'Solvay' company a direct subsidiary of American Natural Gas Company which will separate its ownership from Milwaukee Gas Light Company and relieve the applicant of the responsibility for its operation and management. This will provide greater flexibility by the holding company in meeting the depressed market conditions existing in the coke industry…"

Ex. 41, Application of MGL for Approval of Distribution of Coke Company Stock to ANG, December 21, 1954, WG-ANR-00006482(483).

P69.    In 1959, the Hetherington Report commissioned by ANG indicated that the promise of a minimum delivery of 60,000 therms per day to the Milwaukee Sewerage Commission was not a sound operating decision. Ex. 19, Letter from Hetherington outlining conclusions and recommendations from study of Coke Company requested by ANG, June 10, 1959, WG-ANR-00006870.

P70.    ANG's Board of Directors discussed the Hetherington Report findings at their June 17, 1959 meeting, noting that "earnings can be improved beyond recent increases" and "[f]avorable factors mentioned included the promise of a substantial new foundry coke account upon completion of a steel plant now under construction." Ex. 101, ANG Board of Directors regular meeting minutes, June 17, 1959, ANRC-00005699.

P71.    In a 1958 hearing before the SEC, Ralph McElvenny (still President of ANG and the Service Company) testified that with respect to matters concerning the subsidiaries, "any really important matter in the system is checked with or discussed, or if it is of sufficient importance, approved by the board of the parent company." Ex. 16, Transcript of hearing before

SEC in the matter of *Milwaukee Gas Light Company* on June 4, 1958, WG-ANR-00052302(313).

P72.    McElvenny testified to the SEC that by virtue of him sitting on all the boards of the various companies, including the Service Company, he was afforded the opportunity to "participate in the important affairs of those companies, including the financial end." *Id.* at 316.

P73.    McElvenny testified to the SEC that he discusses subsidiary business (in this particular case, MGL) with "a director of the parent company" – Mr. Nemeyer – including "financial requirements, the number of heating customers, and any other important matter affecting this company on a *day to day basis* or month to month." *Id.* at 321-22 (emphasis added).

P74.    By 1961, it was estimated that Ralph McElvenny, President of the Service Company and ANG, "spent 90% of his time on operating company matters," and even in the last 6 months of the Coke Company's existence, charges allocated to the Coke Company totaled $9,131 (or over $90,737 in 2023 dollars).[129] Ex. 59, Amendment No. 3 to Service Company's Application to SEC for Formation of Service Company, October 2, 1963, ANRC-00010492(495-96). *See also* Ex. 102, Service Company Board of Directors regular meeting minutes, January 18, 1962, ANRC-00011295(296) (noting that "the great bulk of the time and effort of these [dual Service Company-ANG officers] is devoted to the business of System operating companies.").

P75.    Carl Claussen, an ANG director who was then made an officer of the Coke Company by ANG in order to prepare for the Coke Company's dissolution, resolved a labor dispute between the Coke Company and the Coke Company's union. Ex. 103, Letter to Coke Company employees regarding labor agreement with new company, June 1, 1962, ANRC-

---

[129] https://www.in2013dollars.com/us/inflation/1961?amount=9131

00001751; Ex. 104, Table of Contents of Sale of Assets of Coke Company to Wisconsin Coke Company, Inc, June 1, 1962, ANRC-00001866; Ex. 17, Transcript of Claussen talk given before the Citigas Executives Luncheon Club, November 17, 1964, WG-ANR-00007183(192) (noting that the provision in the labor contract between the Coke Company and the union "haunted American Natural when it was negotiating for the sale of the coke company," and "[i]t was necessary to negotiate with the coke company union to have this provision removed before the prospective buyer of the coke company would agree to purchase the property"); Ex. 105, ANG Board of Directors organization meeting minutes, April 26, 1962, ANRC-00005892(896).

P76. In June 1961, members of the Service Company reported to Service Company President McElvenny (who was also ANG's President) that they met with the local Milwaukee assessor to negotiate a reassessment of Coke Company property. Ex. 106, Service Company inter-office memo regarding Coke Company real estate tax assessment, June 30, 1961, ANRC-00008519.

P77. In a November 1961 Service Company inter-office memorandum, Ralph McElvenny was still referring to "continued ownership *and operation* of the Coke Company by American Natural…." Ex. 74, Service Company inter-office memo regarding meeting with Pickands Mather about their proposed purchase of Coke Company, November 27, 1961, ANRC-00008502(506) (emphasis added). *See also id.* at 505 ("[I]f we do not sell the Coke Company *and continue to operate it*, Pickands Mather undoubtedly would be glad to continue to act as sales agent…."); *Id.* at 506 ("If the SEC were informed of our prolonged and exhaustive and unsuccessful efforts to find a buyer, with the remaining alternatives being *continued operation by American Natural* or liquidation of the Coke Company, the latter with a resultant loss of jobs to 400 or more employees in Milwaukee, the SEC might hesitate to force liquidation of the

company"); *Id.* ("It would appear that the move to take now with respect to negotiations with Pickands Mather would be to tell them of *our intention to continue operation*…if we are not able to sell the property at a higher figure." (emphases added).

