# EXHIBIT 16

OFFICIAL REPORT OF PROCEEDINGS

Before The

## SECURITIES AND EXCHANGE COMMISSION

DOCKET No.    70-3692

In the matter of

### MILWAUKEE GAS LIGHT COMPANY

Place    Washington, D. C.

Date    June 4, 1958

Pages    1 - 163

## COLUMBIA REPORTING COMPANY
*Official Reporters*

939 D Street, N.W.            Telephones: REpublic 7-3601
Washington 4, D. C.

ASSOCIATES IN PRINCIPAL CITIES

WG-ANR-00052251

A

## I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Lloyd Nemeyer | 3 | | | |
| Ralph T. McElvenny | 13 | 47 | 144 | 150 |

## E X H I B I T S

| NUMBER | FOR IDENTIFICATION | IN EVIDENCE | WITH DRAWN |
|--------|--------------------|-------------|------------|
| Milwaukee 1 | 7 | 7 | |
| " 2 | 9 | 10 | |
| " 3 | 11 | 12 | |
| " 4 | 14 | 16 | |
| " 5 | 22 | 25 | |
| " 6 | 25 | 30 | |
| " 7 | 31 | 35 | |
| " 8 | 35 | 36 | |
| " 9 | 36 | 40 | |
| " 10 | 45 | 45 | |
| " 11 & 12 | 47 | 47 | |
| " 13 | 145 | | 160 |
| Commission's 1 | 59 | 59 | |
| " 2 | 136 | 136 | |

Incorporations by reference:  79
90
131

WG-ANR-00052252

hudson
mm-1

# BEFORE THE SECURITIES AND EXCHANGE COMMISSION

```
- - - - - - - - - - - - - - - -:
                                :
  In the Matter of:             :
                                :
MILWAUKEE GAS LIGHT COMPANY     : File No. 70-3692
                                :
- - - - - - - - - - - - - - - -:
```

Hearing Room 193
Securities and Exchange Commission
Washington, D. C.
Wednesday, June 4, 1958

The above-entitled matter came on for hearing, pursuant to notice, at 10:00 a.m.

BEFORE:

WILLIAM W. SWIFT, Hearing Examiner.

APPEARANCES:

ARTHUR R. SEDER, JR., 11 South LaSalle Street, Chicago 3, Illinois, appearing on behalf of American Natural Gas Company.

VERNON A. SWANSON, 735 North Water Street, Milwaukee, Wisconsin, appearing on behalf of the Milwaukee Gas Light Company.

WILLIAM R. NOWLIN, appearing on behalf of the Division of Corporate Regulation, Securities and Exchange Division.

WG-ANR-00052253

# P R O C E E D I N G S

Hearing Examiner: Pursuant to the order entered by the Commission in this proceeding on May 20, 1958, the hearing is convened.

Are there any persons here desiring to be heard?

No letters have come to me from anyone asking for leave to be heard in accordance with Rule 17 of the Rules of Practice.

Let the record show that no one answers my inquiry and that no one applies for leave to be heard.

I take it that appearances have been entered.

Mr. Seder, for the Milwaukee Gas Light Company and Mr. Nowlin for the Division of Corporate Regulation, is that correct, gentlemen?

Mr. Seder: Mr. Seder for American Natural Gas Company and Mr. Vernon Swanson for Milwaukee Gas Light Company.

Hearing Examiner: I stand corrected. I thank you, sir.

Mr. Nowlin: Mr. Examiner, it is my understanding that under the present proceedings, the Commission's notice of filing and order for hearing comes in as one of the moving papers without the necessity of offering it in evidence?

Hearing Examiner: That is correct.

Mr. Nowlin: However, I would like to state that the

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 5 of 166   Document 50-27

WG-ANR-00052254

order which bears Holding Company Act Release No. 13761 was printed and published in the Federal Register of May 24, 1958, in Volume 23 at page 3604.

Hearing Examiner: Thank you, Mr. Knowlin.

Mr. Seder, you may proceed.

Mr. Seder: I understand that the application is also made a part of the record, and the amendment, without the necessity for being formally offered?

Hearing Examiner: That is correct. That is one of the moving papers. This hearing is predicated upon it, as well as the order to which I referred.

Mr. Seder: Your Honor, we have two witnesses, Mr. Nemeyer, the president of Milwaukee Gas Light Company, and Mr. McElvenny, the president of American Natural. We would like to put Mr. Nemeyer on and he will be questioned by Mr. Swanson.

Hearing Examiner: Very well. Mr. Nemeyer.

Whereupon,

### LLOYD NEMEYER

was called as a witness, having been first duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

By Mr. Swanson:

Q    Will you state your name and where you reside?

A    Lloyd Nemeyer, and I reside in Milwaukee, Wisconsin.

WG-ANR-00052255

Q     Are you an officer of Milwaukee Gas Light Company?

A     Yes, I am president of that company.

Q     Will you state whether a declaration filed on
Form U-1 by Milwaukee Gas Light Company, upon which this
proceeding is based, was prepared under your supervision?

A     Yes, it was.

Q     And are the statements made in the declaration true
to the best of your knowledge and belief?

A     Yes, they are.

Q     When was the declaration filed?

A     March 19, 1958.

Q     Now will you briefly describe the nature of your
company's business?

A     Milwaukee Gas Light Company is a Wisconsin
corporation and has the largest gas distribution business
in Wisconsin, selling natural gas in a metropolitan area,
with an aggregate population of approximately one million
persons.

The service area includes the City of Milwaukee and
approximately 50 neighboring communities.

The principal office of the company is located in
Milwaukee.  All of the company's outstanding capital stock is
owned by American Natural Gas Company, a registered holding
company under the Public Utility Holding Company Act of
1935.

WG-ANR-00052256

Q      Will you describe the transaction covered by your application?

A      The proposed transaction was set forth in some detail in the application. Briefly the company proposes upon the issuance of an appropriate order of this Commission to enter into a credit agreement providing for the borrowing from banks of up to $15 million on or sometime after June 20, 1958, on notes maturing June 20, 1959. A total of not more than four separate borrowings will be permitted under the agreement.

The notes will be unsecured and will be issued in varying amounts and at various dates on or subsequent to June 20, 1958. The notes will be dated as of the date of issuance, will mature June 20, 1959, and will bear interest at the prime rate prevailing at the First National City Bank of New York for commercial loans on the date of each borrowing.

Under the terms of the credit agreement, the company, subject to the approval of this Commission, will have the right to renew the notes for a period of 12 months beyond their expressed maturity at the prime interest rate prevailing at the First National City Bank of New York for commercial loans on the date of the renewal.

Q      For what purpose do you propose to borrow the $15 million?

WG-ANR-00052257

A    In addition to the substantial cash requirements for normal additions and replacements of property, the company requires a large sum for the major expansion program now in progress to deliver increased volumes of gas to existing customers and to serve new customers.  The company proposes to consummate a permanent financing program in 1959 in an amount sufficient to retire bank loans then outstanding and to provide further funds for construction.

The company consistently has followed the practice of initially financing construction requirements through borrowings from banks, and subsequently consummating a permanent financing program to retire the bank loans and obtain additional capital requirements.

This procedure permits the company to acquire its capital in an economical manner and affords a reasonable period of time within which to study market conditions and develop and consummate a suitable permanent financing program.

Q    Do you presently have outstanding notes payable to banks due within nine months from the date of the borrowing?

A    Yes.  The company has four and a half percent notes payable in the aggregate amount of $3,300,000, which is the maximum amount that may be borrowed without obtaining specific Commission authorization.

Q    When will these notes come due?

WG-ANR-00052258

A        The first notes come due June 20, 1958, and the others are due in August of 1958.

Q        Have you negotiated a credit agreement in order to provide the $50 million that you desire to borrow?

A        Yes.  The form of the credit agreement has been furnished as an exhibit to our declaration.  When approval of this agreement is received, we propose to immediately commence borrowing thereunder.

Mr. Swanson:  I would like to have marked at this time as an exhibit a statement entitled "Milwaukee Gas Light Company, Estimated Construction Expenditures for the Years 1958 and 1959."

Hearing Examiner:  I hear no objection and the statement is admitted in evidence as Milwaukee Exhibit 1.

                        (Milwaukee Exhibit No. 1 was
                        marked for identification and
                        received in evidence)

By Mr. Swanson:

Q        Mr. Nemeyer, I show you what has been marked Milwaukee Gas Light Company Exhibit No. 1 and ask you whether that was prepared under your supervision?

A        Yes, it was.

Q        Will you state briefly what the exhibit purports to show?

A        This exhibit shows the estimated construction

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 10 of 166   Document 50-27

WG-ANR-00052259

expenditures by major types of plant for each of the two calendar years 1958 and 1959. The first column of figures shows the estimated expenses for the construction expenditures for the year 1958 in the amount of $9,116,000. The second column shows the estimated construction expenditures for 1959 in the aggregate amount of $11,375,000.

Mr. Swanson: I wish at this time to offer Milwaukee Gas Light Company Exhibit 1 in evidence.

Mr. Nowlin: May I ask just one or two questions about it?

Hearing Examiner: Yes, you may. I hurriedly, perhaps too hastily, received it in evidence. But you go ahead, Mr. Nowlin.

Mr. Nowlin: This is just a clarifying question.

Mr. Nemeyer, is the exhibit which is being offered in evidence now the same as is reflected in a pamphlet which you or your associates submitted to the staff sometime ago?

The Witness: Yes, it is.

Mr. Nowlin: The title of the pamphlet is "American Natural Gas Company and Subsidiaries, Summary of 1958 Security Issues?

The Witness: Yes.

Mr. Nowlin: Then there is another one, I think, for 1959?

WG-ANR-00052260

The Witness: Yes.

Mr. Nowlin: So the figures reflected on these exhibits were the same as supplied to the staff earlier this year?

The Witness: That is my understanding, yes.

Mr. Nowlin: Mr. Examiner, I have no objection.

Hearing Examiner: I again receive it in evidence.

Mr. Swanson: I now wish to have marked as Milwaukee Gas Light Company Exhibit 2 a statement entitled "Cash Forecast for the Years 1958 and 1959.

(Milwaukee Exhibit No. 2 was marked for identification)

By Mr. Swanson:

Q    Mr. Nemeyer, I show you Milwaukee Gas Light Company Exhibit 2, which has been marked for identification, and ask you whether that was prepared under your supervision?

A    Yes, it was.

Q    Will you state what that exhibit purports to show?

A    This exhibit is a statement showing estimated cash receipts and disbursements for each of the calendar years 1958 and 1959. The cash receipts section shows the $15 million of short-term borrowings which is contemplated by this proceeding. It also shows $11 million of such borrowings in 1958 and $4 million of borrowings as occurring in 1959.

The contemplated permanent financing which we expect

WG-ANR-00052261

to consummate in 1959 is shown in the second column. It consists of $13 million of first mortgage bonds and $7 million of common stock to be supplied by American Natural Gas Company.

In the cash disbursement section, in the 1959 column, the $15 million of one-year notes are shown as being retired from the proceeds of the permanent financing.

The construction figures appearing under the disbursement section were taken from the exhibits just submitted.

Mr. Swanson: I wish to offer in evidence Milwaukee Gas Light Company Exhibit 2.

Mr. Nowlin: Again, Mr. Nemeyer, may I inquire whether or not there has been any change in these figures that are reflected in this exhibit as compared with the statistical information previously supplied the staff earlier in the year?

The Witness: Not to my knowledge.

Mr. Nowlin: Thank you. I have no objection.

Hearing Examiner: The cash forecast for the years 1958 and 1959 will be received as Milwaukee Exhibit 2.

(Milwaukee Exhibit No. 2 was received in evidence)

Mr. Swanson: I now wish to have marked as Milwaukee Gas Light Company Exhibit No. 3 for identification a statement entitled "Milwaukee Gas Light Company, Capitalization and

WG-ANR-00052262

Ratios, Actual and Pro Forma."

<div align="center">(Milwaukee Exhibit No. 3 was

marked for identification)</div>

By Mr. Swanson:

Q    Mr. Nemeyer, I now show you Milwaukee Gas Light Company Exhibit No. 3 which has been marked for identification and ask you whether that was prepared under your supervision?

A    Yes, it was.

Q    Will you now state what Exhibit No. 3 purports to show?

A    This exhibit shows the actual capitalization and the ratios as of December 31, 1957, in column 1.

In column 2 it shows the pro forma capitalization and ratios as of December 31, 1958.

In column 3 we have shown the pro forma capitalization and ratios as of December 31, 1959, giving effect to the permanent financing contemplated during the year and as described in the footnote.

At each period you will note the fine common equity ratios which are 40 percent or better at the end of each period.

Mr. Nowlin:  Mr. Nemeyer, may I inquire again if there has been any change in the computations or figures reflected on this exhibit as compared with the ones previously supplied to the staff earlier this year?

WG-ANR-00052263

The Witness:  No, sir, not to my knowledge.

Mr. Nowlin:  Thank you.  I have no objection.

Mr. Swanson:  I wish to make the offer.

Hearing Examiner:  Let Milwaukee Exhibit No. 3 come in.

(Milwaukee Exhibit No. 3 was

received in evidence)

By Mr. Swanson:

Q     Mr. Nemeyer, will you now state the latest date
you feel it will be necessary to obtain an order authorizing
the company to enter into the proposed credit agreement?

A     Yes.  The application for the proposed credit
agreement was filed on March 19, 1958, with the request that
it be processed under Rule U-23.  It was contemplated that
the first borrowing would occur on or about June 2, 1958.
The first borrowing was to be in the principal amount of
$5 million, of which $3,300,000 would be used to retire
the 4-1/2 percent nine-month notes payable to banks, and
$1,200,000 would be needed for construction in June and
early July.

Our construction program is carefully planned in advance
to utilize both company and contracted labor.  In many
instances it is also timed to city, state and county
decisions to proceed with the laying of express-ways, the
resurfacing of streets and the repaving of highways.

I feel that it is essential that our application be

approved by this Commission by June 16. This would enable us to consummate the credit agreement, complete the paper work required in the borrowings with the New York, Pittsburgh and our local banks, so as to assure ourselves that the funds from the first borrowing are on deposit at our banks by June 20, 1958.

Mr. Swanson: This concludes the testimony of Mr. Nemeyer.

Hearing Examiner: Do you wish to cross-examine at this time?

Mr. Nowlin: I think, Mr. Examiner, we will withhold cross-examination at this time until they complete their case.

Hearing Examiner: Very well. Then you may retire from the stand, Mr. Nemeyer, temporarily.

(Witness temporarily excused)

Mr. Seder: I call Mc. McElvenny.

Whereupon,

RALPH T. MC ELVENNY

was called as a witness, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

By Mr. Seder:

Q    Would you please state your name?

A    Ralph T. McElvenny.

WG-ANR-00052265

Q       Would you state your position with American
Natural Gas Company and the other system companies?

A       Yes.  I am the president of the American Natural
Gas Company.  I am the president and Chairman of the
Michigan Wisconsin Pipeline Company, and American Louisiana
Pipeline.  I am the chairman of Michigan Consolidated Gas
Company and of the American Natural Gas Production Company,
and the president of the American Natural Gas Service
Company.

I am also a director of those companies, plus being a
director of the Milwaukee Gas Light Company and the Milwaukee
Solvay Coke Company.

Mr. Seder:  I would like to have marked as Milwaukee
Exhibit No. 4  a statement consisting of nine pages of
consolidating statements of financial position as of March
31, 1958 and consolidating statement of income and surplus
of American Natural Gas Company and subsidiaries for the 12
months ended March 31, 1958.

A copy has been handed to the reporter.

Hearing Examiner:  Let the statement be so marked for
identification.

(Milwaukee Exhibit No. 4 was
marked for identification)

By Mr. Seder:

Q       Mr. McElvenny, do you have a copy of this

WG-ANR-00052266

exhibit in front of you?

A     Yes, I do.

Q     Was this schedule prepared under your direction?

A     Yes.

Q     Will you state brieflywhat this exhibit shows?

A     The first two pages set forth the assets and liabilities of each of the companies in the American Natural System as of March 31, 1958, and the consolidated information as of that date.

The third page sets forth the statement of income for the 12 months ended March 31, 1958, of each of the companies and the consolidated results of operation.

The fourth page shows the earnings retained in the business of each of the companies and on a consolidated basis for the 12 months ended March 31, 1958. There was no change in other paid-in capital during the 12 months ended March 31, 1958. This schedule has not been included.

The fifth, sixth and seventh pages set forth the inter-company eliminations which are required in the preparation of the consolidating statements. Each of the entries are numbered and can thus be traced to the consolidating statements.

The eighth and ninth pages consist of the notes to the financial statements.

Mr. Seder:  I offer the nine-page schedule that has just

WG-ANR-00052267

been identified as Milwaukee Exhibit 4 in evidence.

Mr. Nowlin:  I have no objection, Mr. Examiner.

Hearing Examiner:  Let the exhibit come in.

(Milwaukee Exhibit No. 4 was

received in evidence)

By Mr. Seder:

Q     Now, Mr. McElvenny, would you briefly outline the

basic financing policy of the American Natural Gas System?

A     Yes.  Our system has followed the policy of

financing each member company separately on the basis of its

own requirements.  The capital structure of each company is

based on the many and varied circumstances that have

applicability.

We believe this policy results in fair treatment to

both the investor and the consumer and facilitates

localized management and regulation by the different state

and federal agencies concerned with the individual companies.

The operations of Milwaukee Gas Light Company are

regulated by the Public Service Commission of Wisconsin,

and the operations of Michigan

Consolidated by the Michigan Public Service Commission.  The

operations of both our pipelines, namely, American Louisiana

Pipeline Company and Michigan Wisconsin Pipe Line

Company are regulated by the Federal Power Commission.

The operations of our service company, the American

WG-ANR-00052268

Natural Gas Service Company, are regulated by the SEC. And each company in our system -- including the parent, being either a registered holding company or a subsidiary of a registered holding company -- is subject to detailed regulation under the Holding Company Act by the Securities and Exchange Commission.

As a result of our policy, the debt of the system is not on the parent company, but rather it is on each individual company, as circumstances indicate, and each company has its own holders of senior securities and its own cost of money.

The sales condition of common stock by American Natural, the parent, provides the equity base for financing the individual subsidiaries, and common stock of the subsidiaries is purchased by the parent as equity funds are required by the individual company.

Q    Mr. McElvenny, would you comment on the financial planning of the American Natural System?

A    Our financial planning is, of course, related to our estimates of construction and related cash requirements. In the natural gas business, such estimates necessarily are composed of various projects and transactions. A few of these may be planned and consummated within the discretion or control of the management alone, but most of the projects are eventsthat are dependent upon or are developed through the process of various regulatory approvals.

WG-ANR-00052269

Certain of them are dependent upon or are geared to the general level of economic activity, and others are dictated by the circumstances of the availability of our product, namely, natural gas.

Thus we are faced with a dynamic situation with respect to our financial requirements, and any financing program must necessarily have a reasonable amount of flexibility in it.

Q    You have referred to the necessity of flexibility. How does the American Natural System attempt to provide this flexibility that you referred to?

A    For many years we have followed, and we believe successfully, the policy of initially financing our construction program with bank loans. After the projects are completed and the new money requirements are known and are of a magnitude to make a permanent financing program feasible and desirable, the permanent financing is consummated in an amount sufficient to pay off the bank loan and generally to provide additional capital to carry the construction program for a reasonable time in the future.

This policy is extremely well adapted to our needs, and I might say is a policy which is also followed by many other companies.

The capital cost of the bank loans are relatively low, and that type of financing is flexible and easy to arrange. The bank loans are usually made under an agreement whereby

WG-ANR-00052270

borrowings can be made from time to time as the funds are required for construction. This avoids the accumulation of large cash deposits and unnecessary capital costs.

Also, the bank loan agreements ordinarily provide that they may be paid off at par and without penalty except from the proceeds of other bank borrowings, any time within the discretion of the borrower. That is a very valuable privilege, since it permits the borrower to adjust himself to any changes in circumstances which were not contemplated at the time the credit agreement was entered into.

Under this type of financing the new capital goes promptly to work in the extension and expansion of facilities, and the attachment of additional customers. It promptly becomes productive of earnings, and thus results in a desirable minimizing of the impact of dilution on the common stockholder.

In other words, the capital represented by the bank loans goes into the property, becomes a part of the rate base, and becomes productive of earnings before it becomes necessary to ask the common stockholder to put up the equity funds which form the equity base for the replacement of the bank loans with permanent capital.

At such times as the requirements provide a feasible basis for permanent financing -- that is, when we have enough temporary bank loans to justify the expense and the

WG-ANR-00052271

trouble of our personal financing -- we then proceed to retire the bank loans by the issuance of permanent securities.

As we all know, any issuance of permanent securities in substantial amount, if the issuer is a part of a holding company system, requires a registration statement since it must be the subject of competitive bidding. The costs of a publis security issue are very substantial and the cost can not be justified unless the amount of the capital being raised is substantial.

It is at the point of time when the temporary financing is to be replaced with permanent financing that it is the most appropriate point at which to make the determination as to the particular type of permanent securities that should be issued. Sometimes market conditions change quite promptly and it is prudent and wise to relate the final determination as to the permanent financing program as close as possible to the time when the permanent capital must be obtained.

