# EXHIBIT 25

# In Chancery of New Jersey

HARRY HELFMAN, *et al.*,

        *Complainants,*

*against*

AMERICAN LIGHT & TRACTION
COMPANY, *et al.*,

        *Defendants.*

ON BILL, ETC.

### Answer of Defendant

### American Light & Traction Company

American Light & Traction Company for its answer to so much of such parts of the bill of complaint as it has been advised it is material and necessary for it to answer says:

#### FIRST CAUSE OF ACTION

Before proceeding to answer seriatim the sixty-three paragraphs of the First Cause of Action, and by way of general introductory answer thereto, this defendant says as follows:

A. The matters complained of in the said sixty-three paragraphs constitute what this defendant has called and will hereinafter call the Transaction of 1928.

The said Transaction was the subject of protracted negotiations between officers of this de-

WG-ANR-00078028

fendant, officers of the defendant The Koppers Company of Delaware, and officers of the defendant The United Light and Power Company. Said negotiations resulted in an agreement comprising six factors, which include all the matters complained of in the First Cause of Action.

The said Transaction could not have been carried out except as a whole, and the results to this defendant and said other corporations cannot be fairly judged except as a whole, although this defendant was directly concerned in only the first four of the six factors. This defendant's participation in said four factors was in the interest of this defendant and of all of its stockholders, and this defendant has benefited and profited thereby.

B. For a considerable time preceding such negotiations The Koppers Company of Delaware through subsidiaries and nominees, and The United Light and Power Company through subsidiaries and nominees, had been the holders of substantial amounts of this defendant's stock, and immediately prior to the said Transaction their respective holdings of said stock, and their respective percentages of the total of said stock then outstanding, were as follows:

| | Preferred | Common | Total |
|---|---|---|---|
| Koppers | 19,399 sh. | 101,444 sh. | 120,843 sh. |
| | 14.47% | 19.43% | 18.41% |
| U. L. & P. | 31,233 sh. | 101,196 sh. | 132,429 sh. |
| | 23.30% | 19.38% | 20.18% |
| Koppers and | | | |
| U. L. & P. | 50,632 sh. | 202,640 sh. | 253,272 sh. |
| | 37.77% | 38.81% | 38.59% |

All of such Preferred shares had been acquired by the holders aforesaid in the market for cash, and all of such Common shares had been acquired

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 3 of 134   Document 50-36

WG-ANR-00078029

by the holders aforesaid for cash and by reason of a 50% stock dividend which this defendant had paid to all of its holders of common stock (including the complainant Helfman) on July 1, 1927.

C. The said Transaction, which as aforesaid comprised six factors, was as follows:

### TRANSACTION OF 1928

I. *Milwaukee Coke & Gas*. This is the matter complained of in paragraphs 33 to 45 of the bill.

This defendant issued 38,272 of its Common shares (then of the par value of $100 each) to Koppers Gas & Coke Company (a subsidiary of The Koppers Company of Delaware) in exchange for 35,000 shares of Milwaukee Coke & Gas Company stock, being all the outstanding stock of that company. When said stock was acquired by The Koppers Company of Delaware the Milwaukee Coke & Gas Company had a large and unprofitable investment in coal mines, and was under very burdensome obligations in connection therewith. This defendant, though desiring to acquire the stock of said Coke Company, was unwilling to acquire it except on condition that the Coke Company be relieved of said unprofitable investment and said burdensome obligations. The Koppers Company of Delaware did relieve the Coke Company thereof, and thereby made the stock of the Coke Company a desirable purchase for this defendant.

II. *Brooklyn Union*. This is the matter complained of in paragraph 14 and in paragraphs 49 to 53 of the bill.

This defendant owned, itself and through nominees, all the capital stock ($1,000 in each

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 4 of 134   Document 50-86

WG-ANR-00078030

case) of four New Jersey corporations, Bexley, Provident, Mutual and Waverly Companies, and said four corporations owned a total of 153,200 no-par shares and $237,000 convertible debentures of the Brooklyn Union Gas Company. Said $237,000 debentures were convertible on and after January 1, 1929, into no-par shares of the Brooklyn Union Gas Company at the rate of 20 shares for each $1,000 of debentures, amounting to 4,740 shares, and in the Transaction of 1928 said debentures were considered as if so converted, and said four New Jersey corporations were considered as owning 157,940 shares of Brooklyn Union Gas stock.

Said shares had been purchased in the market by this defendant and/or its subsidiaries at a total cost of $16,080,550.80.

Said four New Jersey corporations sold their holdings in the Brooklyn Union Gas Company to four Delaware corporations (namely Bexley, Falmouth, Esmont and Gregory Companies, which were organized for the purpose by individuals interested in The Koppers Company of Delaware) and received in payment therefor $21,321,900 of 5½% debentures of the Delaware corporations. Said 5½% debentures were in each case secured by pledge of the Brooklyn Union stock and were unconditionally guaranteed by The Koppers Company of Delaware. The agreements under which the said Brooklyn Union stock was pledged were made between said four Delaware corporations, The Koppers Company of Delaware and Uzal H. McCarter as Trustee. Under the provisions of said agreements the holders of the 5½% debentures had the right to demand and enforce payment of the principal thereof on one year's notice,

WG-ANR-00078031

an unusual and beneficial provision in favor of the debenture holders.

III. *Brooklyn Borough.* This is the matter complained of in paragraphs 46, 47 and 48 of the bill.

The defendant The United Light and Power Company or its subsidiaries had for several years owned 39,582 shares (out of a total of 40,000 shares) of capital stock of the Brooklyn Borough Gas Company.

The United Light and Power Company organized the ten New Jersey corporations named in complainants' paragraph 16, and each of said ten corporations acquired from said The United Light and Power Company or its subsidiaries one-tenth of said 39,582 shares of Brooklyn Borough Gas stock, in exchange for which each of said ten New Jersey corporations issued its own capital stock to the amount of $1,000 to The United Light and Power Company or its nominees.

This defendant issued 56,248 of its Common shares (then of the par value of $100 each) to L. H. Heinke for The United Light and Railways Company, and received from The United Light and Railways Company all the issued capital stock of each of the said ten New Jersey corporations.

Said ten New Jersey corporations then sold their holdings of Brooklyn Borough Gas stock to the ten Delaware corporations named in complainants' paragraph 17 (which had been organized for the purpose by individuals interested in The Koppers Company of Delaware) and received a total of $11,249,600 of 5½% debentures of said Delaware corporations.

Said 5½% debentures were in each case se-

cured by pledge of the Brooklyn Borough stock sold by the New Jersey corporations and said debentures were unconditionally guaranteed by The Koppers Company of Delaware. The agreements under which the said Brooklyn Borough stock was so pledged were made between said ten Delaware corporations, The Koppers Company of Delaware and Uzal H. McCarter, Trustee. Under the provisions of said agreements the holders of the debentures had the right to demand and enforce payment of the principal thereof on one year's notice, an unusual and beneficial provision in favor of the debenture holders.

IV. *Detroit Edison.* This is the matter complained of in paragraphs 54 and 55 of the bill.

For several years prior to July 1928 the defendant The United Light and Power Company or its subsidiaries had owned and possessed 75,000 shares of Detroit Edison stock.

In July 1928 The United Light and Power Company organized the Dexter Company (a New Jersey corporation) and transferred or caused the transfer of said 75,000 shares of Detroit Edison stock to said Dexter Company in exchange for $1,000 capital stock of said Dexter Company.

This defendant then issued 75,000 of its Common shares (then of the par value of $100 each) to L. H. Heinke for The United Light and Railways Company and received said $1,000 capital stock of said Dexter Company, which carried with it the ownership of said 75,000 shares of Detroit Edison stock, which ownership later brought valuable subscription rights as will appear.

The foregoing four factors of the Transaction of 1928 were the ones in which this defendant was directly concerned.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 7 of 134   Document 50-36

WG-ANR-00078033

The other two factors in which this defendant was not directly concerned were as follows:

V. *United American.* Prior to the Transaction of 1928 The Koppers Company of Delaware, through its subsidiary the Koppers Gas & Coke Company had acquired as aforesaid 19,399 of this defendant's Preferred shares ($100 par) and 101,444 of this defendant's Common shares ($100 par). Adding the 38,272 Common shares acquired by Koppers Gas & Coke Company for 35,000 shares of Milwaukee Coke & Gas stock (mentioned in paragraph "C", sub-paragraph I *supra*) said Koppers Gas & Coke Company held 139,716 Common shares of this defendant.

Koppers Gas & Coke Company organized the United American Company (a Delaware corporation) and transferred said 19,399 Preferred and 139,716 Common shares to said United American Company and received $26,872,970 in 5½% debentures of said United American Company. Said 5½% debentures were secured by pledge of the said 19,399 Preferred and said 139,716 Common shares of this defendant. The agreements under which said shares were so pledged were made between the United American Company and The Union Trust Company of Pittsburgh. Under the provisions of the agreements the holders of the debentures had the right to demand and enforce payment thereof on one year's notice.

The Koppers Gas & Coke Company then transferred all the capital stock of the United American Company to The United Light and Power Company, or its subsidiaries or nominees, and received 150,000 shares of the non-voting Class A Common stock of The United Light and Power Company.

WG-ANR-00078034

VI. *Option.* The Koppers Gas & Coke Company received from The United Light and Power Company an option to purchase an additional 180,000 shares of non-voting Class A Common stock of said The United Light and Power Company for cash, at $20 per share.

The numerous New Jersey and Delaware corporations, created in the course of the said Transaction, were so created to comply with the Federal Income Tax law in respect of "re-organizations", and to postpone payment of income taxes until profits were realized; and also in view of Section 70 of the Public Service Commission law of New York governing the holding by one corporation of more than 10% of the stock of a New York public utility corporation.

D. At the conclusion of the Transaction of 1928 The Koppers Company of Delaware and/or its subsidiaries held none of this defendant's stock and the holdings of The United Light and Power Company of this defendant's stock were as follows:

| | Preferred | Common | Total |
|---|---|---|---|
| Total stock of this defendant outstanding before Transaction | 134,081 sh. | 522,143 sh. | 656,224 sh. |
| Issued in Transaction | | 169,520 sh. | 169,520 sh. |
| Outstanding after Transaction | 134,081 sh. | 691,663 sh. | 825,744 sh. |
| Holdings of United Light & Power before Transaction | 31,233 sh. | 101,196 sh. | 132,429 sh. |
| Received by United Light & Power in Transaction | | | |
| III Brooklyn Borough | | 56,248 sh. | 56,248 sh. |
| IV Detroit Edison | | 75,000 sh. | 75,000 sh. |
| V United American | 19,399 sh. | 38,272 sh. / 101,444 sh. | 159,115 sh. |
| Total Received | 19,399 sh. | 270,964 sh. | 290,363 sh. |
| Holdings of United Light & Power after Transaction | 50,632 sh. 37.77% | 372,160 sh. 53.81% | 422,792 sh. 51.20% |

WG-ANR-00078035

The foregoing table shows that after the Transaction of 1928 The United Light and Power Company's holdings were 37.77% of this defendant's Preferred stock and 53.81% of its Common stock, which amounted to 51.20% of its total voting stock; whereas before the Transaction the combined holdings of said Company and The Koppers Company of Delaware were the same 37.77% of this defendant's Preferred stock and 38.81% of its Common stock, which amounted to 38.59% of its total voting stock, as is shown in paragraph "B" above.

E. The immediate results of the Transaction of 1928 to this defendant and the other participants therein are shown in the following three tables:

WG-ANR-00078036

# AMERICAN LIGHT & TRACTION COMPANY

## Transaction of 1928

| | | A. L. & T. Com. Shares | M. C. & G. Shares | B. U. Gas Shares | B. B. Gas Shares | 5½% Debentures | Det. Ed. Shares |
|---|---|---|---|---|---|---|---|
| I | Milwaukee Coke & Gas | —38,272 | 35,000 | | | | |
| II | Brooklyn Union | | | —157,940 | | $21,321,900 | |
| III | Brooklyn Borough | —56,248 | | | 39,582 | | |
| | | | | | —39,582 | 11,249,600 | |
| IV | Detroit Edison | —75,000 | | | | | 75,000 |
| V | United American | | | | | | |
| VI | Option | | | | | | |
| | | —169,520 | 35,000 | —157,940 | | $32,571,500 | 75,000 |

The table shows that in return for 169,520 shares of its Common stock and 157,940 shares of Brooklyn Union stock this defendant and/or its subsidiaries, received $32,571,500 in 5½% secured guaranteed debentures, 75,000 shares of Detroit Edison stock and the entire capital stock (35,000 shares) of the Milwaukee Coke & Gas Company.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 11 of 134   Document 50-36

WG-ANR-00078037

# THE KOPPERS COMPANY OF DELAWARE

(AND ASSOCIATED COMPANIES)

## TRANSACTION OF 1928

|  |  | A. L. & T. Com. Sh. | Pfd. Sh. | M. C. & G. Shares | B. U. Gas Shares | B. B. Gas Shares | 5½% Deb. | U. L. & P. A Com. Sh. |
|---|---|---|---|---|---|---|---|---|
| I | Milwaukee Coke & Gas.. | 38,272 |  | —35,000 |  |  |  |  |
| II | Brooklyn Union ............... |  |  |  | 157,940 |  | —$21,321,900 |  |
| III | Brooklyn Borough .......... |  |  |  |  | 39,582 | —11,249,600 |  |
| IV | Detroit Edison ................ |  |  |  |  |  |  |  |
| V | United American ............ | —139,716 | —19,399 |  |  |  | $26,872,970 | 150,000 |
| VI | Option ............................. |  |  |  |  |  |  |  |
|  |  | —101,444 | —19,399 | —35,000 | 157,940 | 39,582 | —32,571,500 | $26,872,970 | 150,000 |

The table shows that The Koppers Company of Delaware and/or its subsidiaries and associated companies parted with 101,444 American Light & Traction Common, 19,399 American Light & Traction Preferred, the entire capital stock of the Milwaukee Coke & Gas Company and had outstanding an obligation of $32,571,500 in debentures, against which they had received 157,940 Brooklyn Union, 39,582 Brooklyn Borough, $26,872,970 in debentures and 150,000 shares of United Light & Power non-voting Class A Common, and also an option to purchase an additional 180,000 shares at $20 per share in cash.

WG-ANR-00078038

# THE UNITED LIGHT AND POWER COMPANY

## TRANSACTION OF 1928

|  |  | A. L. & T. Com. Sh. | Pfd. Sh. | B. B. Gas Shares | Det. Ed. Shares | 5½ Deb. | U. L. & P. A Com. Sh. |
|---|---|---|---|---|---|---|---|
| I | Milwaukee Coke & Gas |  |  |  |  |  |  |
| II | Brooklyn Union |  |  |  |  |  |  |
| III | Brooklyn Borough | 56,248 |  | —39,582 |  |  |  |
| IV | Detroit Edison | 75,000 |  |  | —75,000 |  |  |
| V | United American | 139,716 | 19,399 |  |  | —$26,872,970 | —150,000 |
| VI | Option |  |  |  |  |  |  |
|  |  | 270,964 | 19,399 | —39,582 | —75,000 | —$26,872,970 | —150,000 |

The table shows that The United Light and Power Company and/or its subsidiaries had parted with 39,582 Brooklyn Borough, 75,000 Detroit Edison and 150,000 non-voting Class A Common, and had outstanding $26,872,970 in debenture obligations and had received 270,964 American Light & Traction Common and 19,399 Preferred. The United Light and Power Company had also given The Koppers Company of Delaware an option to purchase an additional 180,000 shares of said Class A Common stock at $20 per share in cash.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 13 of 134   Document 50-36

WG-ANR-00078039

F. Since the completion of the Transaction of 1928 changes have taken place in certain of the factors. The changes and the present status of the six factors are as follows:

I. *Milwaukee Coke & Gas.* No change has taken place in this factor and this defendant retains and owns 35,000 shares of Milwaukee Coke & Gas Company stock, being all the outstanding stock of that Company.

II. *Brooklyn Union.* In November 1930 the four New Jersey corporations which owned $21,321,900 of debentures of Delaware corporations sold $15,623,370 of debentures to The Koppers Company of Delaware, or one of its subsidiaries, for cash at par and interest, and had remaining $5,698,530 of debentures.

In October 1931 an additional $1,600,000 of Delaware debentures were sold to The Koppers Company of Delaware, or a subsidiary, for cash at par and interest, leaving $4,098,530 of Delaware debentures, which have been called for payment on April 20, 1933.

III. *Brooklyn Borough.* In November 1930, this defendant sold to The Koppers Company of Delaware or one of its subsidiaries all the capital stock of the ten New Jersey corporations which held a total of $11,249,600 of Delaware debentures, and received $11,249,600 in cash and in addition received cash to the amount of the interest accrued on the debentures to the date of sale.

IV. *Detroit Edison.* On December 21, 1928, the Dexter Company as holder of 75,000 shares of Detroit Edison stock became entitled to and

WG-ANR-00078040

did subscribe at $100 per share for new shares of Detroit Edison Company to the extent of one-sixth of its then holdings of Detroit Edison, or 12,500 new shares, and increased its holding to 87,500 shares.

On December 21, 1929, the Dexter Company as holder of 87,500 shares of Detroit Edison stock became entitled to and did subscribe at $100 per share for new shares of Detroit Edison Company to the extent of one-fifth of its then holdings of Detroit Edison, or 17,500 new shares, and increased its holding to 105,000 shares.

V. *United American.* The United Light and Power Company caused its subsidiary, the United American Company, to pay off in cash at par and interest the $26,872,970 of United American debentures.

VI. *Option.* The Koppers Company of Delaware, or a subsidiary, exercised the option to buy 180,000 shares of non-voting A Common stock of the United Light and Power Company at $20 per share and paid that company $3,600,000 in cash for the stock.

G. The net result to this defendant of the Transaction of 1928 is that this defendant, in return for 169,520 shares of its Common stock and 157,940 shares of Brooklyn Union Gas stock formerly owned by it has received

(1) in net cash, $25,472,900;

(2) the entire capital stock (35,000 shares) of the Milwaukee Coke & Gas Company, which has a value of upwards of $8,000,000;

WG-ANR-00078041

(3) $4,098,530 of 5½% secured guaranteed debentures, which have been called for payment on April 20, 1933, and

(4) 75,000 shares of Detroit Edison stock, which through the exercise of rights has been increased to 105,000 shares.

The following three tables show said net result to this defendant, and show also the results of the Transaction to the other participants to the date of the filing of this answer.

WG-ANR-00078042

## AMERICAN LIGHT & TRACTION COMPANY

| | | A. L. & T. Com. Shares | M. C. & G. Shares | B. U. Gas Shares | B. B. Gas Shares | 5½% Debentures | Det. Ed. Shares | Cash |
|---|---|---|---|---|---|---|---|---|
| I | Milwaukee Coke & Gas | —38,272 | 35,000 | | | | | |
| II | Brooklyn Union | | | —157,940 | | $21,321,900 | | |
| III | Brooklyn Borough | —56,248 | | | 39,582 | | | |
| | | | | | —39,582 | 11,249,600 | | |
| IV | Detroit Edison | —75,000 | | | | | 75,000 | |
| V | United American | | | | | | | |
| VI | Option | | | | | | | |
| | | —169,520 | 35,000 | —157,940 | | $32,571,500 | 75,000 | |
| II | Brooklyn Union | | | | | —15,623,370 | | 15,623,370 |
| | | | | | | — 1,600,000 | | 1,600,000 |
| III | Brooklyn Borough | | | | | —11,249,600 | | 11,249,600 |
| IV | Detroit Edison | | | | | | 12,500 | —1,250,000 |
| | | | | | | | 17,500 | —1,750,000 |
| | | —169,520 | 35,000 | —157,940 | | $ 4,098,530 | 105,000 | $25,472,970 |

The table shows that in return for 169,520 shares of its Common stock and 157,940 shares of Brooklyn Union stock this defendant has received in net cash $25,472,970, in addition to which it and/or its subsidiaries have received and now own the entire capital stock (35,000 shares) of the Milwaukee Coke & Gas Company, $4,098,530 of 5½% secured guaranteed debentures and 105,000 shares of Detroit Edison stock. Said $4,098,530 of debentures have been called for payment on April 20, 1933, as aforesaid.

WG-ANR-00078043

# THE KOPPERS COMPANY OF DELAWARE

### (AND ASSOCIATED COMPANIES)

| | | A. L. & T. Com. Sh. | A. L. & T. Pfd. Sh. | M. C. & G. Shares | B. U. Gas Shares | B. B. Gas Shares | 5½% Deb. | U. L. & P. A Com. Sh. | Cash |
|---|---|---|---|---|---|---|---|---|---|
| I | Milwaukee Coke & Gas.. | 38,272 | | —35,000 | | | | | |
| II | Brooklyn Union .............. | | | | 157,940 | | —$21,321,900 | | |
| III | Brooklyn Borough ........ | | | | | 39,582 | —11,249,600 | | |
| IV | Detroit Edison ................ | | | | | | | | |
| V | United American .......... | —139,716 | —19,399 | | | | $26,872,970 | 150,000 | |
| VI | Option ................................. | | | | | | | | |
| | | —101,444 | —19,399 | —35,000 | 157,940 | 39,582 | —32,571,500 | $26,872,970 | 150,000 |
| II | Brooklyn Union ............ | | | | | | 15,623,370 | | —15,623,370 |
| | | | | | | | 1,600,000 | | — 1,600,000 |
| III | Brooklyn Borough ........ | | | | | | 11,249,600 | | —11,249,600 |
| V | United American ............ | | | | | | —26,872,970 | | 26,872,970 |
| VI | Option ............................. | | | | | | | 180,000 | — 3,600,000 |
| | | —101,444 | —19,399 | —35,000 | 157,940 | 39,582 | — 4,098,530 | 330,000 | — 5,200,000 |

The table shows that The Koppers Company of Delaware and/or its subsidiaries and associated companies have paid out $5,-200,000 in net cash, have outstanding debenture obligations of $4,098,530 (which have been called for payment on April 20, 1933, as aforesaid) and have parted with 101,444 of this defendant's Common and 19,399 of this defendant's Preferred shares, and the entire capital stock of the Milwaukee Coke & Gas Company, in return for which they have received 157,940 shares of Brooklyn Union Gas stock, practically all the Common stock of the Brooklyn Borough Gas Company and 330,000 shares of non-voting Class A Common stock of the defendant The United Light and Power Company.

