# EXHIBIT 31

# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## SECURITIES AND EXCHANGE COMMISSION

Docket No. 70-3692

In the matter of MILWAUKEE GAS LIGHT COMPANY

Place Washington, D. C.

Date July 24, 1958

Pages 1-84

O R A L   A R G U M E N T

ALDERSON REPORTING COMPANY
*Official Reporters*
306 Ninth Street, N. W.
Washington 4, D. C.
Telephone: NAtional 8-3406

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 2 of 87   Document 50-42

WG-ANR-00052417

dl

# INDEX

ORAL ARGUMENT OF:                                                PAGE

W. R. Nowlin,

       on behalf of the Commission.                         3

Arthur R. Seder, Jr.,

       on behalf of the Declarant.                          36

REBUTTAL ARGUMENT OF:

W. R. Nowlin,

       on behalf of the Commission.                         79

WG-ANR-00052418

CORNWALL/dgl
7/24/58

BEFORE THE

SECURITIES AND EXCHANGE COMMISSION

- - - - - - - - - - - - - - - :
                             :
      In the Matter of:       :
                             :      File No. 70-3692
MILWAUKEE GAS LIGHT COMPANY   :
                             :
- - - - - - - - - - - - - - - :

Hearing Room 279,
Securities and Exhange Commission,.
Washington, D. C.
Thursday, July 24, 1958.

The above entitled matter came on for oral argument

pursuant to notice at 10:30 a.m. o'clock.

BEFORE:

      EDWARD N. GADSBY, Chairman.
      ANDREW DOWNEY ORRICK, Member.
      HAROLD C. PATTERSON, Member.
      EARL F. HASTINGS, Member.

APPEARANCES:

      W. R. NOWLIN, Counsel for Division of Corporation
      Regulation, on behalf of the Securities and
      Exchange Commission.

      ARTHUR R. SEDER, JR., of Sidley, Austin, Burgess
      and Smith, 11 South LaSalle Street, Chicago 3,
      Illinois, on behalf of the Declarant Milwaukee
      Gas Light Company.

- - -

<u>P R O C E E D I N G S</u>

The Chairman: This is an oral argument in proceedings under Section 7 of the Public Utility Holding Company Act of 1935 with respect to a declaration filed by Milwaukee Gas Light Company, a subsidiary of American Natural Gas Company, a registered holding company, regarding the proposed issuance by Milwaukee Gas Light Company of $15,000,000 principal amount of promissory notes.

Hearings have been held, our Division of Corporate Regulation has filed a recommended findings and opinion and Milwaukee Gas Light Company and American Natural Gas Company have filed a joint brief in opposition thereto.

Requests for time have been submitted by Mr. Nowlin, 60 minutes, and by Mr. Seder, 60 minutes.

Off the record.

(Discussion off the record.)

The Chairman: On the record.

Which one of you gentlemen wants to start off?

Mr. Seder: That is the first problem here. We both want to start off. We are the moving parties here, and we feel that it is appropriate for us to present our program first.

Commissioner Orrick: Applicant usually has to prove its case.

Mr. Nowlin: If the Commission please, the staff feels that we have submitted our proposed findings and opinion

WG-ANR-00052420

and that the proceeding is more or less in the nature of a demurrer in that it is up to us to go forward in support of our request for findings and opinion.

The Chairman: As a matter of fact, Mr. Seder, you have the burden of proof on this, and presumably you should follow the presentation of the persons who do not have it. That is the formal course of action. I don't know why you are fighting about it.

Mr. Seder: Mr. Commissioner, the moving party, the person who is seeking the relief for the action of the body goes first and closes.

The Chairman: That may be true. Do you not think that the proposed findings are being submitted by the Division and, consequently, they should proceed first in order that they can present their argument in favor of their findings? As I say, I do not know what you are fighting about. I would prefer to follow if I were you.

Mr. Seder: I propose both to go first and to follow after they have said what they have to say.

The Chairman: All right. You may proceed, Mr. Nowlin.

ORAL ARGUMENT OF W. R. NOWLIN, ON BEHALF OF THE COMMISSION.

Mr. Nowlin: If the Commission please, before taking up the merits of the proposal of Milwaukee Gas Light Company, I think it would be helpful to the Commission if we were to

WG-ANR-00052421

give you a brief description of the American Natural Gas Company holding company system and some of the pertinent background material which underlies the staff's recommendation that the Commission deny effectiveness of the declaration.

As you probably know, Milwaukee Gas Light Company is a gas distributing company serving natural gas in and around Milwaukee and in various other adjacent communities in the State of Wisconsin.

Milwaukee obtains all of its natural gas supply from an associate pipeline company, the Michigan-Wisconsin Pipe Line Company. Both of these companies are wholly-owned subsidiaries insofar as the common stock is concerned of American Natural Gas Company. American Natural Gas Company is a New Jersey corporation, and through a change of name is a successor to the American Light and Traction Company.

Now, the American Light and Traction Company was reorganized under Section 11 of the Act in 1947 and 1948. The system, as it is presently constituted, is Milwaukee Gas Light Company and another gas utility distributing company, that is, the Michigan Consolidated Gas Company. This company distributes natural gas in and around Detroit and Grand Rapids, Muskegon, Ann Arbor, Ypsilanti, and over 100 other communities in Michigan.

In addition to these two gas distributing companies, we have the Michigan-Wisconsin Pipeline Company that was

WG-ANR-00052422

organized in 1945 and it operates a natural gas pipeline facilities that extend from the Hugaton fields in Texas and Oklahoma to markets in Missouri, Iowa, Wisconsin and Michigan. This line was constructed in 1948 and 1949. We have another pipeline subsidiary, the American-Louisiana Pipeline Co., which was organized in 1953. It owns and operates natural gas pipeline facilities that extend from the Louisiana Gulf Coast to Michigan, where it delivers substantially all of its good to system companies.

This line was constructed and completed in 1955 and 1956. The first full year of operation of that pipeline was in 1957.

In addition to these two pipelines, there is Milwaukee Consolidated Coke Company, which is a non-utility company manufacturing and selling coke and coke oven gas and by-products. They have a recently organized production company, the American Natural Gas Production Company, which is in the business of exploring for gas and acquiring and operating gas producing properties.

The Chairman: Do they sell mixed gas in Detroit?

Mr. Nowlin: I do not think so. It used to be mixed gas, but it is my understanding now that the company serves all natural gas.

The Chairman: What do they do with this coke oven gas?

WG-ANR-00052423

Mr. Seder: There is none in Detroit. There is some in Milwaukee.

The Chairman: Your coke oven plan is in Milwaukee?

Mr. Seder: Yes.

The Chairman: They serve mixed gas in Milwaukee, then?

Mr. Seder: No, there is none served by Milwaukee Gas Light Company. All the coak oven gas goes to the Milwaukee Sewage and Commission.

The Chairman: All right.

Mr. Nowlin: We have the American Natural Gas Service Company, which was organized to render service to the system companies subsequent to the American Light Company's reorganization. The consolidated assets of the American Natural system on March 31, 1958, amounted to around $680,000,000. Its gross operating revenues amounted to $198,000,000, and the consolidated net income per share of American Natural amounted to $4.14 per share. Dividends were paid during the past 12 months of $2.60 per share.

I think it is important at the outset if we can to indicate the importance to the system that these two gas distribution companies bear. The combined assets of the two distributing companies, Milwaukee Gas Light and Michigan Consolidated, are approximately 60 percent of the system's consolidated assets. For the 12 months ended March 31, 1958, their combined

WG-ANR-00052424

operating revenues were 87 percent of the system's consolidated revenues. These two distributing companies purchased approximately 85 percent of the natural gas transmitted and sold by the two pipeline companies.

The American Natural system is unique in one sense, at least as far as financing is concerned. The three holding company systems which we presently have subject to the Commission's jurisdiction are Columbia Gas, National Fuel Gas Company, and Consolidated Natural Gas Company. These companies issue their securities, debt securities and common stock financing, too, at the parent company level. The securities are rested upon all segments of the property, the production property, the transmission properties, the distribution properties. In addition to these three companies, we have had three or four other natural gas holding companies which in the last few years have gone out from under our jurisdiction. One of these is United Gas Corporation, which was formerly a subsidiary of Electric Fuel and Share. The United Gas Corporation, itself, is a gas distributing company. It owns all of the common stock of a pipeline company and of a producing company. The pipeline company and the producing company issue their securities to the parent and the parent, in turn, does the public financing.

You have another company which was not subject to our jurisdiction, the People's Gas and Coak Company of Chicago. The distributing company in that case owns the pipeline company,

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 10 of 87   Document 50-42

WG-ANR-00052425

the common stock, and it does the financing for the distribu-
ting company, and I think -- I am not certain -- but the
Natural Gas Pipeline of America did have debt outstanding at
the time it acquired it, and I think probably it may do the
public financing of the pipeline company.  But the essential
fact I am trying to make is that all of the holding companies
under our jurisdiction, and that have been under our jurisdic-
tion recently, have a different method for financing the sys-
tem than does American Natural.

The American Natural system follows a pattern of
what you might call divisional ends.  The pipeline companies
issued debt securities, and I might say in high proportions --
the American-Louisiana line has issued debt at the rate of 82
percent; the Michigan at the rate of 75 percent -- but the dis-
tributing companies also issued debt, so that you have two
classes of debt issued on different segments of the property.
For practical purposes I think you should look at the American
Natural Gas system really as one company, excluding the service
company.  The two distributing companies and the two pipeline
companies are essentially one company.

The Chairman:  You do not mean to argue that it
is unusual for the subsidiary company to issue debt and the
parent company  to issue equity securities, do you, in a hold-
ing company system?

Mr. Nowlin:  No, sir; my point is that here -- take

a manufacturing gas plant, for example, you have your gas plant and you have your transmission lines and you have your distribution properties. The manufacturing gas companies and electric companies, with very few exceptions, issue their securities on all segments of the property.

The Chairman: Take the two systems that I happen to know most about, New England Gas and New England Electric. Neither of them issue any securities covering all segments of their property, that is, except equity securities.

Mr. Nowlin: Yes, they do, sir, if you will pardon me, to this extent that the electric companies up there issue their debt securities on the general rating, transmitting and distributing facilities.

The Chairman: Yes, that is true.

Mr. Nowlin: I think it has this significant difference from the regulatory viewpoint, Mr. Chairman, that when you have a pipeline company and they have had two pipeline companies which come into this system, they first go to the Federal Power Commission to get a certificate of convenience and necessity and the Power Commission does not have direct jurisdiction over the issuance of securities, but they do require them to submit a showing of a feasibility of financing the pipeline. Now the Power Commission, in general, has been much more generous -- they are more concerned with the consumer interest -- in permitting high proportions of debt than

WG-ANR-00052427

has this Commission; so, what the Commission is confronted
with, they get a certificate of convenience and necessity
from the Power Commission, they get a rate fixed on the basis,
well, say of an 80 percent debt structure, then, they come
to this Commission and ask for authority to issue the securi-
ties so that the Commission is necessarily right in a position
of saying that you cannot do what the Federal Power Commission
has said you could do, and most all of these cases you have,
particularly in this system, where you have a natural gas being
introduced into the system, you have pressure from the communi-
ties and from the state commissions, which I do not criticize
-- I think it is natural,-- to get the gas into the area. And
I think that is what has happened in the American Natural sys-
tem here from this Commission's viewpoint.

