# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**WISCONSIN GAS LLC,**

    **Plaintiff,**

    **v.**                          **Case No. 20-CV-1334-SCD**

**AMERICAN NATURAL RESOURCES COMPANY** and
**HONEYWELL INTERNATIONAL INC.,**

    **Defendants.**

---

## DECISION AND ORDER DENYING AMERICAN NATURAL RESOURCES COMPANY'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR JUDGMENT ON PARTIAL FINDINGS

---

Wisconsin Gas LLC brings this suit against American Natural Resources Company (ANR) and Honeywell International Inc. under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601–9675, to recover costs incurred by Wisconsin Gas in cleaning up a contaminated Milwaukee property known as the Solvay Site. ANR has moved for summary judgment or, in the alternative, for judgment on partial findings, arguing that ANR is not a responsible party as defined by CERCLA. Wisconsin Gas contends that ANR is directly liable for CERCLA response costs as a former operator of the Solvay Site and that ANR contractually assumed the CERCLA liabilities of its former subsidiary, the Milwaukee Solvay Coke Company. I agree that ANR expressly agreed to assume Milwaukee Solvay's CERCLA liabilities via a 1962 liquidation agreement. Accordingly, I will deny ANR's motion and grant summary judgment for Wisconsin Gas against ANR on liability.

# BACKGROUND[1]

From 1904 until 1962, a company operated a manufactured coke and gas plant on a forty-six-acre property located just south of downtown Milwaukee, Wisconsin. *See* Def.'s Facts ¶¶ 1–3, 30–32, 65–83, 88–118; Pl.'s Facts ¶¶ 1, 3. The company had three different names during that period. Originally known as Milwaukee Coke and Gas Company, the company changed its name to Milwaukee Solvay Coke Company in 1942 and was renamed MSC Corporation just prior to its dissolution in 1962. Def.'s Facts ¶¶ 29–30, 43, 104; Pl.'s Facts ¶ 1. For ease of reference, I will refer to that coke company as Milwaukee Solvay.

Milwaukee Solvay's business included manufacturing coke at the Solvay Site and selling the coke, chemicals, and coke by-products to public, industrial, and commercial customers. Def.'s Facts ¶¶ 31, 35, 78. One of Milwaukee Solvay's public utility customers was Milwaukee Gas Light Company, a predecessor of the plaintiff, Wisconsin Gas. Def.'s Facts ¶¶ 22, 26, 34, 37, 46; Pl.'s Facts ¶ 1. At the time, Milwaukee Gas Light was owned by American Light & Traction Company. Def.'s Facts ¶¶ 20–21; Pl.'s Facts ¶ 2. American Light & Traction has undergone a few name changes itself. The company first changed its name to American Natural Gas Company in 1949. Def.'s Facts ¶ 25; Pl.'s Facts ¶ 11. In 1976, it was renamed American Natural Resources Company, one of the defendants in this action. Def.'s Facts ¶ 28. For ease of reference, I will refer to that company as ANR.

In 1928, ANR acquired Milwaukee Solvay, making ANR the direct parent of both the gas manufacturer (Milwaukee Solvay) and the public utility company (Milwaukee Gas Light). Def.'s Facts ¶¶ 33, 48; Pl.'s Facts ¶ 4. Both subsidiaries remained under the ANR umbrella for

---

[1] I take these background facts from ANR's Statement of Proposed Material Facts ("Def.'s Facts"), ECF No. 41; Wisconsin Gas' Response to ANR's Statement of Proposed Material Facts and Its Counter-Statement of Proposed Material Facts ("Pl.'s Facts"), ECF No. 50; and ANR's Response to Wisconsin Gas' Counter-Statement of Proposed Material Facts, ECF No. 61.

several decades until ANR realized that its future was in natural, not manufactured, gas. Def.'s Facts ¶¶ 34–61, 80–100; Pl.'s Facts ¶¶ 8–77. In June 1962, Milwaukee Solvay sold its business and substantially all its assets to an unaffiliated third party, which continued operations at the Solvay Site. Def.'s Facts ¶¶ 101–04. Milwaukee Solvay's sole shareholder, ANR, acquired the company's remaining assets—including cash, other cash items, and accounts receivable—and Milwaukee Solvay ceased all operations. Def.'s Facts ¶¶ 105–13.