P78.    On July 9, 1962, Carl Claussen wrote to the Industrial Commission, State of Wisconsin, Statistical Division that upon liquidation of the Coke Company, "all known and unknown liabilities will be assumed by the sole stockholder, American Natural Gas Company." Ex. 107, Letter from Claussen to Wisconsin Industrial Commission regarding injury claim payments, July 9, 1962, ANRC-00008618.

P79.    On August 8, 1962, Carl Claussen wrote to the Chief Statistician of the State of Wisconsin Industrial Commission that "[w]hen [MSC Corporation] is liquidated, an appropriate resolution will be adopted by American Natural Gas Company assuming all liabilities of MSC Corporation, including any under the Workmen's Compensation Act of Wisconsin…." Ex. 108, Letter from Claussen to Wisconsin Industrial Commission regarding Commission's request for resolution of ANR assumption of liabilities, August 8, 1962, ANRC-00008614.

P80.    On December 31, 1962, the Coke Company and ANG sent a letter to the SEC, which stated that "American Natural has surrendered to MSC all of the outstanding stock of MSC, and has assumed and agreed to pay any and all debts, obligations and liabilities of MSC which may hereafter be established, subject to the limitation that the aggregate amount of debts, obligations and liabilities assumed by American Natural shall not exceed the value of the assets transferred by MSC to American Natural." Ex. 75, Letter to SEC regarding apportionment of federal income tax liability of ANG affiliate groups, December 31, 1962, ANRC-00007818. *See also* Ex. 116, ANR December 15, 2021 Responses to Wisconsin Gas Request for Admission No. 3.

P81.    On December 31, 1962, the law offices of Sidley, Austin, Burgess & Smith wrote a letter to the SEC on behalf of the companies of the American Natural Gas System, which stated: "American Natural has legally acquired the money and property received as a distribution in liquidation of MSC, subject only to such liabilities as have been expressly assumed by American Natural or may be imposed upon American Natural by laws relating to transferee liability." Ex. 42, Letter from Sidley to SEC regarding opinions of review of case file, December 31, 1962, WG-ANR-00052828(829).

P82.    On March 16, 1963, a letter from the Service Company to ANG stated, "As you know, when the Coke Company was liquidated in December, American Natural Gas Company agreed to pay any just claims or debts which might subsequently be developed." Ex. 109, Letter from Service Company to ANG regarding Coke Company liquidation, March 16, 1963, ANRC-00009537.

P83.    In making payments for "any and all debts, obligations and liabilities of [the Coke Company] which may hereafter be established," ANG did not "exceed the value of the assets transferred by [the Coke Company] to American Natural[,]" which totaled $4,962,028 (or approximately $48.7 million in 2023 dollars).[130] Ex. 75, Letter to SEC regarding apportionment of federal income tax liability of ANG affiliate groups, December 31, 1962,  ANRC-00007818. *See also* Ex. 115, ANR 30(b)(6) Tr. at 169:14-172:5; Ex. 116, ANR December 15, 2021 Responses to Wisconsin Gas Request for Admission Nos. 5 and 6 and Interrogatory Nos. 4 (stating that "ANR or its predecessors thus satisfied (or 'exhausted') debts, obligations, or liabilities of MSC to the extent required in the Transfer of Assets in Liquidation") and 5.

---

[130] https://www.in2013dollars.com/us/inflation/1962?amount=4962028

Dated: January 27, 2023                    Respectfully submitted,

                                           */s/ Joseph A. Cancila*
                                           Joseph A. Cancila
                                           Matthew Kennison
                                           RILEY SAFER HOLMES & CANCILA LLP
                                           70 West Madison Street, Suite 2900
                                           Chicago, IL 60602
                                           (312) 471-8700
                                           (312) 471-8701 (fax)
                                           jcancila@rshc-law.com
                                           mkennison@rshc-law.com

                                           James Goldschmidt
                                           Lauren Zenk
                                           QUARLES & BRADY LLP
                                           411 E. Wisconsin Avenue
                                           Suite 2400
                                           Milwaukee, WI 53202
                                           (414) 277-5663
                                           james.goldschmidt@quarles.com

                                           *Attorneys for Wisconsin Gas LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, I caused the foregoing document to be served

via electronic mail on the following counsel of record:

**SHOOK, HARDY & BACON LLP**
James F. Thompson
Mitch F. Engel
Dalton R. Mott
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
Jfthompson@shb.com
mengel@shb.com
dmott@shb.com

*Counsel for Defendant*

J. Timothy Hobbs
K&L Gates LLP
501 Commerce Street Suite 1500
Nashville TN 37203
(615) 514-1811
Tim.hobbs@klgates.com

Ankur K. Tohan
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
(206) 623-7580
Ankur.tohan@klgates.com

*Attorneys for Honeywell International, Inc.*

/s/ *Joseph A. Cancila*
Joseph A. Cancila