At the time of our permanent financing programs, substantial common equity has been used in combination with senior securities to take out the short-term bank loans. We have regularly sold common stock of the parent company, as justified and as desirable in our overall financing program. In the seven years from 1949 through 1957 we have sold five issues of common stock aggregating $83,563,000

WG-ANR-00052272

of new equity money.

Q    Would you care to comment briefly on the financings you have referred to, the common stock financings?

A    Yes, I will very briefly.

In 1949, we made an offering of 276,805 shares on a one for ten basis and raised $7,820,000. In 1950 we offered 304,486 shares on a one for ten basis and raised $6,699,000. In 1951, we offered 334,935 shares on the same one for ten basis and raised $9,211,000.

In 1955, we offered 736,856 shares on a one for five basis and raised $35,738,000.

I might add that that offering was made at the time of the construction of our new pipeline, the American Louisiana Pipeline Company.

In 1957 we offered 442,114 shares on a one for ten basis and raised $24,095,000 of new common. As I said, the total of those offerings is $83,563,000.

In my opinion the financing policy and program which I have outlined has been successful. It represents a feasible and desirable type of program and in all respects is consistent with Section 7 of the Public Utility Holding Company Act.

I might also add that, as I understand the requirements of the Act, that section recognizes that except for certain specific limitations, decisions with respect to the type of

WG-ANR-00052273

decision of management, and that the Commission shall permit a declaration regarding the issue or sale of the security to become effective unless it does not meet the standards.

Mr. Seder: I would like to have marked as Milwaukee Exhibit No. 5 a statement consisting of three pages with respect to Michigan Consolidated Gas Company. The first page is entitled "Estimated Construction Expenditures for the Years 1958 and 1959."

The second page is entitled "Cash Forecast for the Years 1958 and 1959." And the third page is entitled "Capitalization and Ratios, Actual and Pro Forma."

Hearing Examiner: Let that exhibit be so marked for identification.

(Milwaukee Exhibit No. 5 was
marked for identification)

By Mr. Seder:

Q       Mr. McElvenny, the exhibit that has just been identified as Milwaukee Exhibit No. 5 was furnished to the staff in response to informal requests made a month or two ago.

Do you know whether there is any change in the exhibit identified as No.5 and the statements that were previously furnished to the staff?

A       I understand they are identical.

WG-ANR-00052274

Q     Do you have a copy of Exhibit No. 5 in front of you?

A     Yes.

Q     Were these statements prepared under your super-vision?

A     Yes.

Q     Will you state briefly what this exhibit shows?

A     The first page of this exhibit shows the estimated construction expenditures for the years 1958 and 1959 by the principal classifications of expenditures.  You will note that it is estimated that Michigan Consolidated will spend $25,268,000 in 1958, and $32,265,000 in 1959.

I might say there that if the current recession continues, it is very possible that these construction expenditures c an be substantially curtailed.

The second page of this exhibit sets forth the estimated cash receipts and disbursements for the years 1958 and 1959. The construction expenditures appearing under the cash disbursement section were taken from the first page of this exhibit.  The cash receipt section for the exhibit shows that for the year 1958 Michigan Consolidated will need only $3-1/2 million of new money to finance its construction program, and this can be readily obtained from bank loans.

As I have indicated, if the recession continues, it seems likely the construction program may well be reduced, in which event Michigan Consolidated may not find it

WG-ANR-00052275

necessary to obtain the $3-1/2 million of new money in 1958 to finance construction.

It has been estimated in the preparation of this exhibit that in 1959, Michigan Consolidated would sell common stock to American Natural Gas Company for $9 million and issue long-term debt securities for $18 million. The proceeds of this permanent financing will be used to retire the notes issued in 1958, if they are issued, and to finance its 1959 construction program.

You will also note that Michigan Consolidated plans to borrow $10 million in each of these years to finance its inventory gas. These loans are made to permit the storage of large volumes of gas in the period of reduced demand and they are repaid as cash is generated during the winter months, as our send-out increases greatly and cash is generated from the sale of the inventory gas.

I might add that the $8 million shown under cash disbursements in 1958 for financing inventory gas was repaid prior to March 31, 1958.

Page 3 of this exhibit sets forth the actual capitalization and ratios of the company at December 31, 1957 and the pro forma capitalization at December 31 for each of the years 1958 and 1959.

The pro forma capitalization for 1959 reflects the issuance of the securities previously referred to. You

WG-ANR-00052276

will note that the common equity ratio increases in 1958 and remains at approximately 40 percent for the year 1959.

Mr. Seder: Mr. Examiner, I offer Milwaukee Exhibit No. 5 in evidence.

Mr. Nowlin: No objection, Mr. Examiner.

Hearing Examiner: Let that exhibit come in.

(Milwaukee Exhibit No. 5 was received in evidence)

Mr. Seder: I would like to ask the reporter to mark as Milwaukee Exhibit No. 6 a three-page exhibit relating to Michigan Wisconsin Pipeline Company, the first page of which is entitled "Estimated Construction Expenditures for the Years 1958 and 1959." The second page being entitled "Cash Forecast for the Years 1958 and 1959," and the third page "Capitalization and Ratios, Actual and Pro Forma."

Hearing Examiner: Let the exhibit be so marked for identification.

(Milwaukee Exhibit No. 6 was marked for identification)

Mr. Seder: I would like to state in anticipation of counsel's question that this is not identical with the statement for Michigan Wisconsin Pipeline Company that was previously furnished to the staff. The difference is reflected on page 2 of the exhibit with respect to the bank

WG-ANR-00052277

loans expected during 1959, and of course the cash disburse-
ments also reflect that change.

   By Mr. Seder:

Q  Mr. McElvenny, do you have a copy of this exhibit?

A  Yes, I do.

Q  Was this prepared under your supervision and
direction?

A  Yes.

Q  Will you state briefly what this exhibit shows?

A  Page 1 of this exhibit sets forth the estimated
construction program for the years 1958 and 1959.  This
includes the expenditures for transmission plant which is
required to receive gas from the Laverne Field in Oklahoma
and transport it to market.

  The Laverne field is a new source of supply for Michigan-
Wisconsin, and the estimated initial deliveries would
approximate 40 million cubic feet a day.

  Michigan-Wisconsin must receive authority from the
Federal Power Commission to construct these facilities,
and hearings with respect to the facilities estimated to be
constructed in 1958 have recently been concluded and the
matter is now pending before the Power Commission.

  These facilities consist principally of the gathering
facilities in the Laverne Field and the line from the
field to our present main pipeline.

WG-ANR-00052278

Page 2 of this exhibit sets forth the estimated cash receipts and disbursements for the year 1958 and 1959. The construction expenditures reflected on this page are the same as set forth on the previous page.

It will be noted that for the year 1958 Michigan-Wisconsin needs only $5 million of new money. Michigan-Wisconsin will request authority to enter into a credit agreement during 1958 for $5 million to finance this construction. It is estimated that the bank loans obtained in 1958 will be retired in 1959 through the issuance of $20 million of five-year installment promisory notes.

These notes will also supply the additional permanent financing required to complete the balance of the Laverne project.

It is estimated that these notes will be retired through the generation of funds from operation, including depreciation monies, deferred income taxes, and the drawdown of a temporary excess of inventory gas.

I might state that with respect to a five-year credit agreement of this type, we were able to follow this type of financing very successfully in the case of our other pipeline, American-Louisiana.

We borrowed $28 million on five-year notes in 1956, and we paid off $5,600,000 of that, representing one-fifth of the amount, in December 1957, and then due to the fact

WG-ANR-00052279

that our expansion program that much of the capital was raised for did not materialize as expected, and due to the generation of substantial amounts of cash from operations, we were able in May to pay off an additional $17 million of that loan --

Q    Mr. McElvenny, was that in March of 1958 -- the $17 million payment was made?

A    Yes. It was in March. Then in May we made a further payment, and by August we will have completely eliminated the $28 million of credit notes of American-Louisiana.

Page 3 of this exhibit sets forth the actual capitalization and ratios at December 31, 1957, and shows a pro forma capitalization and ratios at December 31, 1958, and 1959. The pro forma capitalization for 1959 reflects the issuance of $20 million in notes previously referred to. It will be noted that the common equity ratio for 1959, after giving effect to the issuance of notes, is 34.5 percent compared with the actual common equity ratio at December 31, 1957, of 35.3 percent.

I might point out that Michigan-Wisconsin commenced operations in 1949 with a common equity ratio of 25.3 percent, which was reduced in April 1950 to 22.8 percent through the issuance of $20 million of debt to finance a large increase in the capacity of the pipeline.

The very noteworthy increase in common stock equity between

WG-ANR-00052280

1950 and the present, from approximately 23 percent to 35 percent. clearly demonstrates the effecti of the rapid debt retirement schedule which is typical of pipeline companies and the beneficial effect of that rapid debt retirement on the common stock equity ratios over a relatively short span of years.

This improvement factor is inherent in the capital structure of Michigan-Wisconsin and of course it is equally inherent in the capital structure of American-Louisiana.

Mr. Seder: Mr. Examiner, I wish to offer in evidence Milwaukee Exhibit No. 6.

Mr. Nowlin: Mr. Examiner, I would like to ask a couple of questions, if you don't mind.

Hearing Examiner: Very well.

Mr. Nowlin: Mr. McElvenny, I think your counsel noted on the record a change on page 2 of Exhibit 6 as compared with the data supplied the staff earlier in the year. Would you identify the change?

The Witness: In the data we presented to the staff, we showed in 1959 that we were borrowing an additional $15 million on bank loans which would be repaid through the permanent financing and the payment of those bank loans is shown under the cash disbursements for 1959. And in the revised data we simply eliminated the receipt of the money

WG-ANR-00052281

from the bank loans and the repayment of the bank loans and showed simply the sale of the permanent financing.

So all we did was eliminate the interim borrowing and repayment on the bank loans and showed instead the resulting transaction of the permanent financing. As far as the actual amounts are concerned, there is no change in the overall requirements.

Mr. Nowlin: Can you tell us, Mr. McElvenny, what occasioned that change, why the change was made?

The Witness: We felt it might not be necessary for us to actually borrow the additional money. Rather, we could raise it through the permanent financing and would not have to go through the financing steps.

Mr. Nowlin: The change was not due to any change in your construction plans?

The Witness: No. They are the same.

Mr. Nowlin: I have no objection, Mr. Examiner.

Hearing Examiner: Let this exhibit come in, referring to Milwaukee Exhibit 6.

(Milwaukee Exhibit No. 6 was received in evidence)

Mr. Seder: I will ask to have marked as Milwaukee Exhibit No. 7 for identification a three-page exhibit relating to American Louisiana Pipeline Company, the first page of which is entitled "Estimated Construction Expenditures

WG-ANR-00052282

for the years 1958 and 1959,"page 2 of which is entitled

"Cash Forecast Figures, 1958 and 1959," page three of which

is entitled "Capitalization and Ratios, Actual and Pro

Forma."

Hearing Examiner:  Let this present exhibit be so

marked for identification.

(Milwaukee Exhibit No. 7 was

marked for identification)

By Mr. Seder:

Q    Was this exhibit prepared under your supervision,

Mr. McElvenny?

A    Yes.

Q    Would you please comment on this exhibit?

Mr. Seder:  Before you do that, again in anticipation

of counsel's question, there have been some changes in the

exhibit as against the statement previously furnished to

the staff.  If we could go off the record for just a minute

or two, I think we could show those to the staff and perhaps

prepare a statement that would identify those changes.

Hearing Examiner:  Very well.  We will suspend for a few

moments.

(Discussion off the record.)

By Mr. Seder:

Q    Mr. McElvenny, for the record would you care to

state what the difference is in this exhibit as opposed to

WG-ANR-00052283

to the statement previously furnished to the staff --
just in general terms?

A    Yes.  In this exhibit we show the complete
elimination of the five-year bank loans of American-Louisiana.
As I have stated, in March 1958, we paid off $17 million,
and between March and August we will retire the remaining
$5,400,000.  Had we not retired the remaining $4,500,000
between May and August, we would have paid off in accordance
with the terms of the credit agreement only one quarter
of the $5,400,000 in December of 1958.  That reduction amounts
to $1,350,000, which would have left $3,050,000 of the
original $28 million of bank loans outstanding at the
close of 1958.

In substance, therefore, we have simply paid off all
of the notes instead of leaving out a total of $3,050,000
at the close of the calendar year 1958.

Q    As I understand it, then, Mr. McElvenny, the
change is on page 2, the case forecast page of Exhibit No. 7,
and whereas the statement previously furnished to the
staff did not anticipate the complete payment of all these
notes in 1958, the present exhibit does, is that correct?

A    That is correct, to the extent, of course, that
the notes are actually eliminated, it will also affect
the other financial exhibits which include as of the close
of 1958 the remainder of the notes which were earlier

WG-ANR-00052284

estimated would be outstanding but which are now being eliminated.

Q      Mr. McElvenny, I ask if you would care to comment on this exhibit in the same manner as the previous exhibits?

A      Page 1 of this exhibit sets forth the estimated construction for the year 1958 and 1959. The 1958 construction consists principally of the lateral to the Big Lake Field.

I might say very briefly the Big Lake Field is an additional reserve which we have secured under contract. The matter has been filed with the Federal Power Commission and is now pending before them.

The 1959 construction program also requires a certificate of public convenience and necessity from the Federal Power Commission, as well as a favorable decision in a suit which is pending in the Federal District Court in which we are seeking to obtain performance by an independent producer of its contract to sell us gas in the Krotz Springs Field in Louisiana.

Page 2 of this exhibit sets forth the estimated cash receipts and disbursements for the years 1958 and 1959. As I have indicated, the exhibit shows the elimination of the remaining amount of the five-year installment promisory notes which were outstanding at December 31, 1957. As of May 21, 1958, as I have indicated, $19 million of this amount had been prepaid, and the balance will be  paid

WG-ANR-00052285

by the end of August.

The construction expenditures appearing in this forecast are the same as those appearing on page 1. American-Louisiana will not require any new financing during the years 1958 or 1959 in order to carry out the estimated construction program.

Page 3 of this exhibit sets forth the capitalization ratios at December 31, 1957, and the pro forma capitalization ratios at December 31, 1958 and 1959.

You will note that the common equity ratio increases from 16.9 percent at December 31, 1957, to 22.4 percent at December 31, 1959. This increase reflects the retirement of the installment notes referred to, the accumulation of retained earnings, as well as the operation of the sinking fund on the bonds.

I feel the facts as respects American-Louisiana indicate very clearly that American-Louisiana has a very simple and strong capital structure and financial position. Indeed, I don't know of any new pipeline that is as strong or well situated financially as American-Louisiana.

Mr. Seder: Mr. Examiner, I wish to offer in evidence Milwaukee Exhibit 7 for identification,

Hearing Examiner: Let it come in.

(Milwaukee Exhibit No. 7

was received in evidence)

WG-ANR-00052286

Mr. Seder:  Mr. Reporter, I ask to have marked as Milwaukee Exhibit No. 8 for identification a one-page statement relating to American Natural Gas Company and entitled "Cash Forecast for the Years 1958 and 1959."

In anticipation of counsel's quesion, I will state that the exhibit is the same as a similar statement previously furnished to the staff, except that the anticipated dividend income for 1958 has been increased by $150,000.

(Milwaukee Exhibit No. 8 was

marked for identification)

By Mr. Seder:

Q       Mr. McElvenny, I will ask whether this exhibit was prepared under your direction and supervision?

A       Yes.

Q       What does this exhibit show?

A       This is an estimated statement of cash receipts and disbursements for the years 1958 and 1959.  The exhibit reflects the sale of 324,217 additional shares of common stock in 1959 through a one for 15 rights offering to the common stockholders in that year.

For the purpose of this exhibit, net proceeds from this offering have been estimated at $50 per share, or an aggregate proceeds of $16,211,000.  The cash disbursements section reflects the proposed investment in the common stocks of the subsidiaries of $9 million in Michigan

WG-ANR-00052287

Consolidated, and $7 million in Milwaukee Gas Light in 1959,
and a million and a half in each of the years 1958 and 1959,
in our production company.

I might say that the investment of the money in the
production company is pursuant to the previous authorization
of the Securities and Exchange Commission.

Mr. Seder:  Mr. Examiner, I offer Milwaukee Exhibit No.
8 for identification in evidence.

Mr. Nowlin:  No objection.

Hearing Examiner:  It is admitted in evidence.

(Milwaukee Exhibit No. 8 was
received in evidence)

Mr. Seder:  Mr. Reporter, I ask to have marked as
Milwaukee Exhibit No. 9 for identification a one-page state-
ment relating to American Natural Gas Company and subsidiaries,
and entitled "Capitalization and Ratios, Actual and Pro
Forma."

(Milwaukee Exhibit No. 9 was
marked for identification)

By Mr. Seder:

Q     Mr. McElvenny, was this exhibit prepared under
your direction and supervision?

A     Yes.

Q     What does this exhibit show?

A     This statement sets forth the capitalization

WG-ANR-00052288

ratio on a consolidated basis at December 31, 1957, and on a pro forma basis for each of the years 1958 and 1959.

The pro forma capitalization for 1959 gives effect to the proposed financing terms of each of the subsidiaries and of American Natural Gas Company. We have prepared this exhibit including and excluding the capitalization of American-Louisiana.

Q     Why have ylu prepared this exhibit in both of those forms -- that is, both including and excluding American-Louisiana?

A     We wish to make the exhibit as accurate and as meaningful as possible. As we all know, American-Louisiana is a recently formed pipeline subsidiary which began operation in August of 1956. It is a major new pipeline running from the rich and prolific gas producing areas of Southern Louisiana to Detroit, with an interconnection at Bridgeman, Michigan, with out other pipeline, Michigan Wisconsin Pipeline Company.

Bridgeman, Michigan, is at the Southeastern corner of Lake Michigan, for purposes of ready identification.

American-Louisiana is a 30-inch line and has a certificated capacity of 360 million cubic feet a day.

The original financing of American-Louisiana, like most new pipeline companies, included a relatively large amount of first mortgage bonds amounting to 75 percent of

WG-ANR-00052289

the cost of the project which was approximately $130 million. This form of financing which is desirable in providing a ready source of capital and in keeping the cost os capital relatively low, is possible since the bonds have a maturity date of only 20 years and will be retired completely through the operation of the sinking fund by maturity.

As the bonds are retired, the common equity increases. I have earlier adverted to the substantial increase in 1958 and 1959 in the common equity of American-Louisiana, and I have also stated my opinion -- which I think is an incontrovertible fact -- that American-Louisiana has a very simple and strong financial position and capital structure.

The inclusion of American-Louisiana in the consolidated ratios of the system tends to lower the consolidated equities, and in that sense produces an inequitable basis of comparison of our system with other systems that do not own new pipeline subsidiaries.

Of course the effect of the failure of other systems in the natural gas business to have control of their source of supply can be very disadvantageous. We have learned of those problems from the best teacher of al, and that is experience, and at times bitter experience.

The diluting effect of American-Louisiana on the system ratios is readily apparent from the exhibit. If

WG-ANR-00052290

American-Louisiana is included in the consolidated capital-
ization, the common equity is 36.3 percent at December 31,
1959. If, however, you exclude American-Louisiana, the
common equity ratio increases to 39.4 percent. This later
figure, of course, includes our other pipeline, Michigan-
Wisconsin, whose equity still is below the two distributing
units, but whose equity has very substantially increased, as
I have noted, since 1950.

Regardless of how you choose to handle American-Louisiana
in your consideration fo the system ratio, this exhibit shows
that after completing all the financing contemplated by the
subsidiary, the common equity ratio increases from that
existing at December 31, 1957, and I feel results in a
very good and strong showing for our system.

Mr. Seder: Mr. Examiner, I offer Milwaukee Exhibit
No. 9 for identification in evidence.

Mr. Nowlton: Mr. Examiner, I am not going to enter
a formal objection to the exhibit, but I would like to
state so far as the staff is concerned, we don't
concede in not objecting to this exhibit that it has any
probative value, or that is, to the extent that it reflects
consolidated figures, excluding American-Louisiana Gas
Company.

In one word, Mr. McElvenny claims credit for a
child and in the next minute he wants to disclaim it in

WG-ANR-00052291

the statistics. I do want to make that observation, we reserve the complete freedom to reserve the use of this statistical information.

The Witness: We are very proud of our child, Mr. Nowlin, but we don't wish the presence of children to be misinterpreted.

Hearing Examiner: Let Milwaukee Exhibit No. 9 come in.

(Milwaukee Exhibit No. 9 was received in evidence)

By Mr. Seder:

Q    Mr. McElvenny, you have testified that the 1958 financing program does not contemplate the issuance of any common stock by American Natural, the parent company.

Would you please comment on this?

A    Yes.  In reviewing the 1958 financial requirements of the individual system companies, it becomes apparent that no additional equity funds are needed or required this year.  Based on the cash requirements as I have outlined them, the various system companies will have outstanding at the end of 1958 a maximum of only $19,500,000 in short-term borrowings.

That excludes the inventory loans to which I have made reference, which go in and out with the storage amount.