WG-ANR-00078044

# THE UNITED LIGHT AND POWER COMPANY

| | | A. L. & T. Com. Sh. | Pfd. Sh. | B. B. Gas Shares | Det. Ed. Shares | 5½ Deb. | U. L. & P. A Com. Sh. | Cash |
|---|---|---|---|---|---|---|---|---|
| I | Milwaukee Coke & Gas............... | | | | | | | |
| II | Brooklyn Union ........................... | | | | | | | |
| III | Brooklyn Borough ......................... | 56,248 | | —39,582 | | | | |
| IV | Detroit Edison .............................. | 75,000 | | | —75,000 | | | |
| V | United American ........................... | 139,716 | 19,399 | | | —$26,872,970 | —150,000 | |
| VI | Option ........................................... | | | | | | | |
| | | 270,964 | 19,399 | —39,582 | —75,000 | —$26,872,970 | —150,000 | |
| V | United American ........................... | | | | | 26,872,970 | | —$26,872,970 |
| VI | Option ........................................... | | | | | | 180,000 | 3,600,000 |
| | | 270,964 | 19,399 | —39,582 | —75,000 | | —330,000 | —$23,272,970 |

The table shows that The United Light and Power Company has paid out $23,272,970 net cash, has issued 330,000 of its A Common shares, has parted with 75,000 shares of Detroit Edison, and practically the entire capital stock of the Brooklyn Borough Gas Company, in return for which it has received 270,964 shares of this defendant's Common and 19,399 shares of its Preferred stock.

WG-ANR-00078045

PARAGRAPHS 1 TO 63

(FIRST CAUSE OF ACTION)

Answering now the sixty-three paragraphs of the First Cause of Action, this defendant says as follows:

*First.* This defendant admits the allegations of paragraph 1; and further answering said paragraph says that this defendant was organized in 1901 by Certificate of Incorporation filed in office of the Secretary of State of New Jersey on April 6, 1901. An Amended Certificate of Incorporation was filed April 19, 1901, and a Second Amended Certificate of Incorporation on May 13, 1901, since which date this defendant's certificate of incorporation has not been amended in any respect except that its capital stock has been increased and by amendment filed in said office May 5, 1930, the par value of both its Preferred and Common shares was changed from $100 to $25. A certified copy of its Certificate of Incorporation as amended to May 5, 1930, is in the possession of this defendant and ready to be produced, and reference thereto is hereby made.

Said Certificate of Incorporation has ever since April 6, 1901, contained the following:

"SEVENTH. The provisions which the incorporators hereby insert in the Certificate of Incorporation of the corporation for the regulation of the business and for the conduct of the affairs of the corporation, and creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, the same being in furtherance of and in addition to and not in limitation of the powers now or hereafter conferred

WG-ANR-00078046

by the present or any future law or laws of the State of New Jersey, are as follows:

\* \* \*

"(14.) The Board of Directors may, before the issue of any new or additional shares of the capital stock of the corporation, determine that the same, or any part thereof, shall be offered in the first instance to all of the then stockholders, in proportion to the number of shares of stock then held by them respectively, or may make any other provision respecting the issue and allotment of the new or additional shares; but in default of any such determination, or so far as the same shall not extend, the new or additional shares may be dealt with by the Board of Directors as if they formed part of the shares in the original capital stock or original issue of shares of the corporation."

And this defendant further says that on May 13, 1901, the first by-laws of this defendant were adopted, and said by-laws as then adopted contained the following:

"Article II, Section 9. Contracts. Inasmuch as the Directors of this Company are men of large and diversified business interests, and are likely to be connected with other corporations with which, from time to time, this Company may have business dealings, no contract or other transaction between this Company and any other corporation shall be affected by the fact that Directors of this Company are interested in, or are directors or officers of, such other corporation.

WG-ANR-00078047

"The Board of Directors, in its discretion, may submit any contract or act for approval or ratification at any annual meeting of the stockholders, or at any meeting of the stockholders called for the purpose of considering any such act or contract; and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the capital stock of the Company, which is represented in person or by proxy, at such meeting (provided that a lawful quorum of stockholders be there represented in person or by proxy) shall be as valid and as binding upon the corporation and upon all the stockholders, as though it had been approved or ratified by every stockholder of the corporation.''

On April 6, 1909, all of this defendant's former by-laws were repealed and new by-laws adopted, and said Section 9 of Article II became Section 8 of Article II with no change except that while the *1901 by-law* read

"Inasmuch as the Directors of this Company are men of large and diversified business interests, etc.'',

the *1909 by-law* reads

"Inasmuch as the Directors of this Company are, *or may be,* men of large and diversified business interests, etc.''

No change has since been made in said section and it has been continuously in effect down to the present time.

And this defendant says that the complainants acquired and hold their stock subject to the afore-

WG-ANR-00078048

said provisions of its Certificate of Incorporation and of its by-laws.

*Second.* This defendant answering paragraph 2 admits that on the date of the filing of the bill of complaint the complainant Helfman was the holder of record of 5,700 shares ($25 par) of this defendant's Common stock.

This defendant does not know whether said 5,700 shares of Common stock were or are actually owned by said Helfman nor does its know whether said shares were or are free and clear of liens. It admits that said shares are of substantial value in the market.

Attached hereto is a schedule marked Appendix No. 1, which is hereby referred to and made part hereof, and which shows the dates when shares of this defendant's Common stock were credited to and registered in the name of said Helfman on this defendant's books and the dates when such shares were debited to and transferred out of the name of said Helfman, together with the number of such shares so credited and registered and/or debited and transferred on each date, and the total then registered. Said schedule also shows the market prices of said Common shares on each of the dates aforesaid and the estimated amounts paid and received for the same by said Helfman on the basis of such market prices.

Said Appendix No. 1 also shows as follows:

That on April 26, 1928, which was shortly before the consummation of the matter complained of in the First Cause of Action (which is herein called the Transaction of 1928), said Helfman

WG-ANR-00078049

was the record holder of 656 shares of defendant's Common stock, then of the par value of $100 each, and later converted into 2,624 shares of $25 par value;

That after said April 26, 1928, and up to May 13, 1929 his record holdings were increased by a total of 450 shares then of the par value of $100 each, and later converted into 1,800 shares of $25 par; and

That after said May 13, 1929, his record holdings were further increased as follows:

August 12, 1929,— 300 shares then of $100 par and later converted into 1,200 shares of $25 par;

June 30, 1930,—1,200 shares of $25 par,

and that both of said last mentioned increases occurred after said Helfman was advised by this defendant's annual report for 1928, receipt of which he acknowledged in a letter dated May 13, 1929, of "the purchase of the stock of the Brooklyn Borough Gas Company and the sale of that stock and of our stockholdings in the Brooklyn Union Gas Company to the Koppers Company and the purchase from them of the Milwaukee Coke & Gas Company," and of the purchase "from The United Light and Power Company (of) seventy-five thousand shares of the common stock of the Detroit Edison Company," and that "they were acquired through the exchange of American Light & Traction Company common stock—one hundred and sixty-nine thousand five hundred and twenty shares of which were issued for that purpose,"—the same being the matter complained of in the First Cause of Action, and herein called the Transaction of 1928.

And this defendant says that said increase

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 24 of 134   Document 50-36

WG-ANR-00078050

of June 30, 1930, of 1,200 shares in the record holdings of said Helfman occurred after he had learned of the purchase by this defendant of the stock (or part of it) in the International Paper & Power Company complained of in the Second Cause of Action.

This defendant further says that on February 25, 1932, and since the filing of the bill of complaint, there were registered on its books in the name of said Helfman 1,324 additional shares of this defendant's Common stock.

This defendant admits the complainant Cranmer is the holder of record of 10 shares of its Common stock, but says that said Cranmer did not become the holder of record of any of said 10 shares until November 11, 1931, and that he was not theretofore the holder of record of any shares of this defendant's stock and that this defendant's records indicate that said 10 shares were purchased by or for him on November 5, 1931.

And this defendant says that complainant Cranmer has been brought into the situation by the complainant Helfman or his agents for the purpose of this litigation, and that while the complainants purport to bring their action in their own behalf and on behalf of all the stockholders of this defendant, the fact is that this suit is not in the interest either of the defendant or of its stockholders and that the complainants are not acting in the interests of this defendant or of its stockholders and are not proper representatives of either.

*Third.* This defendant answering paragraph 3 admits that shortly after May 15, 1931, it received

WG-ANR-00078051

from said Helfman the so-called "demand" a copy of which is annexed to the bill of complaint and marked Exhibit 1. It does not know to what other persons or parties said demand may have been delivered nor the method of delivery.

And further answering said paragraph 3 this defendant says as follows:

By letter dated May 19, 1931, addressed to said Helfman by Rezeau B. Brown, President of this defendant, receipt of said demand was acknowledged and said Helfman was advised that said demand would be placed before the Board of Directors at their first meeting, to be held in June, 1931;

A meeting of this defendant's Board of Directors was held on June 23, 1931, and said demand was then placed before and considered by said Board, and a Special Committee was appointed to investigate the matters referred to in the demand, and the Committee was requested by the Board to arrange for a meeting with said Helfman after it had made its investigation, for the purpose of presenting the results of its investigation and to offer said Helfman the opportunity to present any further facts he might desire the Committee to consider; and by letter dated June 24, 1931, said Helfman was advised to that effect;

During the interval between June 24, 1931, and September 26, 1931, said Helfman made very numerous requests in writing and otherwise to the officers of this defendant and to the said Committee for information all of which was freely and promptly furnished to him. One of these requests was made in an interview with an officer of

WG-ANR-00078052

this defendant on September 17, 1931, and at said interview said Helfman was again requested by said officer to meet with the Committee;

By letter dated September 26, 1931, said Helfman was advised that the Committee had made a report to the Board at their meeting of September 25, 1931, to which report in the possession of the defendant, reference is made. Said report was to the effect that the Committee had been unable to find any evidence which would sustain either Mr. Helfman's charges or conclusions; that the Committee had sought a meeting with Mr. Helfman with a view of a full and frank discussion; that he had expressed himself as either unwilling or indisposed to meet the Committee; that the Committee was anxious to sift his charges thoroughly and had been and still was desirous of receiving from him any information sustaining or tending to sustain his charges; that the Committee could proceed no further at that time unless it could be directed to the evidence upon which Mr. Helfman relied in making his charges; that it had not been able to find such evidence if it existed, and that from its then information the transactions criticized (in Mr. Helfman's ''demand'' of May 15, 1931) were negotiated and concluded without taint of fraud or breach of trust on the part of any director or officer. Said Helfman was furnished a copy of the Committee's report, and was advised that the Committee was still in existence and would be glad to meet with him.

Subsequent to said September 26, 1931, (the date when the Committee's report was transmitted to said Helfman) and down to October 31, 1931, said Helfman made further requests for information all of which requests were complied with. The last written communication of this de-

WG-ANR-00078053

fendant, supplying information, was sent him under date of November 2, 1931.

By letter dated November 14, 1931, said Helfman declined to accept the Committee's invitation of September 26, 1931, and by letter dated December 9, 1931, the Committee again requested a meeting, and asked that Helfman furnish the Committee with any information he might have tending to substantiate his claims. On December 22, 1931, when the bill of complaint was filed, the Committee was still in existence and had not been discharged by the Board, and said Helfman had declined to meet with the Committee.

The investigation made by this defendant through said Committee indicated that the transactions complained of were advantageous and beneficial to this defendant and its stockholders; that the demand for rescission of the various matters complained of would, if complied with, have resulted in great loss to this defendant and its stockholders and that there was no foundation for the claim of, and no proof of, any fraud, mismanagement or negligence on the part of the directors of this defendant which would in fact or law have justified this defendant in the interest of its stockholders in instituting suits against the various corporations, partnerships and individuals complained of by said Helfman. Therefore, this defendant, being furnished with no facts or information by said Helfman and being unable to find any facts or information to justify it in complying with the demands of said Helfman, has not complied therewith.

Except as above admitted this defendant denies the allegations of paragraph 3.

WG-ANR-00078054

*Fourth.* This defendant answering paragraph 4 admits the allegations of said paragraph except the allegation that it is a "public utility holding company" and says that it is a corporation of the State of New Jersey, having powers, privileges and franchises as set forth in its certificate of incorporation on file with the Secretary of State, and that it is authorized to transact business as therein set forth.

This defendant admits that it controls through stock ownership, numerous operating subsidiaries which are engaged in business as set forth in paragraph 4.

*Fifth.* This defendant admits the allegations of paragraph 5 except as follows:

Marshall Field was first elected a director of this defendant on *January* 29, 1924.

Edgar M. Williams was first elected a director of this defendant on *January* 29, 1924.

William B. Tuttle resigned as a director on September 25, 1931, and has not since served as director.

Walter C. Beckjord resigned on *January* 29, 1924 and was again elected a director on *March 21,* 1927.

Franklin Q. Brown has served *continuously* as a director since his first election.

Franklin Q. Brown's resignation was presented at a meeting of this defendant's Executive Committee held July 15, 1924, and the matter of his resignation was laid on the table. No further action was taken on his resignation and he continued to serve as a director.

*Sixth.* This defendant admits the allegations of paragraph 6 except as follows:

WG-ANR-00078055

William F. Rust served as a director of this defendant from the date of his first election on March 15, 1926 to March *18*, 1929.

Cyrus S. Eaton did not serve as a director of this defendant on or after August 15, 1930.

*Seventh.* This defendant admits the allegations of paragraph 7 except as follows:

Walstein F. Douthirt did not resign as a member of the Executive Committee on April 6, 1926. On the said date the Board of Directors of this defendant held its first meeting following the annual stockholders' meeting of March 15, 1926 and at said meeting said Board elected members of the Executive Committee and said Douthirt was not elected.

Cyrus S. Eaton was first elected a director of this defendant at the annual stockholders' meeting of March 15, 1926. He was first elected a member of the Executive Committee on April 6, 1926 and served continuously as director and member of the Executive Committee until August 15, 1930, when his written resignation as director and as member of the Executive Committee was presented at a meeting of the Committee and was accepted.

*Eighth.* This defendant admits the allegations of paragraph 8.

*Ninth.* This defendant admits the allegations of paragraph 9.

*Tenth.* This defendant admits the allegations of paragraph 10.

*Eleventh.* This defendant answering paragraph 11 admits the allegations of said para-

WG-ANR-00078056

graph except that it denies that The United Light and Railways Company caused the incorporation of the United American Company. It is informed and therefore alleges that the defendant Koppers Gas & Coke Company caused the incorporation of said United American Company, and that thereafter said The United Light and Railways Company acquired all the capital stock of said United American Company and that it still owns the same.

*Twelfth.* This defendant admits the allegations of paragraph 12.

*Thirteenth.* This defendant admits the allegations of paragraph 13. ·

*Fourteenth.* This defendant answering paragraph 14 admits that the Mutual, Bexley (of New Jersey), Waverly and Provident Companies were four corporations organized under the laws of New Jersey, the Mutual Company on or about December 30, 1927 and the others on or about July 2, 1928. It admits that it caused the organization of said four corporations. It denies that they acquired, *in exchange for their capital stock,* approximately one-third in the aggregate of all the outstanding capital stock of the Brooklyn Union Gas Company. This defendant says that each of said four corporations began business with $1,000 capital stock, which was subscribed and paid for in cash by this defendant and/or its nominees at the time of the organization of said corporations, and that none of them thereafter issued any stock for any purpose. And this defendant says that said four corporations had acquired from this defendant

WG-ANR-00078057

and/or its subsidiaries and owned 153,200 no-par shares and $237,000 convertible debentures of the Brooklyn Union Gas Company, as alleged in paragraph "C", subparagraph II above.

And this defendant admits that said 153,200 shares then constituted approximately one-third of all the outstanding shares of said Brooklyn Union Gas Company, and says that said $237,000 of debentures were convertible on and after January 1, 1929, into no-par shares of the Brooklyn Union Gas Company at the rate of 20 shares for each $1,000 of debentures, amounting to 4,740 shares, and that considering said debentures as if so converted, the holdings of said four corporations would be 157,940 shares.

But this defendant says that there was outstanding a total of $11,800,000 of such debentures, and that upon the conversion of all of said debentures said 157,940 shares would be only about one-fifth of all the outstanding shares of said Brooklyn Union Gas Company.

And this defendant says that in December 1930 the said Bexley, Provident and Mutual Companies were dissolved and all their indebtedness was paid and their remaining assets distributed to this defendant, the sole stockholder in each of them.

Except as herein admitted, this defendant denies the allegations of paragraph 14.

*Fifteenth.* This defendant answering paragraph 15 admits the allegations of said paragraph except that it denies that the four Delaware corporations named in said paragraph, Bexley (of Delaware), Esmont, Falmouth and Gregory

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 32 of 134   Document 50-36

WG-ANR-00078058

Companies, were organized by The Koppers Company of Delaware or were ever owned or controlled in whole or in part by that Company. It says that said four Delaware corporations were organized by individuals interested in The Koppers Company of Delaware.

And this defendant says that said four Delaware corporations acquired from the four New Jersey corporations named in paragraph 14 all of their holdings in the Brooklyn Union Gas Company.

*Sixteenth.* This defendant answering paragraph 16 admits the allegations of said paragraph, but says that the ten New Jersey corporations named in said paragraph were dissolved in December 1931. And this defendant says that the exact amount of stock of the Brooklyn Borough Gas Company which the said ten New Jersey corporations acquired from The United Light and Railways Company in exchange for all of their capital stock ($1,000 in each case) was 39,582 shares of Brooklyn Borough stock out of a total issue of 40,000 shares.

*Seventeenth.* This defendant answering paragraph 17 admits the allegations of said paragraph, except that it denies that the ten Delaware corporations named in said paragraph, were organized by The Koppers Company of Delaware or were ever owned or controlled in whole or in part by that Company. It says that said ten Delaware corporations were organized by individuals interested in The Koppers Company of Delaware.

And this defendant says that the exact amount of stock of the Brooklyn Borough Gas Company

WG-ANR-00078059

which said ten Delaware corporations acquired from the ten New Jersey corporations named in paragraph 16, was 39,582 shares out of a total issue of 40,000 shares.

*Eighteenth.* This defendant admits the allegations of paragraph 18.

*Nineteenth.* This defendant admits the allegations of paragraph 19 except as to any statements said to "appear more fully hereafter."

And as before alleged in paragraph "F", subparagraph IV, this defendant says that on December 21, 1928, the Dexter Company, the New Jersey corporation named in said paragraph 19, by reason of its then ownership of the 75,000 shares of Detroit Edison stock acquired by it as alleged in said paragraph 19, became entitled to subscribe and purchase an additional 12,500 shares of said stock at $100 per share, and did so subscribe and purchase the same, and became the owner of 87,500 shares; and that, on December 21, 1929, said Dexter Company, by reason of its then ownership of said 87,500 shares, became entitled to subscribe and purchase a further amount of 17,500 shares at $100 per share, and did so subscribe and purchase the same, and became the owner of 105,000 shares, which it still owns.

*Twentieth.* This defendant admits the allegations of paragraph 20.

*Twenty-first.* This defendant admits the allegations of paragraph 21.

*Twenty-second.* This defendant answering paragraph 22 admits the allegations of said paragraph except the last sentence thereof, which

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 34 of 134   Document 50-36

WG-ANR-00078060

is as follows: "Both classes of stock have equal voting power." This defendant has two classes of stock, Preferred stock and Common stock and each share of Preferred stock has one vote, and each share of Common stock has one vote.

*Twenty-third.* This defendant admits the allegations of paragraph 23 except that it says that prior to the second quarter of 1930 there were 691,750 shares of its Common stock outstanding instead of 692,158 shares.

*Twenty-fourth.* This defendant admits the allegations of paragraph 24.

*Twenty-fifth.* This defendant admits the allegations of paragraph 25.

*Twenty-sixth.* This defendant answering paragraph 26 denies the allegations of said paragraph except as admitted in this paragraph Twenty-sixth.

It admits that late in the year 1924 or thereabouts The United Light and Power Company directly, or through a subsidiary or subsidiaries, acquired a large interest in the stock of this defendant and thereafter from time to time acquired additional shares of said stock. This defendant is informed and believes and therefore says that all of such stock was acquired for cash. It says that the holdings of The United Light and Power Company and/or its subsidiaries did not at any time prior to July 1, 1928 exceed approximately 20% of the outstanding stock of this defendant.

In answer to the allegation in paragraph 26 that The United Light and Power Company "then and thereafter from time to time, through the

WG-ANR-00078061

exercise of its voting power, caused an increasing number of its representatives to be elected to the Board of Directors of American Light & Traction Company, and to become members of the Executive Committee and/or officers'', this defendant says as follows:

This defendant's Board of Directors consists of twenty-one members and has consisted of that number for many years.

That the large interest in the stock of this defendant which The United Light and Power Company acquired late in the year 1924 as aforesaid was purchased from the estate of Emerson McMillin, and from the estates of his widow and son, and from certain of his family and his associates, and amounted to about 18% of the total voting stock of this defendant. Mr. McMillin founded this defendant in 1901 and until his death in 1922 had been the controlling force in all of this defendant's affairs.

That subsequent to said purchase Frank T. Hulswit, then president of The United Light and Power Company, was elected to a vacancy caused by death, and William Chamberlain and Richard Schaddelee, then vice presidents of said Company, were elected to fill two vacancies, one of which had been caused by the retirement of a director, who was an executor of the Estate of Mr. McMillin, and the other by the retirement of one of Mr. McMillin's associates who had sold his stock when the stock of the Estate was sold. Subsequently Mr. Hulswit retired from the presidency of The United Light and Power Company and Cyrus S. Eaton, then Chairman of the Board of that

WG-ANR-00078062

Company, succeeded Mr. Hulswit on this defendant's Board. Subsequently B. J. Denman, an officer of The United Light and Power Company was elected a director of this defendant to fill a vacancy caused by resignation, and later Mr. Eaton retired and was succeeded by R. B. MacDonald, an officer of The United Light and Power Company and/or its subsidiaries.