The Chairman: Of course, it is classic to have a
high debt ratio on an overland gas pipeline.

Mr. Nowlin: That is true, sir, but the only instance
I know of under our jurisdiction is this system here. Columbia
Gas, Consolidated Natural Gas, National Fuel Oil, all issued
debt on all segments of their property, not divided.

The Chairman: They have not got long gas pipelines,
have they?

Mr. Nowlin: Not to the extent that this company
has here.

The Chairman: People's Gas has pipeline subsidiaries

WG-ANR-00052428

but do they not issue the debt on the pipelines separately?

Mr. Nowlin: I think People's does. That was the Natural Gas Pipeline Company of America, which started out with debt on that pipeline. It was originally owned by ten, I think, organizers. And, then, later, the common stock was all bought by People's and I do not know definitely, People's was never under our jurisdiction --

The Chairman (interposing): Algonquin has a very high debt ratio. That is owned by New England Gas, Boston and Providence.

Mr. Nowlin: Owned by ten companies, if I remember.

The Chairman: Algonquin, three.

Mr. Nowlin: When it first came in there were several companies. I was on the original --

The Chairman (interposing): New England Gas, Boston Consolidated, and Providence Gas. It doesn't matter. Go ahead.

Mr. Nowlin: I think, Mr. Chairman, even on that point, that these pipeline companies where they have a high proportion of debt, their schedule in the manner and the debt is decreased at a rapid rate.

The Chairman: It is amortized over the life of the service contract, pay-off in 20 years.

Mr. Nowlin: What I was trying to give in the background here, I think that is one of the reasons why this system,

WG-ANR-00052429

by introducing gas into the system, the two pipelines built
in there recently, and that is one of the reasons why they
have got the high proportion of debt in the structure that
they have.  I quarrel not with what they have done.  Our quarrel
is the point that we think they have reached the point where
they should reverse this trend and the debt should start back
downward instead of continuing going up.

I might state that for years, ever since the system
came into being, the Commission has been concerned over the
high proportion of debt in the structure.

With your indulgence I would like to quote from some
of the Commission's decisions, dating back to 1948, in which
they criticized the high porportion of debt.  I should like
to add that ordinarily we would have included these quotations
in a reply brief, but because of the time, the shortage of
time involved, and I am new on the case, this is the first
time that I have ever worked on the American Natural Gas case,
and as I ran across these items after we had filed our re-
quested findings and opinion, with your indulgence I would
like to read some brief excerpts from some of these cases that
date back to 1948.

On December 8, 1948, the Commission issued its find-
ings and opinion on a proposal to borrow from banks an aggre-
gate of $4,500,000 on notes.  The Commission stated, in part,
that American Light -- this is American Light and Traction that

was the predecessor of American Natural:

"American Light has heretofore publicly recognized
'...the real financial need of Milwaukee Gas Light Company
for some additional equity capital' and the record in the in-
stant cast indicates that as late as August 1948 American Light's
estimate of cash receipts and disbursements provided for a
$2,000,000 investment in the common stock of Milwaukee during
1949."

Then it goes on and describes apparently the invest-
ment was made. "While these pending sales of American Light
common stock render it impractical for American at the present
time to sell additional shares of its common stock, we shall
expect American Light, in view of Milwaukee's admitted need of
additional equity capital, which is conceded by American Light,
at the earliest practicable opportunity to propose a permanent
financing of Milwaukee, which shall include an appropriate
amount of equity capital."

Again, in the same year, but on the other distribu-
ting company, Michigan Consolidated had some preferred stock
outstanding, and under its charter provisions it could not
issue in excess of 10 percent of unsecured debt; so, they came
to the Commission to get authority to get a vote of stockholders
to remove that limitation so as to permit them to issue up to
$10,000,000 of unsecured debt, and the Commission issued its
opinion in that case, permitting the solicitation of stockholders,

WG-ANR-00052431

and pointing out: "In this connection it is pointed out that, after giving effect to the issuance of the unsecured indebtedness contemplated in connection with the present proposals than the estimated earnings and dividend payments for the year 1948, the ratio of common stock equity to total capitalization and surplus will have decreased from 50.04 as of January 1, 1948, to 40.42 percent as of December 31, 1948." That is 50.04 compared with about 60 percent for Michigan Consolidated today. This opinion was of July 8, 1948, and it appears in 28 S.E.C. at page 192. The prior cases in in 28 S.E.C., at page 872.

The Commission went on to say: "In the light of the above discussion we are somewhat concerned over the relatively large proposed increase in indebtedness. We think the flexibility being sought by the company should ordinarily be available through the issuance and sale of additional common stock to its parent company, American Light and Traction Company. However, we have given weight to the fact that American Light has invested approximately $7,800,000 in the common stock capital of Michigan Consolidated within the past 12 months." Footnote omitted. "Under all the circumstances, we are not disposed to withhold the proposals now before us" -- that is, to get stockholders' authority to increase the debt -- "subject to the successful solicitation of the preferred stockholders, and subject to certain terms and conditions to be required by us as outlined below. We wish to point out, however,

WG-ANR-00052432

that in giving our approval to the company's proposal to so-
licit the preferred stockholders to increase the amount of
unsecured indebtedness we are not passing upon the issuance
and sale of any specific securities at this time nor are we
passing upon any transactions contemplated by the company
which are not the subject of the instant declaration."

Now, in the following year, I don't know whether
they were successful in getting the preferred stockholders'
authority to increase the amount of unsecured indebtedness or
not, but apparently they did not because in the following year
the Commission issued an opinion on June 28, 1949, which
appears in 29 S.E.C., at page 546, which was upon a declara-
tion filed by Michigan Consolidated Gas Company to issue
$25,000,000 principle amount of sinking fund debentures, a
portion of the proceeds of which was being used to retire pre-
ferred stock. So, I assume, as I said before, that the pre-
ferred stock, they did not get the preferred stockholders'
authority in 1948, and they decided to get rid of the preferred
stock.

In this case the Commission said that "our primary
concern with respect to the proposed issuance and sale of de-
bentures results from the adverse effect which the recent fi-
nancing policies of the applicant have had on its capitaliza-
tion ratios. As we have previously indicated in an earlier
case, the ratio of common stock equity to total capitalization

WG-ANR-00052433

of surplus by Michigan Consolidated was approximately 50 percent as of January 1, 1948. As the result of transactions since that date, and giving effect to the proposed issuance of $25,000,000 of debentures, the ratios of common stock equity and debt to total capitalization and surplus would be 39.7 and 60.3, respectively." That is Michigan Consolidated. "Moreover, the consolidated ratios of American Light and subsidiaries would be 69.1 percent debt, 1.1 percent preferred stock, and 29.8 percent common stock equity on a pro forma basis."

Then, they take up and give effect to the sinking funds and the reductions in the debt that would occur this way and that and the other and then follow with this statement: It appears that equity capital must be provided not only for Michigan Consolidated but for the system as a whole in order to assure that the construction programs of the subsidiaries, including the pipeline project are soundly financed. The management of American Light concedes the need for additional common stock capital and American Light represents, in the record before us, that during the fall of 1949 it will raise approximately $5,500,000 through a rights' offering of common stock to its common stockholders on the basis of a one for ten and that $2,000,000 of such proceeds will be invested in the stock of Michigan Consolidated. American Light's proposed rights' offering is a desirable step in the direction of

WG-ANR-00052434

supplying its system with needed equity capital, but sums proposed to be raised through this offering do not appear to us to be sufficient to meet the system's financial needs for the presently contemplated construction program for the year 1951."

I would like to call the Commission's attention to the fact that at this date, 1949, the Commission pointed out that the consolidated capital structure would be 69.1 percent debt on the basis of the management's proposal for 1948 now before you --

The Chairman: 1958.

Mr. Nowlin: 1958 now before you, financing the requirements through $23,500,000 of bank loans, the debt ratio would be 66.4 percent as compared with 69.1 percent ten years ago, which would represent a 2.7 reduction in the last ten years.

The staff has recommended that the company do a one for ten of common stock offering which would reduce their pro forma financing from 66.4 percent to slightly in excess of 63 percent. In any event, assuming our recommendations should be carried out, there would only be a slight decrease in the proportion of the debt equity in the system, and we sincerely think that this system should be given serious consideration to not only the common stock offering which we propose on a one for ten basis for this year, but it should be given serious consideration for doing further common stock financing or taking appropriate steps to reduce that consolidated debt

WG-ANR-00052435

proportion further down the line.

The Chairman: I wish you would explain to me why you include the short term bank debt as part of the debt capital.

Mr. Nowlin: Mr. Chairman, I was going to come to that at this point. In each one of these opinions which I have read to you -- and I have three more that I want to call your attention to -- in everyone of those cases the Commission has treated the short term bank loan as a part of the debt segment.

The Chairman: That is not customary, is it? My impression is that in financial analysis a short term bank debt is not considered as part of the capital.

Mr. Nowlin: I think that would ordinarily be true, Mr. Chairman. In this case this system is never out of the banks, this is a perpetual revolving fund.

The Chairman. No growing utility is every out of the banks except for a few days at a time.

Mr. Nowlin. I would not want to disagree with you, but I think I can name Columbia Consolidated and National Fuel Gas Company that are out of the bank for several months except on storage loans.

Anyway, the Commission has consistently in all of its opinions included the short term debt in its computations, and the 69.1 percent which I have just mentioned includes bank debt. The other opinion I read from included bank debt. In fact, this Commission's opinion issued last year included

WG-ANR-00052436

the short term notes as a part of the percentage computation,
and I say I think it is appropriate because over this ten-year
period this is really a one company operation, but yet the
system has this constant revolving fund of loan with the banks.
They never get out.  Since they have in the past refunded
most of these bank loans with permanent debt, they really have
a 22- or 23-year maturity instead of a 20-year maturity.

So much for the period up to that point.  Now I would
like to come up to 1955.  On July 29, 1955, the Commission in
connection with the proposed issuance of short term notes
for Milwaukee and Michigan Consolidated stated in part:  "...It
is apparent that the system, because of the continuing demand
for natural gas, will be required to finance additional con-
struction and may once again embark upon a program of issuing
substantial amounts of short term debt."

I would like to interpolate at this point, Mr. Chairman,
that the basis of my study and analysis of this thing since
I have been in it, I have reason to believe that the satura-
tion point in the Detroit and Milwaukee area have been far
from reached and at the present time this system is in a so-
called lull in the storm, that you may anticipate a further ex-
pansion program, even not into new areas but in their own
territory, of substantial amount in the future years to come,
assuming that the recession is over.  I would like to point
out that Detroit has been pretty heavily hit with the

WG-ANR-00052437

automobile industry in the last year or two, and it is probably
harder hit than most other areas, so that there has been a
lull at the present time, but there is not any question that
if times come back to normal in that area there is going to be
another great expansion program and that is one of the reasons
why the staff think that this is the time for this system to
pull in its belt, consolidate its gains, get its system back
in a sound position, to meet its requirements either for the
future or if we get a recession then it can be in a position
to better take care of its obligations. At the present time
it just has too much debt.