To facilitate Milwaukee Solvay's dissolution, in December 1962, ANR and Milwaukee Solvay executed a one-page liquidation agreement, titled Transfer of Assets in Liquidation. Def.'s Facts ¶¶ 114–17 (citing ECF No. 41-60); Pl.'s Facts ¶¶ 78–82. The liquidation agreement indicates that Milwaukee Solvay (then known as MSC Corporation) desired to transfer all its assets to its sole shareholder, ANR (then known as American Natural Gas Company), in exchange for the surrender by ANR of all Milwaukee Solvay's stock. The agreement notes that Milwaukee Solvay had paid and discharged all its known debts, obligations, and liabilities and that ANR agreed "to assume any debts, obligations and liabilities of MSC which may hereafter be established, subject to limitations hereinafter stated." ECF No. 41-60. Paragraph 2 discusses those "limitations":

> American Natural hereby assumes and agrees to pay on behalf of MSC any and all debts, obligations and liabilities of MSC which may hereafter be established, including, but not in limitation of the generality of the foregoing, any liabilities which may be established under the Wisconsin Workmen's Compensation Act; provided, however, that the aggregate amount of debts, obligations and liabilities assumed by American Natural under this paragraph 2 shall not exceed the value of the assets transferred by MSC to American Natural under paragraph 1 hereof.

*Id.*

Years later, environmental damage was discovered at the Solvay Site where Milwaukee Solvay operated its manufactured gas plant for nearly sixty years. Def.'s Facts ¶¶ 9–15.

Wisconsin Gas purchased the Site out of bankruptcy in 2017, cleaned it up, and resold it to a mining corporation. Def.'s Facts ¶¶ 16–18. In August 2020, Wisconsin Gas filed a declaratory judgment action in federal court to determine ANR's allocable shares for the costs and damages associated with remediation of the Solvay Site. *See* ECF No. 1. The matter was randomly assigned to me, and the parties subsequently consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 10, 11. Wisconsin Gas later amended its complaint to add Honeywell International Inc. as a defendant. *See* ECF No. 25.

The amended complaint alleges two counts against ANR. In Count II, Wisconsin Gas seeks contribution from ANR under CERCLA § 113, 42 U.S.C. § 9613(f). ECF No. 25 ¶¶ 85–99. In Count IV, Wisconsin Gas seeks declaratory judgment under CERCLA § 113, 42 U.S.C. 9613(g)(2), allocating future costs between Wisconsin Gas and ANR. *Id.* ¶¶ 105–09. On July 20, 2022, ANR moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. *See* ECF Nos. 40, 42. Wisconsin Gas filed a response to the motion, ECF No. 49, and ANR filed a reply, ECF No. 60.[2]

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[2] Alternatively, ANR seeks judgment on partial findings according to Rule 52(c) of the Federal Rules of Civil Procedure. Rule 52(c) permits a court to enter judgment against a party if it "has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue." Fed. R. Civ. P. 52(c). The rule, on its face, applies to bench trials, and ANR has not cited any authority applying Rule 52(c) to a CERCLA action prior to trial. Thus, I will apply the traditional Rule 56 framework.

4

(1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [my] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [its] favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## DISCUSSION

"CERCLA was passed in 1980 'to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination.'" *Peoples Gas Light & Coke Co. v. Beazer East, Inc.*, 802 F.3d 876, 880 (7th

5

Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602, (2009)). The act permits private parties to seek contribution from "any other person who is liable or potentially liable under section 9607(a)." 42 U.S.C. § 9613(f). To prevail in a contribution action, a plaintiff must establish that "(1) the site in question is a 'facility' as defined by CERCLA; (2) the Defendant is a 'responsible person' for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the Plaintiff to incur response costs." *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992) (citing *Envtl. Transp. Sys., Inc. v. ENSCO, Inc.*, 763 F. Supp. 384, 387 (C.D. Ill. 1991)). "Additionally, a non-governmental plaintiff must show that any costs incurred in responding to the release were 'necessary' and 'consistent with the national contingency plan.'" *Forest Park Nat'l Bank & Trust v. Ditchfield*, 881 F. Supp. 2d 949, 977 (N.D. Ill 2012) (quoting 42 U.S.C. 9607(a)(4)(B)).