WG-ANR-00052292

In addition, Milwaukee Gas Light will have an additional $4 million of short-term notes authorized if the Commission approves the pending application.

As you will recall, the authorization sought in this proceeding is for Milwaukee Gas Light Company to borrow $15 million from the banks, of which it is estimated $11 million would be outstanding at year end.

It may be noted from the exhibit the system capitalization was estimated to be about $600 million at the end of 1958, excluding the short-term notes. I do not feel that that amount of bank borrowings is any really significant amount in relation to our overall asset, capitalization and earnings position.

Certainly it is not a disproportionate amount.

I also would like to comment that the system common equity ratio will increase during the year 1958, whether short-term notes are included or excluded in the determination of capitalization ratios. The actual equity ratio at the end of 1957 was 33 percent, excluding notes payable to banks, and 32.8, including such notes.

Assuming the issuance of $19,500,000 of notes payable to banks, the comparable equity ratio at the end of 1958 will be 35.6 and 34.5 respectively.

As I have previously mentioned, American-Louisiana has prepaid $19 million of its serial notes so far this year

WG-ANR-00052293

and plans to prepay the balance by the end of August, thus reducing system debt by $22,400,000. This prepayment about equals the new bank loans proposed during 1958.

If American Natural followed the policy of financing system debt at the parent company level, the funds used for this repayment could have been used to meet our 1958 requirements and no new financing would have been required.

In other words, the practical effect of what we are proposing during 1958 is simply the transfer of debt from one company to others, reflecting the respective construction programs and financial requirements of the individual companies.

As a matter of fact, the total system debt, even including our construction bank loans, will be less at the end of 1958 than it was at the end of 1957. This fact, of course, accounts for the increase in the common stock equity ratio during 1958. I wish to emphasize again that a review of the ratios of our various companies discloses that Michigan Consolidated and Milwaukee Gas Light will have common equity ratios of 40 and 4 percent, respectively, at the end of 1958, and that Michigan-Wisconsin will be 37.5 percent.

These ratios in my view indicate a very strong equity base for these companies. Both these companies are in good earnings position, and their senior securities are well financed. Of course there is an opportunity for

WG-ANR-00052294

a saving in Michigan Consolidated through the refinancing
of the first mortgage bond issue sold last year
and that matter will be handled at the appropriate time.

The common equity ratio of American-Louisiana, the
child of which we are very proud, is, as has been mentioned
in this room several times, somewhat lower -- indeed considerably
lower -- than our other company, since it is a new pipeline
financed in the traditional manner, with, I might add, the
approval of both the Federal Power Commission and the Securities
and Exchange Commission.

But it is a strong company in a very excellent operating
and financial condition.

One other point I might make.  In considering the
inclusion of our strapping youngster in the family
circle, the reduction in our consolidated ratios thereby
accruing does not represent any deterioration in the protection
of the senior securities of our other system companies, since
they are unaffected by the inclusion in the consolidated
ratios of American-Louisiana.

The inclusion results only in a statistical computation.

Q     Mr. McElvenny, do you have any comment about the
proposal that is specifically before the Commission now?

A     Yes, I think Mr. Nemeyer covered that very
adequately.  As the record shows, the proposal before the
Commission is simply a garden variety traditional form of

WG-ANR-00052295

of financing representing the entering into by Milwaukee
Gas Light Company of a credit agreement with banks. I do
not think that anyone can challenge any feature of the
credit agreement. The loan will be made on an economical
basis.

We have the flexibility which I referred to and which is
desirable, and certainly the credit agreement and notes to be
issued thereunder are reasonably adapted to the securities of
the Milwaukee Gas Light system and that of our American
Natural group.

The notes are reasonably adaopted to the earning power
of Milwaukee --

Mr. Nowlin: Mr. Examiner, I object to that conclusion.
It is merely the witness' opinion evidence and has no
probative value. If he is attempting to relate here his
views as to whether or not this complies with the statute,
I think that is a matter for the Commission to determine
without expert testimony.

The Witness: I just want to state in my view, Mr.
Nowlin, that it does not comply in all respects with the
statute. I recognize the Commission must determine the
matter.

Mr. Seder: Mr. Examiner, this completes Mr. McElvenny's
testimony. Counsel for the Commission has requested that a
further exhibit be made a part of the record. In connection

WG-ANR-00052296

with proceedings in 1956 before this Commission, involving
a credit agreement between Michigan Consolidated Gas Company,
one of the system companies, and certain Banks, American
Natural presented exhibits reflecting a one for ten
ommon stock offering in 1958. And as your Honor has heard
Mr. McElvenny testify, we do not now anticipate such a
stock offering in 1958.

The staff therefore requested a reconciliation of the
exhibits in 1956 and our present plans, and one was prepared
and submitted to the staff sometime ago.

They have requested that this reconciliation be made
a part of the record. I therefore will ask the reporter
to mark as Milwaukee Exhibit No. 10 for identification a
reconciliation that I have referred to. We will ask leave
that it be received in evidence.

We don't have the required number of copies, since we
hadn't anticipated offering this. But I think that the
staff has two, which if that will serve their purposes, I
think we can get along.

Hearing Examiner: Very well, let this folder which
Mr. Seder has been referred to as a reconciliation come
in as Milwaukee Exhibit 10.

> (Milwaukee Exhibit No. 10 was
> marked for identification and
> received in evidence)

WG-ANR-00052297

Mr. Nowlin: May I inquire, does the exhibit which you have just offered reflect the changes which have been identified in the record in previous testimony?

Mr. Seder: No, sir. Since it was prepated at the time the other statements were furnished to the Commission's staff, of course they reflect the circumstances that were in effect at the time.

In other words, the changes that we referred to on the record this morning are not reflected in this exhibit.

Mr. Nowlin: I have no objection, Mr. Examiner.

Hearing Examiner: Does this conclude your examination of Mr. McElvenny, Mr. Seder?

Mr. Seder: It does, your Honor.

Hearing Examiner: Do you wish to cross-examine at this time, Mr. Nowlin?

Mr. Nowlin: Not at this time, no, sir. I suggest we take a few minutes' recess.

Hearing Examiner: Very well, we will have a short recess.

(Whereupon, a short recess was taken)

Hearing Examiner: Let us come to order.

Mr. Seder: Mr. Examiner, counsel for the Commission has requested that the annual report of Milwaukee Gas Light Company for 1957 and the annual report of American Natural Gas Company for 1957 be made a part of the record. I

WG-ANR-00052298

therefore offer in evidence as Milwaukee Exhibit No. 11
the annual report of Milwaukee Gas Light Company and, as
Milwaukee Exhibit No. 12, the annual report of American
Natural Gas Company.

Hearing Examiner: Very well, those two annual reports
are respectively received in evidence under the exhibit
numbers you have mentioned.

(Milwaukee Exhibits Nos. 11 & 12
were marked for identification
and received in evidence)

CROSS-EXAMINATION

By Mr. Nowlin:

Q    Mr. McElvenny, you are a director of Milwaukee
Gas Light Company, is that correct?

A    That is correct.

Q    Are you familiar with the estimate of construction
requirements for 1958 and 1959 of Milwaukee?

A    Yes.

Q    Directing your attention to Exhibit No. 1 of
Milwaukee Gas Light Company, which is an estimate of the
construction expenditures, as I interpret this exhibit, the
expenditures reflected thereon are primarily for the
addition of house heating services, is that correct?

A    As indicated in the exhibit, which reflects
the expenditures by principal items of classification, we

WG-ANR-00052299

have a substantial volume of expenditures planned for mains and regulating equipment for new customers. Then we have a substantial item for services, meters and house regulators. Then we have smaller amounts for structures and improvements and a fairly substantial item of around $1,200,000 for each year for service renewals.

That is a kind of a continuing program. The rest of it is related generally to expansion and improvement of service.

Q     Could you tell me, for example, how much of the estimate of $9,116,000 for 1958 is related exclusively to the installation of additional house heating customers?

A     It is very difficult, I think, to state the precise amount that is related to new customers.

Q     Could you give me a rough estimate?

A     I think we would have to go to the working papers to determine that, Mr. Nowlin.

Q     Could Mr. Nemeyer -- isn't he familiar enough with these estimates to give a calculation of what this construction is to be devoted to?

The Witness:  Mr. Nemeyer, do you have an estimate of about how much of this is related to new customers alone?

Mr. Nemeyer:  Yes, I can support the figures.

Mr. Nowlin:  Would you supply it for the record, Mr. Nemeyer?  I would like to know how much of the estimated

WG-ANR-00052300

construction of 1958 and 1959 is related to the additional
house heating customers?

The Witness: Perhaps we can supply that at the reconvening
of the hearing after lunch. We can provide the data during
the lunch hour, at least in approximate amount, I think.

Mr. Nemeyer: I can give it now.

The Witness: Will you please?

Mr. Nemeyer: In 1958, approximately, it is $800,000
and approximately $2 million in 1959.

By Mr. Nowlin:

Q        Do you know whether or not, Mr. McElvenny, any
of the items listed on Milwaukee Exhibit No. 1 relate to
an extension of service beyond Milwaukee's present service
area?

A        I understand they do not.

Q        Would it be fair to characterize these expenditures
as ordinary expenditures generaly incurred in the course of
each year's operations?

A        Yes.

Q        In other words, you don't anticipate an extension of
a lint out to get a new industrial customer or a new
municipal customer beyond the company's operating area?

A        That's correct.

Q        Do you know about how many house heating customers
you would add at the expenditure of these funds in 1958

WG-ANR-00052302

and 1959?

A     I think we can give you that figure in just a few minutes.

Q     Does Milwaukee Gas Light Company have the gas available to it at the present time to service the proposed new house heating customers that are anticipated to be brought in in 1958 and 1959?

A     In order for Milwaukee Gas Light to serve at least the major portion of the estimated new customers in 1958 and 1959, it will be necessary to obtain an expansion in the number of house heating customers which the customers of Michigan Wisconsin Pipeline Company may serve.

This involves an emendment of the Michigan-Wisconsin tariff on file with the Federal Power Commission to permit the addition by Michigan-Wisconsin's customers of additional space heating consumers -- is the word the tariff uses.

Q     In other words, the Federal Power Commission has jurisdiction over the allocation of gas by Michigan-Wisconsin to Milwaukee Gas Light Company, is that correct?

A     And to its other customers -- that's correct.

Q     So that if you did not get the additional allocation of gas from Michigan-Wisconsin, this construction for house heating customers would not be undertaken, is that correct?

A     Yes. Milwaukee Gas Light would not be able to

WG-ANR-00052303

take on those additional customers.

Q     In formulating your plan for taking on these
additional house heating customers, you didn't rely on the
interruption of interruptible gas to industrial customers
in order to supply the requirements of these new house
heating customers?

A     No.  It is predicated on the assumption, which I
think is a reasonable one, that Michigan-Wisconsin will be
permitted by the Federal Power Commission to expand its
heating load.  I might add that an application to do just
that is pending before the Commission now.

Q     Do you know the status of that application?  Have
hearings been held on it?

A     No, hearings have not been held, and I don't think
the Federal Power Commission contemplates holding hearings.
The matter is pending before the Commission as of this date.
I assume that we will get action on it promptly.

I don't know whether it would be this week or next
week, but I assume we will get an answer from the Federal
Power Commission soon.

Q     Has it been your experience that the Federal Power
Commission would grand an increase in the gas sales by
Michigan-Wisconsin without a hearing or without noticing it
for hearing?

A     The Federal Power Commission has at various times

WG-ANR-00052304

in the past increased the space heating authorization of Michigan-Wisconsin, and I believe they have done it on some occasions without a hearing. There is no requirement that they have a hearing on a matter of this kind.

Q    Milwaukee Gas Light, as I understand it, obtains all of its gas supply from Michigan Wisconsin Pipeline Company?

A    That is correct, all of its natural gas supply.

Q    And that Michigan Wisconsin Pipeline Company obtains a portion of its gas supply from American-Louisiana Pipeline, is that correct?

A    That is correct.

Q    I notice at this point a Federal Power Commission releast for publication that was dated May 2, 1958, which I show you and ask you to examine it and tell us just what that release covers?

A    The release speaks for itself. But to summarize it briefly, Michigan-Wisconsin filed an application with the the Federal Power Commission to permit the expension in its heating load so that the customers served by Michigan-Wisconsin could take on the heating consumers they had estimated in earlier proceedings before the Federal Power Commission, would be attached during the year 1958.

Q    You don't mean Michigan-Wisconsin.  It doesn't

WG-ANR-00052305

have any house heating customers, does it?

A   No.  I said that Michigan-Wisconsin applied for an increase in the authorized total of space heating consumers which Michigan-Wisconsin's customers serve.  So that those customer companies could take on the heating consumers they had estimated in earlier proceedings before the Federal Power Commission would be attached during 1958.  The number of heating consumers previously authorized by the Federal Power Commission was rapidly being absorbed by the customer companies, and in order for those companies to continue to serve the demand in their market areas, it would be necessary for Michigan-Wisconsin to  amend its tariff to increase the number of space heating consumers that its customer companies may serve.

Let me make one more brief statement here in explanation of the situation so you will all understand it.  Michigan-Wisconsin has what we call a flat rate.  Michigan-Wisconsin now charges 37-1/2 cents per Mcf for every cubic foot of gas which its customers buy.  It doesn't matter whether they buy a million a day, 500,000, or 100 million a day.  The rate is the same, irrespective of the load factor.

Many other pipelines have what theycall a demand commodity form of rate where the customer pays a demand charge based upon the amount of gas he has a contractual right to purchase in any one month from the pipeline.  He also

WG-ANR-00052306

pays what is called the commodity charge for each Mcf of gas he actually takes during the month.

The result of that form of rate is that by requiring the customers to pay a demand charge based on the amount of gas he wishes to buy during any month, he naturally relates his demand with some degree of fidelity to his sales. That avoids the pipeline taking the swing of, shall we say, a very warm winter or a particular recession in the industrial group.

If you have a flat rate --

Q    Mr. McElvenny, I don't want to interrupt you, but I think we are fairly familiar with the subject you are discussing. What I want you to do is relate yourself to that release?

A    If I may say one more sentence on the flat rate -- because it is the background and shows the reason why we have had to go back to the Federal Power Commission several times -- if you have a flat rate, then in order that the pipeline may have some knowledge of its requirements and be able to serve them, there should be some limitation on demand; and that in the flat rate is accomplished by a limitation on your space heating consumers, which is the reason for the great load of the distribution companies, and therefore the great demand on the pipeline during the winter. Otherwise the pipeline couldn't function.

WG-ANR-00052307

Now in our rate schedule, our tariff before the Federal Power Commission, the limitation is reflected in a specific number of space heating consumers which each one of our customer companies may have. We have amended that at various times in the past as the load of the customer companies has grown, and as I say we have an application pending now.

To come to the release which you have handed me, Release No. 9806 of the Federal Power Commission, Michigan-Wisconsin filed a motion requesting an amendment in the tariff to permit a substantial increase in the number of space heating customers.

It is 18,751 additional customers.

The Federal Power Commission construed that as involving an amendment in the application of Michigan-Wisconsin and the original application of American-Louisiana, which controlled the volume of gas which was available on a firm basis by American-Louisiana to Michigan-Wisconsin.

On the basis of that construction, the Federal Power Commission said that in our order of March 29, 1957, we in effect froze that situation and no application to amend those orders, those certificates, can now be entertained, and they rejected our application.

I might say we have on file now an application for a rehearing of that order rejecting our application.

However, the Federal Power Commission also has indicated

WG-ANR-00052308

that if the facts support it, the Federal Power Commission will authorize an increase in the number of heating consumers which may be served by the customers of Michigan-Wisconsin upon a showing that on the basis of the firm gas supply available to Michigan-Wisconsin which would not involve any modification of any order for certificates, the additional 18,751 space heating consumers we sought authority to serve could be served.

If we can make that showing, the Commission has indicated we can have the expansion in our service. An application on that basis is now pending before the Commission and we would expect to get some action on it at any time.

Q    Does that application cover the additional gas which Milwaukee Gas Light would need to meet the new house heating customers which you anticipate getting through the construction that you have set out here for 1958 and 1959?

A    The gas is already available.  It covers simply the change in the tariff which would permit Milwaukee to legally serve the increased load.

Q    Frankly, Mr. McElvenny, you have an application before the Federal Power Commission -- Michigan-Wisconsin does -- to obtain additional quantities of gas for Milwaukee Gas Light Company to serve your anticipated new house heating customers, isn't that correct?

A    No, that is not correct.  The correct statement,

WG-ANR-00052309

Mr. Nowlin, is that the gas is already available. We have

an application before the Federal Power Commission to permit

an increase in the number of customers which our own

customers may legally serve.

Q     That does not involve an increased allocation of

gas from Michigan-Wisconsin to Milwaukee Gas Light Company?

A     If the Federal Power Commission had granted our

original application, it would have resulted in a change of

allocation. On the basis of the application now before the

Commission, there is no change in the allocation of the gas.

Q     Mr. McElvenny, isn't it a fact that if the Federal

Power Commission doesn't grant the authority, you can not

under present circumstances serve the additional house

heating customers which you anticipate getting through

your 1958 and 1959 construction?

A     That is correct. Unless we get some relief

from this tariff provision, the company customers of Michigan-

Wisconsin can not take on additional space heating consumers

beyond the presently authorized amount.

Q     As matters stand today the Federal Power Commission

has denied your application for the additional gas, isn't

that right?

A     They have denied the earlier one, which they did in

a previous instance. We filed another one on a different

basis which they have granted. They have denied the one

WG-ANR-00052310

referred to in this release, 9806, and we have filed on a
different basis. We would hope that the present filing would
be granted.

Q    Has your present filing been scheduled for
hearing?

A    No.

Q    Was your prior filing scheduled for hearing?

A    No. No hearing was necessary.

Q    When did you file that application with the Federal
Power Commission?

A    The application referred to in Release 9806 was
filed on April 1, 1958.

Q    Then if the Federal Power Commission does not grant
your petition for a rehearing on your new application,
Milwaukee Gas Light Company will not have the gas to service
the new house heating customers which it anticipates through
its 1958 construction program?

A    I will put it this way:  It will not have the
regulatory authorization necessary to permit it to take on
additional space heating customers beyond the amount now
authorized in the Federal Power Commission Tariff.

Q    You wouldn't undertake to serve these customers
without authorization from the Federal Power Commission,
would you?

A    No.

WG-ANR-00052311

Mr. Nowlin:  Mr. Examiner, if there is no objection I would like to offer this release of the Federal Power Commission as Exhibit No. 1.

Mr. Seder:  No objection.

Hearing Examiner:  Let the release of the Federal Power Commission come in as Commission's Exhibit 1.

(Commission's Exhibit No. 1 was marked for identification and received in evidence)

By Mr. Nowlin:

Q     Mr. McElvenny, who negotiated the proposed bank loan for Milwaukee Gas Light Company?

A     Both Mr. Nemeyer and I participated in the negotiation of the agreement.

Q     In general how are the financial plans for your system companies formulated?  Is that at the parent company level?

A     They are formulated at the operating company level, and then discussed with the necessary financial people at the operating company level.  They have the advice and assistance of the people of the service company and the advise and assistance of the parent company.

Q     Does the parent company have a finance committee composed of members of its board?

A     No.

WG-ANR-00052312

Q     Does it have a finance committee composed of
members of the executive staff?

A     No.

Q     Does the Milwaukee Gas Light Company president
have authority to formulate a financial plan for his own
company -- that is, to determine whether or not he should
make a bank loan or issue bonds -- or is that a matter that
is passed on by the parent company executives?

A     Mr. Nemeyer has the authority and the competence
to formulate appropriate financing plans.  Before it could
become final, it of course would be approved by the board
of directors of Milwaukee Gas Light Company and it would be dis-
cussed with the parent company people.

Q     Does the parent company board of directors
pass on the financial proposal of the subsidiaries?

A     They would pass upon it if it involved action
by the American Natural Gas Company.  For instance, through
the sale of common stock of the American Natural Gas
Company, or the investment by the American Natural Gas
Company in the securities of the subsidiary companies.

A transaction of that kind would be passed upon by the
board of the parent company.

I might also say that any really important matter in
the system is checked with or discussed, or if it is of
sufficient important, approved by the board of the parent company.

WG-ANR-00052313

Q    In other words, Mr. Nemeyer could not on his own initiative formulate a financial program for Milwaukee Gas Light Company and effectuate that program without getting approval of the parent company's executives, is that correct?

A    It would be very unlikely that Mr. Nemeyer would both formulate and effectuate it without, say, discussing it with the parent company.

Q    Does that hold true with respect to the other subsidiary companies -- Michigan Consolidated, Michigan-Wisconsin Pipeline, and American-Louisiana?

A    Yes.  They have appropriate autonomy, but when a plan is proposed or reaches some formulative stage, it is checked with the parent company, that is correct.

Q    Can you tell me whether or not as a matter of general policy you attempt to synchronize or to work out the individual financial requirements of the subsidiaries as a matter of an overall program?

A    We follow the operations of the subsidiaries and we follow their financial requirements.  As I have said, in our system, the issuance of senior securities and the issuance of temporary financing is at the operating company level.  They proceed with those plans, but they are related to an overall consideration by the parent company people as to when and in what amount the equity capital is

WG-ANR-00052314

necessary to implement the financing plans of the subsidiaries.