That Edgar M. Williams who is classified in paragraph 30 as a representative of what the complainants denominate the ''Eaton interests'' was in no sense a representative of such interests if any such interests ever in fact existed which this defendant denies, and was in no sense a representative of The United Light and Power Company. Mr. Williams was first elected a member of this defendant's Board on January 29, 1924, at the suggestion of Mr. Lathrop, then President of this defendant. Mr. Williams and/or certain of his family and relatives had long prior thereto been and now are holders of substantial amounts of this defendant's stock which they had held continuously from the time when this defendant was first organized in 1901. Mr. Williams did not become a director of The United Light and Power Company until April 21, 1925, when he accepted election as such because of the fact that he and/or his relatives and family connections had been holders of substantial amounts of stock of The United Light and Power Company and/or its predecessor corporations ever since the first organization of said corporations. Mr. Williams and/or his said relatives and family connections are still the holders of such large amounts of stock. However, his and/or their holdings of stock of this defendant antedated their holdings

WG-ANR-00078063

of stock in The United Light and Power Company and/or its predecessor.

That Rezeau B. Brown who is also classified in paragraph 30 as a representative of said so-called "Eaton interests" was in no sense a representative of such so-called interests or of The United Light and Power Company. Mr. Brown was elected a director of this defendant on January 18, 1927 to fill a vacancy caused by resignation, and was at the same time elected president, and by virtue of his office of president he became a member of this defendant's Executive Committee.

Prior to his election as president of this defendant Mr. Brown had been for many years and still is the active local chief executive of the Milwaukee Gas Light Company, one of this defendant's most important subsidiaries, and of a number of this defendant's smaller subsidiaries which serve gas in territory surrounding and adjacent to the City of Milwaukee, which subsidiaries purchase gas from said Milwaukee Gas Light Company. On May 4, 1926, Mr. Brown had been elected Vice President and Advisory Engineer of this defendant, and prior to that time his contact with this defendant was through its executive officers in connection with his duties as the operating executive of said Milwaukee Gas Light Company and said other subsidiaries.

Prior to 1926 he had had no contact whatever with The United Light and Power Company and knew personally few, if any, of its then or present officers and directors. At the time of his election as President Mr. Brown was not a director or officer of The United Light and Power Company or any of its subsidiaries and had no

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 38 of 134   Document 50-36

WG-ANR-00078064

interest in said Company or its subsidiaries. He did not become a director of said Company or its subsidiaries until about one year later. He had no financial interest in said Company or its subsidiaries at that time and did not become financially interested in any way in said Company until some time in the early part of 1929.

Appended hereto and marked Appendix No. 2 and made part hereof, is a table showing the constitution of this defendant's Board of Directors from the annual meeting of 1922 to the annual meeting of 1932. Said Appendix No. 2 begins with the annual meeting of 1922 because that was during the lifetime of Mr. Emerson McMillin; and for the reason that 1922 was two years prior to the time when The United Light and Power Company and/or its subsidiaries and The Koppers Company of Delaware and/or its subsidiaries became holders of any of this defendant's stock.

Following the table in Appendix No. 2 and as a part of Appendix No. 2 are statements identifying the various members of the Board.

Appended hereto and marked Appendix No. 3 and made part hereof is a table showing the persons who have been members of this defendant's Executive Committee and chairmen thereof for the same period as that covered by Appendix No. 3.

And appended hereto and marked Appendix No. 4 and made part hereof is another table showing the persons who have held executive offices in this defendant for the same period.

*Twenty-seventh.* This defendant answering paragraph 27 denies the allegations of said paragraph, except as admitted in this paragraph Twenty-seventh.

WG-ANR-00078065

It admits that late in the year 1924 or thereabouts The Koppers Company of Delaware directly or through a subsidiary or subsidiaries acquired a substantial holding of the stock of this defendant and thereafter acquired additional shares from time to time. This defendant is informed and believes and therefore says that all of such stock was acquired for cash. It alleges the fact to be that the holdings of said Company and/or its subsidiaries did not at any time prior to July 1, 1928 exceed approximately 20% of the outstanding shares of this defendant.

In answer to the allegation of paragraph 27 that "through the exercise of its voting power, it (Koppers Company) from time to time caused an increasing number of its representatives to be elected to the Board of Directors of this defendant and to become members of the Executive Committee and/or officers of said Company" this defendant says as follows:

That subsequent to the acquiring of the substantial holding of the stock of this defendant which The Koppers Company of Delaware acquired late in the year 1924 as aforesaid, Henry B. Rust, president of said company, was elected to a vacancy caused by resignation, Donald MacArthur (since deceased) an officer of a subsidiary of said company, John S. Brookes, Jr. an officer of said company, William F. Rust an officer of said company and C. D. Marshall a director of said company, were elected to the Board of this defendant to fill vacancies, one of which had been caused by resignation, one by death and the other two by retirement.

Later Henry B. Rust resigned from this defendant's Board and his place was taken by

Case 2:20-cv-01334-SCD    Filed 01/27/23    Page 40 of 134    Document 50-36

WG-ANR-00078066

Howard Bruce. Mr. Bruce is identified in Appendix No. 2.

At the annual meeting of 1929 Donald MacArthur and William F. Rust retired from the Board and Glenn R. Chamberlain and William B. Tuttle were elected in their places. Messrs. Glenn R. Chamberlain and William B. Tuttle are identified in Appendix No. 2.

At the annual meeting of 1931 C. D. Marshall retired from the Board and Harold Doolittle was elected in his place. Mr. Doolittle is an officer of The Koppers Company of Delaware and is further referred to in Appendix No. 2.

And this defendant further answering paragraphs 26 and 27 denies that any of the persons elected to the Board of Directors of this defendant were in any improper or illegal sense the representatives of The United Light and Power Company or of The Koppers Company of Delaware, or of any particular interests or group of interests, but says that they all fully and fairly and in accordance with their honest judgment represented and acted for the best interests of this defendant.

And further answering paragraphs 26 and 27 this defendant refers to said Appendices Nos. 2, 3 and 4 hereto attached.

*Twenty-eighth.* This defendant has no knowledge of the matters alleged in paragraph 28.

*Twenty-ninth.* This defendant has no knowledge of the matters alleged in paragraph 29, except it denies that the interests of The United Light and Power Company were or should be referred to as the "Eaton interests," and it says that there was no such entity as "Eaton interests" and that the expression "Eaton interests," is misleading.

WG-ANR-00078067

*Thirtieth.* This defendant admits that at its annual meeting of March 21, 1927, the persons named in paragraph 30 were elected directors of this defendant.

It also admits that

Henry B. Rust was president and a director of The Koppers Company of Delaware,

William F. Rust was vice president and a director of The Koppers Company of Delaware,

John S. Brookes, Jr. was secretary of The Koppers Company of Delaware (but this defendant is informed and therefore alleges that said Brookes was not at that time nor has he at any time subsequent thereto been a director of said Company),

Charles D. Marshall was a director of The Koppers Company of Delaware, and

Donald MacArthur, now deceased, was vice president of Seaboard By-Product Coke Company, a subsidiary of The Koppers Company of Delaware.

It also admits that

Richard Schaddelee was then president and a director of The United Light and Power Company,

William Chamberlain was then vice president, general counsel and a director of that Company,

Burt J. Denman was then vice president and general manager and a director of that Company,

Cyrus S. Eaton was Chairman of the Board of Directors of that Company, and

Edgar M. Williams was one of the directors of that Company.

This defendant denies that said Schaddelee, Chamberlain, Denman and Williams were repre-

WG-ANR-00078068

sentatives of and that the defendant Rezeau B. Brown was a representative of the "Eaton interests", so-called, and denies that there was any such entity as the "Eaton interests." It denies that

Rezeau B. Brown was then a director of The United Light and Power Company and says that he did not become a director of that Company until about one year later, which was subsequent to the Transaction of 1928.

It admits that among the directors elected at said annual meeting of March 21, 1927 were the salaried official officers mentioned in paragraph 30.

It admits that its Executive Committee consisted in 1927 of the persons named in paragraph 30, and also admits that said Executive Committee was authorized by this defendant's certificate of incorporation and its by-laws to exercise all the powers of its Board of Directors.

Except as hereinbefore admitted this defendant denies all the allegations in paragraph 30.

And further answering paragraph 30 this defendant refers to and makes a part hereof its answer to paragraphs Twenty-sixth and Twenty-seventh above.

*Thirty-first.* This defendant answering paragraph 31 admits the allegations of said paragraph except the statement that "Rezeau B. Brown in 1927 became and thereafter continued to be a director of said The United Light and Power Company and a member of its Executive Committee," which statement it denies. This defendant states the fact to be that said Brown was first elected a director of said The United Light

Case 2:20-cv-01334-SCD    Filed 01/27/23    Page 43 of 134    Document 50-36

WG-ANR-00078069

and Power Company and a member of its Executive Committee on December 5, 1928 and that he has thereafter continued as such. It says that H. H. McClintic was a director of said Company from April 21, 1926 to March 3, 1931.

*Thirty-second.* This defendant has no knowledge of the matters alleged in paragraph 32.

*Thirty-third.* This defendant denies that it ever owned or now owns *all* the Common stock of the Milwaukee Gas Light Company, but says that in 1927 and for many years prior thereto and continuously to the present time it owned and now owns very large amounts of said stock, and that it now owns 97.43% of the same. It admits that said Milwaukee Gas Light Company was in 1927 and for many years prior thereto had been and now is engaged in the sale and distribution of gas in the City of Milwaukee and vicinity, in the State of Wisconsin.

It admits that said Milwaukee Gas Light Company had in 1927 and now has its own plants to manufacture gas but states the fact to be that in 1927 and for many years prior thereto said gas manufacturing plants had been and now are wholly inadequate to manufacture enough gas to supply the entire demand upon said Company. It states that the maximum continuous operating capacity of said gas manufacturing plants is not more than 18 million cubic feet per twenty-four hours, and that the demand generally exceeds 18 million cubic feet per twenty-four hours and has been as high as 30 million cubic feet. It admits that for over twenty years prior to 1927, the Milwaukee Gas Light Company had purchased a very large part of its requirements from the Milwaukee Coke & Gas Company, and says that

WG-ANR-00078070

under date of June 12, 1917 a contract was entered into between said companies for a period of fifteen years from September 1, 1919 for 12 million cubic feet of unpurified gas per day. That contract is still in effect although it has been supplemented by two later contracts, one made August 27, 1920 for an additional 4 million cubic feet per day, and the other made September 23, 1929 covering gas in excess of 16 million cubic feet per day. Said contract and supplements will not expire in 1932 as alleged in the bill. They will not expire until September 1, 1934.

Except as herein admitted this defendant denies the allegations of this paragraph 33.

*Thirty-fourth.* Answering paragraph 34 this defendant says that 11,863 shares of the stock of the Milwaukee Coke & Gas Company were purchased and paid for by The Koppers Company of Delaware in 1926, and that subsequently in the same year said Company, as it had a right to do, entered into a contract for the purchase of the remaining shares of said Milwaukee Coke & Gas Company, and that said contract provided that interest on the purchase price of said remaining shares should be paid at the rate of 6% from July 27, 1926, until the date of payment of the purchase price, during which time said Milwaukee Coke & Gas Company should pay no dividends, and that no dividends were in fact paid during the whole of the year 1926; and that when The Koppers Company of Delaware, as it subsequently did, paid for said remaining shares as provided for in said contract and came into possession of all the outstanding shares, amounting at that time to 31,015.5 shares for which it paid a total of approximately $4,860,000,

WG-ANR-00078071

said The Koppers Company of Delaware, as owner of all the shares of said Milwaukee Coke & Gas Company, became entitled to that Company's surplus of January 1, 1926, plus subsequent earnings.

This defendant admits that in the year 1927 (and also in the year 1926) Henry B. Rust was president of The Koppers Company of Delaware, and a director of Koppers Gas & Coke Company, and a director of this defendant and chairman of its Executive Committee, and a director of The United Light and Power Company.

Except as hereinabove admitted this defendant denies the allegations in paragraph 34.

*Thirty-fifth.* Answering paragraph 35 this defendant admits that on or about the dates mentioned in paragraph 35 the Milwaukee Coke & Gas Company distributed to its stockholders cash and assets which were charged against its surplus account in the amounts stated in said paragraph and totaling $4,926,519.67.

It denies that the dividend of 22,500 shares of Elkhorn Piney Coal Mining stock, which was charged against surplus in the sum of $2,-625,469.42, reduced the value of the assets of said Company by that amount. It says that while said 22,500 shares had cost said Company $2,625,469.42 and was carried on its books at that amount, the value thereof was very much less than $2,625,469.42.

It says that the stock dividend of 3,984.5 shares, which was distributed as alleged in paragraph 35 was also charged against surplus account at $392,305.00 which was what it had cost said Company, making with said $4,926,519.67 a total charge of $5,318,824.67 against surplus during the

WG-ANR-00078072

two and one-half year period, January 1, 1926, to July 1, 1928.

It says (as it has already said in paragraph Thirty-fourth of this answer) that The Koppers Company of Delaware bought the stock of said Company under such facts and contract as entitled it, as sole stockholder, to the surplus of January 1, 1926, plus subsequent earnings; and that on July 1, 1928, the date of the termination of its ownership of said stock it was entitled to the earnings during the intervening period of two and one-half years.

It says that said Company's surplus of January 1, 1926, as its books were then kept, and its earnings for said period, as its books were then kept, were as follows:

| | |
|---|---:|
| 1926 Jan. 1 Surplus | $3,888,404.75 |
| 1926 Jan. 1 to Dec. 31, Earnings | 893,192.90 |
| 1927 Jan. 1 to Dec. 31, Earnings | 552,224.91 |
| 1928 Jan. 1 to July 1, Loss | —61,782.01 |

and that if no dividends had been charged against surplus during the said period of two and one-half years the Surplus on July 1, 1928 would have been $5,272,040.55 and that deducting therefrom the amounts actually charged against surplus during said period of two and one-half years, and which as aforesaid amounted to 5,318,824.67

there appeared on the books as then kept a deficit on July 1, 1928 of $ 46,784.12

as alleged by complainants in paragraph 40 of the First Cause of Action.

WG-ANR-00078073

But it was known to the officers and agents of this defendant that it had been the custom of said Company to charge against expense accounts excessive amounts for Reserves for depreciation, taxes and other purposes, and excessive amounts for other purposes, thereby improperly increasing expenses and reducing the earnings and surplus; and upon examination by said officers and agents and by Certified Public Accountants it was established that, in said period of two and one-half years, an excess amount of at least $229,570.84 had been charged against expense accounts and credited to the Reserve for Federal Income Tax, and also that an excess amount of $87,436.65 had been charged against expense accounts and credited to the Reserve for Wisconsin State Income Tax. The sum of these two excess amounts, viz $317,007.49, has therefore been credited on the books to Surplus, and this (without taking into account other excessive amounts charged against expense accounts during said period, of which there were several which have also been credited to Surplus) has not only wiped out the said deficit of $46,784.12, but has left a further credit of $270,233.37 to Surplus.

Further answering paragraph 35 this defendant denies that the stock of the Elkhorn Piney Coal Mining Company was valued for dividend purposes at the sum of $2,625,469.42; and repeats that that was merely the amount which said stock had cost said Company and at which it was carried on its books.

And further answering paragraph 35 this defendant says that the loss of $61,782.01 for the first six months of 1928, which appeared on the books of said Company as they were then kept, and which is mentioned hereinbefore in this para-

WG-ANR-00078074

graph Thirty-fifth of this answer, was not in fact a real loss but was due to charges to expense accounts in excess of what was reasonably necessary.

And further answering paragraph 35 this defendant refers to paragraph Fortieth of this answer and makes it a part hereof.

Except as hereinbefore admitted this defendant denies all the allegations of paragraph 35.

*Thirty-sixth.* This defendant, while admitting that the dividends paid by the Milwaukee Coke & Gas Company as alleged in paragraph 35 were not paid in the ordinary course of its corporate business, says that The Koppers Company of Delaware was nevertheless entitled to the same for the reason that, as stated in paragraph Thirty-fourth of this answer, said Company's purchase of all the outstanding capital stock of the Milwaukee Coke & Gas Company was made under such facts and contract as entitled it to the Milwaukee Coke & Gas Company's surplus of January 1, 1926, and under the terms of its subsequent sale of said stock to this defendant, it was entitled also to the earnings of the Milwaukee Coke & Gas Company for the period of January 1, 1926 to July 1, 1928.

Further answering paragraph 36 this defendant admits that the Milwaukee Coke & Gas Company paid dividends as therein alleged viz,

| | |
|---|---|
| 1923, a total of .......................... | $105,000 |
| 1924, a total of .......................... | 105,000 |
| 1925, a total of .......................... | 210,000 |

but denies that the same were in any sense "regular normal dividends of the Milwaukee Coke & Gas Company" as alleged in paragraph

WG-ANR-00078075

36, and says that the financial history of said Company has been such that no "regular normal" dividend policy can be inferred therefrom. Said Company began business in 1903, and paid no dividends until 1906, and from that year to 1925, it paid *net* dividends as follows:

|      | *Period*                         | *Net Dividends* |
|------|----------------------------------|-----------------|
| 1906 | Year ended March 31              | $65,000.00      |
| 1907 | "                                | 97,500.00       |
| 1908 | "                                | 75,000.00       |
| 1909 | "                                | 81,250.00       |
| 1909 | 9 mo. ended Dec. 31              | 131,250.00      |
| 1910 | Year ended Dec. 31               | 175,000.00      |
| 1911 | "                                | 218,750.00      |
| 1912 | "                                | 131,250.00      |
| 1913 | "                                | 262,500.00      |
| 1914 | "                                | 262,500.00      |
| 1915 | "                                | 254,787.50      |
| 1916 | "                                | 335,560.00      |
| 1917 | "                                | 251,445.00      |
| 1918 | "                                | 167,635.00      |
| 1919 | "                                | 167,625.00      |
| 1920 | "                                |                 |
| (including 100% stock dividend)  |                  | 1,910,287.50    |
| 1921 | Year ended Dec. 31               | 351,050.00      |
| 1922 | "                                | (None)          |
| 1923 | "                                | 105,000.00      |
| 1924 | "                                | 105,000.00      |
| 1925 | "                                | 210,000.00      |

Further answering paragraph 36 this defendant admits that said Milwaukee Coke & Gas Company paid no dividends in 1926, and that it paid none in 1927 prior to the dividend of July 29, 1927, mentioned in paragraph 35, and says that the reason why no dividends were paid by said Company during said period was as follows; No dividends had in fact been paid in 1926 prior to the purchase in 1926 by The Koppers Company of the 11,863 shares of Milwaukee Coke & Gas stock

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 50 of 134   Document 50-36

WG-ANR-00078076

mentioned in paragraph Thirty-fourth of this answer, and the contract for the purchase of the remaining shares, also mentioned in said paragraph Thirty-fourth, and which was entered into on July 27, 1926, provided that interest on the purchase price of said remaining shares should be paid at the rate of 6% from July 27, 1926 until the date of payment of the purchase price, during which time no dividends should be paid.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 36.

*Thirty-seventh.* This defendant admits that Henry B. Rust, William F. Rust, John S. Brookes, Jr., Charles D. Marshall, Donald MacArthur, Richard Schaddelee, William Chamberlain, Burt J. Denman, Cyrus S. Eaton, Edgar M. Williams and Rezeau B. Brown were elected as directors of this defendant on March 19, 1928 for the ensuing year and served as such, and that the membership of the Executive Committee for the year 1928 was the same as set forth by complainant in paragraph 30, except that Howard Bruce, who was also a director of one of the subsidiaries of The Koppers Company of Delaware, succeeded Henry B. Rust, both on the Board of Directors and Executive Committee of the defendant, upon the resignation of the said Henry B. Rust on December 4, 1928, and this defendant refers to and makes a part hereof Appendices Nos. 2 and 3.

Except as hereinabove admitted this defendant denies the allegations in paragraph 37.

*Thirty-eighth.* This defendant admits that on July 6, 1928, pursuant to an agreement theretofore reached between officers of this defendant and officers of The Koppers Company of Dela-

WG-ANR-00078077

ware and officers of The United Light and
Power Company, (which said agreement com-
prised the whole of the Transaction of 1928
hereinbefore in paragraphs ''A'' to ''G'' in-
clusive fully described and which was ap-
proved by this defendant Board of Directors at
their meetings of July 3 and 6, 1928) this defend-
ant entered into a written contract with the Kop-
pers Gas & Coke Company for the purchase by this
defendant from said Koppers Gas & Coke Com-
pany of all of the then outstanding stock of the
Milwaukee Coke & Gas Company, which amounted
to 35,000 shares, for 38,272 shares of this defend-
ant's Common stock (then of the par value of $100
per share, and before it had been split up as set
forth in paragraph 23), and this defendant says
that it did shortly thereafter purchase said 35,000
shares of Milwaukee Coke & Gas stock as provided
for in said written contract; but this defendant
denies that said contract was entered into pur-
suant to any previous agreement between the so-
called ''Koppers interests'' and the so-called ''Ea-
ton interests'' or in pursuance of any scheme to
realize for said so-called interests any improper
or fraudulent profits or other advantages at the
expense of this defendant or any of its stock-
holders, and says that said contract was entered
into as part of the said Transaction of 1928, par-
ticipation in which has been beneficial to this de-
fendant and all its stockholders.

And this defendant says that as one of the terms
of said contract of July 6, 1928, under which it
purchased said 35,000 shares of Milwaukee Coke
& Gas stock, said Koppers Gas & Coke Company
assumed as of July 1, 1928, all of the obligations
of the Milwaukee Coke & Gas Company under

WG-ANR-00078078

three certain contracts dated February 9, 1917, April 1, 1918 and April 1, 1927, which the Milwaukee Coke & Gas Company had made with the Elkhorn Piney Coal Mining Company, and agreed to hold the Milwaukee Coke & Gas Company harmless from all liability under said three contracts accruing after July 1, 1928, and to hold the Milwaukee Coke & Gas Company harmless from any and all liability upon a certain guarantee theretofore given by said Company upon bonds theretofore issued by said Elkhorn Piney Coal Mining Company, which said three contracts had cost the Milwaukee Coke & Gas Company very large amounts of money.

And this defendant further says that its said purchase of 35,000 shares of Milwaukee Coke & Gas stock was but one factor in the Transaction of 1928, which has hereinbefore been fully described, and which consisted of six factors, and that the said Transaction could not have been carried out except as a whole, although this defendant was directly concerned in only the first four of the six factors. And this defendant says that its participation in the said Transaction was in the interest of this defendant and of all of its stockholders, and that this defendant has benefited and profited thereby.