The Commission in that case, let me follow on: "We do
not believe that the system should again place itself in a
position where it will have relatively large amounts of short-
term debt outstanding, which it will seek to renew from year
to year, and which may not be refundable with permanent fi-
nancing in the event the financial markets make refunding im-
practicable. We shall, therefore, carefully watch the develop-
ment of the system's financing program both with respect to
the amounts of short term debt for which it may seek authori-
zation in the future and the timing of permanent financing pro-
posals."

"We are also concerned that upon completion of the fi-
nancing program for 1955 and 1956 the system will have a
consolidated debt ratio of 64.73 percent and at the same time

a common stock equity of 30.25 percent, the balance of the capitalization being represented by preferred stock comprising 5.02 percent thereof..."

"In view of the relatively high debt ratios which now exist in this holding company system, we feel that American Natural should plan to sell additional common stock as soon as feasible so as to improve the overall system ratios." That is reported at 36 S.E.C. at pages 409 and 410.

I might point out again that in the '55 computation of 64.73 percent the Commission included the short term loans.

On September 20, 1955, which was just approximately two months after the issuance of that opinion, the Commission issued another opinion in respect to the issuance of sale of American Natural of common stock on a rights' offering on the basis of a one for five basis. That is twice as much as we are suggesting for a one for ten basis. In this connection the Commission stated again: "... We reiterate the view which we expressed in that Memorandum Opinion that in view of the relatively high debt ratios which exist in this holding company system, we believe that American Natural should sell additional common stock as soon as feasible so as to improve the overall system ratios."

In the latter part of 1956 the Commission was again presented with a proposal by Michigan Consolidated issuing to sell up to $30,000,000 of notes to banks. During the course of the

public hearing had in respect to this proposal, Michigan Consolidated revised its financing program, presumably because of the opposition of the staff and probably the Commission so as to reduce by $5,000,000 the proposed bank loans and reduce by $2,000,000 the amount of first mortgage bonds contemplated to be issued and to increase by $7,000,000 the amount of common stock contemplated to be issued by the parent.

In this connection the management prepared and submitted a letter under date of November 7, 1956, which it was requested to be made a part of the record of this proceeding, in which it set forth certain proposals, proposed financings that it contemplated doing, I would say, under a commitment that it would do. In fact, I do not know, but it is quite probable that if absent this commitment the Commission never would have issued the order permitting the financing to go forward, but this letter recognized the Commission's concern over the consolidated debt ratio and set forth various representations among which were representations that American Natural would: (1) proceed as soon as possible with an offering of common stock to its stockholders in 1957 for a one for ten basis; (2) it would request its stockholders at the forthcoming annual meeting to be held in 1957 to amend its charter so as to authorize a sufficient amount of capital to permit another offering in 1958.

In February and March 1957 American Natural kept its commitment with respect to the sale of shares of common stock on a

WG-ANR-00052440

one for ten basis in '57. And they realized about $24,000,000 from the sale of that stock, which together with additional $6,000,000 was invested in the common stock of Michigan Consolidated, one of the distributing companies.

It even went further. In line with this commitment it did not have the stock to make a 1958 offering without going to its stockholders for additional authorization; so, on April 1957, American Natural solicited and obtained from its stockholders authority to amend its certificate of incorporation so as to increase the authorized shares of common stock with the par value of $25.00 each from 5,000,000 to 6,000,000 shares. The proxy statement representation made to the stockholders at that time contained the following representation: "The company's system is constantly expanding and enlarging its facilities to meet the increased demands of its markets. For the last five years this system has expended about $300,000,000 for construction. Equity capital required by this growth has been provided from time to time by offering common stock of the company to existing stockholders at prices below the market price, such offerings, in addition to the one just completed, having been made in 1949, 1950, 1951, and 1955. No additional equity financing is contemplated this year, but it is anticipated that an offering on the basis of one share for each ten shares outstanding will be made during 1958 to provide the equity portion of capital required for further

WG-ANR-00052441

expansion."

When we got down to the hearing we were told that the management did not propose to go through with this equity financing for 1958. They said they did not need that kind of money and we did not need that amount of money.

Their proposals for the system financing aggregated $23,500,000 of bank loans and we estimate that a one for ten offering in this case would produce about $24,000,000 of capital.

There is just something inconsistent, either the company does need the money or it should not be in here applying for approval for bank loans, and that does not give effect to a 1959 program in which they propose to issue $20,000,000 of five-year serial notes to finance construction of one of the pipeline companies. In other words, there is a total of $23,500,000 bank loans they say they need presently for construction during '58 and early part of '59. We have another $20,000,000 in the pipeline company in 1959 and yet they say we don't need this money.

At this point, if the Commission please, on the question of expansion I would like to point out that American Natural Gas Company is not the only one of these natural gas holding company systems that have had tremendous expansion programs during the last ten years. For example, according to Moody's, the consolidated natural gas company gross utility plant

WG-ANR-00052442

amounted to $341,892,000 in 1950. March 31, 1958, it amounted to $695,021,000, or an increase in excess of $341,000,000.

The American Natural Gas Company has had an increase of approximately $368,000,000 during this same period of time. The Columbia Gas System has had an increase of approximately $433,000,000 during this period of time. These systems have had the expansion as great or almost as great as has the American Natural, and yet they have not gone into this high proportion of debt.

Coming back to the merits of the proposal, I would like to state this: that the staff is not taking exception to the use of bank loans in an appropriate amount and at appropriate times. We think it is the legitimate thing to do. But to ride the bank loans on one end to raise cheap money and to do no common stock financing on the other end is playing the middle against both ends. We think it is taking advantage of a leverage situation. While there has been a lull in the storm, as I say, in the construction program of this system, now is the time to do something about it. They cannot lose. If the expansion that they anticipated in the future should develop, then they have got themselves in a sound position to either go to the banks or go to permanent debt or to go to common stock. If we have a further recession, then they have consolidated their position, and are not in the contingent position of maybe winding up in the hands of the banks.

WG-ANR-00052443

Giving effect to Milwaukee's proposed financing, the debt of March 31, 1958, would increase from 60.7 percent to 66.66 percent of total capitalization surplus. We just do not think that it is justifiable for this company to have such an increase in debt under the circumstances which I have outlined and the Commission's past ten year record. We think they ought to do something about that.

They criticize us in the brief by saying if we put $11,000,000 in the common stock of Milwaukee, why, that would immediately bring the debt ratio down to 50 percent. And as a result of that, we probably would have to apply to the Public Service Commission of Wisconsin to get a rate increase because they have fixed rates on the basis of 40 percent equity in the company.

In the first place, the 50 percent equity would be very short-lived because under their own financing program in 1959 the equity would be reduced back to 44 percent.

In the second place, we are far from being convinced that a 44 percent equity ratio would have any effect upon existing consumer's rates for we do not think that the common stock equity component of Milwaukee's capitalization is so rigidly fixed in the rate making process as to discourage common stock financing and improvement in the structure of the system, particularly in the context of the prevailing circumstances. Moreover, we note that for the 12 months ended March 31, 1958,

WG-ANR-00052444

Milwaukee earned in excess of 6-1/4 percent on its total capitalization and surplus at that date, and it earned 10.8 percent on the common stock and surplus segment alone. So, we think it is very doubtful that they will be successful in getting an increase in rates just because there was a slight movement up from 40 percent to 44 percent in the equity portions.

Despite the high proportion of debt that the Commission has consistently criticized over a period of ten years, the management wants to postpone its equity financing until 1959, not only postpone it but it wants to reduce it to a one for 15 basis, which is a third less than it represented to the Commission that it would do in '58 and to its stockholders.

Under the management's proposed permanent financing program for 1959, the system contemplates the issuance and sale of an aggregate of $31,000,000 of bonds, $20,000,000 of five-year notes to banks, and only $16,000,000 of common stock. On this basis the management program contemplates the raising of permanent capital in the proportion of 76 percent debt and 24 percent common stock. After giving effect to the retirement of debt through the operation of existing sinking funds and the pre-payment of all of the five-year notes of American-Louisiana Pipe Line Company, which came about because of an excess amount of cash, as I understand it, even after giving effect to those, the system's resultant debt ratio at the end of 1959 would be 64 percent, thus continually perpetuating the

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 30 of 87   Document 50-42

WG-ANR-00052445

high debt segment which the Commission has constantly criti-
cized over the past ten years.

Coming back to the common stock financing, the
management has urged in its brief that a one for ten offering
would provide $24,000,000 in cash, whereas the maximum new
money requirements of the system for 1958 are only $19,500,000.
As a result of this, there would be at least $4,500,000 surplus
cash during 1958.

In the first place, it is unlikely that a common stock
offering, even if authorized today, could be effected prior
to the last quarter of 1958. Consequently, the major portion
of the proceeds could be immediately utilized to replace the
proposed bank loans and any relatively small balance would be
available for use by the system early in 1959 and they say
Milwaukee needs $4,000,000 early in '59.

Moreover, the slight cost for carrying any remaining
balance during the last quarter of 1958 would be negligible
in comparison with the risk involved in a further postponement
of the equity financing. In fact, in two recent instances
this system has suffered severe penalties from the postpone-
ment of the sale of its securities. For example, on August 1,
1956, Michigan-Wisconsin Pipe Line Company received three bids
on $25,000,000 of first mortgage bonds bearing interest at
4-3/4 percent and rejected the bids. In June 1957, approximately
ten months later, the amount of the bond was increased to

WG-ANR-00052446

$30,000,000 and sold with an interest rate of 6-1/4 percent. This postponement resulted in an annual interest increase of 1-1/2 percent or the equivalent of $450,000 per annum, and I think those bonds are 20-year bonds; so that if you were to compute that over a period of years, it is a tremendous amount of money.

On August 24, 1956, just shortly after Michigan-Wisconsin had rejected its bids, Michigan Consolidated had filed a declaration with the Commission regarding the proposed issuance and sale to several banks of an aggregate of $30,000,000 of bank notes. They got the authority to issue a reduced amount of bank loans. But subsequently in June 1957, Michigan Consolidated sold $30,000,000 principal amount of bonds bearing interest at 6-1/4 percent, the proceeds of which was used to retire a portion of the notes previously issued as presented in the proposal in August 1957.

Mr. Seder: Mr. Chairman, I ask your indulgence to address you in the midst of his argument, as there is nothing whatever in the record about this, and, furthermore, I cannot see what the question of whether 20/20 hindsight is better than foresight has to do with the issue here.

The Chairman: It is an argument, Mr. Seder. It may not be a very heavy argument. Anything that is not in the record we will pay no attention to in deciding the case.

Mr. Seder. Thank you, Mr. Chairman.

WG-ANR-00052447

The Chairman:  Go ahead, Mr. Nowlin.

Mr. Nowlin:  I might state, Mr. Chairman, these are official opinions or releases or orders of the Commission; so, I think the Commission could take judicial notice of its own action.

The Chairman:  It may.  Go ahead.

Mr. Nowlin:  The result there was another increase.