The only element at issue here is whether ANR is a "responsible person" as defined by CERCLA. Section 9607(a) identifies four categories of potentially responsible parties: "(1) present owners and operators of facilities; (2) past owners or operators of the facility at the time of the disposal of a hazardous substance; (3) arrangers of the disposal of hazardous substances at the facility; and (4) certain transporters of hazardous substances." *Peoples Gas*, 802 F.3d at 880 (citing 42 U.S.C. § 9607(a)). Wisconsin Gas seeks to hold ANR responsible for contribution costs under two theories of liability. First, Wisconsin Gas contends that ANR is directly liable for CERCLA response costs as a former "operator" of the Solvay Site.

6

Second, Wisconsin Gas asserts that ANR is liable for contribution costs as "owner" of the Solvay Site because ANR contractually assumed Milwaukee Solvay's CERCLA liabilities.[3]

"Generally, at common law, 'when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets.'" *Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 565 (3d Cir. 1997) (quoting *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 308 (3d Cir. 1985)). "There are, however, four exceptions to this general rule: (1) the purchaser expressly or impliedly agrees to assume the liabilities; (2) the transaction is a de facto merger or consolidation; (3) the purchaser is a 'mere continuation' of the seller; or (4) the transaction is an effort to fraudulently escape liability." *N. Shore Gas Co. v. Salomon, Inc.*, 152 F.3d 642, 651 (7th Cir. 1998), *overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 n.1 (7th Cir. 2010). The exceptions to the general rule comprise what is commonly referred to as the "successor liability doctrine." *N. Shore Gas*, 152 F.3d at 651. In *North Shore Gas Co.*, the Seventh Circuit joined the majority of the other circuits in finding that "Congress intended successor liability to apply in the context of CERCLA." *See id.* at 648–51 (collecting cases). Thus, "[a] corporation may be liable for response costs under CERCLA if the corporation is the corporate successor to a 'responsible person' under CERCLA." *United States v. Iron Mt. Mines, Inc.*, 987 F. Supp. 1233, 1238 (E.D. Cal. 1997) (collecting cases).

Wisconsin Gas argues that ANR expressly agreed to assume Milwaukee Solvay's CERCLA liabilities via the 1962 liquidation agreement. Recall that when Milwaukee Solvay

---

[3] The parties do not appear to dispute that Milwaukee Solvay incurred CERCLA liability as an operator of the Solvay Site.

dissolved in 1962, ANR "assume[d] and agree[d] to pay on behalf of [Milwaukee Solvay] any and all . . . liabilities of [Milwaukee Solvay] which may hereafter be established." ECF No. 41-60. Wisconsin Gas contends that the terms of the liquidation agreement are plain, unambiguous, and broad enough to encompass future environmental liability. ANR insists that Wisconsin Gas' reliance on the liquidation agreement is misplaced because CERCLA expressly prohibits liability transfers, Wisconsin Gas was not a party to the agreement, and the parties did not intend for ANR to assume Milwaukee Solvay's CERCLA liabilities or to upset Wisconsin's corporate dissolution law.

## I.    CERCLA Does Not Prohibit the Creation of Additional CERCLA Liability by Agreement

ANR first argues that CERCLA expressly nullifies any transfer of CERCLA liability. Section 107(e)(1) of CERCLA addresses indemnification/hold harmless agreements:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1). All the courts of appeal, including the Seventh Circuit, have resolved the apparent internal inconsistency in this section by finding that CERCLA prohibits transfers of liability but permits indemnification for that liability. *Peoples Gas*, 802 F.3d at 880 (collecting cases); *see also Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 14 (2d Cir. 1993) (finding that indemnification agreements comply with § 107(e)(1) if "all responsible parties remain fully liable to the government"). In other words, "although § 107(e)(1) would preclude a party from *eliminating* liability through a liability transfer agreement, it does not preclude parties from *creating* additional liability, in effect, on the part of the buyer or anyone else." *United States v.*

8

*NCR Corp.*, 840 F. Supp. 2d 1093, 1097 (E.D. Wis. 2011). The liquidation agreement at issue here is consistent with § 107(e)(1), as it ostensibly created additional liability for ANR without eliminating Milwaukee Solvay's liability; if Milwaukee Solvay still existed, it could be sued, too.

**II.     The Successor Liability Doctrine Permits Courts to Consider Agreements Between the Alleged Successor and a Third Party**

ANR also argues that Wisconsin Gas cannot pursue any claim directly against ANR under the liquidation agreement because Wisconsin Gas was not a party to that agreement. But Wisconsin Gas is not seeking to pursue any contractual rights under the agreement. Rather, Wisconsin Gas points to the agreement to show that ANR succeeded to Milwaukee Solvay's liability for purposes of applying the successor liability doctrine.