The only source of equity capital in our system is through the sale of common stock by the American Natural Gas Company. That is so, since as the SEC well knows, all of the common stock of our subsidiary companies is owned 100 percent by the parent company.

Q    Is there any one of the subsidiary company's executives in a position to have the authority to formulate a financial plan for that individual company without getting the approval of the parent company?

Mr. Seder:  Me. Examiner, that question has been asked and answered two or three times.

Hearing Examiner:  I think I have heard it asked and answered.

Mr. Nowlin:  Maybe my memory is faulty, Mr. Examiner. I will withdraw it if it has been answered.

Hearing Examiner:  We will let the witness answer this particular question.

A    As I have indicated, I think, in our system the operating companies have a certain amount of desirable autonomy.  They formulate a financing plan, and we do that because the financial people in our operating companies have been well trained in financial matters.

Mr. Nemeyer was formerly a partner of Arthue Andersen and Company.  He is thoroughly familiar with finance. He has

WG-ANR-00052315

worked on our financing systems for as long as I have been with the system, 13 years.

Mr. Hoffer, who is our comptroller of the pipeline companies, is an experienced financial man. As I have earlier pointed out, for whatever --

Mr. Nowlin: Just a minute, Mr. McElvenny.

Mr. Examiner, I think my question was susceptible to a categorical answer of Yes or No.

Hearing Examiner: We didn't start out that way, Mr. Nowlin. I think an interruption at this time may delay matters rather than expedite the proceedings.

The Witness: In addition, as I say, for whatever contribution it may make, I am an officer of both of the pipeline companies and of the service company and of the production company. In that capacity I participate in the important affairs of those companies, including the financial end.

Our operating companies have full authority to develop a financing plan. After all, we are an integrated system and we are a reasonably happy family and no one of the operating companies is going to go out on its own and consummate some important plan of financing without due consideration of the interests of the parent company and of the affiliated companies.

I think that is as good a statement as I can make.

WG-ANR-00052316

Hearing Examiner: Mr. McElvenny, haven't you said in substance, both in this present answer and in prior answers, that the officials of subsidiaries have authority to initiate financings, but that before they can be effectuated or are effectuated, they are submitted to the parent company?

The Witness: That is correct. They are considered by the parent company.

By Mr. Nowlin:

Q    I believe you testified earlier this morning on direct that you have a system policy for financing the construction requirements of various subsidiaries through various bank loans. Is that a correct interpretation of your testimony?

A    We finance initially these construction requirements through bank loans, that is correct.

Q    And that is a general system policy?

A    It is with our companies that are operating utilities. In the event of a new company like our two pipe-lines, the situation is difference, as of course it naturally would be.

Q    Who is responsible for the formulation of that policy?

A    As far as I am concerned, it seems to me it has been our system policy ever since I have been there. It was formulated, I suppose, by Mr. Foolfolk, my predecessor.

WG-ANR-00052317

Q      Has it been your policy to use the medium of bank loans even for general normal expenditures in growth in the companies?  Or have you used the bank loans only for a long-period construction program?

A      The bank loans that we have made in the past have been basically to finance construction.

Q      That is why you don't get any revenue for some period of months in the construction which you propose, isn't it?

A      Generally speaking, the construction items which our revenue produces, that would be true.  Of course there are various items of construction, as the classification of accounts indicates, that are in effect renewals or replacements.

They are not revenue-producing, per se, but they do go in your rate base, and in that sense help your earnings.

Q      Let's take the case of house heating customers. If the installation was made this summer, you would immediately begin to get revenue, or leter in the year, would you not, from new house heating customers?

A      Yes, we would continue collecting revenue in October or November as the winter season came on.

Q      That would not be true in the event you were going to make a major extension of the pipeline or some construction that took a period of months, would it?

WG-ANR-00052318

A    A major extension of a pipeline would ordinarily
be related to a market to be attached.  Therefore the period
of time that would elapse before you got started digging
and the time you received revenue would depend on how far
you were going and certain other factors.

But, generally speaking, many substantial construction
programs in our business -- speaking for our own system --
are intimately and basically related to markets.

Q    Isn't it a fact, Mr. McElvenny, that bank loans
are ordinarily resorted to by the gas companies where there
is going to be a lag in the revenues to be derived from
the construction rather than for short-term construction
or the addition of house heating customers?

A    Will you repeat the question?

(Question read)

A    My answer to that is No.

By Mr. Nowlin:

Q    Who negotiated this bank loan of Milwaukee Gas
Light Company, you or Mr. Nemeyer, or both of you?

A    We both participated in it.

Q    Who did you first approach?

A    We discussed the matter with the First National
Bank of New York.  We also discussed it with the
Hanover Bank, the Mellon Bank, and I also discussed it with
the National Bank of Detroit, and Mr. Nemeyer further

WG-ANR-00052319

discussed it with the First Wisconsin National Bank of
Milwaukee, the Marine National, and Marshall and Ilsley Bank
of that city.

Q    Who was the first bank that you approached?

A    The First National City Bank of New York.

Q    When did you first contact the First National City
Bank with respect to the bank loan?

A    This thing was filed on about the third week of
March.  I would think we contacted the banks at probably the
middle or latter part of February, as I recall -- sometime, a
reasonable period in advance of the date when we got the
credit agreement up and got it signed and filed.

Q    Ordinarly when are the companies' estimated
budget for the ensuing year prepared and considered?

A    They prepare a basic budget in the fall, and
then it is considered by management, and I suppose in the
normal process comes up to the executive level and perhaps
the turn of the year, the early part of the following year.

Q    Do the individual subsidiary companies
prepare their estimated budgets for the ensuing year and
then submit them to the parent company officials?

A    They prepare them and then they are reviewed
by the heads of the individual companies, and then they are
discussed with me and the associates in the service company.

Q    And those discussions are ordinarily held in the

WG-ANR-00052320

latter part of the year prior to the ensuing period for which construction is to be effected.

A    Either the latter part or the early part of the next year, depending on what circumstances are involved.

If we are considering a major item like the construction of a new pipeline or a large expansion in capacity of the line, then of course we consider it current.

Q    To be more specific, when was the proposed construction budget of Milwaukee Gas Company for 1958 and 1959 brought to the parent company officials' attention and discussed?

A    I don't recall the particular date.

Q    Was it in the latter part of 1957 or the early part of 1958?

A    I am a director of the company. I attend a meeting every month. I see Mr. Nemeyer on other occasions. He is a director of the parent company. We meet once a month.

I am generally familiar with the affairs of the company. I don't recall when I saw the particular estimates involved.

Q    You don't recall whether or not they were reviewed and discussed by you in 1957 or early 1958?

A    I undoubtedly have discussed them with Mr. Nemeyer and will continue to discuss the financial requirements, the number of heating consumers, and any other important matter

WG-ANR-00052321

affecting this company on a day to day basis or month to
month.

Q    When did you determine you were going to seek
a bank loan for Milwaukee Gas Light Company?

A    I think we made the basic determination a long
time ago when we adopted our general financing policy.
That is simply that we have been doing this for many, many
years with the Commission, and I have explained that.

Basically, when we need additional capital for construc-
tion, we first use a bank loan until we get enough money
involved to justify a public offering.

When we determined to do this particular bank loan
that is presented now before the Commission, I don't recall
a specific date, but I have adverted to the fact it was
filed about the third week in March of 1958, and that we
undoubtedly began putting the deal together so that we
could file it probably about February 1958.  That's as good
as I can give on the date.

Q    I believe you stated that you did confer with
the First National Bank in February 1958.  If that is the
case, you must have formulated your policy with respect to the
bank loan prior to February 1958?

A    We formulated the policy with respect to bank
loans, yes, a long time prior to that.

Q    At the time you formulated the policy for the

WG-ANR-00052322

bank loan of Milwaukee, did you reach a similar conclusion
with respect to bank loans for the other subsidiary
companies?

     A      When you say "our policy," Mr. Nowlin, our
policy was formulated many years ago and has been followed
since then.

     Q      Let's just stick to this particular bank loan
and the bank loans for this ensuing year. At the time you
were determining on the bank loan for Milwaukee Gas Light
Company for 1958, did you also consider and reach a
conclusion with respect to a bank loan for the other sub-
sidiaries which you contemplated for 1958?

     A      We looked at their financial requirements as we
do regularly, and --

     Q      Mr. McElvenny, let's make it a short answer.

     A      When you say "formulated"-- I say our basic policy
has been fixed --

     Q      I am talking about the bank loans for 1958.

     A      Are you talking about the $19,500,000 we are
talking about?

     A      The question is very clear. I asked you when you
decided --

     A      Repeat it. Maybe I will find it clearer.

     (Question read)

     The Witness: We considered the other subsidiaries, yes.

WG-ANR-00052323

By Mr. Nowlin:

Q    In other words, at the time you decided, you and your associates decided that you would pursue the financing of Milwaukee Gas Light Company through the medium of a bank loan, you also made that decision for the other subsidiaries for 1958, did you not?

A    We decided on the basis of then estimates we would pursue the bank loan without, which I have placed in this record for 1958.

Q    That was early in 1958?

A    Yes.

Q    The bank loans we are referring to, Mr. McElvenny, are the $3-1/2 million for Michigan Consolidated, $11 million for Milwaukee, $5 million for Michigan-Wisconsin, making a total of $19,500,000.

A    Yes.  The total bank loan of Milwaukee for which we are asking authorization is $15 million, as you know.

Q    Is it fair to state, Mr. McElvenny, that in the early part of 1958 -- January or February --or the latter part of 1957 that you and your associated had decided you were not going to do any common stock financing for the system companies?

Mr. Seder:  That is two questions -- the early part of 1958 and the latter part of 1957.

Mr. Nowlin:  Read the question back.

WG-ANR-00052324

(Question read)

A    No. We reviewed our situation and we feel that none is required in 1958.

By Mr. Nowlin:

Q    When did you decide that, Mr. McElvenny?

A    It became evident when we reviewed our construction requirements for 1958, and having in mind what our experience was in 1957.

Q    Let me try again: Didn't you decide in the early part of 1958, January of February -- at the time you were considering bank loans --that you would not do any common stock financing for the system companies in 1958?

A    We decided that none was required by the financial facts as they existed. That is correct.

Q    When are your annual reports normally prepared for the individual companies in draft form?

A    They are prepared a reasonable time before they are issued. American Natural's annual report is issued six weeks or two months before our annual meeting, which is at the end of April.

Q    Did you see the draft form before it was sent to the printers for being printed?

A    Yes.

Q    Are you familiar with the fact that you stated in the annual report of Milwaukee Gas Light Company that there

WG-ANR-00052325

will be no common stock financing for the system during 1958.

Perhaps, Mr. McElvenny, I should amend my question to refer to the American Natural Gas Company annual report.

A      Yes, I think that would be an appropriate amendment.

Mr. Nowlin:  Mr. Examiner, I wonder if we could recess for lunchhour and dig this up.

Hearing Examiner:  We will recess at this time and we will return at 1:45, if that is satisfactory.

Mr. Nowlin:  Yes, sir.

(Whereupon, at 12:42 p.m. the hearing was recessed, to reconvene at 1:45 p.m.)

WG-ANR-00052326

AFTERNOON SESSION

(1:45 p.m.)

Hearing Examiner: Let us come to order.

Whereupon,

RALPH T. McELVENNY

the witness on the stand at the noon recess, resumed the stand, was further examined and testified as follows:

CROSS-EXAMINATION (resumed)

By Mr. Nowlin:

Q   Mr. McElvenny, isn't it a fact that in the annual report for the Milwaukee Gas Light Company for 1957, a statement is reflected therein which indicates that the American Natural Gas Company would not do any common stock financing in 1958?

The statement I am referring to is contained on page 4 under the heading "Financing."

A   The statement in question is as follows:  "The company" -- which means the Milwaukee Gas Light Company -- "has done no permanent financing since June 1956.  In the latter part of 1957 we borrowed $3,300,000 from banks to finance temporarily a portion of our current construction program.  Additional financing will be required during 1958 for capital expenditures.  It is contemplated that this financing will take the form of a credit agreement with banks to be retired through permanent financing in 1959."

WG-ANR-00052327

H2

Q    Doesn't that statement indicate that American Natural
is not going to do any common stock financing in 1958?

A    I think the statement is very clear and speaks for
itself, Mr. Nowlin.

Q    Isn't that a clear indication that the Milwaukee
Gas Light Company is going to use bank loans as the medium
for financing its requirements?

A    "It is contemplated that the financing required
during 1958 will take the form of a credit agreement with
banks, to be retired through permanent financing in 1959."
That is what it says.

Q    I repeat:  Isn't that a clear indication that there will
be no common stock financing by American Natural Gas Company
during 1958?

A    My answer to that must clearly be no.

Q    How else could Milwaukee Gas Light Comp any obtain
the funds for its construction requirements?

A    How else than what, Mr. Nowlin?

Q    In what manner other than the bank loan could
Milwaukee Gas Light Company obtain the funds for its construc-
tion program?

A    It could do a permanent financing, if that were
considered desirable, which it isn't.

Q    In what form?

A    Conceivably you could sell bonds, debentures, or

WG-ANR-00052328

H3          preferred stock.

Q     It could not sell any common stock, could it?

A     Not as a practical matter. It couldn't sell any
large amount of common, that is correct, without going outside
the system.

Q     And except to the parent company.

A     That's correct.

Q     The parent company didn't have the money to put it
in funds except through the issuance of securities itself to
the extent of this bank loan. Is that correct?

A     The parent company didn't have a substantial amount
of funds to finance Milwaukee. We have always got some money,
but not enough to finance the program which we referred to
and which is before the Commission now.

Q     Am I to understand from your testimony that at the
time that statement was made, there had been no determination
by the executives of American Natural Gas Company that there
would not be any common stock financing by that company during
1958?

A     It says very specifically what the program is.

Mr. Nowlin: Would you read the question back?

(Question read.)

The Witness: I am a little confused. I think the state-
ment speaks for itself, Mr. Nowlin. I don't understand the
question. If you will restate it again without a double

WG-ANR-00052329

H4

negative, maybe I can understand it.

By Mr. Nowlin:

Q   At the time that statement was made in the annual report of Milwaukee Gas Light Company, had you or your associates -- the executives of American Natural Gas Company -- decided that that company would not issue and sell any common stock during 1958?

A   That was our plan and our contemplation, that is correct.

Q   At the time that statement was made, you did not contemplate doing any common stock financing --

A   Of Milwaukee Gas Light in 1958, that is correct. Now you are talking about American Natural.

Q   First I asked you as to American Natural.

A   At the time this statement was made in the Milwaukee annual report, which is dated February 28, 1958, it was our conclusion that no common stock financing by American Natural was necessary in 1958.

Q   Was your determination or decision, Mr. McElvenny, made known to the Commission or its staff that American Natural did not contemplate doing any common stock financing in 1958?

Mr. Seder:  As of what date?

Mr. Nowlin:  As of February 28, the date of the annual report.

WG-ANR-00052330

H5

A    I don't recall, Mr. Nowlin. You can answer that better than I can.

By Mr. Nowlin:

Q    You don't recall whether or not you advised the staff of the Commission of your decision not to do any common stock financing in 1958?

A    If you put it that way, I am quite confident that prior to February 28, 1958, we had not made such a statement to the staff or to the Commission.

Q    But you had made your determination in so far as you were concerned that you would not do any common stock financing at that time?

A    We were satisfied that no common stock financing was necessary in 1958.

Q    I show you a document, Mr. McElvenny, and ask you if you would examine it and state for the record what it is.

A    The document in question to which you direct my attention is a letter dated November 7, 1956, to the Securities and Exchange Commission, File No. 70-3509, which is signed by the American Natural Gas Company and Michigan Consolidated Gas Company.

Q    This letter was signed by you?

A    Yes, my signature appears on it.

Q    And you are familiar with the statements set forth in this document?

WG-ANR-00052331

H6

A    Yes.

Mr. Nowlin:  Mr. Examiner, I would like to incorporate by reference this letter which appears in Docket No. 70-3509, consisting of five pages, as a part of the record in this proceeding.

Hearing Examiner:  Is there any objection to that?

Mr. Seder:  No objection.

Hearing Examiner:  Let the letter referred to be incorporated in this record by reference.

(The above mentioned material was incorporated into evidence by reference.)

By Mr. Nowlin:

Q    Mr. McElvenny, directing your attention to the letter, would you state what the purpose of this letter was, why it was sent to the Commission?

A    This letter was written in response to the request of the Staff for a statement along these lines.

Q    What was the objective or the purpose of the letter?

A    The objective of the letter was to comply with the demands of the Staff so that Michigan Consolidated Gas Company could obtain the funds which would enable it to pay its debts as they mature and keep from going into court.

Q    How did this arise -- in connection with what?

A    It was in connection with a proposed financing plan of Michigan Consolidated Gas Company, which was pending before

WG-ANR-00052332

87     the Commission.

Q     That is the proposal involving the bank loan.  Is that correct?

A     It involved a bank loan to be refinanced with senior securities.

Q     Were the representations set forth in this letter made in good faith?

A     Certainly.

Q     Do you consider that the proposal which you now have before the Commission on behalf of Milwaukee Gas Light Company to be consistent with the representation set forth in that letter?

A     Yes, I feel it is.

Q     Mr. McElvenny, I direct your attention to page 3 of this document, Item 6(d) in which it is represented as follows:  "At the end of 1958, no subsidiary will have short-term loans to be permanently financed."

Do you consider that representation to be consistent with the proposal now before the Commission on behalf of Milwaukee Gas Light?

A     The letter in 1956 was based upon certain anticipated events, including the necessity for a common stock offering in 1958.  It is predicated upon that assumption but for reasons which I have explained, the necessity does not now exist; and we do not feel that a common stock offering is necessary in

WG-ANR-00052333

H8

1958.

On the contrary, we think that the proper way to handle that is to make an offering in 1959 when we have some current use for the money.

Mr. Seder: Before going any further, I am sure that counsel wouldn't purposely misrepresent by way of questioning what is in the letter. I think in order to relate Item 6(d) -- that portion to which he referred -- the paragraph that precedes it should also be read.

It reads as follows: "Attached are certain amended exhibits prepared at the request of the Staff of the Commission which reflect the revised financing program. Based upon the estimates and assumptions set forth, it will be noted that" -- and then follow five subparagraphs, of which (d) is: "That at the end of 1958 no subsidiary will have short-term loans to be permanently financed."

I think that that ought to be included as a part of the question.

Mr. Nowlin: I have no objection to that.

By Mr. Nowlin:

Q    At the time you submitted this document, Mr. McElvenny, did you understand that these were representations being made to the Commission in order to get an order authorizing your proposed bank loan and other financing?

A    I think the letter speaks for itself.

Case 2:20-cv-01334-SCD    Filed 01/27/23    Page 84 of 166    Document 50-27

WG-ANR-00052334

H9

Q    I am asking what you understood was the purpose of it.

A    Specifically, that, based on the assumptions and estimates set forth, the following would be the indicated result.

Q    Were the representations set forth in this letter made for the purpose of inducing the Commission to approve your pending application on behalf of Michigan Consolidated?

A    They were made in response to the views of the Staff and I think as far as I am concerned or know, were necessary in order to permit Michigan Consolidated to get the bank loan which it urgently needed.

Q    Were they made, in so far as you were concerned, with a viewpoint of inducing the Commission to approve that application of Michigan Consolidated?

A    They were made, yes, as part of the application in response to the position of the Staff.

Q    It was your understanding that unless these revisions or representations were made, you would not get approval of your pending application?

A    We were confident that a letter of this kind was necessary to meet the views of the Staff. I don't know whether the Commission would have approved some revised program or not, but I am quite confident that in order to get the acquiesence of the Staff, a letter of this kind was necessary.

WG-ANR-00052335

H10        Q    Let me direct your attention to page 1 of the letter, which reads as follows:

"We have been advised that the foregoing program is not acceptable to the Commission because the Commission believes that it does not provide sufficient equity funds for the holding company system. In order to provide funds required for construction and expansion purposes in a feasible manner and at the same time meet the requirements of the Commission, we are willing to revise the program as follows" -- and then it sets it forth.

That would indicate that this was a representation made to the Commission rather than the Staff, would it not?

A    It reflects the views of the Staff, and to that extent presumably of the Commission.

Q    Isn't it a fact that the letter is addressed to the Commission and not the Staff?

A    Well, to the Commission, yes. Of course, as you know, Mr. Nowlin, the letter is based on the assumptions. For example, in 1957 the construction program estimated for Michigan Consolidated was reduced $10,691,000 from the estimate. That is a natural fact.

I have explained to you that the program in 1958 may be eliminated, reduced by $3.5 million. In that event, no borrowing at all by Michigan Consolidated will be necessary.

You have already made the point, Mr. Nowlin, that in the

WG-ANR-00052336

H11      event we don't get the approval of the Michigan Wisconsin

space heating request, Milwaukee Gas Light will have a substantial

reduction in its 1958 and 1959 expenditures.  These things are

not graven on stone, Mr. Nowlin; and the Commission understands

that.