Except as hereinbefore admitted this defendant denies all the allegations of paragraph 38.

*Thirty-ninth.* This defendant denies the allegations of paragraph 39, and says that in the acquisition of the stock of the Milwaukee Coke & Gas Company its sole concern was to secure control of a source of supply of gas for its subsidiary the Milwaukee Gas Light Company and at the same time to make an advantageous investment,

WG-ANR-00078079

and that it succeeded in both respects; and that the judgment of its directors that the said purchase at a valuation of $200. a share for its stock was a desirable one and has been entirely justified by the benefits therefrom which have accrued to this defendant.

*Fortieth.* This defendant, answering paragraph 40, denies that The Koppers Company of Delaware or the Koppers Gas & Coke Company purchased the capital stock of the Milwaukee Coke & Gas Company in the year 1927, and says, as it has already said in paragraph Thirty-fourth of this answer, that The Koppers Company of Delaware purchased 11,863 shares of said stock in 1926, and the balance thereof under a contract made in 1926, and refers to said paragraph Thirty-fourth of this answer and here repeats said paragraph Thirty-fourth, and makes it a part hereof.

Respecting the alleged cash and asset withdrawals of $4,926,519.67, and the alleged loss on operations during the first six months of 1928, of $61,782.01, and respecting the allegation that at the time of the purchase of the stock of the Milwaukee Coke & Gas Company by this defendant, the surplus of said Company had disappeared and that its capital had been impaired to the extent of $46,784.12, it repeats paragraph Thirty-fifth of this answer, and makes it part hereof.

It denies that the reasonable worth in money at a fair bona-fide valuation of that stock of the Milwaukee Coke & Gas Company at the time of the purchase thereof by this defendant was less than $3,500,000, and says that such reasonable worth was not less than $8,000,000, as established by an appraisal of the property of said Company, made by disinterested experts.

WG-ANR-00078080

And this defendant further says that when it purchased said stock the Milwaukee Coke & Gas Company had been relieved of its large and unprofitable investment in coal mines and of its burdensome obligations in connection therewith, as is fully set out in paragraph Seventy-third of this answer, and makes it part hereof.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 40.

*Forty-first.* This defendant denies the allegations of paragraph 41.

*Forty-second.* This defendant answering paragraph 42 denies the allegations of said paragraph, except as in this paragraph admitted or explained.

It says that the desirability of the purchase, ownership and operation of a merchant coke plant by a gas manufacturing and distributing utility is a matter of business judgment. That during the period when the defendant Alanson P. Lathrop was the directing and managing head of this defendant he had been opposed to the purchase of the Milwaukee Coke & Gas Company and was of the belief that neither Milwaukee Gas Light Company nor this defendant should own the Milwaukee Coke & Gas Company. That during the said period the defendant Rezeau B. Brown was Vice President and General Manager of Milwaukee Gas Light Company and had been of the opinion that the purchase and ownership of the Milwaukee Coke & Gas Company by this defendant or by the Milwaukee Gas Light Company, was of vital importance to the Milwaukee Gas Light Company due to conditions pertaining to the operation of said latter company, and he had advocated its purchase since about

WG-ANR-00078081

the year 1923. That he was not then in a position of authority and was unable to convince the managing officers of this defendant of the desirability of such purchase and ownership.

This defendant denies that under the circumstances as they existed, it was the duty of the defendant Henry B. Rust in 1926 to negotiate for such purchase on behalf of this defendant, and alleges on the contrary that the said Henry B. Rust was not at any time during the year 1926 in a position to effect such purchase for this defendant.

It admits that the said Henry B. Rust, during the years 1926 and 1927, was President and also a director of The Koppers Company of Delaware. It says that at the time of the election of said Henry B. Rust to the Board of Directors and Executive Committee of this defendant, it was well known that he had for many years held the positions aforesaid in the Koppers Company and its predecessor companies and that he was directly interested in the by-product coke industry. It says that during the year 1924 the said Henry B. Rust was informed that this defendant had considered the purchase of the Milwaukee Coke & Gas Company, and that it had been decided that it should not be purchased. It says that thereafter, and in 1926 the defendant Henry B. Rust, on behalf of The Koppers Company of Delaware, purchased and contracted for the purchase of the stock of said Milwaukee Coke & Gas Company as alleged in paragraph Thirty-fourth of this answer, and as he had the right to do. This defendant knew of the negotiations for the purchase of said stock on behalf of The Koppers Company and did not object thereto.

It says that on January 18, 1927, the defendant

WG-ANR-00078082

Rezeau B. Brown was elected a director and President of this defendant and became its active executive, and that it had been and was the belief of Mr. Brown that the purchase and ownership of the Milwaukee Coke & Gas Company was of importance and financial advantage to this defendant and to the Milwaukee Gas Light Company, and that thereafter, as will later more fully appear, he began an effort to purchase the same.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 42.

*Forty-third.* This defendant answering paragraph 43 says that in July 1928 the contract for the supply of gas by Milwaukee Coke & Gas Company to Milwaukee Gas Light Company had about *six* years to run, to wit: until September 1, 1934, as alleged in paragraph Thirty-third of this answer, (not four years as alleged by complainants). It denies that the Milwaukee Gas Light Company was practically the sole purchaser in sight for the gas of the Milwaukee Coke & Gas Company. It admits that said Milwaukee Gas Light Company also had its own independent plants and sources of supply in Milwaukee but alleges that, as set forth in paragraph Thirty-third of this answer, said plants and sources of supply were wholly inadequate to supply the demand upon the Milwaukee Gas Light Company.

Whether upon the expiration of the present contract in 1934 (not 1932 as alleged by complainants) it would have been "easily possible" for the Gas Light Company to secure a "fair contract" from the Milwaukee Coke & Gas Company, if that Company were then in other ownership, depends upon many unknown factors, and

WG-ANR-00078083

hence this defendant says that neither in 1928 nor at the time of the filing of the bill could the complainants or any one else forecast what could be accomplished in 1934 in the way of new contract.

Answering the allegation that "in any event its (the Gas Light Company's) reasonable cost of gas (under a new contract) would be an item properly included in its costs for rate making purposes" this defendant says that while the allegation expresses a well-known rule of law a utility company always experiences many serious difficulties in its efforts to adjust its rates to what it may be entitled to under the rule. The existing contract prices at which the Milwaukee Gas Light Company buys coke-oven gas are very low, and for many years the public authorities having jurisdiction over that Company's rates to its consumers have based those rates upon the said low contract prices for coke-oven gas, with the result that the Milwaukee Gas Light Company's present rates to its consumers are among the lowest manufactured-gas rates in the country. The said low contract prices for coke-oven gas may have to be raised in 1934, no matter who then owns the Coke Company, and that this would compel the Gas Light Company to seek higher rates to its consumers. This would inevitably bring about vigorous opposition by the municipal and state authorities, because of the very low rates which consumers will then have enjoyed for very many years, and would in all probability result in litigation in which the new and higher contract prices for coke-oven gas would have to be defended by the Gas Light Company. If the Coke Company were then in other ownership the Gas Light Company would be able only to assert that

WG-ANR-00078084

it had made the best contract it could, but with the ownership of the Coke Company in this defendant, the Gas Light Company and this defendant would be able to establish that the new contract prices for coke-oven gas were in fact reasonable, and thus comply with the rule in Smith vs. Illinois Bell Telephone Co. 282 U. S. 133. This defendant does not overlook that that case was decided December 1, 1930, which was subsequent to the Transaction of 1928, but says that the principle then enunciated by the Supreme Court had been anticipated by persons experienced in utility matters.

And this defendant says that for some years the ownership by gas utilities of merchant coke plants as a part of their gas producing equipment had been increasing, and that the purchase or construction of such a plant is a matter to be determined by business judgment; and that it is the duty of a utility company to take such steps as, in its judgment, will provide economical service to the public and a fair return to its stockholders; and this defendant says that under all the circumstances the purchase of the Milwaukee Coke & Gas Company stock by this defendant as a factor of the Transaction of 1928, was not only advisable but highly beneficial to this defendant and to its subsidiary said Milwaukee Gas Light Company in that this defendant and said subsidiary thereafter owned and controlled said subsidiary's sources of gas supply and such supply was no longer dependent upon the business judgment of others or their financial difficulties, and was no longer dependent upon a contract for a long period of years at a fixed price, with the dangers incident thereto.

WG-ANR-00078085

*Forty-fourth.* This defendant answering paragraph 44 denies all of the allegations of said paragraph, and says the purchase of the stock of Milwaukee Coke & Gas Company by this defendant was to its great advantage and has resulted in a very considerable financial gain to it, and alleges the fact to be that the subsequent operation of said Milwaukee Coke & Gas Company has more than justified the purchase thereof, notwithstanding that the low price gas contract has been continued and that the winters of 1930-31 and 1931-32 have been abnormally warm winters which greatly decreased the demand for coke and gas.

*Forty-fifth.* This defendant answering paragraph 45 admits that the 38,272 shares of its Common stock which were issued to the Koppers Coke & Gas Company as a factor of the Transaction of 1928 (see paragraph ''C'', subparagraph I above), together with the 19,399 shares of this defendant's Preferred stock and 101,444 shares of this defendant's Common stock, which had been acquired by the Koppers Gas & Coke Company as stated in paragraph ''B'' above, were transferred in 1928 to United American Company (see paragraph ''C'', subparagraph V above). And this defendant denies absolutely that the issue of its shares of stock to Koppers Gas & Coke Company was pursuant to the scheme alleged in paragraph 38, or pursuant to the plan alleged in paragraph 44, but on the contrary says that said 38,272 shares were issued by this defendant for 35,000 shares of Milwaukee Coke & Gas stock as a factor of the Transaction of 1928 (paragraph ''C'', subparagraph I above), and that said 38,272 Common shares and said 19,399 Preferred

WG-ANR-00078086

and 101,444 Common shares of this defendant's stock were transferred to said United American Company (and the shares of said last named Company transferred to The United Light and Power Company) as a factor of the said Transaction (paragraph "C", subparagraph V above). And this defendant admits that said 38,272 Common shares were subsequently split four for one into 153,088 shares, and says that said 153,088 shares, together with 77,596 Preferred shares (resulting from splitting said 19,399 shares) and 405,776 Common shares (resulting from splitting said 101,444 shares) are still owned by said United American Company, and that all the capital stock of said last named Company is owned by The United Light and Power Company or its subsidiaries.

*Forty-sixth.* For answer to paragraph 46 this defendant says that the transaction therein mentioned constituted a factor of the Transaction of 1928, and refers to paragraph "C", subparagraph III of this answer for a true description of the same. This defendant denies that the same was made or conducted pursuant to any agreement between the so-called "Koppers interests" and the so-called "Eaton interests" and that the same was pursuant to any scheme to realize improper and unjust profits at the expense of this defendant or any of its stockholders, and says that on the contrary it was a factor of the said Transaction of 1928 which has hereinbefore been fully described.

And this defendant admits, as it has already admitted in said paragraph "C", subparagraph III, that one of the results of the said transactions was the issue to The United Light and Power

WG-ANR-00078087

Company (through its subsidiary The United
Light and Railways Company) of 56,248 shares of
this defendant's Common stock for which this de-
fendant received $11,249,600 in 5½% secured
guaranteed debenture bonds (as fully set forth
and described in said paragraph "C", subpara-
graph III above); and that there was thus issued
—not given—to said The United Light and Power
Company, already a stockholder in this defendant
(as fully set out in paragraph "B" above) newly
issued stock of this defendant; but this defendant
denies that such newly issued stock was issued in
fraudulent disregard of any of the rights of any of the
stockholders of this defendant, and denies that,
unless its Board of Directors so determined, any
of its stockholders were entitled to subscribe pro-
portionately or otherwise for any new stock is-
sued by this defendant, and refers to the provision
of its Certificate of Incorporation set out in para-
graph First of this answer.

And this defendant admits as it has already ad-
mitted in paragraphs "A" to "G" inclusive
above, that one of the results of the whole Trans-
action of 1928 was that The United Light and
Power Company, and/or its subsidiaries and/or
nominees, acquired the majority (51.20%, see
paragraph D above) of the voting stock of this
defendant; but this defendant denies that said
Company acquired the same for sums of money
much less than it would have been required to
expend if it had acquired the same in some other
lawful and proper manner, and denies that said
Company acquired in any other than a lawful and
proper manner any of the stock of this defendant
which it acquired in and through the said Trans-
action of 1928 or otherwise.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 62 of 134   Document 50-36

WG-ANR-00078088

And this defendant admits that one of the results of the transactions mentioned in paragraph 46 was to enable The United Light and Railways Company to dispose of its stock in the Brooklyn Borough Gas Company at a price, based upon an estimate of $200 per share for this defendant's Common stock, of approximately $284 a share ($284.209+ per share to be exact); but this defendant denies that said price per share was greatly in excess of the real and true value of said 39,582 shares of Brooklyn Borough Gas stock, and says that this defendant in November 1930 received cash for said 39,582 shares at $284.209+ per share, amounting to $11,249,600, as fully set forth in paragraph "F", subparagraph III, above, and as shown in the table in paragraph "G" above, and that in the meantime (from July 1, 1928 to November 1930) this defendant received interest at the rate of 5½% per annum on the said sum of $11,249,600.

And this defendant says that in reality the net result to this defendant of the Brooklyn Borough factor of the Transaction of 1928 was the issue by this defendant of 56,248 shares of its Common stock for $200 per share in cash, amounting to said sum of $11,249,600, which was advantageous to this defendant and to all of its stockholders.

And for further answer to paragraph 46 this defendant refers to and makes a part hereof paragraphs "A" to "G" above wherein the Transaction of 1928 and its present results are fully set forth.

And this defendant denies that all or any part of the capital stock of said ten Delaware corporations was then owned by the corporations or any of them designated by complainants as the "Kop-

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 63 of 134   Document 50-36

WG-ANR-00078089

pers interests'', but alleges that the said capital stock was all owned by the individuals who either directly or indirectly were interested in the Koppers Company of Delaware.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 46.

*Forty-seventh.* This defendant answering paragraph 47 denies all the allegations of said paragraph, except that it admits that prior to the Transaction of 1928 it had no interest in the stock of the Brooklyn Borough Gas Company.

And for further answer to paragraph 47 this defendant refers to paragraphs ''A'' to ''G'' above wherein the Transaction of 1928 and its present results are fully set forth.

*Forty-eighth.* This defendant answering paragraph 48 admits that control of the Brooklyn Borough Gas Company was acquired by The United Light and Railways Company but denies that such control was acquired on behalf of the so-called ''Eaton interests'', and denies that there is or ever was any such entity.

This defendant says that control of the Brooklyn Borough Gas Company was acquired by The United Light and Railways Company in August 1925 in its own behalf and for its own purposes, by the purchase of 39,582 shares of the Brooklyn Borough Gas Common stock, out of a total outstanding issue of 40,000 shares, at a total cost of $4,424,707.53.

And this defendant admits that, assuming a value of this defendant's Common stock of $200 per share, said The United Light and Railways

WG-ANR-00078090

Company (not the so-called Eaton interests) would have a paper profit as follows:

| | |
|---|---|
| 56,248 A. L. & T. Com. @ $200 | $11,249,600.00 |
| 39,582 Brooklyn Boro (as above) | 4,424,707.53 |
| Paper Profit | $ 6,824,892.47 |

but this defendant denies that The United Light and Railways Company ever realized a profit of $6,824,892.47, or a profit of approximately $7,000,-000 (as alleged by complainants) or any profit whatever on said 56,248 shares of this defendant's Common stock.

And this defendant further says that as no profits whatever have been realized by The United Light and Railways Company, there can be no comparison with the profits, if any, which were realized by the Koppers Gas & Coke Company on the sale by that Company of the stock of the Milwaukee Coke & Gas Company.

And this defendant further says that the result of its exchange of 56,248 shares of its Common stock for said $11,249,600 of debentures and which it has since sold for $11,249,600 in cash, has been that this defendant has received $200 per share in cash for said 56,248 shares of Common stock; but it also says that the same was one of the factors of the Transaction of 1928, and that there can fairly be no severing and separately estimating of the factors of the Transaction of 1928, but that the Transaction of 1928 must fairly be considered as a whole, and its results to this defendant and to the other corporations must be fairly judged as a whole, and that the whole Transaction of 1928 and its present results are

WG-ANR-00078091

fully set out in paragraphs "A" to "G" above, reference whereto is hereby made.

And this defendant denies, as it heretofore denied, that there was any concerted scheme such as is alleged in paragraph 48, and denies that the stock of the Milwaukee Coke & Gas Company was foisted on this defendant at an excessive price, and denies that there was any fraud on this defendant or any of its stockholders, but says that on the contrary the Transaction of 1928 was carefully worked out by officers of this defendant and officers and The United Light and Power Company and of The Koppers Company of Delaware, as set out in paragraphs "A" to "G" above; and this defendant says that the said Transaction of 1928 has not resulted in loss and damage to this defendant or to any of its stockholders, but on the contrary has been beneficial in its results to this defendant and to all of its stockholders.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 48.

*Forty-ninth.* For answer to that part of paragraph 49 which refers to this defendant's ownership of Brooklyn Union Gas Company stock and convertible debenture bonds this defendant refers to paragraph "C", subparagraph II above where such ownership is fully set forth.

And further answering paragraph 49 this defendant denies that through such ownership this defendant had practical control of said Brooklyn Union Gas Company and denies that it was in a position to profit "thereby" (i. e., by reason of practical control which it did not possess). It says that it was in a position to profit by reason

WG-ANR-00078092

of its large holdings in said Company, and that it did profit sustantially by reason of such holdings, as will appear by paragraph Fiftieth of this answer.

*Fiftieth.* Answering paragraph 50 this defendant denies that its participation in the Transaction of 1928, or in any factor thereof, was pursuant to any previous agreement between the so-called "Koppers interests" and the so-called "Eaton interests", or in pursuance of any scheme to realize for said so-called interests any improper or fraudulent profits or other advantages, at the expense of this defendant or any of its stockholders; and says that on the contrary this defendant's participation in the said Transaction of 1928, was for the advantage and benefit of this defendant and all its stockholders.

And further answering paragraph 50, this defendant says that, as stated in paragraph "C" subparagraph II above, its said Brooklyn Union holdings had cost it and/or its subsidiaries $16,-080,550.80, for which it and/or its subsidiaries received $21,321,900 in 5½% secured guaranteed debentures, and that it has since sold $17,223,700 of said debentures for cash at par and has therefore already received in cash $1,142,819.20 more than the cost of said Brooklyn Union holdings, and still has remaining $4,098,530 of said debentures, which it has called for payment on April 20, 1933, as aforesaid.

And further answering paragraph 50 this defendant admits that (as a simple arithmetical calculation will show) the face value of said $21,-321,900 of debentures was at the rate of $135 per share for 157,940 shares of Brooklyn Union Gas stock.

WG-ANR-00078093

Except as hereinabove admitted this defendant denies all the allegations of paragraph 50.

*Fifty-first.* This defendant answering paragraph 51 denies that as therein alleged, there was no good or economic reason for its sale of the stock and convertible debentures of the Brooklyn Union Gas Company and denies that the stock was reasonably worth at the time of the sale in excess of $135 per share. It admits that the lowest price at which the stock sold on the New York Stock Exchange in 1928 was $139 per share and that the highest price was $203.75 per share; but says that if it had attempted to sell so large a quantity of the stock it would have greatly depressed the market and that the sale of said stock as a factor of the Transaction of 1928 was to the advantage of this defendant and resulted in profit as set out in paragraph Fiftieth of this answer.

And further answering paragraph 51 this defendant admits that the properties of the Brooklyn Union Gas Company were valuable, and its field of operations large, but denies that its said field was of a character offering extensive prospective growth and profits, and says that on the contrary said field was confined to its franchise territory, which was entirely surrounded by the franchise rights of other gas utilities which definitely limited its expansion; and that moreover the growth in its sales of gas was slow while the increase in its fixed capital was rapid; the character of its rates was not modern, its depreciation accruals were low, and the sales of gas per meter were decreasing.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 51.

WG-ANR-00078094

*Fifty-second.* This defendant answering paragraph 52 denies the allegations of said paragraph, and says, on the contrary, that the sale of the said stock of the Brooklyn Union Gas Company, both standing by itself as alleged in paragraph Fiftieth of this answer, and taken in connection with the Transaction of 1928, resulted greatly to the advantage of this defendant.

*Fifty-third.* This defendant answering para- 53 admits that in November 1930 Bexley Company, a Quebec corporation, acquired the stock of the ten New Jersey corporations and the debentures mentioned in paragraph 53, and refers to paragraph "F", subparagraph III, above.

This defendant says that said ten New Jersey corporations have been dissolved.

This defendant is not informed whether said Bexley Company (of Quebec) still owns the debentures purchased by it in 1930 as hereinabove admitted.

*Fifty-fourth.* For answer to paragraph 54 this defendant says that the transaction therein mentioned constituted a factor of the Transaction of 1928, and refers to paragraph "C", subparagraph IV of this answer for a true description of the same. This defendant denies that the same was pursuant to any agreement between the so-called Koppers interests and the so-called Eaton interests and that it was pursuant to any scheme to realize improper and unjust profits at the expense of this defendant or any of its stockholders, and says that on the contrary it was a factor of the Transaction of 1928 which has hereinbefore been fully described.

WG-ANR-00078095

And further answering paragraph 54 this defendant admits, as it has already admitted in said paragraph "C", subparagraph IV that one of the results of the said transaction was that The United Light and Power Company, through its subsidiary The United Light and Railways Company, acquired 75,000 shares of newly issued Common stock of this defendant, but denies that said 75,000 shares were so acquired in fraudulent disregard of the rights of any of the stockholders of this defendant and denies that any of the stockholders of this defendant, unless its Board of Directors had so determined, were entitled to subscribe proportionately or otherwise for any new stock of this defendant, and refers to the provision of its Certificate of Incorporation set out in its answers to paragraph First above.