I think it will be admitted that Michigan Consolidated has better credit than the Michigan-Wisconsin Pipe Line, since in one month it rejected the bids, in the same month it went to the banks, and it got caught in the middle on both of them. No doubt that the amount of interest increase on the $30,000,000 of bank loans which were subsequently refunded by Michigan Consolidated involved at least an equal amount of increased interest cost, and that was several million dollars in addition to Michigan-Wisconsin Pipe Line.

The point I wanted to make is that by this deferring and postponing and jockeying bank loans in and issuing debt, you are going to get caught in the middle somewhere, and that is just exactly what happened.  What this company ought to do is to get itself back on a sound basis and issue common stock and reduce its debt.

We have seen, I think, from what I have outlined heretofore, that you have got elements of management reluctance to issue and sell common stock.  You have had all types of

WG-ANR-00052448

refundings and you have had a play on the leverage. Now, we think that the Commission in issuing the statement of policy several years ago regarding its views on refunds of issues and in which it stated it would be guided by in passing upon refunding issues, and we think that the statement contained in the Commission's statement of policy is particularly apt to these three features which I have just pointed out. With your permission again I would like to read a brief excerpt from the Commission's statement of policy. This statement of policy is attached to a decision rendered by the Commission in the matter of El Paso Electric Company, et al, at 8 S.E.C., page 366, and the statement which I will read comes from pages 389 and 390. It reads as follows:

"Aversion to common stock financing often derives from a desire on the part of the holding company as owner of the existing common stock of operating companies to maintain excessive leverage. Additional common stock financing, the holding company fears, might diminish the leverage exercised by it through its common stock ownership, and its subsidiary. This excessive use of leverage akin to the abuse of 'pyramiding' -- a misuse of other people's money, and one of the evils which the Holding Company Act was designed to eliminate.

"To refuse to permit the issuance of obligations to refund outstanding issues, where the security structure

WG-ANR-00052449

would not be sound, is not at all to penalize the common
stock.  It is rather to prevent new public investors in senior
securities of utilities being brought in until such time as
the controlling stock company interests, i.e., the holding
companies, are willing to and able to refinance in such a
way as to bring about a sound structure.  Replacing some of
the existing debt by the sale of common stock may be at an
apparent 'cost' of 9 or 10 percent yet actually it may cost
the issuer's stockholders nothing, and, moreover, may add a
substantial margin of safety to the remaining senior securities.
On the other hand, a mere reduction in interest rates may be
only an apparent benefit, creating the illusion that the
capital structure is being strengthened because of an increase
in earnings coverage, but in reality perpetuating a top-
heavy debt structure that subjects the company to the risk of
default and the common stock to the risk of being completely
wiped out.

"The truth, disclosed by railroad financial history,
is that it was usually when interest rates were low and debt
financing was used (because it was, in short run terms, at-
tractive to the owners of controlling stock), that further
common stock financing under the most favorable terms was also
possible.  The railroads let the chance to do common stock
financing by, and when it later became possible to do debt
financing, common stock financing was also impossible.  The

WG-ANR-00052450

time to do common stock financing is usually the very time
when debt financing on easy terms is available. To postpone
common stock financing at such a time means, too often, that
it will never be done. The argument as to the 'expense' of
raising money through the sale of common stock is thus,
very often, an argument against ever doing adequate common
stock financing."

We think, if the Commission please, that that is
particularly apt to the circumstances which we have just re-
lated.

In our proposed findings and opinion submitted to
the Commission, we set forth as statutory authority for our
recommendations excerpts from the Consumer Power Company case
in which the management, although not disclaiming the appli-
cability of the opinions enunciated in that case, inferentially
questioned its probity by reference to a split decision by the
Commission on a close question and reliance of the staff
upon a decision nearly 20 years old. On the other hand, the
brief seeks to use some of the factual data reflected in the
decision in support of its own contentions. The staff cited
this case solely for the legal principles enunciated therein,
including the Commission's interpretation of the duties im-
posed upon it by Congress in respect of the issuance and
sale of securities under Section 7 of the Act. We did not
attempt to use the statistics and factual data reflected

WG-ANR-00052451

therein because in our judgment the facts in that case are not comparable to those involved in the present case. The principles enunciated in the Consumer case were in the nature of a landmark decision, and insofar as we are aware have not as yet been challenged in a formal proceeding.

In closing, I would like to point out to the Commission that the Milwaukee declaration comes before you under Section 7 of the Act. The proposed bank loan financing has not been authorized by the state commission of Wisconsin. It is the opinion of counsel it is not subject to their jurisdiction, so that you have complete freedom to exercise your prerogative under the standards of Section 7.

The bank notes, as we have pointed out, meet the standards of Section 7(c) and we raise no question about that, but under the standards of Section 7(d) we think that the bank notes are not adaptable to the security structure of Milwaukee and that the other bank notes and system are not adaptable to the holding company system. We think further, under Section 7(d)(3) that the issuance and sale of bank notes in the context of the facts which I have just outlined are not necessary and they are not appropriate.

The Commission in the Consumer case has indicated that in order to be necessary, or stated in the converse, that this company does not have to do bank note financing. There are other avenues available to it, and not only available

WG-ANR-00052452

to it, we insist that it should be required, sofar as we can do it, to issue common stock. So it is not necessary to issue bank notes.

You get to the point, is it appropriate to issue bank notes? They say it is more appropriate, it gives us greater flexibility, and we do not really need the money. That argument could be consistently made every year, because I know of no system that does not have variations in its estimates of construction requirements, and there will be variations from here on out. You cannot always anticipate what is going to happen day by day and year by year. Anyway, we think that we have amply demonstrated the fact that the bank loans are not appropriate here because something ought to be done about this company's debt structure, it ought to be reduced. We think that our proposal to reduce this debt to the extent of a one for ten common stock offering is the minimum that should be required. Even with that reduction it is still going to be considerably in excess of 60 percent, and we would like to see this done today, not tomorrow. We do not know what the markets are going to be next year. We do know what they are today. We know what the experience of the company is. We know what its possibilities are, and even as I have stated two or three times before, if it has the construction program that it anticipates in the future, it is in a much better position, a more flexible position to meet those requirements if it gets

WG-ANR-00052453

a structure set up in the proper way.  If we have a further
recession in that area, and they do not need the money, they
are in a better position to withstand the storm if they
have got the debt down to real proportion.

Thank you.

The Chairman:  Thank you,  Any questions?

All right, Mr. Seger.

ORAL ARGUMENT OF ARTHUR R. SEDER, JR., ON BEHALF OF THE DECLARANT

Mr. Seder:  Mr. Chairman, members of the Commission:
I think on reflection that perhaps it is a good idea that Mr.
Nowlin did go first because I think that his presentation,
while an able one, demonstrates perhaps better than I can do
the basic deficiencies of the division's presentation and its
attitude in this case, because  as you will notice, while
he talks a good deal about the system's permanent capitaliza-
tion ratios and how they need improving and so on, and I will
come to that in a few moments, he does not talk about what is
involved here, which is a Milwaukee Gas Light Company finan-
cing and he does not talk about the fact that we do not have
a permanent financing here involved, but a temporary financing
intended to provide funds until the middle of next year.

It is the division's inability to face the fact that
those are the issues involved here that leads to the trouble,
the fact that we do not really seem to be able to come to
grips with them as to what is involved here.

WG-ANR-00052454

I did not think that he was going to get to the statutory provision involved until he mentioned it in the last few moments, so let's start with what is involved here. We have a statute which Congress passed for a purpose. It did not just pass this particular provision of the Holding Company Act for the fun of it. It had something in mind. What was in the mind of Congress? What is involved in this particular case? It is not what happened back in 1948 or any other time, but what is involved right now and right here.

The issue in this case, gentlemen, is whether the proposed one year financing by Milwaukee Gas Light Company, a distributing company in Milwaukee, Wisconsin, satisfies the conditions of Section 7(d) of the Public Utility Holding Company Act. That is all that is involved. The issue has been narrowed to that extent. It is at that point that we seem to diverge.

What does that section provide? There are two subdivisions that are involved here. Number One, it says that a declaration of a company must be approved unless the Commission finds, first, that the security is not reasonably adopted to the security structure of the declarant and other companies in the holding company system. Skipping number two, which is not involved here, it has to do with the ability of the company, earnings-wise to cover the proposed security issue; three, whether the financing by the issue and sale of the

WG-ANR-00052455

particular security is necessary or appropriate to the economical and efficient operation of a business in which the applicant lawfully is engaged or has an interest.

I hope we can keep in mind those two provisions.

The division, I think, set up a little bit of a straw man in its findings when they have a long excerpt from the Consumer's case as to how the Commission's action under this section does not interfere with the prerogatives of management. We do not contend, of course, that for the Commission to enter adverse findings here or in a case under this section I should say, interferes with the prerogatives of management. I do want to make this point, however, that this section, if you will read it carefully, says, unlike Section 7(c), for example, which says that the Commission shall disapprove a security issue unless it meets certain standards, this is phrased differently and Congress had a particular reason for doing it. This section says that the Commission must approve the security issue unless it makes these adverse findings.

I think that is important, gentlemen, for this reason: that Congress there has put the initial responsibility on management. That is, it is the responsibility of the people who are living with these properties and these problems day by day that has the initial responsibility and they are the ones who have to answer to the stockholders and to the holders of their securities. Again, I want to say that that does not

WG-ANR-00052456

mean that the Commission does not have its proper function to perform because it does. But first of all, you have to throw into the balance of the scales the fact that management, after consideration of the problems that are involved, has decided that the practicalities, the economies of the situation, the necessities of the situation call for one particular kind of financing rather than another.

I think that that standard that I have been mentioning has been applied by the Commission consistently throughout its administration of the Act, and I can point that out, I think, in a couple of ways.

In the first place, I have tried to go through the Commission's reports over the last 25 or 30 years to look to see what the pattern has been with respect to decisions under this section, and I think that I can count on the fingers of one hand the instances in which the Commission has disapproved a declaration under Section 7(d). The Consumer's case was one. There were one or two involving the Virginia Power Company. I cannot remember the others, but as I say, they were few.

There have been literally hundreds of cases, on the other hand, where the declarations were approved.

I cite that to you gentlemen merely to illustrate this point, that that the Commission exercises certainly a restraining influence in the extreme, the unusual situation

where there is a clear possibility or perhaps probability of danger to the consumers and to the investors who are to be protected by this Act, but it certainly does not go out just willy nilly substituting its judgment for that of management in a case where there is ground for reasonable difference of opinion as to what is required.

I want to refer to the Consumer Power case, which is cited at such length in the division's recommended findings.

I had thought that up until the oral argument that that was the principal precedent upon which they were relying for asking the Commission in this case to disapprove the financing here involved because of the debt ratios that were involved but now Mr. Nowlin tells us that they are not using the Consumer's case because of the factual situation involved there, the percentages and ratios and so on, they are citing it merely for the principles of law involved.

If that is the case, what precedent are they relying upon to tell your Honors that you should disapprove this financing? The answer is that there is not any. They searched the records of the Commission for 25 years and they have not come up with a case where the Commission has disapproved a financing under Section 7(d) upon which they are willing to rely as a precedent in this case and I think that is important.

One more preliminary matter and then I want to get

WG-ANR-00052458

right to what is involved here.