The Third Circuit found no trouble considering a similar agreement in *Aluminum Co. of America*. In 1991, Aluminum Company of America (Alcoa) filed a declaratory judgment action seeking to hold Beazer East, Inc., liable for response costs at a contaminated wood treatment facility previously owned by Beazer's predecessor, American Lumber and Trading Company (ALT). *Aluminum Co. of Am.*, 124 F.3d at 555–56. Relying on the terms of a 1954 liquidation agreement between Beazer and ALT, the Third Circuit determined on appeal that Beazer succeeded to ALT's CERCLA liabilities. *Id.* at 565–67. Thus, the court permitted Alcoa to pursue its CERCLA claims against Beazer even though Alcoa was not party to the liquidation agreement. ANR has not cited any binding authority contrary to *Aluminum Co. of America*, and I find the Third Circuit's reasoning persuasive. After all, the nature of most assumptions of liability involves liability *to the public at large*, none of whom would be expected to be a party to the assumption agreement. *United States v. NCR Corp.,* 840 F. Supp. 2d 1093,

1096 (E.D. Wis. 2011) (describing "successor liability as a matter of contract, a contract to which the public is a third-party beneficiary.")

### III.   ANR Succeeded to Milwaukee Solvay's CERCLA Liabilities Via the 1962 Liquidation Agreement

Finally, ANR argues that it is clear from the unambiguous language of the liquidation agreement and the context in which it was executed that ANR did not intend to assume Milwaukee Solvay's CERCLA liabilities. According to ANR, the liquidation agreement was clearly intended to facilitate an orderly liquidation and dissolution of Milwaukee Solvay— ANR agreed to surrender its stock in Milwaukee Solvay in exchange for Milwaukee Solvay's remaining assets. ANR insists, however, that it did not "agree in 1962 to pay unknown and unimaginable environmental liabilities that did not then exist under a statute that was not enacted for another eighteen years." ECF No. 60 at 3. ANR also maintains that the liquidation agreement was not intended to upset Wisconsin's corporate dissolution law, which at the time provided a two-year survival period for claims against dissolved corporations. Thus, as ANR sees it, "the liquidation plan, by its express terms, clearly contemplated ANR's agreement to pay 'on behalf of [Milwaukee Solvay]' only 'liabilities' . . . of [Milwaukee Solvay] that then existed and which might later be established during the statutory survival period." ECF No. 42 at 23–24.

The parties agree that Wisconsin law governs my interpretation of the 1962 liquidation agreement. *See* ECF No. 42 at 19; ECF No. 49 at 25; *see also Peoples Gas*, 802 F.3d at 881 ("We apply state law to determine whether a particular indemnification provision encompasses contribution costs under CERCLA."); *N. Shore Gas*, 152 F.3d at 652 ("It is well-established that state law determines the rules of contract interpretation, even in the context of CERCLA."). According to Wisconsin law, "[c]ontract interpretation generally seeks to give

effect to the parties' intentions." *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶ 26, 833 N.W.2d 586, 592 (citing *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 676 N.W.2d 426, 433). Courts "ascertain the parties' intentions by looking to the language of the contract itself." *Seitzinger*, 676 N.W.2d at 433 (citing *Journal/Sentinel, Inc. v. Pleva*, 456 N.W.2d 359, 362 (Wis. 1990)). "Where the terms of a contract are clear and unambiguous, [courts] construe the contract according to its literal terms." *Tufail*, 833 N.W.2d at 592 (citing *Md. Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 23, 786 N.W.2d 15, 20–21). "If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent." *Tufail*, 833 N.W.2d at 592 (citing *Seitzinger*, 676 N.W.2d at 433). "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Tufail*, 833 N.W.2d at 592 (citing *Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 557 N.W.2d 67, 75 (Wis. 1996)). Also, "[c]ontract language is construed according to its plain or ordinary meaning, consistent with what a reasonable person would understand the words to mean under the circumstances." *Tufail*, 833 N.W.2d at 592 (citations and internal quotation marks omitted).