The Commission has always had a reasonable and flexible

policy.

Q    You can deliver your argument -- or have your

counsel deliver an argument -- to the Commission.  All I

want to do is to get facts.

Mr. Seder:  Counsel has been arguing with the witness

for the last ten minutes about this letter.  I think it is

appropriate for the witness to give his response without

interruption, as counsel has been doing.

Mr. Nowlin:  Mr. Examiner, I object to the characterization

of describing it as argument.  I have been asking questions to

get answers, and I have not been getting responsive answers.

Hearing Examiner:  I think you are getting arguments from

both sides.  Ask another questi on now, Mr. Nowlin.

By Mr. Nowlin:

Q    I direct your attention, Mr. McElvenny, to the last

paragraph of this letter, which reads as follows:

"We request that this letter and the amended exhibits

No. 3 and 18, respectively, attached hereto, be incorporated

in the record of the proceedings in File No. 70-3509, and

WG-ANR-00052337

H12

respectfully request that the Commission enter an order at an early date which would authorize Michigan Consolidated to borrow up to $25 million under its proposed credit agreement."

Isn't it a fact that at your request this letter was made a part of the record for consideration by the Commission?

Mr. Seder: Now, I object to that. This speaks for itself. Counsel has read and characterized the last paragraph, and we will stipulate that the last paragraph says what it says.

A    The letter speaks for itself.

By Mr. Nowlin:

Q    Is it your understanding, Mr. McElvenny, that the Commission relied upon these representations at the time it issued its order?

Mr. Seder:  I object to that.  The witness is in no position to say what the Commission did.

Hearing Examiner:  Objection sustained.

By Mr. Nowlin:

Q    Have you read the Commission's opinion which followed the issuance of its order in this particular case?

A    I undoubtedly did at the time, Mr. Nowlin, but I don't have any recollection of it.

Q    Do you consider that the present proposal which you have before the Commission to obtain an authorization for a $15 million bank loan for Milwaukee Gas Light Company to be consistent with the representations made in this letter of

WG-ANR-00052338

H13          November 7, 1956?

Mr. Seder:  I object to that.  The witness has already said --

Hearing Examiner:  That question has been asked in almost that form, and the witness said he felt it was consistent. Are you still of that opinion, Mr. McElvenny?

The Witness:  Yes, I am.  Any fair consideration of the letter, that is correct.  I say, these things aren't graven on stone.  The Commission on numerous occasions has changed integration orders, changed all sorts of directives.

          By Mr. Nowlin:

Q          Mr. McElvenny, on page 2, Item 5 of this letter, I notice a representation to the effect that the stockholders of American Natural would be asked to increase the authorized common stock so as to enable you to issue and sell common stock in accordance with the representations made in the letter.

Was the authorization for the issuance of additional common stock obtained?

A          The charter was amended to increase the authorized number of shares, yes.

Q          Specifically why have you decided not to issue common stock during 1958 as represented, and in lieu thereof to obtain bank loans to finance the construction requirements of the system?

A          I have explained why we are interested in

WG-ANR-00052339

H14     issuing the bank loans, and I think the explanation is complete.

     Q    You haven't explained why you decided not to issue common stock.

     Hearing Examiner:  He is beginning to offer an explanation.  See what it is.

     A    I have stated a fact which appears very clearly, that we need the flexibility now of bank-loans.  You can see very plainly that even in the Milwaukee situation, a substantial part of the proposed construction in 1958 and 1959 is dependent upon regulatory authorization that we cannot control.

     I think it is also plain from the record that the proposed expansion of Michigan Wisconsin likewise is dependent upon regulatory authorization that we have not yet secured, but which we hope will be forthcoming, but which we cannot control.

     I have earlier adverted to the present recession in Detroit, and to the fact that the Michigan Consolidated construction program was reduced $10,700,000 in 1957, and may well be reduced several million dollars this year.

     The simple fact is that looking at the American Natural Gas System, its consumers and its investors, at the present time there is no reasonable requirement for the sale of additional common stock.  All it would do would be to dilute the equity of our common stockholders and provide them with no anticipatory benefits.

WG-ANR-00052340

H15

Our stockholders have in nine years put up more than
$83 million of additional common stock. They have done that
because they have concluded that the investment of additional
equity money in the system was advisable and desirable. We
want them to continue in that feeling. I think the Commission
itself knows from its own experience that the common stockholders
should only be reasonably requested to go out and provide
additional equity when it can be usefully employed and when
it is necessary in the system.

As to the ratios of our company, the record shows reduction
in our cash requirements in 1957 and the prospective reduction
in 1958, and the record also shows in March 1958 we prepaid
$17 million of the American Louisiana bank loan; and that by
August we will have retired the remaining $5,400,000.

We have eliminated, in other words, $22,400,000 of debt
which wasn't contemplated at this time.

Now, the reduction in our requirements and the elimination
of the debt in American Louisiana indicates that no common
stock is necessary at this time.

Q    Isn't it a fact, Mr. McElvenny, that your decision
represents a complete reversal of that reflected in the
representation made on page 2, Item 5, of your letter to
the Commission, wherein you stated in part:

"In order to make this part of the program as definite
as possible, reference is made to the prop osed second 1 for 10

WG-ANR-00052341

H16

offering in 1958 and the reason for it will be made in the prospectus relating to the first rights offering referred to in the preceding paragraph."

Then the letter runs on: "It is not feasible at this time to determine just when the second rights offering should be made in 1958. The timing during the year will be dependent upon market conditions and the time when funds will be required for construction purposes. In due course the management will discuss the timing with the Commission or its Staff, and we anticipate no difficulty in reaching a mutually satisfactory understanding on the matter."

Do you consider your present proposal to be consistent with those representations?

A    I do, because as I said, I consider the letter was responsive to the facts and the assumptions made at the time in November 1956. I have outlined the very basic changes which have occurred, and I think that any fairminded Commission can see that there is no necessity or desirability at this time for the issuance of common stock.

Q    As to the latter part of this letter, that in due course the management will discuss the timing with the Commission or its Staff and we anticipate no difficulty in reaching a mutually satisfactory understanding on the matter -- prior to the filing of your declaration with the Commission of the Milwaukee Gas Light Company on March 21, 1958, had you

WG-ANR-00052342

H17    discussed the matter with the Commission or any member of the Staff?

A    I don't think we had. We filed it in March, and it is a simple bank loan financing of Milwaukee Gas Light, and it is readily apparent on the face of it what the facts are.

Q    Does that represent a complete abandonment of the representation made in your letter?

A    I don't feel that way.

Q    But you did not discuss the change in your financing plans with any member of the Commission or the Staff prior to the filing of your declaration?

A    That is correct.

Mr. Nowlin:  Mr. Examiner, in order to make certain when I incorporated by reference the five-page letter from American Natural Gas Company, there were also two exhibits -- No. 3 and No. 18 -- that were attached to the letter, which I intended to incorporate also as well as the letter.

Hearing Examiner:  Those two exhibits will be incorp orated in this record along with the letter.

                    (The above two exhibits from Docket
                    No. 70-3509 were incorporated into
                    evidence by reference.)

        By Mr. Nowlin:

Q    Mr. McElvenny, subsequent to the filing of the appli- cation of Milwaukee Gas Light Company on March 21, 1958, did any member of the Staff communicate with you in indicating any

WG-ANR-00052343

H18

problems with the proposal?

A    My understanding was that I think we submitted some supplementary data, or some of our people talked with the Staff; and then we understood that the Staff had no serious problems with it and that it was going to be set down under Rule U-23.

Subsequently that was changed, and we understood that a hearing would be necessary.  I came down with others and we talked with the Staff about it, and the Staff adhered to its view that a hearing was required.  So we are here now on the hearing.

Q    Let me see if I can refresh your memory.  Do you recall whether or not on or about April 3, 1958, you got a telephone call from Mr. Spenser, the Section Chief, advising you that the Staff had difficulty with the financing program, and that you told him the company did not intend to do any common stock financing -- that is, American Natural did not intend to do any common stock financing in 1958?

A    What was the date of that?

Q    April 3, 1958.

A    I think Mr. Spencer called me.  I don't recall what he said about difficulties with the financing because subsequent to that the Staff told us that the matter would be handled under Rule U-23 without a hearing.  But he did call me.  I remember he called me.

Q    Do you recall telling Mr. Spencer that the American

WG-ANR-00052344

H19      Natural did not intend to issue any common stock in 1958, in the course of that conversation?

A    I think what I said was that -- I recall discussing it with him -- that we didn't feel that it was necessary to issue any during 1958 and that, in any event, it was premature at that time; that if we had to issue it in 1958, we certainly weren't obligated in any case to issue it until the latter part of the year.

Q    You do not recall that you flatly told him that the company did not intend to issue any common stock in 1958?

A    I told him we didn't desire to do it, that is correct.

Q    As a result of that telephone conversation, did you send any of your associates to Washington to confer with the Staff regarding this matter?

A    I don't know if it was as a result of that conversation, and I don't recall that I sent them.  I know some people came down and talked with the Staff later.

Q    You don't know how they happened to get here?

A    I was out of town at the time of the conversation and I don't recall.  It was either generated as a result of Mr. Spencer's call to me or some direct communication from the Staff to the Milwaukee Gas Light people.

Q    You don't know whether you advised Mr. Hoffer of your conversation with Mr. Spencer and either suggested or directed him and associates to come to Washington to talk to

WG-ANR-00052345

H20        the Staff?

        A    I know they came down, Mr. Nowlin, but I don't recall

the genesis of it.  I know they came down to talk with the

Staff.  I know that.

        Q    You don't recall whether you were responsible for that

trip or not?

        A    No, I don't recall whether it came from Mr. Spencer's

call to me or whether they communicated also with the company.

        Q    Did you communicate with Mr. Hoffer or any of the

gentlemen who came down here and tell them of your conversation

with Mr. Spencer?

        A    I think I discussed it with Mr. Nemeyer.  I may

have mentioned it to Mr. Hoffer, too; I can't remember.

        Q    You just mentioned that some member of the Staff

indicated that a Rule U-23 procedure would be used?  Will you

tell us what member of the Staff advised you to that effect?

        A    I didn't say advised me.  I said, as I understand it,

I think it came from a conversation with some member of the

Staff with the Milwaukee Gas Light people.

        Q    Do you know who advised you to that effect or where

you got your understanding, from what source?

        A    I don't know what member of the Staff it was, no.

        Q    Who told you about it, Mr. McElvenny?

        Mr. Seder:  Mr. Examiner, I have hesitated to intrude into

this line of questioning.  I fail to see the relevance of this

WG-ANR-00052346

H21　　　　line of questioning as to whether the proposal that is

before the Commission now meets the standards of the Act.  So

I am going to ask counsel whether you are about at the end

of this line of questioning, or whether this is going to go

on.

　　　　If so, I am going to object.

　　　　Mr. Nowlin:  I am going to try to place on this record

the complete details as to the representations that were made

and the failure to live up to these representations in so far as

I have information on them.

　　　　Mr. Seder:  It seems to me we are getting awfully far

afield of the legitimate concern of the Commission, as to

whether this is financing appropriate under the circumstances

that now exist.

　　　　Hearing Examiner:  If objections occur to you later on,

you may interpose them, Mr. Seder.

　　　　Mr. Seder:  I hate to do that, your Honor.  I hate to

interrupt the orderly course of the proceeding.  The issue,

as I understand it, is whether on the facts as they presently

exist this financing is appropriate under the statute and the

Rules of the Commission.

　　　　All of this has nothing whatever that I can see to do

with that issue.

　　　　Hearing Examiner:  I can't control the cross-examination.

As objections occur to you, I will be glad to consider them.

WG-ANR-00052347

H22

Mr. Seder: Thank you.

Mr. Nowlin: Is there a question pending?

(Question read.)

A    It is my recollection that Mr. Nemeyer told me, and he indicated his views were based on a conversation with Mr. Spencer.

By Mr. Nowlin

Q    And that is, that the application would be cleared under Rule U-23 procedure?

A    Yes, that the Staff was recommending that.

Q    Do you recall whether or not that statement was made by any particular member of the Staff or whether that was just Mr. Nemeyer's general observation?

A    N.  As I have just stated, my understanding is that that statement was based on a conversation between Mr. Nemeyer and Mr. Spencer of the Staff.

Q    Was that subsequent to the conference which your associates had with the Staff members?

Mr. Seder:  I object on the general grounds that I previously indicated.

Hearing Examiner:  Read this question, Mr. Reporter.

(Question read.)

Hearing Examiner:  The objection is overruled.

A    It was prior to the last conference we had, at which time it was determined that a hearing probably would be required.

WG-ANR-00052348

H23      At the last conference the Staff said it hadn't made up its

mind yet whether a hearing would be necessary, but we received

a copy of the hearing notice -- I think it was mailed the next

day.

By Mr. Nowlin:

Q     Let me identify for the record:  Who is Mr. Hoffer?

A     Mr. Hoffer is the comptroller of our service company

and of our pipeline company.

Q     Did Mr. Hoffer relay to you the fact that on or about

May 2, 1958, the Staff requested certain information, addi-

tional information, regarding the proposal of Milwaukee Gas

Light Company?

A     Yes, I understand that certain additional informa-

tion was requested and supplied.

Q     So that on May 2 you were well familiar with the

fact that your failure to propose the issuance of common stock

was causing the Staff a good deal of trouble in connection

with this proposed bank loan?

A     No, I am not aware of that at all.

Mr. Seder:  I object, your Honor, on the same grounds.

Hearing Examiner:  Read that question, Mr. Reporter.

(Question read.)

Hearing Examiner:  The objection is overruled.

The Witness:  No, I wasn't aware of that.

WG-ANR-00052349

H24                        By Mr. Nowlin:

Q    Mr. McElvenny, you were aware of the fact that
Mr. Spencer related to you over the telephone on April 16 that
the Staff was having difficulty with your failure to issue
common stock, weren't you?

A    Mr. Spencer wasn't indicating that this thing could
not be approved.  He asked about a common stock offering by
American Natural, and I have explained the response.

Then the Staff asked for further information, which is a
very common practice, as you well know.  There isn't one filing
in a hundred that goes through the Securities and Exchange
Commission without some additional information being supplied.
That is routine.

You asked for that, and it was supplied.  There was
no indication that this thing couldn't be approved.  Indeed,
after we supplied the data, the indication we had from the
Staff to Mr. Nemeyer was that it could be processed under
Rule U-23.  Later that was changed.  When we came down to talk
to the Staff to find out the present basis of their thinking
and if a hearing was necessary, we talked with the Staff and
they told us they had not made up their mind as a result of
the meeting whether or not a hearing would be required.

But obviously they concluded that one was required because
we later received a notice of hearing, and we are here today.
We are not making any point out of what the Staff told us or

WG-ANR-00052350

H25        didn't tell us. The simple fact is we filed an application; we filed supplemental data. We had conferences with the Staff. The matter has been set for hearing. We are having the hearing now. And the matter is before the Commission -- shortly, we hope, for decision on the record.

Does that answer your question?

Q    No, sir.

A    Ask it again, then.

Q    I still want to obtain some more information. I would like to ask you if, as a matter of fact, on May 2, 1958, you didn't personally know that the Staff was having difficulty with Milwaukee Gas Light's proposed bank loan rather than American Natural issuing common stock?

Mr. Seder: Wait just a minute. May I be understood as having a continuing objection to this line?

Hearing Examiner: Yes, you may have that. You may have an exception to my ruling, Mr. Seder.

Mr. Seder: Thank you.

By Mr. Nowlin:

Q    If you don't understand the question --

A    I knew the question and I will be glad to answer it. I knew that the Staff had a question concerning the financing. You say "was having difficulty." I didn't know they were having difficulty.

Q    Do you want to use a better term?

H26

A    Yes, I do.  I say, I knew they had a question.  I not only want to use it, I am using a different term.

Q    And you yourself at no time prior to May 19, 1958, discussed this matter on your own volition with members of the Commission's Staff -- that is, the change in your proposal?

A    You have referred to a conversation I had with Mr. Spencer sometime in April, at which he raised the question and we discussed it.

Q    Do you recall that you and your associates were here for a Staff conference on May 19, 1958, at which this whole subject was discussed?

A    I recall that there was a subsequent meeting to which I have referred following my conversation with Mr. Spencer.  Then the Staff requested additional information which was supplied.  And then I think our people discussed that with the Staff.

Then later on we understood the matter was cleared by the Staff for processing under Rule U-23.  Then we had a later telephone conversation that it looked like a hearing might be required or that they had some continuing problems.

So we came down here -- I came down at that meeting, and we discussed the thing out.  As a result of that, the Staff was still of the view that a hearing should be held and we have got one.

That is the chronology of it, to the extent of my knowledge.

H27

Hearing Examiner: Maybe I can shorten this. What was the date that you came down here, Mr. McElvenny?

The Witness: May 19.

Mr. Nowlin: I have dates here, Mr. Examiner, which I would like to read into the record. If anybody wishes to correct them --

Hearing Examiner: Are you asking Mr. McElvenny about whether he and some others of his company were here on May 19? It now appears that he was here.

The Witness: I have said that.

Mr. Nowlin: I know that. I am trying to get some other dates established here.

Hearing Examiner: Proceed.

By Mr. Nowlin:

Q  I would like to establish with Mr. McElvenny that on May 2, before the conference on May 19, he knew of his own knowledge that the Staff were having difficulty -- if you want to use that -- or having trouble with the Milwaukee Gas Light proposal to issue a bank loan. He knew that one of the problems was that he did not propose to do any common stock financing as was represented in this letter.

A  You have asked that question several times. But I will be glad to answer it again. I knew that the Staff had questions concerning the financing, Mr. Nowlin. We supplied the data you requested. Subsequent to that, we understood that the

WG-ANR-00052353

H28

matter was appropriate for clearance under Rule U-23 without a hearing. Then we got the telephone call which indicated the Staff had some remaining questions, and that a conference would be appropriate.

We came down on May 19 and had the conference. The Staff said they still didn't know whether a hearing would be necessary, and on the following day the hearing notice was issued -- May 20.

I have answered that several times. May I do it again?

Q     You may if necessary for cross-examination. You indicate there that you were taken unawares by the Staff recommending the hearing. I would like to refresh your memory and ask if you know if Mr. Spencer called Mr. Nemeyer and told Mr. Nemeyer that the Staff was recommending that an order for hearing be issued, and that was the day prior to the Commission's issuance of an order? Did you know that?

A     No, I did not know that.

Q     Mr. Nemeyer did not tell you that Mr. Spencer had called him and told him that the Staff was going to recommend the hearing?

Hearing Examiner:  What is the date of this call, now, that --

A     The conference was May 19.

Mr. Nowlin:  I have here May 16 advised Mr. Nemeyer the Staff was recommending a hearing.

WG-ANR-00052354

H29

Hearing Examiner: They were here on the 19th. Now, what is the date of this call to Mr. Nemeyer? What is that date?

Mr. Nowlin: That is what I am trying to get here in the record.

Hearing Examiner: That hasn't been mentioned.

Mr. Nowlin: I would like to state here that according to the memorandum I have -- anybody can correct it if they want to -- on April 3, 1958, Mr. Spencer, Chief of the Section, called Mr. McElvenny somewhere in Louisiana, I think, and advised him of the Staff's having difficulty -- if you want to use a different term -- with the proposal to issue a bank loan rather than issue common stock.

Hearing Examiner: Mr. Nowlin, we have been over that ground several times.

The Witness: Fifty times.

Hearing Examiner: Wait a minute, let me finish. We have gone into this telephone call that Mr. Spencer made to Mr. McElvenny. You say it was down in Louisiana. There was some mention that he wasn't in Detroit. But now what is this memorandum here about a call that Mr. Spencer put in for Mr. Nemeyer on May 16? That is the thing we are going into now.

Mr. Nowlin: If you will let me, Mr. Examiner, there are six or seven dates here. I will give you the chronology of

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 105 of 166   Document 50-27

WG-ANR-00052355

H30    these.

Mr. Seder:  Mr. Examiner --

Hearing Examiner:  One minute, please, sir.  It seems to me we have gone into this call of May 2 rather fully.  $^C$an't we go to some other call?

Mr. Nowlin:  This is the April 3 call I am talking about now.

Hearing Examiner:  I mean the April 3 call.  I got the wrong date. We have been into that several times.

Mr. Nowlin:  I am trying to get to the next event and the next event so we will have the chronology.

Hearing Examiner:  What is the next event?

Mr. Nowlin:  The next event is on April 16.

Hearing Examiner:  That is what I am inquiring about.

Mr. Seder:  Wait a minute.  I object to counsel testifying from a memorandum or reading it into the record.  If he has questions he wants to ask of the appropriate witness, that is one thing.  But just to read memoranda of telephone conversations containing characterizations of what was said I think is improper.

Hearing Examiner:  I think if Mr. McElvenny knows nothing of this call of $^M$ay 16 to Mr. Nemeyer, you should direct your inquiry to Mr. Nemeyer, Mr. Nowlin.  Mr. McElvenny hasn't been asked if he knows of any such call.

Mr. Nowlin:  I beg your pardon, Mr. Examiner.  I asked him

WG-ANR-00052356

H31

if he had been informed by Mr. Nemeyer.