And this defendant admits, as it has already admitted in paragraphs "A" to "G" above, that one of the results of the whole Transaction of 1928 was that The United Light and Power Company, and/or its subsidiaries, acquired the majority (51.20%, see paragraph "D" above) of the voting stock of this defendant; but this defendant denies that said Company acquired the same for sums of money much less than it would have been required to expend if it had acquired the same in some other lawful and proper manner; and denies that said Company acquired in any other than a lawful and proper manner any of the stock of this defendant which it acquired in and through the Transaction of 1928 or otherwise.

And further answering paragraph 54 this defendant admits that another result of the transaction described in paragraph 54 was to enable The United Light and Railways Company to dis-

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 70 of 134   Document 50-30

WG-ANR-00078096

pose of its stock in the Detroit Edison Company to a wholly owned subsidiary of this defendant; but denies that said The United Light and Railways Company so disposed of the same at a price greatly in excess of the real and true value thereof and at a large profit.

And for further answers to paragraph 54 this defendant refers to paragraphs "A" to "G" of this answer wherein the Transaction of 1928 and its present results are fully set forth.

Except as hereinabove admitted this defendant denies the allegations of paragraph 54.

*Fifty-fifth.* This defendant answering paragraph 55 denies that, as alleged in said paragraph there was no good business or economic reason for its acquisition of the 75,000 shares of Detroit Edison stock mentioned in said paragraph, but says that there were such reasons, and that some time prior to the Transaction of 1928 it had acquired through subsidiaries several thousand shares of Detroit Edison stock.

And this defendant denies that the stock of the Detroit Edison Company was not equal in value, to the Common stock of this defendant.

And this defendant further answering paragraph 55 says that said 75,000 shares constituted about 8.3% of the outstanding stock of the Detroit Edison Company, and while this defendant admits that there did not inhere in the purchase all of the speculative advantages that might accrue to a holding company through the ownership of all the voting stock of an operating company, or all the advantages that might accrue through the holding of not less than a voting control of an operating company, there nevertheless did

WG-ANR-00078097

inhere advantages which were, in the judgment of the officers and Board of Directors of this defendant, and still are important to this defendant.

And this defendant admits that the Detroit Edison Company was then paying and has since paid dividends at the rate of 8% ($8 per share), and says that said Company had paid dividends at that rate for a considerable period prior thereto.

And further answering paragraph 55, this defendant says that any comparison of book values at any given time is usually very misleading unless many factors such as depreciation and other reserves, financial structures, interest charges on and maturity dates of prior obligations, franchise conditions, rate structures, prospects of future growth and prospective fixed capital requirements are taken into consideration, and that these factors can only be ascertained and given proper weight by persons of experience in public utility operation.

And while admitting that the *reported* net income per share of the Detroit Edison Company was less than this defendant's net income per share on its Common stock, this defendant says that for some time it had been the custom of the Detroit Edison Company to finance its fixed capital requirements in large part by giving its stockholders the right to subscribe for new shares of stock at their par of $100 per share (for examples of this in 1928 and 1929 see paragraph ''F'', subparagraph IV above) and that for the most part such new shares were offered for subscription very late in the year, and were paid for and issued late in December and so became outstanding at the close of the year, thus very much increasing the number of shares out-

WG-ANR-00078098

standing at the close of the year over the average number outstanding during the year; and that the *reported* net income per share was calculated on the shares outstanding at the close of the year, and that if the net income per share were adjusted to the average number of shares it would add in some years more than $2 per share to the *reported* net income. Other proper adjustments of the relative net income per share might also be made.

Except as hereinabove admitted this defendant denies the allegations of paragraph 55.

*Fifty-sixth.* For answer to paragraph 56 this defendant denies that the matters therein mentioned were part of any such concerted scheme as is described in paragraph 56 or of any scheme and says as follows:

It admits that The Koppers Company of Delaware, or its subsidiaries sold and transferred to the United American Company all of its holdings of stock in this defendant, preferred and common, in exchange for $26,872,970 of debentures of the United American Company and says that said Koppers Company sold all the capital stock of the United American Company to The United Light and Power Company for 150,000 shares of the non-voting Class A Common stock of The United Light and Power Company, and refers to paragraph ''C'', subparagraph V above where it is so stated, and says that such sale and transfer constituted a factor of the Transaction of 1928.

It admits that The Koppers Company of Delaware or its subsidiaries was granted an option to purchase an additional block of stock of The United Light and Power Company (to-wit; 180,-000 shares of non-voting Class A Common stock

WG-ANR-00078099

at $20 per share in cash) and that such option
was exercised during the year 1930 by The Kop-
pers Company of Delaware, or its subsidiaries,
and refers to paragraph ''C'', subparagraph VI,
and to paragraph ''F'', subparagraph VI, above,
where it is so stated, and says that the same was
a factor of the Transaction of 1928.

It admits as it has already admitted in para-
graphs ''A'' to ''G'' above, that as one of the re-
sults of the whole Transaction of 1928, The United
Light and Power Company, and/or its subsidiar-
ies became the holder of an outright majority
(51.20%, see paragraph ''D'' above) of the voting
stock of this defendant; but this defendant says
that prior to the acquisition by The Koppers
Company of Delaware and/or its subsidiaries
and by The United Light and Power Company
and/or its subsidiaries, of their holdings of
stock of this defendant as fully set out in para-
graph ''B'' above, no one person or corporation
or group of persons or corporations held as much
as 25% of the voting stock of this defendant, and
that by acquiring their said holdings which as
shown by said paragraph ''B'' amounted, prior to
the Transaction of 1928, to a total of 38.59% of
the voting stock, and by the said Transaction
of 1928 which resulted in lodging 51.20% of the
voting stock in The United Light and Power Com-
pany, they did not take away or wrest voting
control of this defendant from any one or from
any group who theretofore claimed or could have
claimed voting control of this defendant.

It admits that The Koppers Company of Dela-
ware, and/or its subsidiaries, became and is the
holder of a large amount of stock of The United
Light and Power Company (in addition to its pre-
vious holdings) to-wit; one lot of 150,000 shares

WG-ANR-00078100

of non-voting Class A Common stock which it received as stated in paragraph "C", subparagraph V above, and another lot of 180,000 shares of non-voting Class A Common stock which it paid for in cash at $20 per share amounting to $3,600,000, as stated in paragraph "F", subparagraph VI, above; and

It admits that since the Transaction of 1928 through which The United Light and Power Company acquired a majority (51.20%) of the voting stock of this defendant, The United Light and Power Company has reported this defendant as a company controlled by The United Light and Power Company, and that said last named Company has exercised its voting control of this defendant, but this defendant says that it has nevertheless continued to function as theretofore, and has issued its own reports to its stockholders, and that while The United Light and Power Company, as it has the right to do, and as every other stockholder has the right to do, has sought to and has aided this defendant in the management of its properties and business, it has done so without charge or compensation of any kind.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 56.

*Fifty-seventh.* This defendant answering paragraph 57 denies that as the result of the Transaction of 1928 the so-called "Eaton interests" and the so-called "Koppers interests" or any other so-called interests or persons or corporations whatever realized in any manner any fraudulent and unjust profits and advantages, or any profits and advantages whatever at the expense of this defendant or any of its stockholders, and says that on the contrary the said Transac-

WG-ANR-00078101

tion of 1928 has resulted in profit and advantage to this defendant and all its stockholders.

And this defendant denies that the said Transaction of 1928 resulted in any loss and damage whatever to this defendant, either in the sum of $7,000,000 as stated in paragraph 57 or in any other sum, and says on the contrary that it has resulted in great gain and benefit to this defendant as set forth in paragraph "G" of this answer, to which reference is hereby made.

*Fifty-eighth.* This defendant answering paragraph 58 admits that the Transaction of 1928 was recommended to its Board of Directors by its Executive Committee and was authorized and approved at a meeting of the Board of Directors of this defendant held on July 3, 1928.

And this defendant admits that at said meeting the nineteen directors named in paragraph 58 were present and voted and approved the said Transaction of 1928, but denies that any of said nineteen directors represented or acted for any particular group of interests among the stockholders.

And this defendant particularly denies that Rezeau B. Brown was at that time in any manner a representative of The United Light and Power Company, or of the so-called "Eaton interests", and says that he was not even a stockholder in The United Light and Power Company, and that, on the contrary, he was an officer of this defendant and that he had served this defendant and its subsidiaries for about thirty years and was financially interested in this defendant or its subsidiaries to a large amount.

And this defendant denies that Edgar M. Williams was in any sense a representative of The

WG-ANR-00078102

United Light and Power Company or of the so-called "Eaton interests", and refers to what is hereinbefore said in paragraph 26 respecting Mr. Williams and his connection with this defendant.

And this defendant denies that any of its Directors or members of its Executive Committee in any way represented interests hostile to the interests of this defendant, but says that they acted solely in the interest of this defendant and its stockholders and in the exercise of their best business judgment in connection with the Transaction of 1928. And in this connection this defendant refers to Article II, Section 9 of its By-Laws as set forth in full in paragraph First of this answer and makes it a part of its answer to paragraph 58.

And this defendant admits that on July 6, 1928, at an adjourned meeting of its Board of Directors, a resolution was passed to correct an error of 2,812 shares of Common stock in the figures of the Transaction of 1928 as approved and authorized at the meeting of July 3, 1928.

Except as hereinabove admitted this defendant denies all the allegations of paragraph 58.

*Fifty-ninth.* This defendant denies all the allegations of paragraph 59.

*Sixtieth.* This defendant denies all the allegations of paragraph 60, except that it says that it has no knowledge whether complainants were advised by counsel as mentioned in said paragraph.

*Sixty-first.* This defendant answering paragraph 61 admits that since July 1928 there have been changes in the condition of the Milwaukee Coke & Gas Company due to capital additions and

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 77 of 134   Document 50-36

WG-ANR-00078103

improvements which have cost approximately $1,000,000, but denies that said sum of $1,000,000 was provided by this defendant and alleges that it was provided out of the earnings of the Milwaukee Coke & Gas Company. It admits that said sum may be said to have been invested by this defendant in that this defendant, as holder of all the Common stock of said Coke Company did not require said Coke Company to pay out all of its earnings in dividends; and admits that since July 1928 there have been changes in the condition of the Brooklyn Union Gas Company due to completion of a coke and by-product plant, then under construction, which cost upwards of $15,000,000, and other large additions to its plants and property.

Further answering paragraph 61 this defendant denies that since July 1928, independent third persons have acquired liens or other rights in respect to the shares of stock or any of them issued, purchased and/or sold or transferred in the Transaction of 1928. It says that an industrial depression and severe economic disturbance has taken place in this country and the world at large which has brought about great shrinkages in the market quotations of securities, and it says that but for said business depression, which has thus affected market quotations, complainants would not have objected to the matters of which they now complain, and this defendant further says that this suit was not induced by any legitimate complaint with respect to the Transaction of 1928. Because of the result of said business depression, which could not have been anticipated in 1928, the holdings of complainant Helfman in stock of this defendant have declined upon

Case 2:20-cv-01334-SCD    Filed 01/27/23    Page 78 of 134    Document 50-36

WG-ANR-00078104

the market, and the said complainant Helfman, although fully informed of the matters of which he complains, not only acquiesced therein, but increased his holdings in the stock of this defendant when the market was high although warned by the President of this defendant that there was no economic reason for the high market, and against the advice of the President of this defendant. Notwithstanding the economic depression this defendant has earned and paid its customary rate of dividend on its Common stock, and the complainants have received the same.

This defendant further answering paragraph 61 says that recission of the Transaction of 1928 would be greatly to the detriment of this defendant and its stockholders, as the complainants well know. And this defendant further says that it has greatly profited by the Transaction of 1928, in that it has acquired the stock of the Milwaukee Coke & Gas Company, which it values at upwards of $8,000,000, and the ownership of which is otherwise of great value to its subsidiary the Milwaukee Gas Light Company. In addition thereto it has received net cash in the amount of $25,472,970, and has remaining $4,098,530 of 5½% debenture bonds guaranteed by The Koppers Company of Delaware which debentures have been called for payment on April 20, 1933, and also has received 105,000 shares of Detroit Edison stock, all as set out in the table contained in paragraph "G" above.

And this defendant says that, based on market quotations of December 22, 1931, the date when the bill of complaint was filed, the Transaction of 1928 had resulted to this defendant as follows:

WG-ANR-00078105

This defendant issued 169,520 shares of its Common stock, which were then of $100 par value, but which have since been converted into 678,080 shares of $25 par value, which latter shares were quoted at $23 per share on December 22, 1931, making a total market quotation of $15,595,840

This defendant parted with 157,940 shares of Brooklyn Union Gas stock, which was quoted at $77 per share on said December 22, 1931, making a total market quotation of 12,161,380

making a total of $27,567,220

for which this defendant has received in net cash 25,472,970

and has also received and now owns 105,000 shares of Detroit Edison stock, which was quoted at $113 per share on said December 22, 1931 making a total market quotation of 11,865,000

and has also remaining $4,098,530 of 5½% secured guaranteed debentures, for which no market quotations were available, but which it has called for payment at par on April 20, 1933, and therefore estimates at par 4,098,530

making a total of $41,436,500

or an indicated profit $13,679,280

to which should be added the value of the 35,000 shares of Milwaukee Coke & Gas stock, which this defendant estimates to be not less than 8,000,000

making a total of $21,679,280

WG-ANR-00078106

*Sixty-second.* This defendant admits the allegations of paragraph 62.

*Sixty-third.* This defendant answering paragraph 63 denies that as therein alleged its Board of Directors has never made a full and fair disclosure to the stockholders of this defendant of the facts in connection with the Transaction of 1928.

It says that under date of November 5, 1928, the complainant Helfman addressed a letter to the President of this defendant in which he asked numerous questions concerning the Transaction of 1928. Some time thereafter the said President was in Detroit and met the complainant Helfman in the office of the manager of the Detroit City Gas Company, and then and there answered all the questions that said Helfman at that time asked with respect to the said Transaction.

This defendant further says that a full disclosure of the said Transaction was made at the annual meeting of the stockholders of defendant, held March 18, 1929, and that the consummation of said Transaction was then approved by the stockholders. In addition to the disclosure made at the annual meeting on March 18, 1929, defendant's printed annual report for the year 1928, which was sent to all of its stockholders including complainant Helfman and to which reference is hereby made, contained a statement of the Transaction of 1928. The complainant Helfman acknowledged receipt of said annual report in a letter dated May 13, 1929, addressed to the President of this defendant. This defendant therefore denies that complainant Helfman first learned the material facts of said Transaction in March and April of 1931.

WG-ANR-00078107

This defendant says that shortly after the sending to this defendant of his said letter dated May 15, 1931, Exhibit 1 to the bill, the said complainant Helfman made very numerous inquiries of defendant and its officers respecting the said Transaction. All information requested by the said complainant Helfman was freely and promptly furnished him. The correspondence between said defendant and its officers, which began shortly after May 15, 1931 and continued down to and including December 9, 1931, is too voluminous to attach to this answer. It shows that complainant Helfman's said letter of May 15, 1931 was presented to defendant's Board of Directors at the first regular meeting held after its receipt, to wit; June 23, 1931, as alleged in paragraph Third of this answer.

This defendant denies that following the receipt of said letter of May 15, 1931, the Board of Directors and Executive Committee of this defendant pursued a dilatory course of action and alleges that on the contrary the Special Committee appointed by the Board of Directors on June 23, 1931, diligently investigated the complaint and repeatedly requested and invited the said Helfman to cooperate with the Committee and furnish the Committee with any information he might have in addition to that which the Committee had, and offered to lay before the said complainant Helfman all the information which the Committee had assembled in the course of its investigation. Said complainant Helfman persistently refused to meet with the Committee and/or to furnish the Committee any information and neglected to take advantage of the Committee's offer to fully inform himself of the facts and cir-

WG-ANR-00078108

cumstances surrounding the said Transaction, and requested no information whatever except in answer to specific questions propounded by him. And this defendant denies that further effort by the complainant Helfman to secure relief within the Company would have been futile, and says that the Company through the Special Committee of its Board, and through its Board and executive officers, was ready and willing to grant to the complainants any relief to which they might be entitled, if it could be made to appear that they were entitled to any relief, but that as hereinabove set forth, the complainant Helfman although requested and urged to do so, failed to inform the Company of any facts nor could the Company through the thorough investigation conducted by the Special Committee, discover any facts to warrant it in yielding to the complainant Helfman's demands. And this defendant says that the complainants have made no bona fide effort to secure the relief they claim to be entitled to within the Company and for that reason, among others, their bill is improvidently filed.

WG-ANR-00078109

AND FURTHER ANSWERING the "First Cause of Action" this defendant says as follows:

*Sixty-fourth.* That the first interest of The United Light and Power Company in this defendant through stock holdings occurred late in 1924, when it purchased the shares then owned by the estate of Emerson McMillin deceased, by the estates of his deceased widow and son, and by certain members of his family and certain of his associates.

That this defendant was organized in 1901, through the efforts and genius of Mr. McMillin, and until his death on or about May 31, 1922, this defendant was practically managed and controlled by him. This defendant was very successful, and its stock had become one of the desirable investments among holding companies, with the result that both the Preferred and Common stock was rather closely held and retained by the original stockholders and their heirs. The deaths of Mr. McMillin and of his widow and son, placed on the market their stock holdings, as well as those of various members of his family, and for the first time an opportunity was presented of purchasing a sizable block of the Common stock, which was purchased by The United Light and Power Company as aforesaid. Following the purchase of the McMillin holdings, The United Light and Power Company began the accumulation of shares in the market but found an active competitor in The Koppers Company of Delaware. The result of competition was to rapidly increase the market price of the shares. The United Light and Power Company and The Koppers Company of Delaware gradually increased their respective holdings through purchases in the market, with the

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 84 of 134   Document 50-36

WG-ANR-00078110

result that by July, 1928, their joint holdings constituted 38.59% of the voting shares as stated in paragraph "B" above.

*Sixty-fifth.* That at this defendant's annual meeting held March 17, 1924, the following twenty-one directors were elected:

1. George Blumenthal
2. Franklin Q. Brown
3. Paul M. Butterworth
4. R. R. Colgate
5. Henry L. Doherty
6. W. F. Douthirt
7. George A. Elliott
8. T. R. Fell
9. Marshall Field
10. Stanhope Foster
11. Warren W. Foster
12. William B. Joyce
13. Alanson P. Lathrop
14. James Lawrence
15. Philip Lehman
16. James M. McCarthy
17. M. S. Paine
18. Seward Prosser
19. Edgar M. Williams
20. Gen. James H. Wilson
21. Chas. Willard Young

Chas. Willard Young died October 29, 1924, and on November 5, 1924, Frank T. Hulswit, who was then President of The United Light and Power Company was elected as his successor. On November 18, 1924, R. R. Colgate resigned as director and November 25, 1924, Henry B. Rust, President of The Koppers Company, was elected to succeed him.

WG-ANR-00078111

*Sixty-sixth.* That of the twenty-one directors elected at this defendant's annual meeting held on March 16, 1925, none were in any way officially connected with either The United Light and Power Company or The Koppers Company of Delaware, except said Frank T. Hulswit then President and Richard Schaddelee then Vice-President of The United Light and Power Company, and said Henry B. Rust, President of The Koppers Company of Delaware and Donald MacArthur, an officer of a subsidiary of said Company. Said McArthur resigned in July, 1925, and John S. Brookes, Jr., General Counsel of said Koppers Company was elected in his place; and at the same time Paul M. Butterworth, one of the executors of the estate of Emerson McMillin, resigned and William Chamberlain, then Vice President and General Counsel of The United Light and Power Company was elected in his place, with the result that there were five directors out of twenty-one who were officers and/or directors of The United Light and Power Company and/or The Koppers Company of Delaware.

*Sixty-seventh.* That at this defendant's annual meeting held on March 15, 1926, said Richard Schaddelee and William Chamberlain were re-elected, but said Frank T. Hulswit, who was then no longer an officer or director of The United Light and Power Company, was succeeded by Cyrus S. Eaton, then an officer and director of said Company; and said Henry B. Rust and John S. Brookes, Jr., were re-elected; and William F. Rust, an officer and director of The Koppers Company of Delaware and Donald MacArthur, referred to above, succeeded T. R. Fell and Stan-

WG-ANR-00078112

hope Foster: with the result that there were seven directors who were officers and/or directors of The United Light and Power Company and/or The Koppers Company of Delaware and/or its subsidiaries. On April 20, 1926, said Donald MacArthur resigned and C. D. Marshall, a director of The Koppers Company of Delaware, was elected in his place.

That on January 18, 1927, Rezeau B. Brown was elected a director to fill a vacancy caused by resignation, and was also elected President of this defendant to succeed Alanson P. Lathrop who at the same time was elected Chairman of the Board.

*Sixty-eighth.* That at this defendant's annual meeting held March 21, 1927, said Richard Schaddelee, William Chamberlain and Cyrus S. Eaton were re-elected, and B. J. Denman an officer and director of The United Light and Power Company was elected to a vacancy which had been caused by resignation, and said Henry B. Rust, John S. Brookes, Jr., William F. Rust and C. D. Marshall were reelected and Donald MacArthur referred to above was elected to succeed an associate of Mr. McMillin; with the result that there were nine directors who were associated with said two companies as aforesaid.

That at this defendant's annual meeting held March 19, 1928, no change was made in the membership of the Board; and the Board then elected was in office at the time the Transaction of 1928 was authorized.

That in respect of Edgar M. Williams, who is classified in complainants' paragraph 30 as a representative of the so-called "Eaton interests" this defendant refers to and makes part hereof paragraph Twenty-sixth of this answer.

WG-ANR-00078113

(TRANSACTION OF 1928)

*Sixty-ninth.* During the summer or early in the fall of 1927 Rezeau B. Brown, President of this defendant, learned that The Koppers Company of Delaware was negotiating for the purchase of a large coke oven plant which was then being erected by it for the Brooklyn Union Gas Company, and for a contract to sell the by-product gas from said coke oven plant to the Brooklyn Union Gas Company for a long period of years.

This defendant's subsidiary the Milwaukee Gas Light Company was at that time dependent upon a contract with the Milwaukee Coke & Gas Company for a large part of its supply of gas, and it was the belief of Mr. Brown that it was highly disadvantageous to an operating utility to be tied up by contract for a considerable period of time for an important part of its gas supply and to be without ownership or control of all its sources of supply, and he was also of the belief that the sale by the Brooklyn Union Gas Company of its coke plant, and the execution by it of the proposed contract for gas with said Koppers Company would result in financial injury to the Brooklyn Union Gas Company, and therefore to this defendant by reason of its large holding of the shares of the Brooklyn Union Gas Company.