I think your Honors have already recognized that
the division's recommended findings and opinion are frankly
a partisan statement. That is, they have not presented to
you a calm balancing of the factors involved and something
that someone who is completely neutral and impartial would
present. They have presented you with what is a partisan job.
It is a job of advocacy. I think that is perfectly proper, I
think Mr. Nowlin has done a fine job of presenting a point of
view, but I want to suggest to your Honors that it is just
that, it is a brief, and the analyses that are put forward
there should be considered in the light of what we say in our
brief because by looking at the two you see where the truth
lies.

Let's talk about Milwaukee Gas Light Company and
$15,000,000 of short term notes. That is what we are here for.

There is no question of Milwaukee's need for or the
proper utilization of the money involved here. That issue is
out in as much as there has been no question raised about it.
The $15,000,000 is to be used first to repay $3,300,000 in
outstanding short term loans. Secondly, to pay for $7,700,000
in new construction in 1958. That makes a total of $11,000,000
estimated to be used this year, plus $4,000,000 to carry over
to cover the new construction in the early part of next year
pending permanent financing.

Case 2:20-cv-01334-SCD   Filed 01/27/23   Page 44 of 87   Document 50-42

WG-ANR-00052459

Our plans and proposals are that sometime in the middle of 1959 or earlier there will be a permanent financing by the system, a common stock offering, and also the issuance of permanent debt -- permanent financing -- and that out of that financing Milwaukee will receive $7,000,000 from the parent company in exchange for its common stock and that it will issue $13,000,000 in long term debt, and then that, of course, would become a part of the permanent capitalization of the company and these temporary bank loans would have been retired.

The Chairman: Tell me, Mr. Seder, does this bank loan agreement provide for taking it down in installments or is it all to be taken down at one time?

Mr. Seder: That is a very important point, Mr. Chairman. I am coming to that because it clearly calls for taking it down in installments and that is an integral part of this whole arrangement which I intend to emphacize in about two minutes, if I may.

The Chairman's question raises the very topic I was about to discuss, that is, why go the bank loan route? Why not go to the permanent financing that the division suggests and why not specifically go to the common stock financing that the division suggests?

This is not a capricious sort of decision on the part of management. They do not just sit around there trying

WG-ANR-00052460

to think how they can antagonize the Division of Corporate Regulation. There are good business reasons why this is done, and I think we can demonstrate that to the Commission.

The bank loans that are involved here provide a flexibility that is absent in permanent financing. Now, why do we need flexibility? There are about three reasons.

In the first place, the gas company, like every other company, is subject to the ebb and flow of the business cycle and the business conditions generally so that to the extent that other companies are affected by that, why, of course, the gas company is affected, too.

In addition to that, though, and unlike other companies, regular commercial companies, almost everything that a gas pipeline or gas distributing company does is subject to regulatory authority so that if they want to construct a project they just cannot go out and start laying the pipe or putting in the valves and so on. They have got to get the regulatory authorization before they can do it; so that means that whether or not they get certain regulatory authority for which application has been made has a great deal to do with whether the construction that they propose to make is going to go ahead.

Thirdly, whether they go ahead with these programs depends upon whether natural gas is available, and, of course, that is subject to not only the regulatory authorization but,

WG-ANR-00052461

of course, the necessity of getting the gas and getting it delivered.

Of course, like any company estimates are made and budgets are prepared as to particular construction, but particularly they are subject to fluctuation depending upon these three considerations that I have just mentioned.

The result is that it is not known just when the money will be needed and how much will be needed. We have ideas, we think we have estimates, but the bank loan route provides the very flexibility, the ability to accommodate the cash requirements to these various things that make it a very worthwhile way in which to finance.

The fact is that the bank loans give you the money when needed and, Mr. Chairman, this gets to your point now, and it gives you the fact that there are no excess accumulations of cash.

How does the bank loan do that? Well, it does it in five ways, and I want to skip over this pretty quickly. But in the first place, as the Chairman has indicated, you borrow it in installments. This particular credit agreement provides up to four installments of the money. So that you do not get the whole $15,000,000, some of which may never be needed and some of which certainly is not going to be needed until sometime in 1959, all at once so that it is in the treasury of the company doing absolutely no good at all. The

WG-ANR-00052462

money is in the banks until it is actually needed, and then it is taken down in these installments as the cash requirements of the construction program demand.

The Chairman: Is there a commitment fee to the provision?

Mr. Seder. Yes, sir.

The Chairman: One half of one percent.

Mr. Seder. A quarter of one percent.

There is no minimum borrowing requirements. That means that if some of these programs that we have been talking about do not go through as we anticipate, then it is anything below $15,000,000, but no minimum provision.

Thirdly, the loan commitment may be reduced at any time, and, Mr. Chairman, this again goes to your commitment fee, anytime that one of these programs that we are talking about is indicated to be unnecessary, then the commitment can be reduced and the commitment fee in that small amount can be eliminated.

Fortunately, the interest rate is the prime rate on the date of borrowing and I know you gentlemen are more familiar than I am with the fact that that is a great advantage in this short term situation, that you can borrow money at the cheapest possible rates, and not only that, it is the rate at the moment of borrowing so that if there is a further decline anytime during this period, why, the company gets the

WG-ANR-00052463

advantage of that.

The Chairman: Of course, if there is a rise in your discount rate, you get caught.

Mr. Seder: Absolutely.

Fifth, all notes may be prepaid without penalty. That means that when the permanent financing is appropriate, when the time comes when it ought to be financed, we can do it. So that while these notes mature June 1, 1959, if it is appropriate to refinance before that time, why, these notes can be prepaid.

Compare that with your permanent financing situation under these conditions. Under that you get all the cash right at the start; it is in your treasury; it isn't being used, but it is there. The people who put it up, naturally enough, are going to expect some return on it even thought it isn't earning the money.

Secondly, you have got to obtain the maximum amounts you need. I mean, you cannot go out on a permanent financing every week or two. These are expensive propositions, so that you have got to ask for the maximum amount you think you are going to need so that if the program falls below that maximum amount, why, that means, obviously, that you have got excess cash around, whereas the fact that the bank loans may be borrowed in installments is just the reverse of that situation.

We have examples in this record right here of just

WG-ANR-00052464

what I am talking about sofar as these uncertainties are con-
cerned.  In the first place, Milwaukee estimates it is going
to spend nearly $4,000,000 over the next two years to connect
new space heating customers.  With respect to at least a
large proportion of all of that expenditure, the company does
not yet have the requisite authority from the Federal Power
Commission.  It is a little bit more involved than that, but
that is what it amounts to.

The Chairman:  Are you still under restrictions
in Detroit?

Mr. Seder:  No, sir.

The Chairman:  Where are you?  Milwaukee?

Mr. Seder:  That is, the company in Detroit is
accepting space heating applications and filling them.

The Chairman:  It is not in Milwaukee yet?

Mr. Seder:  At the moment it is connecting new
space heating customers, but, as I say, a substantial amount,
if not all of this new construction that we are talking about
here, the approximately $4,000,000, is going to require some
additional statutory authorization which we do not even have.

The Chairman:  From whom?

Mr. Seder:  It works this way.  The Federal Power
Commission has required Michigan-Wisconsin, which is the
supplier of Milwaukee, to insert in its tariff a restriction
on the number of space heaters that the distributing companies

WG-ANR-00052465

may connect, and the Federal Power Commission has not yet
authorized any increase in that authorized number of space
heaters.

The Chairman: Then, you are under restrictions in
Milwaukee?

Mr. Seder: Yes, sir; I did not want to give the impression that Milwaukee was, itself, subject to this because
it works a little bit around about.

The Chairman: It works around the table. All right.

Mr. Seder: A second point that I want to refer to
here in this same connection, and I will come back to it a
little later then, is the fact that in 1957 Michigan Consolidated spent $10,000,000 less for new construction than had
been anticipated in late 1956 because of the economic recession in Detroit, so that you see in the first instance that I
gave you it was a regulatory problem, in the second it was an
economic problem. So you see that there is a need for flexibility here so that the company can accommodate itself to
these conditions which, with the best management and the best
foresight in the world cannot entirely be foreseen.

The solution that the company has followed in the
past, and it is not anything unique to this system, it is
followed by many, if not all companies, is to finance their
annual construction programs initially with bank loans and
subsequently they are replaced with permanent financing. That

WG-ANR-00052466

means when the new construction has actually taken form, it is either in the ground or else it is ordered and it is all set, and at the same time when there is enough of these bank loans accumulated to make the expense of a permanent financing worthwhile, why then, we permanently finance. So there are the two factors, that by the time permanent financing is appropriate, when the construction requirements of the company are concrete, when they become definite, and secondly, when there is a sufficient volume of these to make a permanent financing economically justifiable. You gentlemen, of course, pass on these requests for fees and expenses in connection with these financings all the time. You know much better than I do how expensive they are, and you just cannot go out every other month and do permanent financing. You have got to allow a reasonable accumulation.

Let's turn to the division's idea of what the 1958 financing ought to be like. The division says that Milwaukee ought to be required to issue permanent securities now. And Mr. Nowlin thmped the table when he said that, equity securities, except he said a little later that, of course, he could not get around to it until late this year, so I do not know exactly what he means by now, but anyway, he says that they should be required to issue permanent securities now and that those permanent securities ought to be common stock.

Let us look at this. Put yourself in the position

WG-ANR-00052467

of management now with this recommendation staring you in the face. This recommendation is, I think, the sole result of misplaced reliance upon this 1956 letter that Mr. Nowlin referred to. It is in the record. Secondly, in this connection I want you to consider the effects of a common stock financing this year.

Let us talk about the 1956 letter for a moment, not because I think it is particularly relevant here, but because so much has been made of it, and because I want to satisfy the Commission and I hope you will ask me questions if you are not satisfied as to just what this is all about. Because, as I say, I think that has generated a lot of the controversy in this case.

In that letter which was sent in to the Commission by the company in connection with the temporary financing by Michigan Consolidated in late 1956, the company said that it was going to issue common stock on a one for ten basis in 1957 and that in 1958 it would do additional permanent financing to consist of another one for ten common stock offering and some debt, and the company set forth some pro forma exhibits showing that on the basis of certain estimates and assumptions that were made, how this whole thing would work out and those are in the record, too.

American Natural did make the one for ten common stock offering in 1957 just as it said it would do, and in the

WG-ANR-00052468

annual meeting in April of 1957 it went to its stockholders just as it said it would do, and got authorization for further common stock, that is, the corporate authorization that it needed to issue additional common stock.

In 1958, that is earlier this year, when it came time to consider the appropriate financing this year it became perfectly apparent to the management, as I think it will become apparent to you gentlemen in just a moment, that a permanent financing and specifically a common stock financing in 1958 would be wholly improper. Why was that? It was because between 1956 and earlier this year, 1958, there was a substantial change in the conditions upon which this 1957 letter which Mr. Nowlin is pleased to refer to as a commitment was based. That letter was based upon certain assumptions, one of which was that there was going to be a certain construction program for the system companies which would result in certain financial requirements in 1957, certain additional financial requirements in 1958, which this proposed common stock offering and debt financing was going to satisfy.