## A.      CERCLA can apply to pre-CERCLA assignments of liability

The fact that the liquidation agreement was executed well before CERCLA's passage does not preclude me from finding that it encompassed Milwaukee Solvay's CERCLA liabilities. Accepting ANR's argument to the contrary "would be inconsistent with CERCLA's retroactive application and with Congress' intention of assigning CERCLA liability broadly." *Iron Mt. Mines*, 987 F. Supp. At 1240–41. Moreover, courts routinely analyze pre-CERCLA contracts when attempting to ascertain CERCLA liability. *See Peoples Gas*, 802 F.3d at 880–81 (rejecting argument that an agreement signed "well-before CERCLA was passed" could not relieve a party "of its liability for contribution under CERCLA"); *N. Shore Gas*, 152 F.3d at

11

652 ("[A] contract may contemplate CERCLA liability even if it was drafted before passage of the statute."); *Aluminum Co. of Am.*, 124 F.3d at 565 ("An agreement entered into prior to the passage of CERCLA can allocate CERCLA liabilities."); *Olin Corp.*, 5 F.3d at 15–16 (analyzing indemnification clause in a pre-CERCLA agreement); *Iron Mt. Mines*, 987 F. Supp. at 1241 ("There are many precedents for the proposition that CERCLA liability can be assumed by a pre-CERCLA agreement."); *A-C Reorg. Trust v. E.I. Dupont De Nemours & Co.*, No. 94-C-574, 1997 WL 381962, 1997 U.S. Dist. LEXIS 6180, at *15 (E.D. Wis. Mar. 10, 1997) ("Indemnification agreements entered into before CERCLA was enacted may still cover CERCLA liabilities.").

**B.    The plain language of the liquidation agreement alone is general enough to cover CERCLA liabilities**

"[W]here . . . a contractual assignment of liability pre-dates CERCLA, courts will look to see 'whether an indemnification provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims.'" *Peoples Gas*, 802 F.3d at 880–81 (quoting *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3rd Cir. 1994)). The liquidation agreement in this case is silent on the matter of Milwaukee Solvay's CERCLA liabilities. Nevertheless, the language used is clear, unambiguous, and very broad. ANR assumed "any and all . . . liabilities of [Milwaukee Solvay] which may hereafter be established." The parties' use of the phrase "any and all" signifies their intent not to limit the assumption to specific types of liabilities. Similarly, the use of "hereafter" shows that the liabilities were not limited to those that existed at the time; in other words, the parties clearly contemplated—and the liquidation agreement encompassed—future, unknown liabilities.

The Seventh Circuit has found similar agreements sufficiently broad to encompass CERCLA liabilities. For example, in *Peoples Gas*, a gas manufacturer agreed in 1920 to assume operation of a coke plant "without liability of any character on the part of [the manufacturer], except as expressly assumed under the terms of [that] contract." *Peoples Gas*, 802 F.3d at 881. The Seventh Circuit determined the plain language of that agreement was unambiguous and broad enough to absolve the gas manufacturer's successor of liability for contribution costs under CERCLA. *See id.* at 881–83 ("This is precisely the kind of broad and general release language that has been construed by courts to encompass CERCLA liability."). Likewise, in *Harley-Davidson, Inc. v. Minstar, Inc.*, 41 F.3d 341, 344 (7th Cir. 1994), the Seventh Circuit held that an agreement whereby a buyer agreed to indemnify a seller "against all debts, liabilities, and obligations, without any limitation, . . . whether known or unknown, . . . and whether existing on the date of this agreement or coming into existence hereafter" barred the buyer's CERCLA claims against the seller's successor.

Courts outside the Seventh Circuit "universally have held that language transferring 'all liabilities' is sufficiently broad to include environmental liability." *Iron Mt. Mines*, 987 F. Supp. at 1241 (collecting cases). For example, as discussed above, the Third Circuit held in *Aluminum Co. of America* that a 1954 agreement in which a buyer "'assumed all of the liabilities and obligations of [the seller] of whatsoever nature,' [was] sufficiently broad to encompass assumption of CERCLA liabilities." *Aluminum Co. of Am.*, 124 F.3d at 565–66. The Second Circuit reached a similar result in *Olin Corp.*, a case involving an indemnification agreement whereby a buyer "assume[d] and agree[d] to be responsible for and to pay, perform, discharge and indemnify [the seller] against, all liabilities (absolute or contingent) . . . of [the seller] . . . as they exist on the Effective Time or arise thereafter." *Olin Corp.*, 5 F.3d at 12–13.