Mr. Seder:  His answer was No.

Hearing Examiner:  I don't recall it, but I will let you ask that question right now.

Mr. Nowlin:  If it is necessary, I can call the Commission's Staff member and put him on the stand to support this.

Hearing Examiner:  Now you are arguing with me.  Will you ask Mr. McElvenny the plain question if he knows about a call that Mr. Spencer made to Mr. Nemeyer on April 16.

By Mr. Nowlin:

Q    Do you know that call, Mr. McElvenny?

A    I don't recall --

Q    It is May 16 instead of April 16.

Hearing Examiner:  May 16; I am wrong again.  May 16.

The Witness:  Mr. Nowlin, I don't recall the call, but there was some reason why we called a conference on May 19.  I must have known from some source that the Staff had some continuing problems because otherwise I would not have attended the conference on May 19.  I don't recall the call on May 16. As I say, we were here on the 19th.

Q    You don't know how you happened to get down here, then?

A    I must have been informed that the Staff continued to have some questions concerning the financing or I would not have come to the conference.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 107 of 166   Document 50-27

WG-ANR-00052357

H32                Q     Then you did attend the conference with the Staff on May 19?

        A     Yes, I have said that many times.

        Q     Was there any doubt left in your mind after that conference that the Staff was having difficulty with your failure to propose the issuance of common stock rather than the bank loan of Milwaukee Gas Light?

        A     There was quite a bit of doubt left in my mind.  I am not making anything out of this, because in the latter part of the conference the Staff said that they had not yet made up their mind whether a hearing was required.

I have said that shortly afterward, however, the hearing notice issued and we are here.

    Mr. Nowlin:  Read that answer back.

    (Answer read.)

        By Mr. Nowlin:

        Q     Mr. Nemeyer didn't advise you on May 16 that Mr. Spencer had told him that the Staff was recommending that this matter be set down for hearing?  That was three days before the May 19 conference.

        A     Mr. Nemeyer must have told me or someone from Milwaukee Gas Light must have told me that the Staff continued to have problems, because we arranged the conference for May 19.

I repeat, Mr. Nowlin, that at that conference on May 19 the Staff said they had not yet made up their mind -- that is,

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 108 of 166   Document 50-27

WG-ANR-00052358

H33    on May 19 -- whether a hearing was necessary. That is the
last information I had on it.

Q    Mr. McElvenny, as the president of American Natural
Gas Company, I would assume that you have inquiries or con-
ferences with representatives of Moody's Investors' Service
from time to time. Is that correct?

A    If we have a financing program pending, they ask
us to send copies of the responsive documents; and occasionally
if they have questions, they will either call me or call some
of our financial people.

Q    Do you recall whether or not a representative
of Moody's inquired of you sometime in the latter part of
April or early May as to whether or not American Natural Gas
Company would issue any common stock in 1958?

A    No, I don't recall.

Q    Do you recall whether or not you ever made a statement
to a representative of Moody's Public Utilities Service sometime
in April or early May that you did not contemplate having any
common stock issued by American Natural during 1958?

A    I think I expressed the hope that we would not have
to issue any common stock in 1958, but that we contemplated
an offering in 1959. I think I expressed that sentiment.

Q    Let me read you an excerpt from Moody's Public
Utilities, page 1395, Volume 29, Friday, May 2, 1958.

A    What is the date?

WG-ANR-00052359

H34

Q    May 2, 1958, which reads as follows:  "May offer
common in 1959.  Company states it does not expect to sell any
common shares in 1958 but probably will sell some common
stock in 1959."

Are you familiar with that statement?

A    I haven't seen it before, but I think someone adverted
to it generally in the meeting we had on May 19, something to
the effect that Moody's was making some statement about the common
stock offering.  I haven't seen it before.

Q    You don't know whether that statement is attributable
to a request for information from you?

A    No, I don't.  As I say, I have expressed the sentiment
that we hope we would not have to issue common stock in 1958,
but that wecontemplated it in 1959.  I expressed that at the
meeting of stockholders.

Q    In your judgment, Mr. McElvenny, is it not feasible
for American Natural Gas Company to issue common stock at the
present time or during 1958?

A    It is not desirable.  I will put it that way.

Q    I didn't ask you that.  I asked if it was feasible.

A    It is possible, but it is not desirable.

Q    Is there any reason that you know of that American
Natural Gas couldn't market common stock on a favorable basis
at the present time?

A    There are lots of reasons why it shouldn't.

WG-ANR-00052360

H35 Q I didn't ask you that.

Mr. Nowlin: Would you read the question back?

(Question read.)

The Witness: Yes, there are. There are reasons I have indicated at considerable length in this record which indicate that it would not be regarded by our stockholders as a favorable basis.

Indeed, it would be regarded by our stockholders as an unfavorable basis.

By Mr. Nowlin:

Q Do you know what your stock is selling for at the present time?

A It is selling for around $60 a share.

Q Do you know what the yield basis is on the common stock of American Natural Gas at the present time to the owner?

A It is a component of the market price and the dividend.

Q You don't happen to know yourself?

A No. It can be computed.

Q Is it your opinion, Mr. McElvenny, that the company could not issue and sell common stock at the present time on a favorable basis as compared with what it has done in prior years?

A We could sell common stock, certainly, from the point of view of our stockholders. It would not be afavorable

H36        basis.

Q        Would there be any less favorable basis to an issue

this year than there was in 1956?

A        Certainly.

Q        What would be the differences?

A        All the difference in the world.  In our earlier offer-

ing --  we had an offering in 1955.  Is that the one you meant

or some other offering?

Q        You had an offering in 1955 and 1957.

A        That's right.  And those offerings were necessary

to provide the equity base for the expansion which was then

underway.  The 1955 offering raised 35.7 million dollars to

provide for the equity financing of our new pipeline.  The

offering in 1957 provided funds for the permanent financings

then underway.

Q        According to the information which I have here,

Mr. McElvenny, American Natural sold in August 1955, 736,856

shares of its common stock at $48.50 per share.

A        Yes, I just discussed that.

Q        A rights offering.

A        Yes.

Q        The present market on your stock is what?  I hate

to ask you to repeat that.

A        About $60 a share.

Q        So that you could issue and sell stock at a higher

WG-ANR-00052362

H37       price today than you did in 1955, couldn't you?

          A    If that were determined to be a proper thing to do,

we could sell stock, that's correct.

          Q    You could get more money for less shares in 1958

than you did in 1955, couldn't you?

          A    I don't know.  The price of 48.5 was a substantial

discount from the existing market.  If we were going to make

a large offering of common stock now, I don't know what the

market price of our stock would result in.

          Q    Let's go back to March 1957.  The records indicated

you sold 472,114 shares of common stock at $54.50 a share.

          A    Yes.

          Q    So that you could sell shares today on today's market

and raise more money on less shares than you did in 1957,

couldn't you?

          A    That is a matter to be determined by future events.

I don't know, as I say, what price would be appropriate if

we had to go ahead and sell more common stock now.

          Q    Did you know what price was appropriate in 1955

and 1957?

          A    We pitched it in relation to the current market

price

          Q    Couldn't you do the same thing in 1958?

          A    But we don't know just what the current market price

is going to be after the offering is announced and we get ready

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 113 of 166   Document 50-27

WG-ANR-00052363

H38        to fix the price.

Q      Did you know what it was in 1955 and 1957?

A      Mr. Nowlin, we knew it when we fixed it. We ordinarily fix the price in relation to the market price a day or two prior to the time we get the comp etitive bid from the underwriters to underwrite any unsubscribed issue.

So the price that you offer your stock to your stockholders at is pegged in relation to your market price at a time shortly before the offering is made.

Q      At what kind of discount was your offering in 1955?

A      That is all a matter of record in the files of the Commission. You have our prospectus and everything. I can't remember offhand, but it has been our practice to try to offer the stock to our stockholders at a considerable reduction from the current market price.

Q      Are there any factors that you know of today that would prevent American Natural from selling shares on a 1 for 10 basis as represented in 1956?

Mr. Seder:   I object to the last characterization.

A      The factors that are in opposition to it are simply we have no use for the money now.

By Mr. Nowlin:

Q      That doesn't go to the feasibility of selling --

A      Yes, it goes to the feasibility. Of course it does.

WG-ANR-00052364

H39

Q    Mr. McElvenny, isn't it a fact you have some 6.25 percent bonds outstanding today in the system?

A    That's correct.

Q    Isn't it a fact that you could, on the same basis of the 1955 and 1957 discounts, raise cash through the sale of common stock at a cost of money less than 6.25 percent?

A    No.

Q    Do you know what your --

A    You know your interest on your debt, Mr. Nowlin, is deductible for taxes. So you can just take 52 percent of that.

Q    Subject to check, Mr. McElvenny, I am quoting here from a sheet put out by Bear, Stearns and Company, which is dated May 1958. It indicates that American Natural Gas Company's common stock is selling on a yield basis of 4.4 percent. That is a little bit better than 2 percent under the present interest rate of your bonds, isn't it?

A    You referred to something Bear, Stearns put out?

Q    Statistics of Bear, Stearns, if you wish to check --

A    I don't wish to check it. The yield price of your common stock is based upon many factors which appeal to the investory. One is present dividend and the present earnings. Two, the expectation of acontinuation or increase in earnings --

Mr. Nowlin:  I suggest, Mr. Examiner, he is not answering my question. Would you read the question back?

WG-ANR-00052365

H40

The Witness: Of course it is. You try to ignore all the facts --

Hearing Examiner: What is your question?

Mr. Nowlin: Read the question back.

(Question read.)

The Witness: The effective cost of our bond money is 3 percent.

By Mr. Nowlin:

Q   You are computing that after deducting taxes?

A   Yes.

Q   I am talking about the coupon rate that your bonds carry and the interest which you pay on it.

A   You are making a lot of other assumptions as to the sale price of our common stock. If the common stockholder wants me to believe that an issue of common stock had to be sold whether or not the company needed money, you can be sure that the relationship between the earnings and dividends of the company and the price of the stock would change quite promptly, and Bear, Stearns would be one of the first to agree with that.

Q   At the time you went to your stockholders for an increase in the authorized shares of common stock, did you make any representation to those stockholders as to what the purpose of that increase would be?

A   Our proxy is filed with the Commission. It is a

WG-ANR-00052366

H41     matter of record before you.  I don't recall the language,
        but I am quite confident we told them that we desired the
        increase in authorized stock so we could make additional
        sales of common stock from time to time in the future to
        provide the equity capital necessary to finance the continuing
        expansion of the system.

        Q    And you didn't make any representation that the
        authorization would be used during 1958?

        A    Mr. Nowlin, get the proxy and look at it.

        Q    I am asking you.

        A    I said I couldn't recall.  I don't know the exact
        wording in the proxy.  It is a matter of record.

        Q    It just happens, Mr. McElvenny, that all the files
        in the Commission are not a part of this record.

        I have here the price range of the New York Stock Exchange
        of American Natural common stock for several years that has been
        obtained by one of my associates from The New York Times and
        other publications available to the Commission.

        I would like to read these into the record, subject to
        your checking if you have any objection to them.

        According to this chart, 1954, the common stock had a
        high of 50-7/8 and a low of 39-3/4.  The last sale was at
        48-1/4.  I will be glad to give you a copy of this if you
        want it.

        Hearing Examiner:  Pass it to him.

WG-ANR-00052367

H42

The Witness:  Thank you.

By Mr. Nowlin:

Q    In 1955 there was a high of 60-1/2 and a low of 46-3/8.  The last sale was 56-7/8.  In 1956 there was a high of 70-1/4, a low of 55-7/8, and the last sale was 64.

In 1957 there was a high of 64-1/8, a low of 44, and the last sale was 48.  In 1958, to and including May 31, a high of 61-5/8, a low of 48-1/2, and the last sale was at 61.

If you find upon examination that any of these computations are wrong, I will be perfectly willing to amend them.

Earlier in your testimony, Mr. McElvenny, I think you referred to $28 million of notes of American Louisiana Pipeline Company outstanding at the beginning of this year, 1958.

A    No, they were outstanding in 1956 and at the close of 1957 we had paid off an installment of $5,600,000 -- paid off one-fifth of them, as I recall.

Q    Then you paid off -- was it $17 million --

A    We paid off $17 million by March 31, 1958.  Then we are paying off the remaining $5,400,000 by August.  $5,400,000; we have already paid off, I think, $2,000,000 now, between March and the close of May.

Q    Going back to the $17 million payment in March, were the funds for that payment obtained by virtue of the curtailment of the construction program of American Louisiana?

A    In the retirement of that debt, about $9 million

WG-ANR-00052368

H43      represented the curtailment of contemplated construction.
The rest was cash generated from operations.

Q      You mean excess cash over working capital requirements?

A      Yes.

Q      Turning to the negotiation of Milwaukee's bank loan,
Mr. McElvenny, did you do the principal amount of talking
with the representatives of the First National Bank in arranging
the loan?

A      Yes.

Q      Was there any information given to the bank as to
what the system's financing plan for the ensuing year would be
or as to what Milwaukee Gas Light's plans were?

A      We told them that we planned to execute the credit
agreement as reflected in the filing here, and that in 1959
we would contemplate retiring it through a sale of senior
securities, debt and common stock.

Q      In other words, they were familiar with your desire
to borrow $4 million in the early part of 1959?

A      Oh, yes, the credit agreement permits the borrowing
of $15 million, and it also permits the extension of that for
a year.

Q      Did you negotiate the terms of the agreement with
the First National Bank of New York?

A      We negotiated an agreement on most of the provisions

WG-ANR-00052369

H44    which I can state are pretty routine because they follow

our customary form of credit agreement which we have been using

for quite a number of years.  Then we had further negotiations

on one particular aspect of the agreement.

Q    Does the First National Bank in the case of your bank

loans act as the principal on behalf of other banks?

A    No, no.  We negotiate with each bank and each bank

commits only for its own individual requirements.

Q    In other words, you don't go to the First National

Bank and negotiate a loan with them and they act as

principal and arrange the farming out of the other part of

the loan to other banks?

A    No.  We negotiate with each bank

Q    You negotiate directly with each bank?

A    That's correct.

Q    Do you negotiate with respect to their commitment

or with respect to the terms of the bank loan?

A    We go to them and tell them how much money we have

in mind.  We also say that we would like to see them come

in for a certain piece of it if we can arrange mutually satis-

factory terms.

Then they say, "Well, what do you have in mind?"  We say,

"Well, here is our traditional loan agreement.  We would

contemplate those terms."  Then we get down and discuss the

more important provisions of the loan agreement -- the

WG-ANR-00052370

H45

commitment fee, the interest rate, the right to prepay, the right to reduce the commitment and stop the payment of the commitment.

Q    Were the limitations and conditions contained in the loan agreement suggested by the First National Bank of New York or by one of the other banks, or by all of them?  Just how did you arrive at the terms and conditions?

A    We set up the deal in a manner that is satisfactory to us, and then we go around to the banks and sit down with their loan officers and go over the basic provisions of the agreement.  They sometimes have suggestions.  Then we consider them.  We set the deal up ourselves initially.

Q    You mean you set up the covenants and representations and warranties in the agreement?

A    That's right.  Those are matters that are considered by the bank.  If they have any views on them, you negotiate with respect to them.

Q    Is the restriction imposed on the credit agreement upon the payment of dividends at your suggestion, or was that the bank's requirement, as reflected on page 6, Item 7.2?

A    That restriction is one that we have been using for a long time.  As I recall, we suggested that.  We put that in the original draft.

Q    The banks didn't require it?  It was at your suggestion that it is in there?

WG-ANR-00052371

H46

A     That's right.

Q     How about Item 7.3? Was that put in upon your own initiative or upon the requirement of the banks?

A     That is another provision which follows earlier credit agreements, and we put that in, too.

Q     How about Item 7.4? Did you put that in the agreement or did the banks require it?

A     That likewise followed an earlier agreement and we put it in initially.

Q     Item 7.5: Would you tell me about that?

A     That follows the form of an earlier agreement. We put it in.

Q     Do you know whether or not that was initially required by the banks or did you voluntarily offer to put these restrictions on the loan?

A     My recollection is that those resulted from discussions with the banks in earlier loan agreements. They were agreed upon after discussions and negotiations between the management and the loaning officers of the banks and their counsel. Ordinarily, Mr. Nowlin, in a credit agreement which may run for a year -- or with the approval of the SEC, two years -- the banks want some restriction along the line you have referred to.

Q     That dates back several years, or when did those first come into being?

WG-ANR-00052372

H47

A    Yes, it dates back several years.

Q    Have you raised any question with respect to this bank loan or the loans in the last year or two as to whether or not these were appropriate restrictions?  That is, question with the banks?

A    I have reviewed them in connection with this particular transaction.  I have read this loan agreement.  But in my then state of enlightenment and in my present state I didn't have any feeling there was anything inappropriate about them from the point of view of the company.

Q    As I understand it now, the bank didn't insist on any of these. You proposed this yourself on your own initiative?

A    We proposed them in the original draft because, as I say, of the customary practice of the bank of wanting some protection on these points.

Q    You speak of customary practice.  Are you talking about your own system companies, or are you talking about companies in general?

A    I can speak more, I think, authoritatively on our own system companies.  But I also have some knowledge of what protection banks like in these loan agreements; and I think I can state with conviction and considerable assurance that some type of restriction along these lines is required by banks in agreements of this kind.

Q    Are you familiar with a recent bank loan made earlier

WG-ANR-00052373

H48

this year by National Fuel Gas Company?

A    No.

Q    Would it surprise you to find that National Fuel Gas Company borrowed $15 million from several New York banks without any credit agreement whatever containing any limitations or restrictions?

A    It wouldn't surprise me because many companies can go into a bank and just give a bank a note for a reasonable amount of money. They have what you call a line of credit. Banks extend those every day.

Q    Would it surprise you to know that Consolidated Natural Gas Company borrows money without any of these limitations in its bank loan agreement?

A    It wouldn't surprise me.

Q    Would it surprise you to know that Columbia Gas borrows money from banks without any limitations of this nature --

A    It wouldn't surprise me at all. It would surprise me, however, if you found any limitations in this credit agreement which are in any way seriously adverse to the best interests of Milwaukee Gas Light.

Q    Isn't it a fact, Mr. McElvenny, that the operation of these restrictions or limitations here in effect place this bank loan on a comparable basis with that of debentures in that it has a clause in it concerning merger or consolidation;

WG-ANR-00052374

H49       that the limitations on the dividend payments are comparable

to the first mortgage requirements; and it has a limitation

on the issuance of senior securities unless applied to the

reduction of the bank loans first?

Do you consider that doesn't place the Milwaukee Gas Light

Company in a straitjacket?

A      No.  These have no real relationship to the covenants

which are customary -- indeed, required -- on the debentures,

Mr. Nowlin.

Q      Do you know of any requirement in a debenture indenture

that gives greater protection than the banks have got here

on this particular bank loan?

A      Oh, sure.  There would be all sorts of provisions

in the debenture indenture.

Q      Would you name one or two, Mr. McElvenny?

A      Look at what we have got in here.  We can borrow up

to a stated amount.  We don't have to take the money down until

we need it.  If we want to pay it off any time, we can pay

it off at the face amount without penalty.  If we don't need

to borrow the amount of the commitment, all we have to do is

reduce the commitment at that time.

Look at the flexibility we have -- no public offering

is involved.  I can give you a good example.  If you will take

a look at the collateral indenture of the American Natural

Gas Company when it borrowed the $15 million to pay off the

WG-ANR-00052375

H50      preferred stock under the integration plan some years ago
and compare it with this, y ou will then understand what I mean.
I went through that financing.  Mr. Dern and I negotiated that
financing, and we worked intimately on that collateral.  There
are all sorts of restrictions in there.

There is nothing in this indenture, Mr. Nowlin, contrary
to your assumption, that has any invidious restrictions on
Milwaukee Gas Light Company.

Q      There may be a difference of opinion on that, Mr.
McElvenny.

A      I wish you would develop it if there are.

Q      I should like to ask again if when you went to the
banks they insisted on any of these restrictions?

A      I have stated that pursuant to our practice, we
suggested the customary restrictions which we have had with
the banks.  For example, look at this one.  The comp any covenants
that it will not, without the prior written consent of each of
the banks, enter into any merger or consolidation proceedings.

The lawyers like to get that thing, but as far as a business
provision, it is meaningless to the gas company.  If you don't
like that, Mr. Nowlin, the banks will readily consent to take
it out.

We have to come down here and go through a long integration
proceeding if we sought to merge or consolidate with any company.
That is meaningless, Mr. Nowlin.  It doesn't have any materiality

WG-ANR-00052376

B51

to this loan agreement or to this financing. It doesn't cost us a cent and it in no way forces us to operate or to live under any invidious restriction.

If you can find anything in this loan agreement that does, I would appreciate your calling it to my attention.

Q    How does it happen that you are charged a quarter of one percent commitment fee in this bank loan? Did the bank suggest that, or was that advocated by you?

A    No, the banks wanted a commitment.

Q    Why?

A    It is very common -- because when you go in to discuss a loan with a bank, they say, "When do you want the money?" They say, "If youwant it in a week or tomorrow, we will give it to you and you can pay the current prime rate on it."