That as a public utility operator of long standing Mr. Brown was convinced, because of the very definite limitations upon utilities, and their inability to demand a rate higher than a fair return upon existing values, and the competition of other fuels, that the future welfare of this defendant would be detrimentally affected unless he could prevent the proposed sale of

WG-ANR-00078114

the Brooklyn Union's coke plant and the execution of the proposed gas supply contract between the Brooklyn Union Gas Company and the said Koppers Company, and could also purchase the Milwaukee Coke & Gas Company for this defendant.

*Seventieth.* That in the operation and management of the Milwaukee Gas Light Company Mr. Brown had for many years faced difficulties in the matter of the gas supply under the contract with Milwaukee Coke & Gas Company, and unsatisfactory conditions had arisen from time to time, such as the lack of assurance of a dependable supply of gas when most needed, due not only to the financial difficulties of the Coke Company which arose from time to time by reason of the exhaustion of its working capital by payment of losses under the coal contracts, but also because of economic conditions which prompted the Coke Company from time to time to increase or decrease its output of coke and its consequent ability to supply gas.

As early as 1923, when acting as Vice President and General Manager of Milwaukee Gas Light Company, a subsidiary of this defendant, he had endeavored to persuade the officers of this defendant to buy the Milwaukee Coke & Gas Company. That in addition to the views then held by the management of this defendant the ownership of the coal mines by the Coke Company together with the burdensome obligations of the Coke Company in connection therewith seemed to be an insuperable obstacle to the management of this defendant and it was then unwilling to undertake the operation of the coal mines and to stand the

WG-ANR-00078115

loss which the Coke Company was annually sustaining by reason of its interest in the coal mines and said burdensome obligations. Mr. Brown endeavored to find a purchaser for the coal mines but was unsuccessful. Soon after he became President of this defendant and was in a position to influence its policies, he began negotiations to obtain the Milwaukee Coke & Gas Company and was informed that The Koppers Company of Delaware would not sell the same because of its relation to its other coke-oven interests in that region.

*Seventy-first.* That prior to the time when he became President of this defendant, Mr. Brown had had very slight acquaintance or contact with the officers of The United Light and Power Company, but after his election he gradually became better acquainted with them and realized that as utility operators of long experience they well understood the limitations and necessities of public utility operation and would be in accord with his own ideas. That after learning that the said Koppers Company was negotiating for the purchase of the Brooklyn Union's coke plant and for the gas supply contract with said Company, Mr. Brown, as President of this defendant appealed to the executive officers of The United Light and Power Company, asking their assistance in preventing the Brooklyn Union coke plant sale and the execution of said gas supply contract, and in negotiating on behalf of this defendant for the purchase of Milwaukee Coke & Gas Company.

That as the result of the appeal of Mr. Brown the executive officers of The United Light and Power Company reached the conclusion that the

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 90 of 134   Document 50-36

WG-ANR-00078116

interests of the stockholders of this defendant, of which it was one of the largest, would be best served if the sale of the Brooklyn Union coke plant and the proposed gas supply contract between the Brooklyn Union and Koppers Company could be prevented, and if this defendant could acquire said Milwaukee Coke & Gas Company.

That following such conclusion the officers of The United Light and Power Company and Mr. Brown had a long series of negotiations with the officers of said Koppers Company during which irreconcilable differences of opinion arose, but which, nevertheless, ultimately resulted in the Transaction of 1928; and this defendant says that instead of a conspiracy upon the part of The United Light and Power and said Koppers Company to mulct this defendant, The United Light and Power Company was an ally of this defendant in the said negotiations.

*Seventy-second.* That at the time of the controversy aforesaid the various parties, to wit, this defendant, The United Light and Power Company and The Koppers Company of Delaware, owned either directly or through subsidiaries, the following securities:

This defendant:

> 153,200 shares Brooklyn-Union Gas stock.
>
> $237,000 Brooklyn Union Gas convertible debentures, convertible into 4,740 shares.
>
> (The above being equivalent to 157,940 shares)
>
> 6,456 shares Detroit Edison stock.

WG-ANR-00078117

The United Light and Power Company:

    39,582 shares Brooklyn Borough Gas stock (out of a total of 40,000 shares)

    75,000 shares Detroit Edison stock.

    31,159 shares of this defendant's Preferred stock.

    101,196 shares of this defendant's Common stock.

The Koppers Company of Delaware:

    35,000 shares Milwaukee Coke & Gas stock (being the entire capital stock).

    19,399 shares of this defendant's Preferred stock.

    101,444 shares of this defendant's Common stock.

*Seventy-third.* That after a series of meetings between the officers of this defendant, The United Light and Power Company, and The Koppers Company of Delaware, at which all differences between the officers of this defendant and The Koppers Company of Delaware were discussed, the following principles were agreed upon, subject to the ability of the negotiators to arrive at proper exchange bases;

(a): That this defendant should (1) acquire from The Koppers Company all the capital stock of the Milwaukee Coke & Gas Company in exchange for this defendant's Common stock, and (2) dispose of its Brooklyn Union holdings to The Koppers Company so as to be no longer concerned as to whether the Brooklyn Union Company sold its coke oven plant to The Koppers Company and made a long time contract to purchase gas from The Koppers Company.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 92 of 134   Document 50-36

WG-ANR-00078118

(b): That The Koppers Company should (1) relinquish the stock of the Milwaukee Coke & Gas Company to this defendant in exchange for this defendant's Common stock, and (2) take over this defendant's Brooklyn Union holdings, which, however, it was unwilling to do unless it could acquire the Brooklyn Borough holdings of The United Light and Power Company.

(c): That The United Light and Power Company should relinquish its Brooklyn Borough holdings, and also its Detroit Edison holdings, for this defendant's Common stock.

(d): That The Koppers Company should relinquish to The United Light and Power Company all The Koppers Company's holdings of this defendant's Preferred and Common stock, including the Common stock to be received by The Koppers Company in exchange for the Milwaukee Coke & Gas stock, which, however, The Koppers Company was unwilling to do unless it could acquire a larger equity interest in The United Light and Power Company.

(e): That a careful study of values should be made and that the relative values of the various stocks should be determined as nearly as possible, giving due consideration to earnings, past performances and future prospects, and to market quotations as well.

(f): That because the parties contemplated only an exchange of securities the matter should be worked out in such a way as to defer the payment of any income tax until profits if any should be actually realized.

WG-ANR-00078119

*Seventy-fourth.* That the negotiations which resulted in the "Transaction of 1928" commenced during the latter part of 1927 and extended for a period of more than seven months. That at the beginning of the negotiations the market quotations of this defendant's Common stock was approximately $175 per share, but ultimately a price of $200 per share was adopted as the basis for comparison with the value of the other stocks involved in the negotiations. Relative values were then established for the other stocks, but it was found that it would be impossible to work out the exchanges on the basis of the values so established without considerable diminution of present earnings to The Koppers Company, a condition to which it ultimately agreed for the reason that its acquisition of the Brooklyn Union and Brooklyn Borough stocks was expected to be of great value in its plans for extending its coke oven operations.

That the negotiators knew that all the stocks to be exchanged had been purchased by their respective owners within a period of about three years last preceding and that during that period there had been large appreciation in the market quotations out of proportion to any increase in their earnings.

That in the exchanges as finally worked out The United Light and Power Company and The Koppers Company of Delaware exchanged stocks on the basis of the then high market quotations, while this defendant, although participating in part in exchanges on such high level, was also issuing a large amount of its own stock for *cash* on the same high level, and further was put in position to realize in cash its profits on its Brooklyn Union holdings at approximately the same

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 94 of 134   Document 50-36

WG-ANR-00078120

high level, all of which has resulted in large financial gain to this defendant.

### (MILWAUKEE COKE & GAS)

*Seventy-fifth.* That, with respect to this defendant's acquisition of the stock of the Milwaukee Coke & Gas Company in exchange for 38,272 shares of its Common stock (which as has been said was but one factor of the Transaction of 1928), this defendant says that Rezeau B. Brown, who as has been said became President of this defendant on January 18, 1927, had for many years prior thereto been the chief managing officer of the Milwaukee Gas Light Company, which for many years had been purchasing gas from the Milwaukee Coke & Gas Company, and was familiar with the plant of said Coke Company, having been frequently consulted concerning its operation and having also been consulted concerning the rebuilding of portions of said plant, and that he was also familiar with the financial affairs and condition of said Coke Company: and that a brief summary of facts pertaining to such financial affairs, (all references to said Coke Company's earnings being limited to the two and one-half year period from January 1, 1926 to July 1, 1928, during which time The Koppers Company was in control of said Coke Company and was entitled to its surplus and earnings) is as follows:

#### CAPITAL STOCK

The Coke Company was organized in
  1903 with paid in Capital stock of    $ 540,800
which was gradually increased until
  1909 when it was    1,750,000
In 1920 a stock dividend of 100% was
  paid, increasing the capital stock to    3,500,000
at which figure it stood on July 1, 1928.

WG-ANR-00078121

### BONDS

A bond issue of $1,000,000, placed on the property in earlier years, had been paid out of earnings by 1918.

| | |
|---|---:|
| In 1918 the Coke Company embarked on a coal mining venture which was financed by 6% Bonds, issued in 1918, to the amount of | $1,000,000 |
| 7½% Bonds, issued in 1921, in the amount of | 2,000,000 |
| Total | $3,000,000 |

The 6% bonds were due at the rate of $100,000 per year and the 7½% bonds at the rate of $167,000 per year, imposing a retirement charge of $267,000 a year on the Coke Company, in addition to interest on the bonds.

By January 1, 1926, the bonds had been reduced to $2,132,000, and on July 1, 1928, they had been reduced to $1,331,000, reducing by $1,669,000 the Coke Company's cash resources which might otherwise have been distributed as dividends.

*Seventy-sixth.* The coal mines were owned by the Elkhorn Piney Coal Mining Company. The Milwaukee Coke & Gas Company owned 75% of the stock of said Elkhorn Company. This stock cost the Coke Company $2,625,469.42 to December 29, 1927, when the Coke Company passed it out as a dividend to The Koppers Company, then its sole stockholder. The other 25% of the Elkhorn stock was owned by the Northwestern Iron Company.

In order to further finance the coal venture the Coke Company unconditionally guaranteed the principal and interest of $2,894,000 of bonds of the Elkhorn Company, (the Northwestern Iron

Case 2:20-cv-01334-SCD    Filed 01/27/23    Page 96 of 134    Document 50-36

WG-ANR-00078122

Company contracting with the Coke Company to assume 25% of the guarantee) and furthermore the Coke Company entered into contracts with the Elkhorn Company to buy from the Elkhorn Company 75% of the entire coal production of certain of its mines at cost plus 35 cents per ton, for fifteen years. These contracts were necessary to induce the sale of said $2,894,000 Elkhorn bonds. The Coke Company further guaranteed that in the year 1919, and each year thereafter until said bonds were paid, said mines would produce 1,600,000 tons of coal, and in the event of failure to produce that tonnage, the Coke Company would pay to the Elkhorn Company a profit of 35 cents per ton upon 75% of the shortage. As a result of said contracts the Coke Company was obliged to pay each year to the Elkhorn Company large sums of money, and to take and use in its coke plants a large tonnage of coal at prices higher than those for which coal of similar quality could have been purchased on the open market, as the Elkhorn mines were what are known as high cost mines.

*Seventy-seventh.* During the two and one-half year period January 1, 1926, to July 1, 1928 the coal venture cost the Coke Company (among other things) as follows:

| | |
|---|---:|
| Minimum tonnage guarantee | $279,146.42 |
| Coal mined under minimum guarantee and sold for account of the Coke Company | 482,202.17 |
| Paid by the Coke Company in excess of open market price | 333,299.95 |
| Interest paid by Coke Company in excess of agreed liability | 60,206.25 |
| | $1,174,854.79 |

an average of $469,941.91 per annum.

WG-ANR-00078123

When this defendant acquired the stock of the Coke Company on July 1, 1928, it did not acquire what The Koppers Company had purchased, but it acquired the stock of the Coke Company after that Company had been relieved of its interest in the coal mines, and of all the obligations it had assumed in connection with the coal mining venture.

| | |
|---|---|
| The Coke Company's earnings available for dividends according to its own books for the two and one-half year period from January 1, 1926 to July 1, 1928 were | $1,383,635.80 |
| If there be added to this the loss from the coal mining venture, for the same period, as above | 1,174,854.79 |
| the Coke Company's earnings would have been | $2,558,490.59 |

or an average of $1,023,396.24 per year.

During the same two and one-half year period greater amounts than later found necessary were credited to Reserves as follows:

| | |
|---|---|
| Reserve for Federal Income Tax | $107,434.27 |
| Reserve for Wisconsin State Income Tax | 76,999.75 |
| and if these were added its earnings would have been | $2,742,924.61 |

or an average of $1,097,169.84 per annum, without taking into account several other excess amounts charged for depreciation and various other ex-

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 98 of 134   Document 50-36

WG-ANR-00078124

pense accounts. This average of $1,097,169.84 per annum was 14.43% on the price of $7,654,400 which complainants say that this defendant paid for the stock of the Coke Company.

The subsequent operation of the Coke Company has amply justified its purchase by this defendant at the price paid therefor. Equipment has been added for producing more gas for the benefit of the Milwaukee Gas Light Company, and notwithstanding the low contract price for gas except as to a small amount produced in 1929 and 1930 in excess of the 16,000,000 cubic feet per day, the earnings available for dividends have been as follows:

| | |
|---|---|
| 1928 last half | $272,055.79 |
| 1929 | 1,150,512.71 |
| 1930 | 746,948.67 |
| 1931 | 341,848.09 |
| | $2,511,365.26 |

or an average of $717,532, despite the fact that the past two winters have been abnormally warm, which, happening concurrently with the industrial depression has seriously diminished the demand for coke as well as its market price. This average of $717,532 was 9.37% on the price of $7,564,400 which complainants say this defendant paid for the stock of the Coke Company.

## (Brooklyn Union)

*Seventy-eighth.* This defendant began the accumulation of its Brooklyn Union holdings in April 1926, at an initial price of $71.50 per share. By September of that year 79,500 shares had been

WG-ANR-00078125

purchased, and the market had risen to $96.00 per share.

The remainder of this defendant's holdings were purchased from April to December in 1927, the market rising rapidly although the earnings in 1927 were slightly less than in 1926, and the last purchases were at $150.00 per share. The average was $101.81 per share, but the market had risen to a point where further purchases would reduce unduly the return. Moreover it was apparent that the Convertible debentures could be exchanged for stock quite promptly after January 1, 1929, further reducing the earnings per share.

*Seventy-ninth.* There had been diversity of opinion among the officers and directors of this defendant as to the legality of the holding of such an amount of the stock because of the provisions of Section 70 of the New York Public Service Commission Law, and when opportunity presented to dispose of the holding at substantially the then market quotation, in connection with adjusting the differences between the managing officers of this defendant and The Koppers Company, it was felt that it was good business judgment to take advantage of the opportunity.

*Eightieth.* There were other sound business and economic reasons for disposing of the stock, among which were the following:

(a) The Brooklyn Union's franchise territory was limited to (1) the Borough of Brooklyn, except the 30th and 31st Wards, and (2) the 2nd and 4th Wards of the Borough of Queens. This

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 100 of 134   Document 50-36

WG-ANR-00078126

territory is entirely surrounded by territory covered by franchises held by other utility companies, thus definitely limiting the Brooklyn Union's opportunities for future expansion into new territory.

(b) The Brooklyn Union's sales of gas were increasing very slowly.

(c) Notwithstanding the slow increase in gas sales the Company's fixed capital had risen from about $67,000,000 in 1923 to about $95,000,000 in 1927, and there were then fixed capital additions budget and under construction which would materially add thereto. From 1923 to 1927 fixed capital had increased over 30%, while gas sales increased only about 12%. In the same time the number of meters had increased from 615,000 to 688,000, indicating practically no increase in sales of gas per meter.

(d) The Company had not succeeded in its efforts to get authority from the New York Public Service Commission to put into effect a scale of rates that would enable it to sell gas for industrial uses.

(e) The Company had continued to base its credit to Reserve for Depreciation on an old established basis of 3 cents per thousand cubic feet of gas sold, and gas sales were not increasing, and thus the annual credits to Reserve for Depreciation were not increasing, while on the other hand fixed capital was increasing very rapidly.

(f) As has been said in paragraph Seventy-third of this answer The Koppers Company was

WG-ANR-00078127

unwilling to relinquish the stock of the Milwaukee Coke & Gas Company to this defendant unless it could acquire this defendant's Brooklyn Union holdings (as well as The United Light and Power Company's holdings of Brooklyn Borough Gas stock).

*Eighty-first.* For such and other reasons the sale of this defendant's Brooklyn Union holdings was wise, and was to the advantage of this defendant, and by reason of such sale this defendant has already received back in cash $1,142,819.20 more than the cost of said holdings, but has also received and still owns $4,098,530 of 5½% secured guaranteed debentures, which have been called for payment on April 20, 1933 (see paragraph Fiftieth of this answer).

### (Brooklyn Borough)

*Eighty-second.* This defendant had no concern in connection with the Brooklyn Borough Gas stock, except that, as stated in paragraph Seventy-third of this answer. The Koppers Company was unwilling to relinquish the Milwaukee Coke & Gas stock to this defendant unless it could acquire the Brooklyn Borough holdings of The United Light and Power Company (as well as the Brooklyn Union holdings of this defendant); and, as part of the Transaction of 1928 and to procure the Milwaukee Coke & Gas stock and to dispose of its Brooklyn Union holdings, this defendant issued 56,248 shares of its Common stock for $11,249,600 of 5½% debentures, for which it has since received $11,249,600 in cash, which amounted to selling such Common stock for $200

Case 2:20-cv-01334-SCD    Filed 01/27/23    Page 102 of 134    Document 50-36

WG-ANR-00078128

per share in cash, which has been greatly to the benefit of this defendant and its stockholders.

(DETROIT EDISON)

*Eighty-third.* As stated in paragraph Seventy-second of this answer this defendant had, through a subsidiary, acquired 6,456 shares of Detroit Edison stock prior to the Transaction of 1928. Said shares had been acquired in 1926 by purchase in the market, and through subscription rights.

In 1925 this defendant had sold at an advantageous price its holding of St. Paul Gas Light stock. Said St. Paul Gas Light Company not only furnished gas in St. Paul and vicinity, but also furnished electric service in the same territory, and in 1924 about 85% of its gross corporate income was from electric service. It was the most important electric interest of this defendant; and although the price at which this defendant sold the stock was very advantageous to this defendant and this defendant made a very substantial profit, it left this defendant with a largely preponderating interest in gas utilities.

Hence in order to increase its electric interests this defendant made its original purchase of Detroit Edison stock, and when opportunity presented, in the Transaction of 1928, to increase its Detroit Edison holding it was considered wise to do so.

*Eighty-fourth.* The Detroit Edison Company was one of the outstanding electric properties of the country. In 1928 it was serving 21 cities, 66 incorporated villages, 105 unincorporated villages

WG-ANR-00078129

and rural territory in 10 counties, all contiguous. This defendant's most important gas subsidiary, the Detroit City Gas Company, was serving gas in a part of the same territory and this defendant's officers were therefore very familar with the growth in population and the industrial development of the territory. The population had increased from 1,400,000 to 1920 to about 2,500,000 in 1928.

The operating revenue of the Detroit Edison Company had increased from $533,847.20 in 1903, to $47,379,778.70 in 1927. In the five years immediately preceding 1928 its operating revenues had been as follows:

|      | Operating Revenue | Gain over Preceding Year |
|------|-------------------|--------------------------|
| 1923 | $31,724,184.85    | $5,316,025.84            |
| 1924 | 34,163,286.50     | 2,439,101.65             |
| 1925 | 38,948,782.51     | 4,785,496.01             |
| 1926 | 44,854,735.44     | 5,905,952.93             |
| 1927 | 47,379,778.70     | 2,525,043.26             |

*Eighty-fifth.* As has been said in paragraph Fifty-fifth of this answer the *reported* net income per share of the Detroit Edison was calculated on the number of shares outstanding at the close of the year, and that if such income per share were calculated on the average number of shares outstanding during the year, it would be substantially greater. The following table shows for the five years immediately preceding 1928 this defendant's income per Common share, and the Detroit Edison income per share based on the average number of shares outstanding during each year.

| | American Light & Traction | Detroit Edison |
|---|---|---|
| 1923 | $6.65 | $13.02 |
| 1924 | 9.70 | 12.30 |
| 1925 | 12.39 | 12.27 |
| 1926 | 12.29 | 12.34 |
| 1927 | 12.22 | 11.65 |
| | $53.25 | $61.56 |

In 1928, as it later proved, each company earned approximately $14.00 per share.

*Eighty-sixth.* The drop in market quotations of this defendant's Common shares has been relatively greater than the drop in Detroit Edison shares, and this defendant has had and now has, on the basis of market quotations, a substantial advantage in the Detroit Edison factor of the Transaction of 1928.

(RESULT AS OF APRIL 12, 1932)

*Eighty-seventh.* In paragraph Sixty-first of this answer this defendant showed the results of the Transaction of 1928 based on market quotations of December 22, 1932, the date when the bill was filed. It now shows in the same form the results based on market quotations of April 12, 1932.

This defendant issued 169,520 shares of its Common stock, which were then of $100 par value, but which have since been converted into 678,080 shares of $25 par value, which latter shares were quoted at $14.75 per share

WG-ANR-00078131

| | |
|---|---:|
| on April 12, 1932, making a total market quotation of | $10,001,680 |
| This defendant parted with 157,940 shares of Brooklyn Union Gas stock, which was quoted at $69 per share on said April 12, 1932, making a total market quotation of | 10,897,860 |
| making a total of | $20,899,540 |
| for which this defendant has received in net cash | 25,472,970 |
| and has also received and now owns 105,000 shares of Detroit Edison stock, which was quoted at $84 per share on said April 12, 1932, making a total market quotation of | 8,820,000 |
| and has also remaining $4,098,530 of 5½% secured guaranteed debentures, for which no market quotations were available, but which it has called for payment at par on April 20, 1933, and therefor estimates at par | 4,098,530 |
| making a total of | $38,391,500 |
| or an indicated profit | $17,491,960 |
| to which should be added the value of the 35,000 shares of Milwaukee Coke & Gas stock, which this defendant estimates to be not less than | 8,000,000 |
| making a total of | $25,491,960 |

WG-ANR-00078132

### Second Cause of Action.

*First.* This defendant for answer to paragraph 1 of the "Second Cause of Action" repeats its answer to the First Cause of Action.