Things did not work out that way. In 1957 the system companies spent $16,500,000 less for new construction. I want to emphasize this figure, $16,500,000 less for new construction in 1957 than had been estimated at the time the letter was written in November of 1956. That meant that the new money requirements of the system were simply that much

WG-ANR-00052469

less so that when we came to 1958 you have got, instead of
new money requirements of around $34,000,000 or $35,000,000
which had been anticipated back there, a maximum, and I say
a maximum, of $19,500,000 of new money requirements or only
a little more than half as much as had been estimated in
1956.

It is right at this point here that the division's
recommendation, its position, that American Natural ought to
make a common stock offering this year breaks down and I
want to point out why.

First, it would generate immediately $24,000,000
or $25,000,000 of cash as opposed to total new money re-
quirements throughout the year estimated to be $19,500,000.
That is the first problem.

The second problem is it generates this $24,000,000
or $25,000,000 all at once, so that while some of these re-
quirements spread out over the months you get the cash right
now. It is not doing any good right away. I have covered
those inferrentially in connection with my general considera-
tion of the bank loan situation, but now I want to come to
what I think is the most important deficiency, if I may
call it that, in the division's presentation here. That is
this: that under their proposal all of the new money require-
ments of the system for 1958 would be met with equity money.
In other words, we have got this $24,000,000 or $25,0000 of

WG-ANR-00052470

equity money substantially less new money requirements in toto, so that that means that in order to make use of the money all of the new money requirements of the system for 1958 would be met with equity money.

That was not contemplated at all in 1956 when this letter was written. No, sir. In 1956 it was contemplated that the total new money requirements in 1958 would be such that it would require both the common stock offering and a debt financing and that appropriate proportions of each would be put into the capitalization of each of the companies and that the result would be that there would be both debt and equity added, but the division proposal now is not that. It proposes to put the whole, every bit of the new money requirements, in common stock of each of the companies.

Let us see what that would do. So far as Milwaukee Gas Light Company is concerned it would have $15,000,000 in new money. That compares with the estimate in common stock, I should say equity -- the estimate back in 1956 was that it would get approximately, I think, $4,000,000 of equity and $6,000,000 of debt or something like that. In other words, it was approximately an equal division of debt and equity, but they are going to substitute a full amount of equity money for that.

That would jump Milwaukee Gas Light Company's common equity ratio from approximately 40 percent where it is

WG-ANR-00052471

now to 50 percent. Mr. Nowlin tried to anticipate our argument a little bit on that socre. He says, "Well, they would not have to get a rate increase." He says, "Maybe the equity ratio will go down again next year." I do not know on what basis he makes that assumption, but anyway, he says under the Wisconsin Commission's latest order they are making ten percent on their common equity ratio. Well, the fact is, gentlemen, that if this common equity ration of Milwaukee Gas Light Company jumps up ten percent, they are going to have to get a rate increase and the reason for that is that the present rates were fixed on the basis of a 60 percent debt, 40 percent common equity ratio.

You gentlemen are all familiar, I know, with the manner in which a regulatory commission goes about fixing rates. They calculate the cost of the debt money; then, they calculate the cost of the equity money. They apply it to the appropriate capitzliation. Now, if they found the rates that they fixed were just and reasonable upon a capitalization structure of 60/40, why, it is just common sense that those rates are not going to be just and reasonable if the capital structure is suddenly altered violently by the addition of a big amount of additional common stock.

Let us talk about Milwaukee's capitalization. Let us get down to the heart of what is involved in this statutory requirement here.

WG-ANR-00052472

In the first place, I do not think that my able adversary here mentioned in any connection the fact, or he certainly did not emphasize it at any rate, that this is a temporary financing, it is not a permanent alteration or a permanent addition to the capitalization ratio of the company.

The cases that he is talking about, he talks about the Consumer's case, for example, the setting forth the applicable principles of law, and we think it does, too. There the Commission was concerned with a permanent financing so that what was involved was a permanent capitalization ratio to result from the issuance of particular securities.

That is not what we are involved with here at all. What we are involved with here is a temporary financing to be retired within less than a year.

The Chairman asked Mr. Nowlin if he thought that did not make a difference inasmuch as the Commission's own regulations provide that those temporary notes are to be considered as current liabilities. I think it does make a difference. I think this Commission has said that it makes a difference.

The whole theory behind the sections of the Act that we are talking about now is to prevent a company from adding a lot of long term debt to its system so that somewhere down the road, if business conditions change, they will be faced with the necessity of refunding at a time when it will not

WG-ANR-00052473

be possible for them to do so, and the Commission in the Consumer case and in other cases has referred to the horrible example of the railroads who did just what Congress intended here to prevent, that is, had a lot of long term debt, all of it maturing at the same time and then coming to a situation where they could not refinance.

I want to digress just a second to say that that situation is not here for one reason, which is that these mortgage bonds are not all repayable at one time as the ordinary railroad bonds were. Sofaras the pipe line companies are concerned, their sinking fund provisions require that the total debt be sunk out on an annual basis so that at the end of the 20- or 25-year period there is not any debt to be refunded when these bonds are completely retired.

The Chairman: Are the Michigan-Wisconsin bonds issued under that provision?

Mr. Seder: Yes, sir.

The Chairman: And also the Louisiana bonds?

Mr. Seder: Oh, yes, indeed. It is a 20-year sinking fund, so that at the end of 20 years they are out.

The distributing companies, as is common with distributing companies, generally, do not have quite as stringent sinking fund provisions as those, but approximately 40 percent of their debt is also sunk out, so that you do not have this problem of a big slug of debt all coming due at one time with

WG-ANR-00052474

the necessity of refinancing.

I say that is a digression to indicate that we do not have exactly the same problem here as the railroads face, but, nevertheless, this statute here applies to gas companies, we recognize it, and we recognize that there is an obligation on the Commission to see that there is not an inordinate amount of long term debt outstanding.

Here we have got a temporary financing which means that the Commission is being asked whether it will substitute its judgment for that of the management that sometime before June of next year is a more appropriate time to permanently finance than it is right now. I hope you gentlemen will remember that that is the issue because in a nut shell, that is it.

Mr. Nowlin indicated that the issue is really a little narrower than that because he says, of course, you could not make this common stock financing before close to the end of the year anyway, and he is right, of course. It takes a while. So, the issue is really this: Should we make a common stock financing at the end of this year, or should we make it at the middle of next year? Now, that is getting down to pretty picayune considerations, it seems to me, and the only way that I can explain them is that the division is dedicated to the proposition that because we said that we anticipated making a common stock offering in 1958, that at the

WG-ANR-00052475

stroke of mid-night on December 31, they are going to be
sure that we made one rather than on the second of January.

It seems to me that this is just not an appropriate
situation in which the Commission should say you have got
to do it this year rather than next year.  This is a temporary
financing so that a lot of this talk about what the capitali-
zation ratios of the company ought to be really do not have
a whole lot of place here.

Of course, they like to add the whole $15,000,000
to the debt structure of Milwaukee Gas Light, you see, that
gives a big debt picture, but of course, what is going to
happen next year when this is permanently financed?  Part of
it is going to be debt and part of it is going to be equity;
so, the permanent debt ratio is not going to be at all what
they chose to show in their tables in the recommended opinion.

Talking about equity ratios, though, Milwaukee's
common equity ratio is about 40 percent.  It is going to go
up a little bit as the result of this permanent financing next
year.  I frankly cannot see, having done as much research
as I could into the situation of the other companies, that
there is anything that is alarming, anything that would justify
the Commission getting near a situation of this kind and say-
ing "Management, no, you may not."  Forty percent is not at
all an unusual common equity ratio of gas distributing com-
panies.  We have listed in our brief six or eight other

WG-ANR-00052476

comparable distributing companies, all having good conserva-
tive managements, all having good bond ratings, whose common
equity ratios are considerably less than that, some of them,
and some of them approximately equal.

Commissioner Orrick: You are not considering the
system's ratios?

Mr. Seder: I am coming to that in a moment. But
I think this is as good a time as any to get right to that
point.

Mr. Nowling likes to talk about system equity ratio
or capitalization ratioes, of course, because he cannot do
much with Milwaukee's, but as he pointed out right at the
outset of his remarks this sytem is different from the other
holding company systems which finance their debt at the parent
company level. Each individual operating company in the
American Natural system has its own debt securities. It does
its own individual financing. So that while Mr. Nowlin is
pleased to say that this is really just one company, that is
not really right. It is not one company, it is about four
separate operating companies, each of which has its own
individual bondholders, so that while we certainly do not take
the position that we should not look at the capitalization
ratios of the other companies -- and I am coming to that in
just a moment -- we do say that this is unlike the other sys-
tems in that the senior security holders in each company look

WG-ANR-00052477

primarily to that company sofaras their capitalization ratio are concerned.

Does that answer your Honor's question?

Commissioner Orrick: You go ahead and finish your argument.

Mr. Seder. All right, sir.

Let us talk about this 40 percent debt ratio. As I say, we have set out some comparable ones in our brief. One thing that the division likes to do in talking about capitalization ratios is they always talk about the debt ratio. I think you all know why they do that. If they talk about debt ratio, why, then, that throws everything else over into the equity side, including both preferred and common. In other words, if they refer simply to the debt ratios of various companies, then, whether the companies that they are comparing with our companies, for example, have preferred stock or not does not show up.

That is a recognized technique. I do not take issue with their right to do so. But the Commission certainly ought to know why they do it, and to take account of the fact, because this Commission has said over and over again that you have got to consider not only the debt, but whether the equity includes preferred. I want to quote a brief excerpt from one of this Commission's earlier decisions, and the reason I do so is that it is not quoted in our brief, and I think it is

particularly pertinent here because the Commission in dealing with this problem of comparing a company with no preferred stock and a company that had preferred stock said this:

"It is also noteworthy that the capital structure of the new corporation is to include no preferred stock. For an operating company we think a ratio of even 66 percent debt and no preferred stock may well be more conservative than a ratio of 50 percent debt plus 25 percent preferred stock, a structure that has been thought allowable by some authorities."

That is the Jacksonville Gas Company case, 11 S.E.C., 449. In other words, the Commission there said a 66 percent debt ratio, which is six points higher than ours, is a better, more conservative ratio than if you have just got 50 percent debt and 25 percent preferred stock.

The Chairman: Have you got any preferred stock?

Mr. Seder: No, sir. There is no preferred stock of any of the operating companies, and there is a minute amount of preferred stock of the holding company which the holding company is under orders of the Commission to eliminate within the next year.

The Chairman: I recall.

Mr. Seder: I want to turn to the system common equity ratios because that is what my friend, Mr. Nowlin, has so much to say about.

In 1955, in an opinion from which he read having to

WG-ANR-00052479

do with financing by Milwaukee Gas Light and Michigan Consoli-
dated, the Commission authorized the temporary financing that
was involved, but they expressed some concern over the perma-
nent capitalization of the company. They said that they
thought that the common equity ratio which was estimated would
be as of December 31, 1956, 30.3 percent, it ought to be
improved.

Commissioner Patterson. Can't you go back a little
bit? Wasn't that 1955 application for nothing but a bank
loan? $30,000,000?

Mr. Seder. There were applications, your Honor,
by both Milwaukee Gas Light and Michigan Consolidated for
bank loans.

Commissioner Patterson. For bank loans alone?