13

According to the court, "[t]he language evidence[d] the parties' 'clear and unmistakable intent' that [the buyer] indemnify [the seller] for all liabilities related to the . . . site [at issue], even future unknown liabilities." *Id.* at 15–16. And finally, in *Iron Mountain Mines*, the Eastern District of California held that a buyer expressly assumed the CERCLA liability of a seller via a 1968 agreement in which the buyer agreed to assume "all of the liabilities" of the seller. *Iron Mt. Mines*, 987 F. Supp. at 1239–42.

## C. The liquidation agreement does not contain any limiting language suggesting that the parties did not intend ANR to assume environmental liability

An agreement to assume "all liabilities" will encompass CERCLA liabilities unless "other clauses in or attachments to the agreement make it clear that the parties did not intend to include environmental liabilities." *Iron Mt. Mines*, 987 F. Supp. at 1241 (collecting cases). Here, the only specific liability the liquidation agreement mentions is workmen's compensation. The agreement, however, expressly indicates that the liabilities ANR assumed included but were not limited to worker's comp. *See* ECF No. 41-60. The agreement also says that the aggregate amount of debts, obligations, and liabilities ANR assumed shall not exceed the value of the assets transferred by Milwaukee Solvay to ANR. However, that limitation does not suggest a clear intent to exclude environmental liabilities.[4]

Perhaps ANR's best argument is that the liquidation agreement limited ANR's assumed liabilities to those that could be established against Milwaukee Solvay within two years of its dissolution. At the time ANR and Milwaukee Solvay executed the liquidation

---

[4] Wisconsin Gas alleges that the value of assets transferred by Milwaukee Solvay to ANR was about $5 million (in 1962 dollars). ECF No. 25 ¶ 34.

14

agreement, Wisconsin law provided a two-year survival period for claims against a dissolved corporation:

> The dissolution of a corporation shall not take away or impair any remedy available to or against such corporation, its directors, officers or shareholders, for any right or claim existing or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within 2 years after the date of such dissolution.

Wis. Stat. § 180.787 (1951). ANR maintains that, because CERCLA liability did not exist or mature within that two-survival period, such liability cannot be considered "liabilities of MSC which may be hereafter established." ANR relatedly asserts that the "liabilities of MSC" could be "established" only by a judgment against Milwaukee Solvay (then known as MSC Corporation). Put another way, ANR says that it agreed to assume only liabilities that could be established against Milwaukee Solvay during the two-year survival period. Thus, according to ANR, whatever liabilities it assumed expired two years after Milwaukee Solvay dissolved in 1962.

ANR's reliance on Wisconsin's corporate dissolution statute is misplaced. For one, the language used in the liquidation agreement does not make it clear that the parties intended to limit the liabilities ANR assumed from Milwaukee Solvay to the two-year survival period. The agreement doesn't mention the dissolution statute or suggest a limited temporal period for when Milwaukee Solvay's liabilities could "hereafter be established." ANR therefore appears to be reading into the liquidation agreement a significant limitation regarding the assumption of liability that is not explicit from the agreement's plain language. Moreover, although Wisconsin's corporate dissolution statute extends the life of a corporation for only two years after its dissolution, the statute does not limit claims against a successor corporation

that voluntarily assumed its predecessor's liabilities before that two-year window closed. ANR therefore conflates Milwaukee Solvay's capacity to be sued with its own liability.

Other courts have rejected the same argument ANR makes here. Recall *Aluminum Co. of America*, the case where the buyer (Beazer) agreed in a 1954 liquidation agreement to assume all liabilities of the seller (ALT) concerning a wood treatment facility that was found to be contaminated decades later. Beazer argued that all the liabilities it assumed, including CERCLA liabilities, ceased to exist after ALT dissolved and its capacity to be sued expired three years thereafter. *Aluminum Co. of Am.*, 124 F.3d at 567. On appeal, the Third Circuit found that Beazer had misread Delaware's corporate dissolution statute. The court noted that, although ALT no longer could be sued, that statute did not provide any protection for Beazer, which had voluntarily assumed ALT's obligations: "This does not mean, however, that where a separate entity has received assets of a dissolved corporation and assumed its corporate liabilities, a creditor may not bring a suit to enforce that obligation against the continuing separate entity." *Id.* The Eastern District of California reached the same conclusion in *Iron Mountain Mines*, finding that "the caselaw draws a distinction between capacity to be sued and successor liability." *Iron Mt. Mines*, 987 F. Supp. at 1240 n.14.