We say, "No; we have to go to the SEC. We would hope it would take six or eight weeks to file the thing and get it considered and get it approved, but it is conceivable it may take longer."

The bank says, "Well, will it take two months? Can we look forward then to getting the interest rate on the money?" We say, "Well, no, it might be three months. We can't say definitely. But we want you to give us a commitment that when we get through the SEC you will sign a credit agreement in the form we have negotiated and which has been approved by the SEC."

WG-ANR-00052377

H52

They say, "Heavens, we are sitting by for three or four months without any use of the money and yet you want us to commit." We say, "Yes." They say, "Well, all right, we understand the utility business and we know you have got to go through regulation. But in consideration of us telling you we will stand by you, we want a commitment fee from the date we sign the agreement until you take down the money. When you take down the money, you pay the prime rate on the amount you take down. But if you want us to stand by for three or four months now, and then maybe a year later, on some portion of the commitment, we have to get something for it, particularly since we are giving you the prime rate at the time you borrow or at the time you renew.

"We don't want to look ahead a year in the future and agree now to give you the prime rate. That itself is a commitment to go for two years."

Q    Did you raise any question about the quarter of one percent commitment fee which they charge?

A    Yes, I did.

Q    But you have no objection to it?

A    No, I think it is, under the circumstances, a reasonable charge.

Q    Do you know whether or not other natural gas companies have made bank loans on a comparable basis to this without either a limitation or without a quarter of one percent standby?

WG-ANR-00052378

A    No. As I say, I think you can go into the bank right now and borrow the money without any standby. But to get the flexible authority which we have and also to have the privilege of borrowing from time to time at the prime rate then existing and also if we extend, we get the prime rate existing at the time of the extension.

That was important to us. They said, "Well, we will loan you money at the prime rate now." We said, "No, we want the prime rate at the time we borrow." We had to bargain hard on that point because it occurred to us the money market might be softening and that the prime rate would go down.

Therefore we got that very desirable advantage, but the bank said, "In consideration of all that, we have got to have a standby fee."

Q    You are not familiar with the recent bank loan of National Fuel Gas Company?

A    No, I am not.

Q    Would it surprise you to know that they borrowed $15 million without any quarter of one percent commitment fee or without any of these limitations?

A    I have just said you can go in and borrow money any time you want, Mr. Nowlin, on a note, if you want to do it that way. But that isn't our deal.

Q    Was there any indication given to the banks that this loan was going to be in existence longer than eight or nine

WG-ANR-00052379

H54    months?

A    We said we expected to pay it off, but we wished the right to extend. Anyone wants that. If you go over and borrow a substantial amount of money, I think you would like the right to extend.

Q    Were they familiar with your representation that you were going to be permanently financing in 1959 to retire the bank loans?

A    They are quite familiar with our plans.

Q    Were they familiar with that when you negotiated --

A    Certainly they were. I told you that.

Q    Then it is very highly problematical that you have any commitment at the end of 1958.

A    Mr. Nowlin, I will repeat it --

Q    You needn't rep eat it.

A    If you go and borrow a substantial amount of money from the bank, any sensible person hopes to pay it off by maturity. But, I repeat, if you can get the right to renew at the prime rate then existing, and it doesn't cost you anything, you are very foolish not to take it. That is my view. I have said that before. I now repeat it.

That is a valuable privilege to the borrower.

Q    Do you consider, Mr. McElvenny, that your comp any is as good a company as National Fuel Gas Company?

A    Now, if you will pardon me --

WG-ANR-00052380

H55

Mr. Seder: Wait just a moment.

The Witness: My modesty is showing at this point and I would have to say that I consider our company one of the blue chips of the industry.

By Mr. Nowlin:

Q   Isn't one of your objectives, as the head of the American Natural System, to raise money on an economical basis?

A   Yes, both debt and common.

Q   Do you consider that you raised the bank loan money here on the most economical basis for the system?

A   I think so.

Mr. Seder: Your Honor, I object to any further questioning with respect to these loans unless we know something about the terms of the loan agreements. Mr. McElvenny has testified that this is our agreement and that counsel is now bringing up another agreement which he has said he doesn't know about.

Mr. Nowlin: It is a matter of public record if you want to look at them, which we can do. I want it in the record so we can make the comparison.

Hearing Examiner: Have you exhausted this line of examination?

Mr. Nowlin: Just about.

Hearing Examiner: Very well, let's pass.

Mr. Seder: This witness has stated he isn't familiar with the terms of the other loan agreement about which he is being

WG-ANR-00052381

H56                 asked to make comparisons.

The Witness:  Further, the question of what commitment
fee will actually be paid is problematical.  In any event,
it can't be a large amount because if your plans change or
are changed for you so that you don't need the money, all you
do is go in and reduce the amount of the commitment --
which you can do under the credit agreement, and that stops
the payment of the commitment fee on that portion of the credit
obligation.

The rest of the money you take down as soon as you need
it.  The testimony is that between now and the end of the year
we will take down $11 million of the $15 million, Mr. Nowlin.

By Mr. Nowlin:

Q    Mr. McElvenny, did you give any consideration to
American Natural Gas Company making this bank loan and advancing
the funds to Milwaukee?

A    We considered it, yes.

Q    Is it your opinion that you could not have made
a better arrangement for American Natural than you did make
for Milwaukee?

A    It is my opinion that this is as good an arrangement
as we could have made.  It is most desirable indeed.

Hearing Examiner:  We will take a short recess.

(A short recess was taken.)

Hearing Examiner:  Let us come to order.

WG-ANR-00052382

By Mr. Nowlin:

Q    Mr. McElvenny, directing your attention to Milwaukee's credit agreement, on page 2 appears the following statement: "This agreement shall be executed as soon as practicable after all necessary regulatory approvals shall have been obtained and not later than June 1, 1958, and shall become effective immediately upon execution thereof, although dated for convenience as of June 1, 1958."

As I interpret that, your loan agreement has already expired, hasn't it?

A    When we get approval by the Commission, we will provide that particular provision to delete the June 1 date to substitute the applicable date.  That was an assumption that we would surely have been approved.

Q    Have you conferred with the banks to determine whether or not they would be willing to extend the agreement on the same terms?

A    Yes; they are willing.

Q    I believe earlier in your testimony you made a statement to the effect that your stockholders would be awfully unhappy if you had a common stock offering this year.  Is that a correct interpretation of your testimony?

A    I think I said it wouldn't be gratifying to them, or words to that effect; that's correct.

Q    I would like to show you a document here, Mr.

B58        McElvenny, and ask you if you will identify it for the record.

A        This is the proxy statement for the annual meeting

of stockholders of American Natural Gas Company, held April 24,

1957.

Mr. Nowlin:  Mr. Examiner, I would like to incorporate by

reference this document just referred to by Mr. McElvenny, which

appears in the Commission's file No. 1-3530-2-3.

Mr. Seder:  No objection.

Hearing Examiner:  Let the proxy statement come into this

record by reference.

(The above mentioned material was
incorporated into the record by
reference.)

By Mr. Nowlin:

Q        I think I asked you earlier, Mr. McElvenny, whether

or not you had made any representations to your stockholders

at the time you sought the increase in the authorized shares.

You didn't recall.

A        I said we made some statement in the proxy statement

about it.  I suggested that we look into that because I

couldn't remember the precise statement that we had made.

Q        I would like to direct your attention to part of

the statement which appears on page 4 of this proxy statement

and which reads as follows:  "The company's system is con-

stantly expanding and enlarging its facilities to meet the

increased demands of its markets.  For the last five years the

WG-ANR-00052384

H59

system has expanded about $300 million for construction.
Equity capital required by this growth has been provided
from time to time by offering common stock of the company
to existing stockholders at prices below the market prices,
such offerings in addition to the one just completed having
been made in 1949, 1950, 1951, and 1955. No additional equity
financing is contemplated this year, but it is anticipated
that an offering on the basis of one share for each ten shares
outstanding will be made during 1958 to provide the equity
portion of the capital required for further expansion."

Do you consider the stockholders, having given you the
proxies to authorize the increase in capital stock on the
basis of that representation, would still be unhappy if you
carried out the representation?

A    I think the statement pretty plainly indicates to
the stockholders that common stock is sold in order to
finance continuing expansion. I have already stated --
for reasons set forth in this record -- that we do not have
any substantial expansion in 1958, that we substantially
curtailed our expansion in 1957; and that no common stock
money is required in 1958.

Q    What did you mean w en you said "No additional
equity financing is contemplated this year"? Is it anticipated
that an offering on the basis of 1 share for each 10 shares
outstanding will be made during 1958?

WG-ANR-00052385

H60

A    What is the rest of it?

Q    "To provide the equity portion of capital required for further expansion."

A    For further expansion, yes. Read that sentence and read it in the light of the two proceedings. It makes perfectly plain to the stockholder that he is asked to contribute equity capital in order to finance expansion and further expansion. What do you think an equity stockholder puts up his money for, Mr. Nowlin?

Q    I am not on the witness stand, Mr. McElvenny. I am asking the questions.

I believe, Mr. McElvenny, that the financial statements of Milwaukee Gas Light Company indicate that there is a total of $3,300,000 of bank notes which mature at varying dates during 1958. Do you have any compilation available that would show us the different maturity dates of these notes?

A    We can supply that.

Mr. Nowlin: If there is no objection, Mr. Examiner, I would like the rep orter to copy these maturities into the record.

Hearing Examiner: Is there any objection to this statement being copied literally into the record?

Mr. Seder: No objection.

Hearing Examiner: Copy it in, Mr. Reporter, at this point.

WG-ANR-00052386

H61

## MILWAUKEE GAS LIGHT COMPANY    40-177

## Borrowings under 1st sentence of 6(b)

### Promissory Notes

| Date of Issue | Amount | Rate | Maturity |
|---|---|---|---|
| 9-20-57 | $750,000 | $4\frac{1}{2}$ | 6-20-58 |
|  | 125,000 | $4\frac{1}{2}$ | 6-20-58 |
|  | 125,000 | $4\frac{1}{2}$ | 6-20-58 |
|  | $1,000,000 | | |
|  | - - - - - - - - | | |
| 11-6-57 | $1,000,000 | $4\frac{1}{2}$ | 8-6-58 |
|  | 150,000 | $4\frac{1}{2}$ | 8-6-58 |
|  | 150,000 | $4\frac{1}{2}$ | 8-6-58 |
|  | $1,300,000 | | |
|  | - - - - - - - - | | |
| 11-29-57 | $ 750,000 | $4\frac{1}{2}$ | 8-29-58 |
|  | 125,000 | $4\frac{1}{2}$ | 8-29-58 |
|  | 125,000 | $4\frac{1}{2}$ | 8-29-58 |
|  | $1,000,000 | | |
|  | - - - - - - - - - | | |
| TOTAL AT PRESENT | $3,300,000 | | |
|  | - - - - | | |

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 137 of 166   Document 50-27

WG-ANR-00052387

H62     By Mr. Nowlin:

  Q  I hand you, Mr. McElvenny, a copy of a compilation which we have prepared reflecting bond ratings by Moody's and Standard Poors with respect to your system companies. I wish you would examine that and see if you find anything which is incorrect.

  A  A quick check of the data here seems to indicate that it is accurate. However, I would like the privilege of making a more considered check of it and having the privilege of filing any correction necessary which we note.

  I would like to make one other statement, that in connection with the Michigan Wisconsin Pipeline bonds, in addition to the rating shown on the exhibit Mr. Nowlin has tendered, a reputable rating agency -- Fitch -- also rates Michigan Wisconsin bonds and rates them A.

  Mr. Nowlin: Mr. Examiner, subject to being corrected for error upon check by Mr. McElvenny and his associates, I should like to offer this one-page document entitled, "American Natural Gas Company and Subsidiaries, Bond Ratings by Investment Services," dated June 2, 1958.

  Hearing Examiner: Let that tabulation come in, subject to the right of check. If the company finds any errors and sends in a letter with respect to it, the letter will become a part of this exhibit when filed with the Docket Section.

WG-ANR-00052388

H63

(The above mentioned document was
marked and received in evidence as
Commission's Exhibit No. 2.)

By Mr. Nowlin:

Q    In the course of your earlier testimony, Mr. McElvenny,
you have referred to your proposals to do equity financing
in 1959.  Is that correct?

A    Yes.

Q    Can you tell us just when you propose that that
financing be done?

A    As at the present time, the most feasible period
would normally be about June 1959.  By that time we would have
completed a normal storage cycle and we would have had the
benefits of the earnings derived from the winter heating
season.

Q    How much money are you anticipating obtaining from
common stock financing in 1959?

A    Our assumption is $16,200,000.

Q    During 1959 will you have any notes owing to banks
by any of the companies in the system?

A    Yes, we will have the $15 million that is the subject
of this proceeding.  We also will have the other indebtedness
that I have referred to in my testimony on behalf of Michigan
Consolidated and Michigan Wisconsin.

Q    In the event you should do equity financing to the
extent of $16 million in 1959, would be borrowing from the banks

WG-ANR-00052389

again during that year, except for your gas storage loans?

A    No.  No, we would do permanent financing in that year, retire the bank loans, and get some additional capital to take us into 1960 and perhaps into 1961.

Q    So your plans then for 1959 would call for no bank indebtedness by any system companies at the end of 1959?

A    That's right.

Q    Mr. McElvenny, to whom do you anticipate selling the $20 million of five-year notes-- to be issued by American Louisiana?

A    Michigan Wisconsin.  We contemplate a five-year credit arrangement by Michigan Wisconsin, and that would continue through 1960, 1961, 1962, 1963 and 1964.

Our thought on that is that we would arrange a deal like we had on American Louisiana with installment credit loans from the banks.  It would be in effect permanent financing, however, rather than bank loans to finance contemporary construction.

Q    I would like to direct your attention to Milwaukee's Exhibit No. 4, which is the consolidating statement of financial position, and particularly to the item on page characterized as reserves, federal and state income taxes.

This indicates a consolidating figure of $9,959,562, and I ask you if you will tell us what that consists of.

A    That breaks down into two components represented by

WG-ANR-00052390

H65

liberalized depreciation in the amount of $4,340,742, and five-year accelerated amortization of $5,618,820, or a total of $9,959,562.

Q    According to the tabulation, the major item of deferred Federal and state income taxes relates to Michigan Consolidated Gas Company.  Is that correct?  I beg your pardon; and American Louisiana Pipe Line Company also.

A    Yes, as shown in the schedule.

Q    Is the item of Michigan Consolidated Gas Company of $3,290,012 related to an accelerated amortization program?

Mr. Seder:  Mr. Examiner, we have the information.

A    Mr. Nowlin, the bulk of it is the accelerated depreciation and the remainder is the accelerated amortization.

By Mr. Nowlin:

Q    Do any of your companies in the system have reserves for income taxes that may be attributable to claiming amounts in excess of depreciation accrued on the books?

A    I think that's the origin of these amounts we are discussing.

Q    Let's take Milwaukee Gas Light.  Do you know whether or not Milwaukee has claimed amounts for income tax purposes for depreciation in excess of its annual accruals by reason of which it has a contingent liability for income taxes?

A    Will you repeat the question?

Hearing Examiner:  Read the question, Mr. Reporter.

WG-ANR-00052391

H66

By Mr. Nowlin:

Q    Stated very simply, Mr. McElvenny, has Milwaukee been claiming for income tax purposes greater amounts for depreciation than it has been accruing on its books?

A    I don't know.

Q    Do you know whether any of the other companies in the system -- what their situation is?

A    I am quite confident that Michigan Consolidated and American Louisiana have because as a result of the information we have given you, it is perfectly apparent that they have a reserve for deferred taxes.

Q    Do you know what period of years -- take Michigan Consolidated, for example -- what period of years does their contingent liability stretch over?

A    I don't understand your reference to a contingent liability.  The accruals for Federal income taxes are made in response for compliance with provisions of the Federal income tax law.  They relate, (a) to accelerated amortization which is taken under assessment certificates issued by the Federal Government; and (b), five-year or liberalized depreciation, so-called, which is made in accordance with the Internal Revenue Code.

Q    That is not what I am talking about.

A    I don't understand any reference to contingent

WG-ANR-00052392

H67        liability.

Q        That is your accelerated amortization program which
is related to the war effort that you are talking about there.
What I am talking about is Milwaukee accruing on its books
annually an amount of depreciation that is equivalent to the
amounts which they claim for income tax purposes?

A        I just don't know.

Q        Mr. McElvenny, I have before me again this compilation
of statistical information from various gas companies prepared
by Bear, Stearns & Co. which I am waiting for you to check and
correct if it should prove incorrect.

According to this statistical information, the consolidated
depreciation and depletion reserve of the American Natural
Gas System amounted to 16.8 percent.  I assume that is for the
year ending 1957.  It is dated May 1958.

Do you consider that the depreciation reserve for the
American Natural Gas System reflects the true condition of the
properties?

A        I think our depreciation reserve is fully adequate
to reflect the loss in service value of the property not restored
by current maintenance.

Q        Has the Federal Power Commission required any of your
companies to set up reserves on a straight line basis?

A        The situation at Federal Power ordinarily is that
the pipe lines propose a certain rate of depreciation and you

WG-ANR-00052393

H68

take that until it has changed. As I recall, both our pipe lines are taking a 3.5 percent depreciation rate on a straight line basis in respect of depreciable plant.

Q     You have no depletable assets, have you, in the system?

A     We have minor amounts, but I don't recall any significant item, no.

Q     You don't have any producing gas wells that are owned by the system?

A     I say we have minor amounts, Mr. Nowlin.  That is what I had reference to in our production company.  We undoubtedly -- yes, we have some; but they are not substantial.  We hope in time they will become substantial.

Q     I notice your reserve is 16.8 on a consolidated basis. The reserve for Columbia Gas System is 22.8.  The reserve for Consolidated Natural Gas System is 26.5.  The reserve for National Fuel Gas Company is 26.5 -- all of which are substantially in excess of your system.

Do you have any explanation as to why their reserves greatly exceed those of yours?

A     It is a component of various facts.  In so far as the pipe lines are concerned, one of the important elements is what the regulatory body will permit you to take.  In so far as the two distribution companies are concerned -- Milwaukee Gas Light and Michigan Consolidated -- an important factor is what the

WG-ANR-00052394

H69　　　two State Commissions, respectively -- the Wisconsin Commission

and the Michigan Commission -- permit.

We have to make a depreciation study in Michigan and

file it with the Commission, and they determine the amount of

depreciation. They order. They approve it and that is what you

take, and nothing else. And the same thing is exactly true in

Wisconsin. The depreciation is determined by the State Com-

mission. That is an important factor.

Q　　　Pardon me for interrupting, but is that in connection

with a rate proceeding or independent of a rate proceeding?

A　　　No, just in connection with your operation. A further

factor is the rate of expansion. If you have an old-line company

that has been in existence for many years; no one wants their

service; they haven't got natural gas in adequate amounts; if they

did, they have no place to sell it -- you acquire a very conserva-

tive capital structure.

In time you get 60 or 70 percent common stock and you have

a tremendous depreciation reserve because, in substance, what

you are doing is liquidating your property.

Thank goodness that has not been our experience, and I

sincerely trust that during my active business lifetime it will

not be our experience.

We have grown and grown very vigorously. We anticipate

that we will continue to grow. We go up and down during the

years, but our long-term trend, we hope, is vigorous growth.

WG-ANR-00052395

H70

One of the incidents of growth is that your property is
relatively new and therefore your accumulated reserve in
relation to the property is lower than with an older line company.
I think those are the two principal factors that control the
relative amount of your depreciation reserve.

Another factor, of course, is how clean is your property
accounting.  A lot of companies have big reserves and they have
never written out assets in excess of original cost.  In our
properties, if we have any amount at all in excess of original
cost, it is negligible.  All of our properties have been
reviewed for original cost by the State Commissions and other
regulatory bodies, and our assets are stated at original cost.
We have no unrecorded retirements or things like that.

Q    Does the Michigan State Commission require you to
set up certain amounts for depreciation for Michigan Consolidated?

A    Yes.

Q    Apart from rate proceedings?

A    Yes.  They determine the rates by classes of property.
The same thing in Milwaukee.

Q    Mr. McElvenny, could you supply for the record the
approximate amount of unbonded bondable property additions
as of a recent date for Milwaukee?

A    Yes, we can.

Q    Will you do so, please?

A    As of March 31, 1958, Milwaukee Gas Light had unbonded

WG-ANR-00052396

H71        additions of $5,482,270.

Mr. Nowlin:  Mr. Examiner, I think that is all I have.

Hearing Examiner:  Have you any redirect, Mr. Seder?

Mr. Seder:  Yes, Mr. Examiner, I have a few questions.

Hearing Examiner:  Very well.

## REDIRECT EXAMINATION

By Mr. Seder:

Q    Mr. McElvenny, counsel for the Commission asked you on cross-examination some questions regarding the yield to the investor holding American Natural common stock, which he indicated was 4.4 percent at the present market values. He asked some questions relating that to the cost of debt money.

I wonder whether you would comment on whether the yield to the investor is the equivalent of the cost of equity money to the system, to the company?

A    It very clearly is not. The traditional method of computing the cost of equity money is the price earnings ratio as adjusted for considerations which necessarily require consideration in relation to the common stock financing.