*Second.* This defendant answering paragraph 2 admits that on April 2, 1929 the International Paper & Power Company, a Massachusetts voluntary association formed in 1928, (hereinafter in this paragraph referred to as the parent company) owned or controlled most of the capital stock of International Paper Company, a New York corporation, which, with its subsidiaries, was one of the world's largest makers of paper, chiefly news print and kraft. But this defendant says that said parent company in addition to said International Paper Company owned or controlled power and/or utility properties, and that such power and utility holdings then constituted about 62% of the total assets of said parent company, while only 36% of its assets consisted of holdings representing paper pulp and miscellaneous investments, and only 2% represented holdings in companies publishing newspapers. Said parent company had outstanding on March 31, 1929 (the nearest available date to said April 2, 1929) $90,400,200, (not $91,021,700) of 7% cumulative preferred stock; $1,657,000 of 6% cumulative preferred stock; 990,371 shares of Class A and the same amount of Class B common stock, and 1,900,693 (not 2,496,668) shares of Class C common stock. This defendant admits that said Class A stock was entitled to an aggregate of $12.00 in dividends before any payments could be made by way of dividends on B stock or C stock, and that after payment of said

WG-ANR-00078133

$12.00 said A and B shares formed one class of shares entitled to $12.00, and when that was paid then all Classes A, B and C were to constitute one common stock. Except as herein admitted, it denies the allegations of paragraph 2.

*Third.* This defendant admits the allegations of paragraph 3, except that it denies that the United Light & Power Company was controlled by Cyrus S. Eaton and/or his associates through other corporations, and that this defendant was controlled by the said Cyrus S. Eaton and/or his associates through other corporations or otherwise.

*Fourth.* This defendant admits the allegations of paragraph 4.

*Fifth.* This defendant admits the allegations of paragraph 5.

*Sixth.* This defendant admits the allegations of paragraph 6.

*Seventh.* This defendant denies each and every allegation contained in paragraph 7.

*Eighth.* This defendant denies each and every allegation contained in paragraph 8, except that it admits The United Light and Power Company during the period of October 9, 1929, to October 24, 1929 was in control of the voting stock of this defendant.

*Ninth.* This defendant denies each and every allegation therein contained in paragraph 9.

*Tenth.* This defendant denies that Otis & Co. during the times mentioned in paragraph 10 operated heavily on the New York Stock Exchange in International Paper & Power Company stock, and alleges the fact to be that Otis & Co. did not

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 108 of 134   Document 50-36

WG-ANR-00078134

at any time seek to make or maintain a market for said stock. It admits that Otis & Co., did through their own floor members, but more largely through floor brokers and other stock exchange houses, buy for its customers a large amount of said stocks during the period mentioned, and that a large amount was purchased by this defendant, by Continental Shares Incorporated and by other companies in which Cyrus S. Eaton was personally interested. It alleges the fact to be, however, that all of said companies were purchased for permanent investment and that while they bought large amounts, they sold substantially none at all. It is the belief of this defendant that substantially all of said purchases are still held by the companies which originally made the purchases, or their affiliates. It specifically denies that Continental Shares Incorporated did, during the times mentioned, control the voting B shares of United Light and Power Company.

Except as herein admitted this defendant denies the allegations of paragraph 10.

*Eleventh.* This defendant denies each and every allegation contained in paragraph 11.

*Twelfth.* This defendant admits the allegations of paragraph 12.

*Thirteenth.* Answering paragraph 13, this defendant denies that as alleged in said paragraph there was no sound or good business or economic reason for the purchase by this defendant of the stock of the International Paper & Power Company but, on the contrary, says that there were sound and good business and economic reasons for said purchase. Further answering paragraph 13, this defendant repeats the facts concerning

WG-ANR-00078135

the business of the International Paper & Power
Company mentioned in paragraph Second above,
and further says that said International Paper
& Power Company owned and still owns a con-
trolling interest in other power companies which
had and have strategic importance and possibili-
ties of great future growth and that it had and
has a controlling interest in companies which
owned and now own very important water power
sites, some of which were then developed, and
some of which were then undeveloped and which
had and have great potential, as well as substan-
tial immediate value, and that one of the objects
of the purchases by this defendant of said shares
was to secure an influential position in the affairs
of said Company and a voice in the direction and
possible disposition of its utility properties, and
that by such purchases this defendant, in conjunc-
tion with The United Light and Power Company,
desired to acquire and did acquire a stock interest
in said Company substantially as important as
that of any other stockholder; and further, that
the officers, members of the Executive Committee
and Directors of this defendant voted for the pur-
chase of said shares solely because they believed,
in the exercise of honest business judgment, that
such purchase would be for the benefit of this
defendant, and they are still of that opinion.

Further answering paragraph 13, this defend-
ant denies that the business conducted by the
International Paper & Power Company and/or
its subsidiaries was foreign to the character of
business in which this defendant and/or its sub-
sidiaries were and are engaged, and says that of
the total capital assets of said International
Paper & Power Company more than 60% con-

WG-ANR-00078136

sisted of holdings in power and utility companies and properties, the business of which was fundamentally similar in character to the business of this defendant, and while this defendant admits that said International Paper & Power Company was to the extent of less than 40% of its capital assets interested in the manufacture and sale of paper and timber products and the publishing of newspapers, it states the fact to be that said Company's interest in the publishing of newspapers amounted to less than 2% of its total capital assets.

*Fourteenth.* This defendant answering paragraph 14 says that through the purchase of said International Paper & Power Company stock, it, in conjunction with The United Light and Power Company, acquired an influential position in the affairs and management of the International Paper & Power Company; that good relations have been established with the management of said Company, and that William Chamberlain, Chairman of the Executive Committee of this defendant, who is also President of The United Light and Power Company, has become a member of the Board of Directors and Executive Committee of the International Paper & Power Company since said purchases were made, all to the great advantage of this defendant and its stockholders. Except as herein admitted, this defendant denies the allegations of paragraph 14.

*Fifteenth.* This defendant admits the allegations of paragraph 15.

*Sixteenth.* This defendant answering paragraph 16 admits that the business of said International Paper & Power Company was not being

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 111 of 134   Document 50-36

WG-ANR-00078137

conducted at a profit sufficient to pay dividends on its A, B and C shares, no dividends ever having been paid on said B and C shares, as alleged in paragraph 15, and admitted by this defendant in paragraph Fifteenth of this answer. This defendant, further answering paragraph 16, says that at the time of its purchase of said International Paper & Power Company shares, said Company had been but recently organized and that the business of some of its subsidiaries was being conducted at a substantial profit and it was expending large amounts in the development of properties which had not yet become productive, and the indications were that the business of said Company would shortly be placed on a profitable basis, and this defendant still believes that with changing economic conditions which may be reasonably anticipated in the future, the power and utility holdings of said Company will prove of great value and profit to said Company and its stockholders, including this defendant. This defendant further says that William Chamberlain first became a member of the Board of Directors of said International Paper & Power Company on January 8, 1930, which was subsequent to this defendant's purchases of said stock.

*Seventeenth.* This defendant, answering paragraph 17, denies that the stocks of the International Paper & Power Company, purchased by this defendant, are now almost worthless or of little value, and says that present current market quotations are not a criterion of the real values of said stock. It denies that said purchase has resulted in other than a paper loss to this defendant at this time and denies that it has sustained any great financial loss in fact and denies

WG-ANR-00078138

that the same amounts to over $5,500,000.00. It denies all of the allegations of the second paragraph of paragraph 17 and says that the determination of whether or not this defendant should have sold its stock in the International Paper & Power Company was a matter of business judgment, the responsibility for which is lodged in the Board of Directors, and it says that the object of this defendant in purchasing the said stocks of International Paper & Power Company was not with respect to any immediate or substantial increase in stock quotations or from the standpoint of a stock trader, but that said stock purchases were made because this defendant and its responsible officers and directors, were of the opinion that the stocks of the said International Paper & Power Company presented a character of investment which it was desirable for this defendant to enter upon in connection with the development and extension of its business, and that it then was the opinion of this defendant and its Board of Directors that by retaining said stocks this defendant will over a period of years reap a substantial benefit for itself and its stockholders.

*Eighteenth.* This defendant, answering paragraph 18, denies that the 1929 transaction in said International Paper & Power Company stock was not disclosed to the stockholders of this defendant at any time and says that it was fully reported at the next meeting of the stockholders which was held in March of 1930. It has no knowledge as to when the complainant Helfman learned of the same, but it admits that he did send certain communications to the President of this defendant. It denies that its President ignored the same or that no attention was ever

WG-ANR-00078139

paid to the same, and says that the said communications were considered by its President and by various of the members of the Executive Committee, and says that nothing contained in said communications caused the officers or directors of this defendant to alter their judgment with respect to the advisability of the original purchase and the advisability of retaining said shares of stock of International Paper & Power Company.

*Nineteenth.* This defendant, answering paragraph 19, admits that since the purchase of the said International Paper & Power Company shares the market price thereof has declined. It admits that it has made no effort to dispose of said shares. It denies that it made no effort to dispose of said shares because of any desire of The United Light and Power Company or of Cyrus S. Eaton, or anyone else, to prevent a break in market price of said shares. It says that the protracted business depression and the resulting decline in the price of all securities were not foreseen late in the year 1929 or early in the year 1930, and says that its officers and directors, in determining to retain ownership of the said stock, not only acted in accordance with their best business judgment at the time, but in consistence with their belief that the ownership of said shares was desirable and advantageous to this defendant, and that their judgment was not in any way influenced or controlled by any of the matters and things alleged in paragraph 19. Except as herein admitted this defendant denies all the allegations in paragraph 19.

*Twentieth.* This defendant denies paragraph 20 and every allegation therein contained.

WG-ANR-00078140

*Twenty-first.* This defendant denies every allegation contained in paragraph 21, except that says it has no knowledge as to what the complainants may have been informed by their counsel.

*Twenty-second.* This defendant denies every allegation contained in paragraph 22, except that says it has no knowledge as to what the complainants may have been informed by their counsel.

*Twenty-third.* Further answering the Second Cause of Action this defendant says that at the annual meeting of its stockholders held March 17, 1930, full explanation was made in respect of the purchase of said shares, including the price paid thereof, and said purchase was there and then ratified.

### THIRD CAUSE OF ACTION.

*First.* This defendant for answer to paragraph 1 of the "Third Cause of Action" repeats its answer to the First Cause of Action.

*Second.* This defendant, answering paragraph 2, admits the allegations, except that it alleges that prior to August 15, 1930, the officers of this defendant had been negotiating with Otis & Company for the purchase of 126,000 shares of Detroit Edison Company stock, and that at the time of such meeting the negotiations had been concluded, subject to the approval of the Executive Committee, on the basis of $222.50 per share.

*Third.* This defendant answering paragraph 3, admits the allegations contained therein; but says that at the time of borrowing the sum of $27,500,000.00 referred to in said paragraph 3 the officers of this defendant were authorized so to do,

WG-ANR-00078141

and that the members of the Executive Committee knew that money owing to subsidiaries of this defendant on the greater portion of the debentures referred to in the First Cause of Action would shortly be paid to an amount nearly sufficient to repay said loan of $27,500,000.00. The sum of $26,872,600 was so paid to this defendant and/or its subsidiaries in November, 1930, as mentioned in paragraph "F" of this answer.

*Fourth.* This defendant, answering paragraph 4, admits that the stock of the said Detroit Edison Company was purchased on a declining market, but says that at that time no one could tell whether the market would continue to decline or rise and that the earnings of the Detroit Edison Company had then declined slightly, as was also true of almost all other utilities. Except as herein admitted, it denies every allegation in paragraph 4. Further answering paragraph 4 it says that in addition to the matters alleged to its answer to the First Cause of Action there were most excellent business and economical reasons for purchasing the said 126,000 shares of Detroit Edison Company stock; that this defendant was already the owner of more than 105,000 shares of Detroit Edison Company stock, but that a much larger position was held by other interests; that the block of 126,000 shares, when offered, was equally available to the said other interests, and it was believed that they not only wished to own said 126,000 but were making arrangements for financing its purchase. It was the opinion and judgment of this defendant that if said large block of stock was acquired by said other interests, this defendant would have been definitely limited in its opportunity for future

WG-ANR-00078142

purchases, and that its investment in the Detroit Edison Company was too large to leave unprotected under the circumstances, and further, that by acquiring said additional 126,000 shares, it would become the largest individual stock owner of Detroit Edison Company, and would thus be in a position to unite with other large holders, to and for the advantage of this defendant and its stockholders.

*Fifth.* This defendant, answering paragraph 5, admits that Cyrus S. Eaton resigned as a member of the Executive Committee of this defendant and as a Director, on August 15, 1930. It denies that said resignation was tendered in an attempt to relieve the purchase by this defendant of the said Detroit Edison Company stock of any illegality existing or seeming to exist by reason of the connection of said Cyrus S. Eaton with Otis & Company, and by reason of his membership on said Executive Committee and on said Board of Directors, and it further says that no illegality existed by reason of those facts. It denies that said Cyrus S. Eaton and/or Otis & Company controlled The United Light and Railways Company and/or the United American Company, and it denies that they, or either of them, controlled this defendant, its Executive Committee and/or its Board of Directors.

*Sixth.* This defendant answering paragraph 6 says that it has no knowledge or information sufficient to form a belief as to what the complainants may have been advised by their counsel or as to whether the firm of Otis & Company has been liquidated or as to whether the members thereof are non-residents of the State

WG-ANR-00078143

of New Jersey, and it denies that there was any fraud or fraudulent features in connection with the purchase of the said 126,000 shares of the Detroit Edison Company stock by this defendant, and it denies that the said Otis & Company and/or Cyrus S. Eaton or either of them dominated and controlled this defendant.

*Seventh.* This defendant, answering paragraph 7 denies that the members of the Board of Directors of this defendant were guilty of neglect of duty or negligence in the purchase of said 126,000 shares of Detroit Edison stock, or that said transaction was a fraud on it. It admits that this defendant may thus far have lost some revenue as a result of said purchase, but re-alleges that said purchase was based upon good, sound business and economic reasons relating to the conduct of this defendant's business over a long period of years, which reasons far outweighed any possible temporary loss of revenue which might result to it from said purchase.

*Eighth.* This defendant, answering paragraph 8, says that annual report of this defendant for the year 1930 stated with respect to the said purchase of stock as follows: "During the year a substantial block of Detroit Edison stock was purchased. The financing of this purchase was accomplished through funds received from the retirement of callable debentures." And this defendant says that said annual report was sent out at about the time of the annual meeting held March 23, 1931, and that at the annual meeting full explanation was made in respect to the purchase of said shares, including the price paid

WG-ANR-00078144

therefor and the seller thereof, which purchase was then and there ratified.

*Ninth.* This defendant, answering paragraph 9, says that it has no knowledge as to what the complainants may have been advised by their counsel. It denies that the members of its Board of Directors are liable for any damages, and denies that any damages and losses have been sustained by this defendant or by its stockholders as the result of the purchase of the said stock of the Detroit Edison Company, or by reason of any of the other matters alleged in the Bill of Complaint.

This defendant prays to be hence dismissed with its costs and charges in this behalf most wrongfully sustained.

Dated April 15, 1932.

McCARTER & ENGLISH,

*Solicitors for and of Counsel with the Defendant American Light & Traction Company.*

WG-ANR-00078145

## APPENDIX NO. 1.

### HARRY HELFMAN

American Light & Traction, Common Stock
Shares $100 par until May 5, 1930, when
changed to $25 par.

| | | | | Shares | Market | Amount | Average |
|---|---|---|---|---|---|---|---|
| 1923 | May | 1 | Credit | 20 | 120 | $2,400 | 120 |
| | | 2 | " | 40 | 120 | 4,800 | |
| | | | | 60 | | 7,200 | 120 |
| | | 4 | " | 30 | 118 | 3,540 | |
| | | | | 90 | | 10,740 | 119.3 |
| | | 9 | " | 10 | 118 | 1,180 | |
| | | | | 100 | | 11,920 | 119.2 |
| | July | 25 | (Stock Dividend) | 1 | ...... | ........ | |
| | | | | 101 | | 11,920 | 118 |
| | Oct. | 26 | (Stock Dividend) | 1 | ...... | ........ | |
| | | | | 102 | | 11,920 | 116.8 |
| 1924 | Jan. | 25 | (Stock Dividend) | 1 | ...... | ........ | |
| | | | | 103 | | 11,920 | 115.7 |
| | Mch. | 6 | Debit | —10 | 128 | —1,280 | |
| | | | | 93 | | 10,640 | 114.4 |
| | | 24 | " | —20 | 131 | —2,620 | |
| | | | | 73 | | 8,020 | 109.8 |
| | | 25 | " | —10 | 134 | —1,340 | |
| | | | | 63 | | 6,680 | 106 |
| | | 31 | Debit | —20 | 132 | —2,640 | |
| | | | | 43 | | 4,040 | 97.4 |
| 1926 | May | 11 | Credit | 20 | 208 | 4,160 | |
| | | | | 63 | | 8,200 | 130.1 |
| | | 15 | " | 25 | 202 | 5,050 | |
| | | | | 88 | | 13,250 | 150.5 |
| | | 17 | " | 15 | 202 | 3,030 | |
| | | | | 103 | | 16,280 | 158 |
| | Oct. | 4 | " | 50 | 214 | 10,700 | |
| | | | | 153 | | 26,980 | 176.7 |
| 1927 | Apr. | 30 | " | 1 | 240 | 240 | |
| | | | | 154 | | 27,220 | 176.6 |
| | June | 6 | " | 150 | 240 | 36,000 | |
| | | | | 304 | | 63,220 | 207.9 |

WG-ANR-00078146

| | | | Shares | Market | Amount | Average |
|---|---|---|---|---|---|---|
| | (Brought forward) | | 304 | | $63,220 | 207.9 |
| | 23 | (Stock Dividend) | 152 | ...... | ........ | |
| | | | 456 | | 63,220 | 138.6 |
| 1928 Apr. | 26 | Credit | 200 | 197 | 39,400 | |
| | | | 656 | | 102,620 | 156.4 |
| July | 31 | " | 100 | 217 | 21,700 | |
| | | | 756 | | 124,320 | 164.4 |
| Sept. | 10 | " | 200 | 219 | 43,800 | |
| | | | 956 | | 168,120 | 175.8 |
| 1929 May | 10 | " | 50 | 242 | 12,100 | |
| | | | 1,006 | | 180,220 | 179.1 |
| | 13 | " | 100 | 245 | 24,500 | |
| | | | 1,106 | | 204,720 | 185 |
| Aug. | 12 | " | 300 | 343 | 102,900 | |
| | | | 1,406 | | 307,620 | 218.7 |
| 1930 May | 5 | Changed to $25 | | | | |
| | | Par 1,406 x 4 | 5,624 | | 307,620 | 54.7 |
| June | 30 | Credit | 1,200 | 58 | 69,600 | |
| | | | 6,824 | | 377,220 | 55.2 |
| Nov. | 20 | Debit | —424 | 48 | —20,352 | |
| | | | 6,400 | | 356,868 | 55.7 |
| | 24 | " | — 200 | 45 | — 9,000 | |
| | | | 6,200 | | 347,868 | 56.1 |
| Dec. | 8 | " | — 500 | 43 | —21,500 | |
| | | | 5,700 | | 326,368 | 57.2 |

WG-ANR-00078147

In the foregoing table, the column headed 1928 shows the election of four persons who were affiliated with The United Light and Power Company namely,

> William Chamberlain,
> Burt J. Denman,
> Cyrus S. Eaton and
> Richard Schaddelee,

all of whom were directors or officers of that Company; and five persons who were affiliated with The Koppers Company of Delaware, namely,

> John S. Brookes, Jr.,
> Donald MacArthur,
> C. D. Marshall,
> Henry B. Rust and
> W. F. Rust,

all of whom were directors or officers of that Company and/or its subsidiaries.

The other twelve directors elected at the annual meeting in 1928 were the following:

(1) Walter C. Beckjord. At the time of his election Mr. Beckjord was in the employ of this defendant in the capacity of Engineer and prior thereto he had for many years been in the service of this defendant and/or its subsidiaries. On May 4, 1926, Mr. Beckjord had been elected a vice president of this defendant from which time he served continuously as vice president until January 7, 1930 when he resigned as vice president (but not as director) and became vice president of the Boston Consolidated Gas Company in the stock of which the persons who are stockholders of The Koppers Company of Delaware are largely interested.