Mr. Seder. Yes, sir.

Commissioner Patterson. And at that time the com-
pany took the position that equity financing was not needed?

Mr. Seder. Actually, there was an equity financing
right at the time. The Commission approved the things almost
simultaneously.

Commissioner Patterson: I mean your original
application, there was not any application to sell any com-
mon stock?

Mr. Seder. I think your Honor may be thinking of
another proceeding, perhaps the 1956 proceeding, but this

WG-ANR-00052480

involved, as you may recall, a common stock financing prin-
cipally to supply the equity money for the new American-
Louisiana pipeline. But in addition, to provide some equity
money for the other operating company, there was a one for
five common stock offering in 1955.

Commissioner Patterson: Wasn't there one for ten?

Mr. Seder. There was a one for ten in 1957.

Commissioner Patterson: That is right, but your
application that you originally put in was for a bank loan
entirely, $30,000,000, and then you cut down the bank loan
and decided you would do some equity financing?

Mr. Seder. Yes, sir.

Commissioner Patterson: That is what I wanted to
get back a little bit on that one.

Mr. Seder: Let me clear that up for your Honor.
The application in 1956, which is the one your Honor is re-
ferring to --

Commissioner Patterson (interposing): That is right.

Mr. Seder (continuing): -- was by Michigan Con-
solidated for around $32,000,000 in short term money.

That was the only application that was before the
Commission, and the company then did voluntarily cut it
down to $25,000,000 and proposed this financing program that
I have been discussing that was embodied in this November 7,
1956, letter.

WG-ANR-00052481

The only thing that was before the Commission at that time specifically was a short term loan that was granted. As a part of the general picture, the permanent financing of the company was inquired into and that has followed through as we have been talking about here. That is the one for ten common stock offering in 1957, and then the anticipated offering in 1958, which we think because of the change in circumstances now should not be made until sometime prior to the middle of 1959.

The Chairman: What bank does Michigan Consolidated have now?

Mr. Seder: It has none.

The Chairman: It has been retired?

Mr. Seder: There are none on any of the companies except Milwaukee which had $3,300,000. I wanted to mention that in another connection, but I think it is probably just as well to do that now.

When the Commission made the statement that Mr. Nowlin quoted about being concerned about the amount of short term money that the company had outstanding, here was the situation. Milwaukee had, I think, $7,500,000 of temporary notes outstanding which they were asking to be renewed again. Michigan Consolidated had $26,000,000 of notes and the two companies were asking that it be increased to a total of $67,500,000 in temporary notes at that time. And the Commission granted that

WG-ANR-00052482

declaration. It is under those circumstances that the Commission said we are concerned about the amount of short term money outstanding, and the fact that this has been refunded. We do not have that situation here. We have $3,300,000 of temporary loans by Milwaukee Gas Light. Nothing else.

The Chairman: What is the debt ratio of Michigan Consolidated?

Mr. Seder: It is around 40 percent, your Honor. The common equity ratio.

The Chairman: Debt ratio around 60?

Mr. Seder: Yes, sir.

The common equity ratio as of December 31, 1957, was 39.2 and the debt ratio of 60.8; by taking into account the financing we propose to make next year, its common equity ratio will increase to 40.1 and its debt ratio will decrease to 59.9.

Commissioner Orrick: While we are talking about ratios, could you indicate the trend of the system ratios, say, over the past five or ten years?

Mr. Seder: I would be glad to do so.

Commissioner Orrick: Before you go on.

Mr. Seder: We are going up with the common equity. As I mentioned just a moment ago, in 1955, at the time that the Commission issued this opinion in which it said it was concerned about the capitalization, it was estimated that as

WG-ANR-00052483

of December 31 -- excuse me, if I interrupt myself to say that this is set out at page 25 of our brief.

Commissioner Orrick: I see it, but that does not include the short term.

Mr. Seder: Oh, no. And properly so.

Commissioner Orrick: There is a dispute about that, I take it.

Mr. Seder. Of course, if you want to assume that the short term money is long term money, and if you want to assume that the short term debt is all going to be debt when it is refinanced, why, you can go ahead and do that, sure. But those are pretty violent assumptions, because the short term money is refinanced with debt and equity so that to put it all on the debt side is just -- you can do it --

The Chairman: When did you build your Louisiana pipeline?

Mr. Seder: In 1957.

The Chairman: 1957?

Mr. Seder. 1956 and completed in 1956.

The Chairman: But in 1955 you had a large amount of short term money?

Mr. Seder: Yes, sir.

The Chairman: I see. And I assume that was in con-nection with local construction rather than --

Mr. Seder: Yes, sir.

WG-ANR-00052484

Commissioner Orrick: Could I ask a question?

Mr. Seder: Yes, sir.

Commissioner Orrick: I take it from what you say that you would object specifically to Mr. Nowlin's statement that the utilization of this technique of short term bank loans in effect results in a long term debt of in excess of 20 years on the average?

Mr. Seder. Oh, I certainly do. I do, indeed. The fact that as of the time that this application was filed, Milwaukee had $3,300,000 only, which is substantially below its five percent, and it is below, I do not know that it is substantially, that no other company in the system had any bank loans outstanding I think is a conclusive answer to that contention.

As the Chairman indicated a little earlier, that does not mean that we are not going to do bank loan or do not propose to do bank loan financing from time to time, because we do. We think that is the business-like way to do things, but to say this is simply a revolving fund, I do not think is borne out. We borrow the money, we take it down as needed to finance construction. When enough has been accumulated, when the construction is pretty definite, why, we permanently finance it at appropriate ratios which this Commission has to approve, which it will approve next year, and then when the next segment of construction comes along, we do the same

WG-ANR-00052485

thing.  But I do not think that that is by any stretch of the imagination a revolving sort of thing that he is talking about.

　　　　To continue with this common equity trend, the actual for the system as of December 31, 1957, was 33 percent, up three percent from that that had been estimated a year before; as of December 31 of this year it will be 35.6 percent; and, then, taking account of the financing as we propose to make next year, permanent financing, the system ratio will be 36.3 percent.  So, it is increasing.

WG-ANR-00052486

#4 alc-1

Now, I want to say one more word about the system ratios.

The Chairman: You are not putting your best foot forward in some ways.

Mr. Seder: I am about to do it, I think. You are talking about American-Louisiana.

The Chairman: I am talking about the proposed reduction in the debt of your pipeline companies by amortization.

Mr. Seder: I am coming to that in a moment. I can see that I misorganized my argument but I didn't forget it because it is a very important part of our picture.

That is this, that American-Louisiana which has a very low common equity ratio, around 16.9 percent, of course, has a very material depressant effect upon the system common equity ratios, but we are not apologizing one iota for American-Louisiana's capitalization ratio because that capitalization was approved by this Commission for good, sound, adequate reasons that are all spelled out in that opinion. Now, those reasons were, I think, two-fold, anyway. One was that American-Louisiana had long term contracts which assured it of a ready market throughout the life of its bonds, but secondly, and perhaps more important, this has been touched on already a time or two, those bonds are all going to be retired through sinking fund provisions over

WG-ANR-00052487

their life. They are retired every year at a five year rate so that at 20 years it's all gone. You don't have the situation of a stable, unchanging capitalization ratio. You have got the situation of a very low common equity ratio to begin with, but a very fast accelerating common equity ratio as those bonds are sunk out.

Now, the Federal Power Commission has recognized that, but while Mr. Nowlin chooses to say that this Commission was pressured into it in recognizing the same thing I don't believe that for a moment. I don't think this Commission is subject to that kind of pressure. I think that this Commission saw the facts just as the Federal Power Commission did and just as I have stated, namely, that these bonds are going to be sunk out, the common equity ratio improves rapidly, so to start out with a very high one just won't make sense. And this has been the traditional way in which natural gas pipelines have been financed. Some of the new pipelines, such as American-Louisiana, have substantially less common equity than American-Louisiana. Some of the older pipelines, those who have been going for ten or twelve years, have common equity ratios below twenty percent and I want to explain that for just a moment -- and I am getting toward the end of my argument here.

The Chairman: I assume you are because you have been an hour already.

Mr. Seder: Well, I will close very promptly.

So that you gentlemen may predict how long this is going to be I have two more points and they are very short.

That is that the one way that this system could satisfy what the Division seems to want, that is to improve its common equity ratios and diminish its debt ratios, is one that I don't think the Commission is going to find commends itself to common sense and that is simply not to expand, because through the operation of the sinking funds, why, our common equity will increase awfully fast, sure; but that means that we become a stagnant, self-liquidating organization. We don't serve our customers, we don't increase our facilities. All we do is to let the sinking fund go ahead. We don't put in the new facilities that are required.

Now, you simply can't put in new facilities at a high common equity ratio to begin with. You put them in at a proper, appropriate common equity ratio to start with as this Commission and the Federal Power Commission have determined and as a result of the sinking fund operations why, of course, it improves over the years.

That is point number 1.

Point number 2 is this. That while we are talking here and the Division is talking about this 19-1/2 million dollars of new debt that the system intends to create this year, actually there is a net reduction in system debt this

WG-ANR-00052489

year and the reason for that is this, that American-Louisiana had something like 28 million dollars of 5-year notes that were issued a few years ago. This year they are to be retired serially over a five year period --

      The Chairman:  American-Louisiana did?

      Mr. Seder:  Yes, sir.

      The Chairman:  Why?

      Mr. Seder:  For the financing of a step of its expansion program subsequent to the --

      The Chairman:  Why five years?

      Mr. Seder:  Well, the reason for that is principally because of the accelerated depreciation provisions of the tax laws, you generate a lot of cash in the first few years that the facilities are in operation so that it is perfectly feasible, in fact, we found that a very, very sound way of financing new pipeline construction.

      The Chairman:  All right.

      Mr. Seder:  Well, this year American-Louisiana has or will within the next month have retired by pre-payment $22,400,000 of that $28,000,000 issue.  Now, think of that. It will all be gone at that point.

      Think of that.  That means that the system, and this is what Mr. Nowlin likes to talk about -- the system -- will have retired by pre-payment 22-1/2 million dollars of debt this year at the time that it is asking to issue only

19-1/2 million dollars of these short term loans.

I think that is awfully significant. The fact that not only have we retired by pre-payment a greater amount than we are asking to issue, but secondly that, of course, the sinking fund provisions of the first mortgage bonds are going ahead all the time, too, so they are being retired, too. That is in addition to the $22,400,000.

T$_h$e Chairman: What are your total sinking fund requirements?

Mr. Seder: In dollars? Would you like them by companies or systemwide?

The Chairman: Oh, systemwide. I don't care anything about the breakdown.

Mr. Seder: I'm sorry I don't have the figure right at hand.

The Chairman: That is all right.

Mr. Seder: It is, in 1959 it will be $14,000,000. You can see how much that means we are retiring every year. In addition, of course, there are additions to surplus every year so that common equity is increasing, too. So, put those three things together. You have got a pre-payment of $22,400,000, you have got a sinking fund retirement of $14,000,000, you have got surplus added to your common equity.

It seems to me that this isn't one of those close

WG-ANR-00052491

cases that the Commission, well, for which this provision of the Act was put in. This isn't one of those situations where there is a grave danger to consumers or investors. This is a situation where to return to the one issue that I mentioned before, we do permanent financing very late this year or some time around the middle or early part of next year.