ANR's attempt to distinguish the above cases is unavailing. It says that *Aluminum Co. of America* and *Iron Mountain Mines* arose in a materially different context, as both cases involved a buyer that continued the operations of a seller, its former subsidiary. While true, that fact was not key to the reasoning of either court. The Third Circuit observed in a footnote that extrinsic evidence showed the buyer's purpose was not merely to dissolve the seller but also to continue the seller's operations. *Aluminum Co. of Am.*, 124 F.3d at 566 n.14. Although that observation further supported the court's interpretation of the liability assumptions

16

clause, ultimately the court determined that the intent of the parties was clear from the face of the clause without needing to consult outside evidence. *See id.* at 566.

The same thing happened in *Iron Mountain Mines*. After finding the assumption of liability provisions unambiguous and broad enough to cover CERCLA liabilities, the Eastern District of California explained how the circumstances surrounding the seller's dissolution also supported that reading. *See Iron Mt. Mines*, 987 F. Supp. at 1240–43. But the court's ruling would have been the same without consideration of that extrinsic evidence. Neither the Third Circuit nor the Eastern District of California mentioned the continued operations by the parent when addressing the buyer's dissolution argument.[5]

The cases ANR relies upon are distinguishable from our case, as the agreements in those cases contained expressed limitations on the assumption of liability. For example, in *Cooper v. Lakewood Engineering & Manufacturing Co.*, 45 F.3d 243, 245 (8th Cir. 1995), a shareholder agreed to assume, "at the time and in the manner as [the dissolving corporation] is obligated so to do, . . . any and all of the . . . liabilities . . . of [that corporation]." Similarly, in *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, No. 92 C 20259, 1996 WL 67216, 1996 U.S. Dist. LEXIS 1738, at *27 (N.D. Ill. Feb. 16, 1996), shareholders agreed to assume only "the known or contingent liabilities" of the dissolving corporation. The agreement in *Columbia Propane, L.P. v. Wisconsin Gas Co.*, 661 N.W.2d 776, 781 (Wis. 2003), limited the assumption of liabilities to those "then outstanding" at the time of the agreement. And finally, in *Gillespie Community Unit School District No. 7 v. Union Pacifica Railroad Co.*, 43 N.E.3d 1155,

---

[5] ANR relies on *De St. Aubin v. Johnson*, 502 N.E.2d 360 (Ill. App. Ct. 1986), to support its argument that any liabilities expired after the two-year survival period. However, that case is distinguishable from our case, as it involved a suit against the shareholders of a dissolved corporation—a group explicitly mentioned in Wisconsin's corporate dissolution statute. The court was not asked to apply the statute to a corporate successor that agreed to assume the dissolved corporation's liabilities.

17

1176–78 (Ill. App. Ct. 2015), the court found that extrinsic evidence demonstrated that the "liabilities" referenced in an assumptions clause meant only perfected liabilities. In contrast to these cases, the liquidation agreement at issue here does not include any similar limiting language, and the agreement on its face—without resort to any outside evidence—clearly contemplated future, unknown liabilities.

*     *     *

In sum, the assumptions clause of the 1962 liquidation agreement between ANR and Milwaukee Solvay is clear, unambiguous, and general enough to encompass assumption of CERCLA liabilities. The inclusion of the phrases "on behalf of" Milwaukee Solvay and liabilities of Milwaukee Solvay "which may hereafter be established" do not make clear that the parties intended to limit ANR's assumption to only those liabilities that were established during the two-year period after Milwaukee Solvay's dissolution. ANR therefore is liable under CERCLA § 113 as "owner" of the Solvay Site, as it succeeded to Milwaukee Solvay's CERCLA liabilities. Because I find that ANR expressly assumed Milwaukee Solvay's CERCLA liabilities, I do not need to decide whether ANR is directly liable under CERCLA § 113 as a former "operator" of the Solvay Site.

## CONCLUSION

For all the foregoing reasons, the court **DENIES** American Natural Resources Company's motion for summary judgment or, in the alternative, for judgment on partial findings, ECF No. 40. Given the unambiguous language in the 1962 liquidation agreement, Wisconsin Gas LLC is entitled to summary judgment against ANR on liability pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.

**SO ORDERED** this 27th day of March, 2023.

 

 

 

_____
STEPHEN C. DRIES
United States Magistrate Judge