For example, there is a well-known and established factor of pressure which makes itself manifest at the time of a common stock financing.  The market price almost inevitably falls off, and sometimes very, very substantially under the weight of an additional common stock offer.

Of course the amount of the pressure and the invidious

WG-ANR-00052397

H72

effect of it can be accentuated if the common stock financing
does not represent a well-considered plan from the point of view
of the common stockholder.

So you get that well-known factor of market pressure.

Then, as I say, you look at the price earnings ratio
after you have adjusted for the inevitable pressure. And
instead of getting the cost of money for your common stock
to the company of 4.4, you ordinarily would have a cost of 8 or
10 percent. Indeed, in these rate cases before the Commissions,
the Commissions will ordinarily give you a cost of money for
your common stock of around 11 percent -- 11.3, in that range.

So a reference of 4.4 as a cost of money as American
Natural Gas common stock is simply a computation which reflects
an alleged yield at a certain time, but it is not associated
with the reality of raising additional common stock money.

Mr. Seder:   I ask the reporter to mark as Milwaukee
Exhibit No. 13 for identification a one-page tabulation en-
titled, "American Natural Gas Company, Bond Ratings of
Subsidiary Companies."

(The document was marked for
identification as Milwaukee Exhibit
No. 13.)

By Mr. Seder:

Q     I ask you if that was prepared by a member of your
staff?

A     It was.

WG-ANR-00052398

H73

Q    What does that purport to show?

A    That shows the bond ratings of the bonds of our sub-
sidiary companies as rated by Standard and Poors, Moody's and
Fitch.  It also -- in order to make the exhibit more meaning-
ful -- has the explanation of the various rating designations.

It indicates, for example, that the Aaa is the gilt-edge;
the Aa, high quality; the A, higher medium grade; and the Baa
is the medium grade, lower medium grade, or good grade, de-
pending upon which particular rating agency you use.

But all of the ratings go from a 1-plus, from Standard
and Poors, down to B1-plus; from Aa in Moody's down to Baa; and
from Aaa down to Bbb on Fitch, and are included as bank quality
ratings.  In other words, any bonds given any one of those
four designations are generally considered to be eligible for
bank investment, which means a good quality bond.

Q    Would you care to comment on the relationship between
bond ratings and common equity ratios?  Do you have any figures
there that bear on that subject?

A    Yes, I have.  I think they are very interesting,
because otherwise the situation might readily be misunderstood.

As I have said, and as the record shows, Michigan Wisconsin
Pipeline bonds are rated Baa by Moody's; B1-plus by Standard
and Poors; and A by Fitch.  It has a common stock equity of
35.3 percent.

Now, Colorado Interstate Gas Company, which has a common

WG-ANR-00052399

H74

equity of 23.6 percent, its bonds are rated A by Moody's; A by Standard and Poors; and Bbb by Fitch. Northern Natural Gas Company, which has a 30.9 percent common equity, has received the encomium of an A rating from all three agencies. Tennessee Gas Transmission Company, a well-known company in the natural gas business, has a 17.9 percent common equity.

Mr. Nowlin, I hope I haven't interefered, but I would like to listen to some of these statistics.

I was just saying that Tennessee Gas Transmission Company, a well-known transporter of gas, has a common equity after eleven years of operation of 17.9 --

Mr. Nowlin: I didn't ask you anything about Tennessee Gas.

The Witness: It has A rating by Moody's; Aa rating by Standard and Poors; and Aa rating by Fitch on its bonds. I am discussing any necessary relationship between common stock equity and bond equity.

Here is Texas Eastern Transmission Corporation, a large and successful pipeline. It has a common equity of 20.3 percent. It has A ratings by two of the rating agencies, and a Baa by the third.

Mr. Nowlin: Mr. Examiner, I am going to move to strike this line of testimony. It has no relation to any issue, comparative statistics, or anything else to do with what is in this case. Mr. McElvenny can read on here for time immemorial.

Mr. Seder: Your Honor, this is redirect. Counsel went

WG-ANR-00052400

H75

into the ratings of the company, put in an exhibit to that
effect, and he has also gone into the question of the common
equity ratios. I think it is proper redirect to go into the
relationship, if any, between those.

Mr. Nowlin: Mr. Examiner, these are pipeline companies.
I am talking about holding company systems when I referred to
the three companies I did. There is no relationship between
Texas Eastern and Tennessee Gas and the Natural Gas System.

Mr. Seder: Counsel's exhibit specifically refers to the
bond ratings of all the companies, the subsidiary companies,
of the American Natural System, including the pipeline company.

Hearing Examiner: The objection is overruled.

The Witness: Here is Transcontinental Gas Pipeline Corpora-
tion, a large and prosperous company. It has achieved a common
equity of 19.4 percent. It has received A ratings from two
of the agencies on its bonds, and a Baa by the third.

I repeat, Michigan Wisconsin's common equity is 35.3 per_
cent.

Let's just take a brief look at certain distribution
companies --

Mr. Nowlin: Mr. Examiner, may I interrupt a moment and
say this is going to run on interminably. He is injecting new
matters into here. I will be on cross-examination for another
twenty-four hours, and it hasn't any relevancy to this case.

Hearing Examiner: It seems to me that you brought it up,

WG-ANR-00052401

H76

Mr. Nowlin. You may have an exception to my ruling.

Mr. Nowlin: I am just suggesting that I am going to have to cross-examine and prove that there is no parallel between these companies and his company.

Hearing Examiner: That isn't before me. I have this particular question. I think this is relevant. I overrule your objection. You may have an exception.

The Witness: Let's look for a minute at a comparison of the bonds between our own two subsidiary operating companies -- Michigan Consolidated and Milwaukee. They both have approximately the same common stock equity of forty percent. Moody's rates Michigan Consolidated A, and it rates Milwaukee Gas Light Baa -- although their common equity for all practical purposes is the same.

Here is the Alabama Gas Corporation, with a 40.4 percent common equity -- just about the same. It has a Baa rating on its bonds. The same with Milwaukee Gas Light Company. The Atlanta Gas Light Company, with less common equity, 36.8, has an A rating. The Gas Service Company, which is a large company serving down in Kansas City, has an equity of 34.9 percent, and has an A rating on its bonds.

The Laclede Gas Company, a well-known company serving St. Louis, has a common stock equity of 32.2 percent, has an A rating on its bonds.

Here is the Montana-Dakota Utilities Company, not as well-

H77

known a company as the others but a good company, has a 29.2 common stock equity, has a Baa rating, the same as Milwaukee Gas Light Company, which has a far higher common equity.

The Southern Union Gas Company has a 31.2 percent common equity. It has an Aa rating; and the Washington Gas Light Comp any, of course which is a good company, has the same common stock equity as our two operating subsidiaries, has an Aaa rating on its bonds.

I think those are very interesting facts when you speak in terms of rating on bonds in relation to common stock equity.

Mr. Seder: That is all the questions I have on redirect.

### RECROSS-EXAMINATION

By Mr. Nowlin:

Q     Mr. McElvenny, I wish you would refer to the charts you were reading from a while ago of these different companies. Refer to Washington Gas Light and tell us what the debt and preferred ratios are on that company.

A     The preferred is 8.1 and the long-term debt is 51.1.

Q     Isn't the debt of Washington Gas Light considerably lower than that of Milwaukee or Michigan Consolidated?

A     There is no difference between the common equity. The senior securities are the same.

Q     You didn't on all these different companies you cited from your statistical information give the debt ratios on any of those companies of the preferred stock, did you?

WG-ANR-00052403

H78

A   I gave the common equity, that's right.  The senior securities are the difference between the common equity and the capitalization.

Q   Do you know whether or not any of the companies which you listed on there have as much debt as Milwaukee or Michigan Consolidated?

A   The Alabama Gas Corporation has 55.8 compared with 59.9 of Milwaukee Gas Light Company.  The Gas Service Company which has an A rating has 65.1 percent debt compared with 59.9. Montana-Dakota has 54.7 compared with 59.9.

Q   How about Southern Union Gas Company?

A   Southern Union has 47.5 of long-term debt and 21.3 of preferred stock.  In the natural gas business, preferred stock is a senior security.  Indeed it is far worse than debt issue.  The cost of it to the company is far greater and you have to sink it out anyway.

Q   Will you refer, Mr. McElvenny, to your chart and give us the consolidated debt on the Consolidated Natural Gas Company as compared with the American Natural?

A   The Consolidated Natural Gas Company had gone from a common equity ratio --

Q   Just please answer my question and you can explain it any way you want to.

A   I am giving it to you if you will be patient.

Q   Just give me the answer and explain it then, if you

WG-ANR-00052404

H79       want to.

A    All right.  The senior securities have gone --

Mr. Nowlin:  Mr. Examiner --

The Witness:  From 13.6 percent.  I am answering your question.  Just wait a minute.  The senior securities have gone from 13.6 percent in 1949 to 38.7 percent in 1957.

Mr. Nowlin:  Mr. Examiner, I move to strike that answer and ask you to instruct the witness to answer my question categorically.

Hearing Examiner:  If the witness can answer it categorically, he should do so, and add an explanation if he cares to offer one.

The Witness:  The Consolidated Natural Gas Comp any and subsidiaries has long-term debt in 1957 of $201,809,000.  That compares with $30,381,000 in 1959.

By Mr. Nowlin:

Q    Will you give us the ratios, Mr. McElvenny?

A    I have given it to you.  I have given you the debt. The debt is 61.3 percent -- no; the common equity of Consolidated Natural, which I gave you a minute ago and you objected to, is 61.3 percent and the long-term debt is 38.7 percent, just what I gave you.

Q    Now, will you give me the consolidated ratio of debt of Columbia Gas?

A    The capitalization of the Columbia System, I have it

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 155 of 166   Document 50-27

WG-ANR-00052405

H80

here as of December 31, 1957, of Columbia with Gulf Interstate.

Q    I didn't ask you for that.  I asked for Columbia.

A    The Columbia Gas System as of December 31, 1957, long-term debt of 54.5 and common equity of 45.5.

Now, to bring a little reality into the situation, they proposed a merger with Gulf Interstate.

Mr. Nowlin:  I object, Mr. Examiner.

The Witness:  I know, but I want to give you what they are.

Mr. Nowlin:  That is not responsive to any question I have asked and it is not relevant to anything in this case.

The Witness:  Surely he wants to --

Mr. Nowlin:  If he wants to make that argument to the Commission, okay; but I am trying to get facts on the record here.

The Witness:  Let's get them in.

Mr. Seder:  A moment ago counsel said give the answer first, and any explanation second.

Hearing Examiner:  Why is it relevant to his answer, what he is trying --

Mr. Nowlin:  I know what he is going to get off into. Gulf Interstate is not even a subsidiary of Columbia Gas.  So why refer to it?

The Witness:  They publicly propose the acquisition of the company.

Mr. Nowlin:  Go ahead.  You are taking your time.

WG-ANR-00052406

H81

The Witness: All right. Let me say that we are talking now about the Columbia Gas System.

By Mr. Nowlin:

Q    I didn't ask you about it, but you are talking about it.

A    You asked about it and I want to answer your question. Just a little background material which you may or may not know. I assume you do.

Columbia obtains its major source of supply from Gulf Interstate. Indeed, the principal purpose of Gulf Interstate and the reason it was built was to supply the Columbia System with a large additional volume of natural gas. The service is rendered under a transportation agreement where all of the gas is transported for Columbia.

Indeed it is purchased in the field, most of it, by a Columbia subsidiary -- United Fuel.

Mr. Nowlin: Mr. Examiner --

The Witness: Wait --

Mr. Nowlin: Just a minute, Mr. McElvenny. I would like to inquire if these are statements you are making under oath of y our own knowledge, or hearsay?

The Witness: I am sure they are correct.

By Mr. Nowlin:

Q    If they are hearsay, then I don't want any more of it.

A    I am sure they are correct.

WG-ANR-00052407

H82

Q    Do you know these of your own knowledge?

A    Yes, that's right.  United Fuel buys the major portion of that gas and Gulf Interstate transports it.  All right, now, Columbia has proposed the acquisition of Gulf Interstate for the same reasons that led us to build both of our pipelines -- they have to get some control of this gas supply so they can live in the business.

All right, now, let's take Columbia and look at it on a realistic basis.  After they have consummated the deal which is now before the regulatory body, their long-term debt goes from 54.5 to 57.9, and their common equity comes out at 38.7.

All right, that is what happened to any normal system when you introduce into it a new pipeline.  Gulf Interstate is a new line. It is financed.  We have a large amount of senior securities like any other new pipeline; and when you do the same thing to Columbia that everyone is so anxious to do with us -- put our new American Louisiana in -- of course it drags your ratios down and that distorts it.

Q    Mr. McElvenny , are you testifying in opposition to an application which Columbia has pending here --

A    Of course not.

Q    What is this relevant to?

A    I told you the same reasons that motivated us motivated them.

WG-ANR-00052408

H83

Q    What is this relevant to?

A    I am showing you what ratios are.

Mr. Seder:  Mr. Examiner, I think that counsel is arguing with the witness.  If he has an objection to make, I suggest that it should be directed to you and I will answer it if it seems appropriate.

Mr. Nowlin:  Mr. Examiner, I will object to it and move that his whole answer to this last question be stricken.

Mr. Seder:  Mr. Examiner, counsel asked the witness to testify regarding the equity debt ratios of the Gulf Interstate system, and the witness has been doing so.

Hearing Examiner:  The motion to strike is denied.  You may have an exception, Mr. Nowlin.

Mr. Nowlin:  I would like to call the Examiner's attention to the fact that there is a pending application before the Commission on this very subject.  His testimony may have some bearing on it.  This isn't an issue in this proceeding.  It doesn't have a thing in the world to do in answer to my question.

All I asked him to do was give me the ratio of debt of Columbia Gas.  He has gone on here for five minutes on Gulf Interstate.

By Mr. Nowlin:

Q    Mr. McElvenny, are you through?

A    Until you ask another question.

Q    Will you give me the debt ratio of National Fuel Gas

WG-ANR-00052409

H84          Company and also the common stock equity ratio?

             A    They have a common equity at the end of 1957 of 58
      percent and long-term debt of 41.4.

             Q    Now would you give me the debt ratio of the United
      Gas Corporation and the common stock equity ratio?

             A    I haven't got it.

             Q    Mr. McElvenny, directing your attention to Milwaukee
      Exhibit 13, can you tell me what the purpose of this exhibit is?

             Mr. Seder:  I can state that.  In part it was to --

             Mr. Nowlin:  Do you want to testify now, or Mr. McElvenny?

             A    The purpose of it was to give a more complete presenta-
      tion of facts which were initiated by the offering of your own
      exhibit.  That is the purpose of it.

             By Mr. Nowlin:

             Q    Wasn't this exhibit prepared, Mr. McElvenny, before
      we introduced our exhibit this morning?

             A    Yes.  It is dated June 3, 1958.

             Q    Did you anticipate that we were going to offer into
      evidence the ratings of Moody's and Poors and prepared this to
      offset that?

             A    No.  We just had it so we could look at it.  But
      since you opened up the subject, we felt we might as well put
      in a more complete presentation.

             Q    You were not going to put it in other than if we had
      offered an exhibit?

WG-ANR-00052410

H85

A No, I wasn't going to put it in.

Q Will you tell me who prepared this exhibit?

A Well, it is stated on the lower lefthand side --
R. E. Johnson; and it is dated June 3, 1958.

Q Can you tell me where the characterizations in the
second portion of the exhibit came from -- that is, characteriza-
tions such as "gilt-edge, high quality, higher medium grade"?

A I have assumed that it comes from the descriptive
material put out by the specific rating agencies to explain
the meaning of the symbols, the rating symbols.

Q Do you know whether or not that was the characterization
used by the publication itself or whether that is some
individual's characterization?

A I assume that it is the characterization that is
put out by the rating agencies themselves.

Q Aren't you fairly well familiar with Moody's and
Standard and Poor's publications on public utilities and
holding companies?

A I know they put out a great reference book on
public utilities, industrials and other things.  But I can't
keep the data in mind.

Q Do you know of your own knowledge whether or not
either one of those publications use such characterizations as
reflected on this exhibit, such as "highest grade, high grade,
upper medium grade and medium grade, gilt-edge, high quality,

WG-ANR-00052411

B86    higher medium"?

        A    I assume that that is a commonly used interpretation
of the ratings.  That is my assumption.

        Q    Then you are not testifying from your own knowledge
or your own appraisal of these ratings?

        A    I haven't investigated it myself, but I assumed
that that is what it is.

        Mr. Nowlin:  Mr. Examiner, in view of this exhibit and
these characterizations on here, I should like to get a stipula-
tion that the Staff and the Commission may refer directly to the
sources of this information for the ratings, rather than de-
pending upon these characterizations or definitions of the
ratings.

        Mr. Seder:  We certainly have no objection to that.  I
think you will find that those characterizations are in there,
but if they aren't, disregard them.

        (Discussion off the record.)

        Mr. Seder:  Mr. Examiner, I am going to ask to withdraw
Milwaukee Exhibit 13 and to strike all of Mr. McElvenny's
testimony with respect thereto so that there will be no
p ossible question of any kind raised in the future.

        Milwaukee Exhibit 13 was introduced on redirect examination
by the applicants in the nature of additional material to an
exhibit put in by counsel for the Commission.  We had not
anticipated ahead of time that we would put this in as an exhibit.

WG-ANR-00052412

H87

The proposed exhibit contained the name of the member of the staff of American Natural Service Company who prepared it, and this gentleman is a former employee of the Securities and Exchange Commission who would be prohibited by the Commission's Rules from appearing in any matter before the Commission.

That matter having been raised and in order to avoid any possible contension that this constitutes an appearance on his part, we are withdrawing the exhibit.

Hearing Examiner: Very well, the exhibit is withdrawn and the testimony of Mr. McElvenny with respect to it is stricken.

(The document previously identified as Milwaukee Exhibit No. 13 was withdrawn.)

By Mr. Nowlin:

Q    Mr. McElvenny, could you briefly tell us what the application for the certificate to build $22 million worth of facilities to take 40 million cubic feet of gas daily from the LaVerne area of Harper County before the Federal Power Commission involved?

To make it short: Does that involve getting additional gas supplies for American Louisiana?

A    For Michigan Wisconsin.

Hearing Examiner: When we say the testimony is stricken, now, that means that the record will be written --

WG-ANR-00052413

H88

Mr. Nowlin:  Expunged.

Hearing Examiner:  That is what I wanted to bring out. Do you want the whole testimony expunged?

Mr. Seder:  No, sir.  I think my statement on the record that it is stricken is sufficient.

Hearing Examiner:  All right.

Mr. Seder:  I don't think we ought to start striking.

Hearing Examiner:  I don't think so.

The Witness:  The expenditure to which you refer is for the attachment of additional reserves by Michigan Wisconsin Pipeline Company and the transportation of those reserves to market.

By Mr. Nowlin:

Q    Is the additional supply of gas contemplated through that proposal for the system's present requirements, or does it anticipate a further expansion of the system's operating area?

A    The application indicates that it is for our existing markets.

Q    In other words, you are not anticipating in the Wisconsin-Minnesota area extending your pipelines into a new area on the basis of this new gas supply?

A    No, this is for our existing markets.

Mr. Nowlin:  That is all I have, Mr. Examiner.

Hearing Examiner:  Does this complete the presentation

WG-ANR-00052414

B89        of evidence on both sides?

Mr. Seder:  Just one second, please.

This completes the presentation of evidence.

Hearing Examiner:  Does anyone desire a recommended de-
cision by the Hearing Examiner, or is that waived?

Mr. Seder:  I would like to have just half a minute to
talk it over.

Hearing Examiner:  Very well.

(A brief recess was taken.)

Mr. Seder:  Mr. Examiner, if I may, I would like to
amend the application to the extent that while we waive the
intermediate decision procedure, we do wish to reserve the
right to file exceptions and brief to proposed findings and
order prepared by the Staff, and to ask the Commission to
hear the matter orally, if necessary.

Mr. Nowlin:  As I understand it, then, you are waiting
for the Staff to go ahead and prepare requested findings and
opinion for the Commission?

Mr. Seder:  Yes, sir.

Mr. Nowlin:  Which you want the right, in the event an
adverse recommendation should be made, to file briefs and
request oral argument in respect thereof.

Mr. Seder:  That is correct.  I would hope that that won't
be necessary, but we want to reserve the right to do so.

Mr. Mitchell:  May I point out that you also would have

WG-ANR-00052415

H90      the right to file proposed findings or recommended findings.

Mr. Seder:  I think we are willing to waive that right.

Mr. Nowlin:  Then I assume, Mr. Examiner, they have waived the Trial Examiner's report.

Hearing Examiner:  He so stated in his remarks.

Mr. Nowlin, will you communicate to the Commission the posthearing procedure requested by Mr. Seder; and the Commission will, I take it, on hearing from you, notify counsel just what the posthearing procedure will be.

Mr. Nowlin:  All right, sir, I will.

Hearing Examiner:  Are we ready to close the record?
I hear no objection.  The hearing is now closed.

(Whereupon, at 5:11 p.m., the record was CLOSED.)

WG-ANR-00052416