WG-ANR-00078148

APPENDIX NO. 2

AMERICAN LIGHT & TRACTION COMPANY

DIRECTORS

1922—1932

| (1) | A | 1922 March 20 | | 1923 March 19 | | 1924 March 17 | | 1925 March 16 | | 1926 March 15 | | 1927 March 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/16/08<br>3/18/12 | (1) Beckjord, W. C.<br>(2) Blumenthal, Geo.<br>(3) Brookes, J. S., Jr.<br>(4) Brown, F. Q.<br>(5) Brown, R. B. | Blumenthal<br><br>Brown, F. Q. | | Beckjord<br>Blumenthal<br><br>Brown, F. Q. | Res. 1/29/24 | Blumenthal<br><br>Brown, F. Q. | | Blumenthal<br><br>Brown, F. Q. | Elec. 7/21/25 | Blumenthal<br>Brookes<br>Brown, F. Q. | Res. 11/18/26<br>Elec. 1/18/27 | Beckjord<br>Brookes<br>Brown, F. Q.<br>Brown, R. B. |
| 7/6/09 | (6) Bruce, H.<br>(7) Butterworth, P. M.<br>(8) Chamberlain, G. R.<br>(9) Chamberlain, W.<br>(10) Clark, F. L. | Clark | | | | Butterworth | | Butterworth | Res. 7/21/25<br>Elec. 7/21/25 | Chamberlain, W. | | Chamberlain, W. |
| 4/6/09<br>3/21/22 | (11) Colgate, R. R.<br>(12) Corrigan, Jas.<br>(13) Denman, B. J.<br>(14) Doherty, H. L.<br>(15) Doolittle, H. | Colgate<br>Corrigan | | Colgate<br>Corrigan | Res. 9/11/23<br>Elec. 9/11/23 | Colgate<br>Doherty | Res. 11/18/24 | Doherty | | Doherty | | Denman |
| 11/1/21<br>7/7/14 | (16) Douthirt, W. F.<br>(17) Eaton, C. S.<br>(18) Elliott, G. A.<br>(19) Fell, T. R.<br>(20) Field, M. | Douthirt<br><br>Fell | Elec. 1/19/23 | Douthirt<br>Elliott<br>Fell | Elec. 1/29/24 | Douthirt<br>Elliott<br>Fell<br>Field | | Douthirt<br>Elliott<br>Fell<br>Field | | Douthirt<br>Eaton<br>Elliott<br>Field | | Douthirt<br>Eaton<br>Elliott<br>Field |
| 6/25/01<br>6/25/01<br>3/18/12 | (21) Foster, S.<br>(22) Foster, W. W.<br>(23) Hodenpyl, A. G.<br>(24) Hulswit, F. T.<br>(25) Jeliffe, C. N. | Foster, W. W.<br>Hodenpyl<br>Jelliffe | | Foster, W. W.<br>Hodenpyl<br>Jelliffe | Elec. 5/1/23<br>Died 4/23/23 | Foster, S.<br>Foster, W. W. | Elec. 11/5/24 | Foster, S.<br>Foster, W. W.<br>Hulswit | | Foster, W. W. | | Foster, W. W. |
| 3/15/09<br>4/17/06<br>2/1/21 | (26) Joyce, W. B.<br>(27) Lathrop, A. P.<br>(28) Lawrence, J.<br>(29) Leahy, T. M.<br>(30) Lehman, A. | Joyce<br>Lathrop<br>Lawrence | | Joyce<br>Lathrop<br>Lawrence | | Joyce<br>Lathrop<br>Lawrence | | Joyce<br>Lathrop<br>Lawrence | | Joyce<br>Lathrop<br>Lawrence | Elec. 4/20/26 | Lathrop<br>Lawrence<br>Lehman, A. |
| 6/25/01<br>3/15/09 | (31) Lehman, P.<br>(32) Lehman, R.<br>(33) MacArthur, D.<br>(34) MacDonald, R. B.<br>(35) McCarthy, J. | Lehman, P.<br><br>McCarthy | | Lehman, P.<br><br>McCarthy | | Lehman, P.<br><br>McCarthy | | Lehman, P.<br>MacArthur | Res. 6/16/25<br>Elec. 11/17/25<br>Elec. 6/16/25<br>Res. 11/17/25<br>Res. 7/21/25 | Lehman, P.<br>MacArthur | Res. 4/20/26<br>Res. 4/20/26 | MacArthur |
| 6/25/01<br>3/15/09<br>3/20/16<br>11/4/14 | (36) McMillin, E.<br>(37) McMillin, M.<br>(38) Marshall, C. D.<br>(39) Paine, M. S.<br>(40) Prosser, S. | McMillin, E.<br>McMillin, M.<br>Paine<br>Prosser | Died 5/31/22 | McMillin, M.<br>Paine<br>Prosser | Died 1/25/24 | Paine<br>Prosser | | Paine<br>Prosser | | Paine<br>Prosser | Elec. 4/20/26<br>Res. 11/18/26 | Marshall<br>Paine |
| 3/20/11 | (41) Rust, H. B.<br>(42) Rust, W. F.<br>(43) Schaddelee, R.<br>(44) Tuttle, W.<br>(45) Williams, E. M.<br>(46) Wilson, J. H. | Wilson | | Wilson | Elec. 1/29/24 | Williams | Elec. 11/25/24<br>Died 2/23/25 | Rust, H. B.<br>Schaddelee<br>Williams | | Rust, H. B.<br>Rust, W. F.<br>Schaddelee<br>Williams | | Rust, H. B.<br>Rust, W. F.<br>Schaddelee<br>Williams |
| 3/21/21 | (47) Young, C. W. | Young | | Young | | Young | Died 10/29/24 | | | | | |

WG-ANR-00078149

| 1928 March 19 | | 1929 March 18 | 1930 March 17 | | 1931 March 23 | | 1932 March 21 |
|---|---|---|---|---|---|---|---|
| Beckjord<br>Brookes<br>Brown, F. Q.<br>Brown, R. B. | | Beckjord<br>Brookes<br>Brown, F. Q.<br>Brown, R. B. | Beckjord<br>Brookes<br>Brown, F. Q.<br>Brown, R. B. | | Beckjord<br>Brookes<br>Brown, F. Q.<br>Brown, R. B. | | Beckjord<br>Brookes<br>Brown, F. Q.<br>Brown, R. B. |
| | Elec. 12/4/28 | Bruce | Bruce | | Bruce | | Bruce |
| Chamberlain, W. | | Chamberlain, G.<br>Chamberlain, W. | Chamberlain, G.<br>Chamberlain, W. | Res. 9/26/30 | Chamberlain, G.<br>Chamberlain, W. | | Chamberlain, G.<br>Chamberlain, W. |
| Denman | | Denman | Denman | | Denman<br>Doolittle | | Denman<br>Doolittle |
| Douthirt<br>Eaton<br>Elliott<br>Field | | Douthirt<br>Eaton<br>Elliott<br>Field | Douthirt<br>Eaton<br>Elliott<br>Field | Res. 8/15/30 | Douthirt<br>Elliott<br>Field | | Douthirt<br>Elliott<br>Field |
| Foster, W. W. | | Foster, W. W. | Foster, W. W. | | Foster, W. W. | Elec. 9/25/31 | Foster, S.<br>Foster, W. W. |
| Lathrop<br>Lawrence<br>Lehman, A. | | Lathrop<br>Lawrence<br>Lehman, A. | Lathrop<br>Lawrence<br>Lehman, A. | Res. 1/6/31 | Lathrop<br>Lawrence<br>Leahy | | Lathrop<br>Lawrence<br>Leahy |
| MacArthur | | | | | MacDonald | | MacDonald |
| Marshall<br>Paine | | Marshall<br>Paine | Marshall<br>Paine | | Paine | | Paine |
| Rust, H. B.<br>Rust, W. F.<br>Schaddelee<br>Williams | Res. 12/4/28 | Schaddelee<br>Tuttle<br>Williams | Schaddelee<br>Tuttle<br>Williams | | Schaddelee<br>Tuttle<br>Williams | Res. 9/25/31 | Schaddelee<br>Williams |

WG-ANR-00078150

(2) Franklin Q. Brown. As alleged by complainants in paragraph 5 of the bill, and as shown in column (1) of the foregoing table, Colonel Brown first became a director on March 18, 1912 and he has continuously served as such down to the present time. Colonel Brown and/or his family and relatives have continuously since said March 18, 1912, or prior thereto, been holders of substantial amounts of this defendant's stock. Colonel Brown has long been well known in the financial circles of the country.

(3) Rezeau B. Brown. Mr. Brown has been identified in this defendant's answer to paragraph 26 of the First Cause of Action.

(4) Walstein F. Douthirt. As alleged by complainants in paragraph 5 of the bill, he was first elected a director on November 1, 1921. He had a part in the organization of this defendant in 1901 and prior thereto he had for some years been associated with the various utility companies which this defendant acquired in 1901 and 1902. He left the service of this defendant late in 1902 and entered the service of another utility organization and continued in that service until the close of 1921 when he returned to active service with this defendant as Vice President and has since continued as such.

(5) George A. Elliott. Colonel Elliott was first elected a director of this defendant on January 19, 1923, to fill a vacancy which had been caused by death. For a long time prior thereto Colonel Elliott and/or his family and relatives had been and they now are holders of substantial amounts of this defendant's stock. Colonel Elliott has for many years resided in Wilmington, Delaware, and

WG-ANR-00078151

many of his associates in Wilmington had been and now are substantial holders of this defendant's stock. He was first elected to this defendant's Board at the suggestion of the then president of this defendant, Mr. Lathrop.

(6) Marshall Field. As has been hereinbefore mentioned Mr. Field was first elected a director of this defendant on January 29, 1924. Mr. Field is widely known in financial circles of the country. He has been and now is the holder of substantial amounts of this defendant's stock, and was first elected a director at the suggestion of Mr. Lathrop.

(7) Warren W. Foster. As alleged by complainants in paragraph 5 of the bill, and as shown in column (1) of the table, Judge Foster was first elected a director on June 25, 1901 when this defendant's first Board of Directors was elected. Judge Foster and/or his relatives have since June 25, 1901 continuously been holders of substantial amounts of this defendant's stock. Judge Foster has long been well known in financial circles.

(8) Alanson P. Lathrop. As alleged in paragraph 5 of the bill and as shown in column (1) of the table, Mr. Lathrop first became a member of this defendant's Board of Directors on April 17, 1906. Mr. Lathrop had for many years been an officer of companies which were then or subsequently became subsidiaries of this defendant. He had been the local active operating executive of Detroit City Gas Company, this defendant's most important subsidiary, and of the St. Paul Gas Light Company formerly one of this defendant's important subsidiaries but which has since been sold by this defendant.

WG-ANR-00078152

(9) James Lawrence. As alleged in paragraph 5 of the bill and as shown in column (1) of the table, Mr. Lawrence first became a member of this defendant's Board of Directors on February 1, 1921. He had since 1903 been an officer or employee of this defendant. Prior to 1903, he had been for many years in the service of the Milwaukee Gas Light Company which in 1901 became one of this defendant's important subsidiaries.

(10) Arthur Lehman. Mr. Arthur Lehman had been for many years and was in 1928 and now is a senior partner in the firm of Lehman Bros. He was elected a member of this defendant's Board on April 20, 1926 when he took the place of Mr. Philip Lehman who was elected a member of the Board on June 6, 1901.

(11) Martin S. Paine. As mentioned in paragraph 5 of the bill and as shown in column (1) of the table, Mr. Paine was first elected a director of this defendant on March 20, 1916. Mr. Paine has served continuously as a director since his first election. He has for a great many years been and now is a holder of very substantial amounts of this defendant's stock and is widely known in financial circles. Mr. Paine was first elected to this defendant's Board at the suggestion of Mr. Lathrop who was then president of this defendant.

(12) Edgar M. Williams. Mr. Williams has been identified in this defendant's answer to paragraph 26 of the First Cause of Action.

During the interval of the annual meetings of 1928 and 1929, Henry B. Rust resigned as a director and as a member of the Executive Committee and his place was taken by Howard Bruce.

WG-ANR-00078153

Howard Bruce. Mr. Bruce has served continuously as director member of the Executive Committee since his election. Mr. Bruce was and is an officer and director of The Bartlett Hayward Company. Mr. Bruce is also an officer of The Bartlett Hayward Corporation, which is a holding company for the stock of The Bartlett Hayward Company, and the entire stock of The Bartlett Hayward Corporation is owned by the defendant, The Koppers Company of Delaware. Mr. Bruce is also Chairman of the Board of the Baltimore Trust Company and a director of the Baltimore & Ohio Railroad.

When Mr. Rust resigned as a member of the Executive Committee he also resigned as Chairman and Mr. William Chamberlain was elected Chairman.

At the annual meeting of 1929, Donald MacArthur and W. F. Rust retired from the Board and Glenn R. Chamberlain and W. B. Tuttle were elected. Otherwise the Board remained unchanged.

Glenn R. Chamberlain. Mr. Chamberlain served until September 26, 1930 when he resigned. He was again elected at the annual meeting of 1931 and is still a director. For a great many years Mr. Chamberlain has been and still is in the service of the Grand Rapids Gas Light Company, one of this defendant's important subsidiaries and for some years past he has been and now is the active local executive head of that Company. He was elected to this defendant's Board of Directors at the suggestion of President Brown in pursuance of a policy to include in this defendant's Board the active heads of certain of its important subsidiaries.

WG-ANR-00078154

William B. Tuttle. Colonel Tuttle was first elected a director of this defendant at the annual meeting of 1929 and served continuously until September 25, 1931 when he resigned. Colonel Tuttle has been in the service of this defendant and/or its subsidiaries ever since the organization of this defendant in 1901. He has for many years been the active local head of this defendant's important subsidiaries at San Antonio, Texas, and his election to this defendant's Board was at the suggestion of President Brown in pursuance of the same policy as that mentioned with respect to Mr. Glenn R. Chamberlain.

No changes in the Board took place until August 15, 1930 when Mr. Cyrus S. Eaton resigned as a member of the Board and of the Committee. On September 26, 1930, Mr. Glenn R. Chamberlain resigned from the Board, as has already been said, and on January 6, 1931 Mr. Arthur Lehman resigned from the Board. No elections were made to fill these vacancies until the annual meeting of 1931.

At the annual meeting of 1931 Mr. Glenn R. Chamberlain was again elected a director and at the same meeting Messrs. Harold Doolittle and Thomas M. Leahy were elected to the Board.

Harold Doolittle. Mr. Doolittle was and still is an officer of The Koppers Company of Delaware and/or its subsidiaries.

Thomas M. Leahy. Mr. Leahy was first elected a member of this defendant's Board at the annual meeting of March 1931 which was long subsequent to all of the transactions complained of in the bill. Mr. Leahy is still a member of this defendant's Board. Prior to his election as a director Mr.

WG-ANR-00078155

Leahy had, except for the period when he served in the World War, been continuously in the service of this defendant since 1908. Prior to his service with this defendant he had been in the employ of the Binghamton Gas Works which was then one of this defendant's subsidiaries but which has since been sold by this defendant.

No further changes have taken place in the Board except that on September 25, 1931 Colonel Tuttle resigned and Mr. Stanhope Foster was elected to the vacancy.

Stanhope Foster. Mr. Foster is a member of the New York Bar and an associate of the firm of Chadbourne, Hunt, Jaeckel & Brown. Mr. Foster is a nephew of Judge Warren W. Foster whose large interest and long continued service as a director of this defendant have hereinbefore been mentioned.

WG-ANR-00078156

# AMERICAN LIGHT & TRACTION COMPANY

EXECUTIVE COMMITTEE
CHAIRMEN
1922—1932

| (1) | A | 1922 April 4 | | 1923 April 3 | | 1924 April 1 | | 1925 April 7 | | 1926 April 6 | | 1927 April 5 | 1928 April 3 | | 1929 April 2 | 1930 March 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4/6/09<br>5/7/12 | (1) Blumenthal, Geo.<br>(2) Brown, F. Q.<br>(3) Brown, R. B.<br>(4) Brookes, J. S., Jr.<br>(5) Bruce, H. | Blumenthal<br>Brown, F. Q. | Res. 5/2/22<br>Elec. 11/8/22<br>Res. 1/30/23 | Brown, F. Q. | | Brown, F. Q. | Elec. 10/21/24 | Blumenthal<br>Brown, F. Q. | Res. 4/21/25<br><br>Elec. 1/19/26 | Brookes | Elec. 1/18/27 | Brown, R. B.<br>Brookes | Brown, R. B.<br>Brookes | Elec. 12/4/28 | Brown, R. B.<br>Brookes<br>Bruce | Brown, R. B.<br>Brookes<br>Bruce |
| | (6) Butterworth, P. M.<br>(7) Chamberlain, W.<br>(8) Douthirt, W. F.<br>(9) Doherty, H. L.<br>(10) Eaton, C. S. | | Elec. 11/8/22 | Douthirt | Elec. 9/11/23 | Butterworth<br>Douthirt<br>Doherty | Res. 11/25/24 | Douthirt<br>Doherty | | Chamberlain<br><br>Eaton | | Chamberlain<br><br>Eaton | Chamberlain<br><br>Eaton | | Chamberlain<br><br>Eaton | Chamberlain<br><br>Eaton | Re |
| 6/25/01 | (11) Fell, T. R.<br>(12) Field, M.<br>(13) Foster, W. W.<br>(14) Hodenpyl, A. G.<br>(15) Hulswit, F. T. | Foster, W. W. | Elec. 5/2/22<br>Res. 12/5/22 | Foster, W. W.<br>Hodenpyl | Elec. 1/29/24 | Fell<br>Foster, W. W. | Res. 1/29/24<br><br>Elec. 11/25/24 | Foster, W. W.<br><br>Hulswit | Elec. 4/21/25 | Field<br>Foster, W. W. | | Field<br>Foster, W. W. | Field<br>Foster, W. W. | | Field<br>Foster, W. W. | Field<br>Foster, W. W. |
| 4/5/21<br>4/7/08<br>2/1/21<br>6/25/01 | (16) Jelliffe, C. N.<br>(17) Lathrop, A. P.<br>(18) Lawrence, J.<br>(19) Lehman, P.<br>(20) Lehman, R. | Jelliffe<br>Lathrop<br>Lawrence<br>Lehman, P. | Res. 11/8/22<br>Elec. 12/5/22 | Jelliffe<br>Lathrop<br>Lehman, P. | Died 4/23/23 | Lathrop<br><br>Lehman, P. | | Lathrop<br><br>Lehman, P. | Res. 6/16/25<br>Elec. 11/17/25<br>Elec. 6/16/26<br>Res. 11/17/25 | Lathrop | | Lathrop | Lathrop | | Lathrop | Lathrop |
| 6/25/01<br>6/29/10 | (21) McMillin, E.<br>(22) McMillin, M.<br>(23) Paine, M. S.<br>(24) Rust, H. B.<br>(25) Williams, E. M. | McMillin, E.<br>McMillin, M. | Died 5/31/22<br>Elec. 1/30/23 | McMillin, M.<br>Paine | Died 1/25/24 | Paine | | Paine<br>Rust, H. B. | Res. 1/19/26 | Rust, H. B. | | Rust, H. B. | Rust, H. B. | Res. 12/4/28 | | |
| | (26) Young, C. W. | | | | Elec. 1/29/24 | Young | Res. 10/21/24 | | | | | | | | | |
| 6/1/15 | CHAIRMAN, EXECUTIVE COMMITTEE<br>McMillin, E.<br>Foster, W. W.<br>Rust, H. B.<br>Chamberlain, W. | McMillin, E. | Died 5/31/22<br>Elec. 1/19/23 | Foster, W. W. | | Foster, W. W. | | Foster, W. W. | | Rust, H. B. | | Rust, H. B. | Rust, H. B. | Res. 12/4/28<br>Elec. 12/4/28 | Chamberlain | Chamberlain |

WG-ANR-00078157

| | 1931<br>March 25 | | 1932<br>March 22 |
|---|---|---|---|
| | Brown, R. B.<br>Brookes<br>Bruce | | Brown, R. B.<br>Brookes<br>Bruce |
| | Chamberlain<br>Douthirt | | Chamberlain<br>Douthirt |
| 8/15/30 | | | |
| | Field<br>Foster, W. W. | | Field<br>Foster W. W. |
| | Lathrop | | Lathrop |
| | | Elec. 1/5/32 | Williams |
| | | | |
| | Chamberlain | | Chamberlain |

WG-ANR-00078158

## APPENDIX NO. 4.

### AMERICAN LIGHT & TRACTION COMPANY

#### Executive Officers
#### 1922—1932

| (1) | A | 1922 April 4 | | 1923 April 3 | | 1924 April 1 | 1925 April 7 | 1926 April 6 | | 1927 April 5 |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/6/09 | CHAIRMAN OF BOARD<br>McMillin, E. | McMillin, E. | Died 5/31/22 | | | | | | Elec. 1/18/27 | Lathrop |
| 4/6/09 | Lathrop, A. P.<br>PRESIDENT<br>Lathrop, A. P.<br>Brown, R. B. | Lathrop, A. P. | | Lathrop | | Lathrop | Lathrop | Lathrop | Res. 1/18/27<br>Elec. 1/18/27 | Brown, R. B. |
| 4/6/09<br>4/3/17<br>11/1/21<br>4/5/21<br>9/7/20 | VICE-PRESIDENTS<br>McMillin, M.<br>Jelliffe, C. N.<br>Douthirt, W. F.<br>Young, C. W.<br>Lawrence, J.<br>Brown, R. B. | McMillin, M.<br>Jelliffe<br>Douthirt<br>Young<br>Lawrence | | McMillin, M.<br>Jelliffe<br>Douthirt<br>Young<br>Lawrence | Died 1/25/24<br>Died 4/23/23 | Douthirt<br>Young<br>Lawrence | Died 10/29/24 | Douthirt<br>Lawrence | Douthirt<br>Lawrence | Douthirt<br>Lawrence |
| | Beckjord, W. C.<br>Brookes, J. S., Jr.<br>Leahy, T. M.<br>C. N. Chubb | | | | | | | | Elec. 5/4/26 | Beckjord |
| 4/16/07 | SECRETARY<br>Jelliffe, C. N.<br>Young, C. W.<br>Lawrence, J. | Jelliffe | | Jelliffe | Died 4/23/23<br>Elec. 5/17/23 | Young | Died 10/29/24<br>Elec. 11/18/24 | Lawrence | Lawrence | Lawrence |
| 4/2/12 | TREASURER<br>Jelliffe, C. N.<br>Lawrence, J. | Jelliffe | | Jelliffe | Died 4/22/23<br>Elec. 5/17/23 | Lawrence | Lawrence | Lawrence | | Lawrence |

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 133 of 134   Document 50-36

WG-ANR-00078159

| 1928<br>April 3 | | 1929<br>April 2 | | 1930<br>March 25 | 1931<br>March 25 | 1932<br>March 22 |
|---|---|---|---|---|---|---|
| Lathrop<br><br>Brown, R. B. | | Lathrop<br><br>Brown, R. B. | | Lathrop<br><br>Brown, R. B. | Lathrop<br><br>Brown, R. B. | Lathrop<br><br>Brown, R. B. |
| Douthirt<br>Lawrence | | Douthirt<br>Lawrence | | Douthirt<br>Lawrence | Douthirt<br>Lawrence | Douthirt<br>Lawrence |
| Beckjord | Elec.     1/8/29 | Beckjord<br>Brookes | Res.     1/7/30<br>Elec.     2/4/30 | Brookes<br>Leahy | Brookes<br>Leahy | Brookes<br>Leahy<br>Chubb |
| Lawrence | | Lawrence | | Lawrence | Lawrence | Lawrence |
| Lawrence | | Lawrence | | Lawrence | Lawrence | Lawrence |

WG-ANR-00078160