Now, under those circumstances and under the circumstances in this record I submit, your Honors, that you have no basis for making adverse findings.

The Chairman: What is the present debt ratio of Michigan-Wisconsin?

Mr. McElvenny: They have a common equity of 37 percent. In 1950 Michigan-Wisconsin had a 20 percent common equity. It now has a 37 percent common equity.

Mr. Seder: I had intended to mention that as showing the common equity of these pipelines. I think that is a good illustration of this fact.

The Chairman: Any questions?

Commissioner Hastings: There seems to be some difference of opinion as to the treatment of the short term debt in computing the equity debt ratio.

Having knowledge that the short term debt will ultimately be permanently financed and without some pre-determination of the ratio of debt to equity securities which will be issued to retire the short term debt, have you any

a7

alternative but to treat the short term debt as though it would be a permanent debt item, or how would you treat it, let's put it that way.

Mr. Seder: Yes, your Honor, I am glad you asked that question.

You do have an alternative. In the first place, we have made our estimates and they are in the record here, our exhibits. What we would propose to do so far as that is concerned at the time of the permanent financing in 1959 is before you.

Now, secondly, this Commission has jurisdiction over that permanent financing so that it will determine at that time, which is the appropriate time, what proportion of the permanent financing should be taken out in debt and how much in equity.

Just on that very point I think it is interesting to indicate the way the state commissions approach that at the time of a rate case. They look at this temporary financing and what they do is to allocate it on the same basis -- same ratios as the permanent financing. In other words, in Milwaukee's recent rate case they took the temporary bank loans that were outstanding and they allocated it 40 percent to equity and 60 percent to debt.

The Chairman: They did?

Mr. Seder: Oh, sure. I am informed that the Federal

WG-ANR-00052493

Power Commission follows the same practice.

The Chairman:  I am informed that the Massachusetts Commission doesn't.

Mr. Seder.  Maybe I cited the wrong authority here.

Commissioner Hastings:  Then you think it would be appropriate to take your existing debt ratio and presume that the short term financing would follow that same ratio? Then there would be no change in the equity debt ratio in any pro forma computation that might be made?

Mr. Seder:  Well, you could do that, your Honor, but that isn't what we have done because we have assumed in our estimates a particular allocation as between the two. A particular allocation as between debt and equity at the time we do our permanent financing next year.  But we have actually assumed a higher percentage of debt at that time so that our common equity ratio will improve as a result of operations through until the end of 1959.  So that, I think, is one way of doing it.  That is, that you could say, well, we'll just allocate it on the basis of the present capitalization ratio.  As I say, that is a problem that is properly before the Commission at the time we get to the permanent financing.  But I don't think there is any basis whatever for allocating it all arbitrarily to debt because that isn't the way it works out.

WG-ANR-00052494

Commissioner Orrick: I don't want to be facetious, but presuming there isn't a change of circumstance that would alter your '59 financing?

Mr. Seder: All I can say is this in that respect and I know what you are talking about, that our commitment, as Mr. Nowlin chooses to talk about it, was made in good faith and I say that very sincerely. We went to our stock-holders and we got the authorization for the additional common stock, but when we got to 1958 the circumstances had changed so that it would have been foolhearty, we think, to go ahead with the kind of a program that had been talked about and set out in 1956.

In the first place, it was impossible because we needed only a little more, half as much new money, so there had to be some change.

Now, you say how do we know there won't be a change in circumstances before 1959? I say that our estimates and what we say we are planning to do are made in the utmost good faith and if we should come to you next year with a proposal that is materially different, and there hadn't been any change in circumstances, why then this Commission would have every right to say that we should not be permitted to do it.

The Chairman: But you don't consider yourself an infallible prophet of the economic future of the country?

Mr. Seder: Exactly.

Commissioner Hastings:  May I carry my point a little bit further and I would like to ask, isn't it necessary to make some forecast or determination of the form and substance of the ultimate permanent debt in order to make the negative findings  necessary under 17 in connection with a declaration covering a short term financing?

Mr. Seder:  I think that so far as putting together what the Commission has in mind as being appropriate permanent financing you have to do something like that.  I think, if I understand your Honor's question, that that misplaces the emphasis just a little bit. That is the fact is that the question of the protection of investors and consumers so far as the short term financing is concerned is really whether as of June of next year the circumstances will have changed so much that there would be difficulty in taking this out with appropriate proportions of equity and debt.

Now, we think that the circumstances are well enough known so that there isn't the slightest danger in that respect.  Perhaps I haven't answered your question adequately.  I want to do that if I can.

Commissioner Hastings:  I think that does it.

The Chairman:  All right, any further questions? If not, thank you very much, Mr. Seder.

Have you any rebuttal?  I will give you a few minutes.

WG-ANR-00052496

all

Mr. Nowlin: We have five minutes and I don't want to take that. I want to compliment Mr. Seder in doing an excellent job of evading the issue in this case.

Mr. Seder: Thank you very much, Mr. Nowlin.

REBUTTAL ARGUMENT OF W. R. NOWLIN, ON BEHALF OF THE COMMISSION.

Mr. Nowlin: The issue in this case is simply this, the Commission for ten years says this system has too much debt. You cut this apple any way you want to. If you have got too much debt you have got too much whatever your equity is. If you put equity in you reduce your debt. But the important part is that the Commission for ten years has constantly told this company that it had too much debt.

Commissioner Orrick: But aren't they reducing it?

Mr. Nowlin: I want to come to that. Here in 1949 the Commission said they had 69.1 percent debt.

Commissioner Orrick: How much?

Mr. Nowlin: Sixty-nine point one percent. On their pro forma figure that appears today including these bank loans it will be 66.4 percent. That is a reduction of 2.7 percent in 10 years. That is the important part, that is the proof of the pudding, not what you are going to do.

The Chairman: Mr. Nowlin, as a matter of accounting, bank debts maturing in less than one year are carried as a current liability, are they not?

xxxxxxxx

WG-ANR-00052497

Mr. Nowlin:  Yes, sir; I think that is true.

The Chairman:  Then how do you transfer that out of current liabilities into capital accounts?

Mr. Nowlin:  The Commission, Mr. Chairman, is the one that has concluded over the period of ten years the short term notes as a part of its computation.

The Chairman:  I would like a rationale of the computation --

Mr. Nowlin:  The only thing I can say is that the debt was so much and so much in ten years and they have made these bank loans, and the equity is so much an amount today, and there is only 2.7 difference.  I don't know how it could have been translated to the capital account other than through the debt.  They have tremendous expansion programs during this ten years time.

The Chairman:  Yes, they do.

Mr. Nowlin:  And the debt still remains essentially the same.

The Chairman:  If you include as a long term debt the current liabilities of three million-odd dollars, yes.

Mr. Nowlin:  I say the Commission has consistently done that over the period of the last ten years and even last year.  Maybe it's wrong, but that is what has been done.

The Chairman:  All right.

Mr. Nowlin:  I would also like to call attention

WG-ANR-00052498

a13

to the fact that the permanent financing program for 1959,
the company submits, here is $51,000,000 of debt and $16,000,000
of common stock. That is on the ratio of 74 percent debt
and 26 percent common equity.

The Chairman: Say that again.

Mr. Nowlin: The system's program contemplates
$51,000,000 of long term debt.

The Chairman: When?

Mr. Nowlin: Next year, 1959.

The Chairman: Yes.

Mr. Nowlin: That is $31,000,000 of bonds and
$20,000,000 of five year serial notes on the pipeline for a
total of $51,000,000 and they propose to issue $16,000,000
of common stock.

The Chairman: That isn't before us, is it?

Mr. Nowlin: No, but I say it is the trend, Mr.
Chairman.

The Chairman: That isn't before us yet, is it?

Mr. Nowlin: No, it is only before you in the
context that you must appraise this trend —

The Chairman: We are not passing on that now, are
we?

Mr. Nowlin No, sir; but only in the context of
this present program.

The Chairman: All right.

WG-ANR-00052499

dl

Mr. Nowlin: And they are arguing that they are going to do this in 1959 and they are going to get better and better. We have heard that argument for ten years, but it never occurs. This system, as you have pointed out in your inquiry here on the sinking fund situation, they have continued expanding the pipeline and all the record I have seen in this case is this system has got a lot more expansion to go. They are still under wraps as to the amount of gas they get allocated and can use in their area. You do not know but what they will loop the line next year and the American-Louisiana line next year. As Mr. Seder pointed out, they cannot remain static, they have got to keep going, that is what has happened over the last ten years.

The Chairman: All right.

Mr. Nowlin: There is this point. Up until 1957, the American Louisiana line was not in complete operation, but since 1957 when that line went in there this system is functioning at its maximum capacity, as I understand it, on the basis of the gas it has got now. They have got additional gas down in the Oklahoma Panhandle area that they contemplate brining in the pipeline next year, and they are going to issue $20,000,000 of five-year serial bank notes on Michigan-Wisconsin, apparently, to finance that; so, my point is that the Commission itself has said here for ten years that this debt is too high. Now, either you meant what you said or you did

WG-ANR-00052500

d2

not. And that is our whole position here. The program they have outlined for '58 or '59 just does not do the job. It is, continuing on, saying, "Just leave us alone, let us go our merry way." We are not complaining about bank loans. Sure they give you flexibility. But there comes a point when you ought to stop and take account of yourself and get back on a sound basis so that when the expansion comes next year or the year thereafter, you are in a position to do the job.

Now, I think it goes even broader than this point, if as a result of the high debt ratios and the lack of equity in here your bond ratings are down, you are in effect perpetuating a lack of economy and raising capital. This company owes it to itself and stockholders and consumers to put itself up in a position to raise its capital on as economic a basis as it can. I have said the Commission has said this debt ratio is too high consistently for years and years. There was probably some reason in '55 and '57 when these pipeline companies were in construction for not stopping this constant increase in debt, but now they have got a lull in the storm, they have got finance markets, as far as we can see you have got the unusual situation that in their operating area there is a recession, but you have tot a bull market, I can't think of a better time for them to pull in their belt and try to improve this situation, but their own program for 1959 does not contemplate any reduction in this debt. It is

WG-ANR-00052501

3

on a 74/26 basis, so you go on and argue next year they come
in, something will happen. We want to use bank loans again.
That is the cheapest way to obtain money. We want to apply
the leverage factor. We think the day has come the Commission
should call a halt to this and think that day has been reached.
Either you meant what you said in your findings or you did not

Mr. Seder: I know you do not want to prolong
this, but I will say one sentence and sit down.

Mr. Nowlin says since 1949 we have not improved our
debt ratio as much as the division would like. Since that
time we have constructed two interstate, long distance pipe-
lines. I think that the Commission ought to take that into
account; in fact --

Mr. Nowlin: One.

Mr. Seder: There has been a substantial expansion
of the Michigan-Wisconsin line doubling its capacity now, two
pipelines.

The Chairman: Thank you.

Thank you, gentlement, very much. We will close
the hearing and take the matter under advisement.

(Whereupon, at 12:50 p.m. o'clock, the hearing was
closed.)

WG-ANR-00052502